**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

JUN 0 9 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **INTERNATIONAL UNDERWRITERS**<br>**GENERAL AGENCY, INC.,** | §<br>§<br>§ | |
| **Plaintiff,** | §<br>§ | |
| **v.** | §<br>§ | CIVIL ACTION NO. ___ *B-03-108* |
| **GE REINSURANCE CORPORATION**<br>**("GE") AND SPENCER TUCKER,**<br>**("TUCKER")** | §<br>§<br>§<br>§ | |
| **Defendants.** | §<br>§ | |

---

### NOTICE OF REMOVAL

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1332, 1441, et. seq., Defendant, GE Reinsurance Corporation (hereinafter "GE Reinsurance"), respectfully files this Notice of Removal seeking removal of this action from the District Court of Cameron County, Texas, 197th Judicial District, to the United States District Court for the Southern District of Texas, Brownsville Division, on the grounds of diversity of citizenship, and in support thereof respectfully shows the Court as follows:

### INTRODUCTION

1.     On May 2, 2003, Plaintiff filed their Original Petition and Application for Injunctive Relief ("Original Petition") in the matter entitled *International Underwriters General Agency v. GE Reinsurance Corporation and Spencer Tucker,* in the 197th Judicial District Court, Cameron County, Texas, Cause No. 2003-05-2265-C.  The Original Petition was served on

1

Defendant GE Reinsurance Corporation on May 9, 2003. Defendant Spencer Tucker has not yet been served.

## THE NOTICE OF REMOVAL IS PROCEDURALLY CORRECT

2.      Pursuant to 28 U.S.C. § 1446(a), the following documents are attached as Exhibit A: a copy of Plaintiff's Original Petition and Application for Injunctive Relief filed in the State Court Action ("Original Petition"), Proof of Service of the Original Petition, Defendant GE Reinsurance Corporation's Original Answer, and the parties' Rule 11 Agreement. No other pleadings or orders have been filed or served in the State Court Action.

3.      Simultaneous with the filing of this Notice of Removal, Defendant is filing in the State Court Action the Notice of Removal to Federal Court attached as Exhibit B.

4.      Venue is proper in this district under 28 U.S.C. § 1441(a) because this district and division embrace the place in which the removed State Court Action was pending.

5.      Defendant first received the summons and copy of the Original Petition on May 9, 2003. This Notice of Removal is therefore filed within the thirty day time period required by 28 U.S.C. § 1446(b).

## NATURE OF THE SUIT

6.      This case arises out of four intertwined written contracts. Ultimately, the rights and obligations under the four contracts flow directly between Plaintiff IUGA and Defendant GE Reinsurance. Under the contracts, IUGA performs all functions necessary for the issuance, service, management and loss adjustment of nonstandard auto insurance policies. GE Reinsurance underwrites the risk on the policies and pays commissions to IUGA. GE Reinsurance terminated this program on or about March, 2001. The gravamen of Plaintiff's complaints is that Defendant GE Reinsurance allegedly made several promises and

2

representations that it would continue to provide reinsurance for the policies Plaintiff underwrote, and that in reliance on those promises and representations, Plaintiff made crucial and strategic business decisions. In its petition Plaintiff studiously avoids referring to the written agreements governing the parties' relationship. Instead, Plaintiff asserts Defendant GE Reinsurance's conduct in canceling the reinsurance program involved fraud, negligent misrepresentation, a breach of its common-law duty of good faith and fair dealing, defamation, business disparagement, and violations of the Texas Insurance Code.

### BASIS FOR REMOVAL

7.     This Court has original jurisdiction over the matters made the basis of this lawsuit pursuant to 28 U.S.C. § 1332(a). Plaintiff is incorporated in Texas, where it also principally conducts its business. Defendant GE Reinsurance is incorporated in Illinois with its principal place of business located in Barrington, Illinois. Although Defendant Spencer Tucker is a Texas citizen, he has not yet been served in this action, and his joinder as a party should be disregarded as a fraudulent joinder. Therefore, complete diversity of citizenship exists between the parties, as required by section 1332. Further, Plaintiff alleges actual damages of $2 million and seeks to recover exemplary damages, treble damages, and statutory penalties. *See Plaintiff's Original Petition and Application for Injunctive Relief,* ¶ 18. Because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, this Court has diversity jurisdiction over this matter. *St. Paul Reinsurance Co., Ltd v. Greenberg*, 134 F.3d 1250, 1253 (5th Cir. 1998); *see Ray v. State Farm Lloyds,* No. CIV.A.3:98-CV-1288-G, 1999 WL 151667, at *2-3 (N.D. Tex. Mar. 10, 1999) (in determining the amount in controversy, the court may consider "policy limits . . . penalties, statutory damages, and punitive damages"); *Fairmont Travel, Inc. v. George S. May*

3

*Int'l Co., et. al.*, 75 F. Supp. 2d 666, 668 (S.D. Tex. 1999); *Chittick v. Farmers Ins. Exch.*, 844 F.

Supp. 1153, 1155 (S.D. Tex. 1994).

### SPENCER TUCKER WAS FRAUDULENTLY JOINED IN PLAINTIFF'S SUIT.

8.     Title 28 U.S.C. § 1441(a) provides that

> any civil action brought in a State court of which the district courts
> of the United States have original jurisdiction, may be removed by
> the defendant or defendants, to the district court of the United
> States for the district and division embracing the place where such
> action is pending.

28 U.S.C. § 1441(a). If federal jurisdiction is based on diversity of citizenship under 28 U.S.C.

section 1332, an action is "removable only if none of the parties in interest properly joined and

served as Defendants is a citizen of the state in which such action is brought." 28 U.S.C. §

1441(b).

9.     However, a non-diverse defendant named in the state court action may be

disregarded if the removing defendant shows that the resident defendant was fraudulently or

improperly joined. *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999). Fraudulent

joinder is established by showing either (1) that there was an actual fraud in the plaintiff's

pleading of the jurisdictional facts *or* (2) that the plaintiff has no possibility of establishing a

cause of action against the non-diverse defendant in state court. *Id.* (citations omitted); *see also*

*Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992). A determination of

fraudulent joinder is based on an analysis of causes of action alleged in the complaint at the time

of removal. *See Tedder v. F.M.C. Corp.*, 590 F.2d 115, 116-17 (5th Cir. 1979). If no viable

claims exist against the non-diverse defendant, his presence must be disregarded for

jurisdictional purposes. *See French v. State Farm Ins. Co.*, 156 F.R.D. 159, 162 (S.D. Tex.

1994).

400203.0006 324963

10.     When considering whether a non-diverse defendant has been fraudulently joined to defeat diversity of citizenship jurisdiction, a court should "pierce the pleadings" and "consider summary judgment-type evidence such as affidavits and deposition testimony." *Cavallini v. State Farms Mutual Auto. Ins. Co.*, 44 F.3d 256, 263 (5th Cir. 1995). Under this test, a plaintiff "may not rest upon the mere allegations or denials of its pleadings." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000). Further, the conclusory or generic allegations of wrongdoing on the part of the non-diverse defendant are insufficient to defeat an assertion of fraudulent joinder. *See Badon v. RJR Nabisco, Inc.,* 224 F.3d 382, 392-93 (5th Cir. 2000). Therefore, removal will not be precluded merely because Plaintiff's complaint, on its face, sets forth a state law claim against a non-diverse defendant. *Id.* Rather, removal is proper "if the plaintiff's pleading is pierced and shown that as a matter of law there is no reasonable basis for predicting that the plaintiff might establish liability on that claim against the in-state defendant." *Id.*

11.     When conducting a fraudulent joinder analysis, a court must resolve all disputed questions of fact and ambiguities of law in favor of the non-removing party, but only when there actual controversy exists—that is, when both parties have submitted evidence of contradictory facts. *Badon*, 224 F.3d at 393-94. A court should not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts" to support his claims against the non-diverse defendant. *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the Court, after resolving all disputed questions of fact and ambiguities of law in favor of the non-removing party, finds that there is no reasonable basis for predicting that the state law might impose liability on the defendant under the facts alleged, there is fraudulent joinder, and the defendant's presence must be disregarded by the Court in determining the existence of diversity

5

jurisdiction and assessing the propriety of removal. *See Carriere v. Sears, Roebuck & Co.*, 893

F.2d 98, 101-02 (5th Cir. 1990).

### THERE IS NO REASONABLE BASIS FOR IMPOSING LIABILITY ON TUCKER AND HIS PRESENCE MUST BE DISREGARDED FOR PURPOSES OF DIVERSITY JURISDICTION.

12.    This lawsuit is at most a breach of contract dispute between Defendant GE

Reinsurance and Plaintiff: whether Plaintiff is entitled to damages from Defendant GE

Reinsurance because of GE Reinsurance's cancellation of the reinsurance agreements that form

the basis of the parties' relationship. Curiously, Plaintiff does not lodge any type of breach of

contract claim against Defendant GE Reinsurance. Instead, Plaintiff alleges Defendant GE

Reinsurance made various false promises and misrepresentations regarding the reinsurance

program, wrongfully "pulled the plug" on the programs and then engaged in a campaign to

defame and disparage Plaintiff's business. In accordance with those factual allegations, Plaintiff

asserts claims of fraud, negligent misrepresentation, breach of good faith and fair dealing,

defamation, business disparagement, and violations of the Texas Insurance Code against

Defendant GE Reinsurance.

13.    In a transparent attempt to avoid federal court jurisdiction, Plaintiff also asserts

the same extra-contractual claims against Defendant Spencer Tucker. Mr. Tucker is a former GE

Reinsurance representative whose only involvement with IUGA or the transactions giving rise to

this suit consisted of routine administrative communications with the two insurance companies

on whose paper the IUGA policies were issued and with Plaintiff's broker. Plaintiff's Original

Petition makes no specific allegations against Tucker to support a cause of action for fraud,

negligent misrepresentation, or violations of the Texas Insurance Code, and leaves Defendants to

guess as to the factual basis for these allegations.

6

14. The Fifth Circuit confronted similar circumstances in *Griggs* and found that removal was appropriate based on fraudulent joinder. *Griggs*, 181 F.3d at 702. Griggs brought suit against State Farm for its failure to pay insurance benefits under a homeowner's insurance policy. *Id.* at 698. Griggs joined his State Farm agent, Blum, based on allegations that Blum made actionable misrepresentations in violation of the Texas Insurance Code and the Texas Deceptive Trade Practices Act. *Id.* Griggs relied on the recent Texas Supreme Court decision in *Liberty Mutual Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482 (Tex. 1998), to support his claims against Blum. *Id.* at 701. Griggs argued that the mere possibility that a claim can be stated against insurance agents requires the conclusion that he in fact stated a valid claim against Blum. *Id.* The Fifth Circuit disagreed, stating that

> [w]hile the burden of demonstrating fraudulent joinder is a heavy one, we have never held that a particular plaintiff might possibly establish liability by the mere hypothetical possibility that such an action could exist. To the contrary, *whether the plaintiff has stated a valid state law cause of action depends upon and is tied to the factual fit between the plaintiff's allegations and the pleaded theory of recovery.*

*Id.* (citing *Burden v. General Dynamics, Corp.*, 60 F.3d 213, 218-221 (5th Cir. 1995)(emphasis added)); *see also City of Alamo v. Casas*, 960 S.W.2d 240, 251-52 (Tex. App.—Corpus Christi 1997, writ denied). The Fifth Circuit analyzed the specific factual allegations against Blum and found that there was no basis for liability against him. *Id.* at 702.

15. By the same rationale relied on in *Griggs*, Plaintiff's Petition is devoid of specific factual allegations against Tucker and provides no basis in law or fact upon which Plaintiff can state a valid state law cause of action against Tucker. Plaintiff alleges in a conclusory fashion that "Defendants" engaged in various fraudulent acts. However, the specific facts alleged in the

7

petition are at best conclusory, make no reference to actions by Mr. Tucker, and simply do not support any cause of action against Mr. Tucker.

16. Plaintiff fails to specifically allege a single misrepresentation or actionable statement made by Tucker. Plaintiff's petition alleges that Defendant GE Reinsurance agreed to provide reinsurance for some of its insurance products, and GE Reinsurance made various promises and representations to Plaintiff regarding the reinsurance program. Plaintiff contends GE Reinsurance promised that it "would continue on [Plaintiff's] book of business at renewal in March 1, 2001," but contrary to those assurances GE Reinsurance "pulled the plug" and refused to continue providing reinsurance. *See Plaintiff's Original Petition and Application for Injunctive Relief,* ¶¶ 9, 10. There are no facts in the petition to support the contention that Tucker made any of these alleged promises. Similarly, Plaintiff does not specify how Tucker violated any section of the Texas Insurance Code or how Tucker's acts or omissions were a producing cause of damages recoverable under the Texas Insurance Code. Plaintiff's cause of action depends upon and is tied to the factual fit between its allegations and pleaded theory of recovery. *Griggs,* 181 F.3d at 701. Here, there is clearly no fit between the facts alleged and Plaintiff's assertions of fraud and negligent misrepresentation against Tucker.

17. Even assuming Plaintiff alleged the necessary facts to support its negligent misrepresentation claim or Texas Insurance Code claim, there is no possibility that it will succeed under state law because these claim are barred by the applicable limitations period. In Texas, a claim for negligent misrepresentation must be brought within two years the cause of action accrued. TEX. CIV. PRAC. REM. CODE § 16.003(a) (Vernon 2002); *HECI Exploration Co. v Neel,* 982 S.W.2d 881, 885 (Tex. 1998). The Texas Insurance Code provides that a Plaintiff must bring any claim under the code within two years of the date the allegedly unfair act or

practice occurred. TEX. INS. CODE ANN. article 21.21, § 16(d) (Vernon Supp. 2002). GE Reinsurance terminated the two reinsurance contracts in question on February 29, 2001 and April 30, 2001, respectively. Plaintiff filed suit until May 2, 2003, more than two years after the contracts were terminated. Based on the skeletal facts asserted in Plaintiff's petition, it appears that all of Plaintiff's complaints arise from the cancellation of the two reinsurance contracts. If follows, therefore, that any possible claim of negligent misrepresentation or Insurance Code violations against Tucker arose around February and March 2001 and are now barred; there is now no possibility of recovery against Tucker on those claims.

18.    The only reference to Tucker in the entirety of the petition is in the paragraph describing GE Reinsurance's alleged campaign to defame and disparage Plaintiff's business; limitations bars any possibility of recovery on these claims as well. A claim for defamation must be brought within one year of the date the cause of action accrued, and a claim for business disparagement must be brought within two years of the date the cause of action accrued. TEX. CIV. PRAC. REM. CODE §§ 16.002, 16.003(a) (Vernon 2002).

19.    Moreover, Plaintiff fails to detail any facts showing how, when, and where Tucker allegedly committed these acts or allegedly communicated or published the actionable statements. There are simply no facts provided in Plaintiff's petition to connect Tucker with the alleged wrongdoing except for the conclusory allegations that he is somehow responsible for the prohibited conduct. "[C]onclusory or generic allegations of wrongdoing on the part of the non-diverse defendant are not sufficient to show that the defendant was not fraudulently joined." *Badon*, 224 F.3d at 392-93. Therefore, Plaintiff may not rely on its contentions to show that it is possible to recover against Tucker for defamation or business disparagement.

400203.0006 324963

20.    In sum, Plaintiff has no cognizable fraud, negligent misrepresentation, defamation, business disparagement, or Texas Insurance Code claim against Tucker. The essence of Plaintiff's complaints in this suit are related to Defendant GE Reinsurance's cancellation of the reinsurance contracts. Plaintiff has not alleged any conduct by Tucker that could possibly be actionable. Therefore, all of Plaintiff's claims against Tucker cannot stand and should be dismissed.

## PRAYER

21.    WHEREFORE, Defendant GE Reinsurance hereby removes the State Court Action to this Court for trial and determination provided by law and requests this Court to proceed with this action, make all orders necessary and appropriate to effectuate this removal, and proceed as if this action had originally been commenced in this Court .

Respectfully submitted,

AKIN, GUMP, STRAUSS, HAUER
& FELD, L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 281-7000
Telecopier: (210) 224-2035

By: _Roberta J Sharp_
Attorney in Charge
ROBERTA SHARP
State Bar No. 00788400
Southern District Bar No. 17556
Of Counsel:
RICK H. ROSENBLUM
State Bar No. 17276100
Southern District Bar No. 13015

ATTORNEYS FOR DEFENDANTS GE
REINSURANCE CORPORATION

10

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was sent via certified mail, return receipt requested on this ___9th___ day of  June, 2003 to the following attorney of record:

Christopher Lee Phillippe
307-3 McFadden Drive
Brownsville, Texas  78521

ROBERTA J. SHARP

11

400203.0006  324963

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL UNDERWRITERS** | § | |
| **GENERAL AGENCY** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **B-03-108** |
| | § | Civil Action No. _____ |
| **V.** | § | |
| | § | |
| **GE REINSURANCE ("GE"), and** | § | |
| **and SPENCER TUCKER ("TUCKER")** | § | |
| | § | |
| **Defendants.** | § | |

---

## INDEX OF MATTERS BEING FILED

1.    JS44 Civil Cover Sheet

2.    Supplemental Cover Sheet

3.    GE Reinsurance's Notice of Removal

4.    Exhibit A:    Copies of all process, pleadings, orders, and the docket sheet on file in the state court lawsuit

5.    Exhibit B:    Notice of Removal Filed in State Court

6.    Exhibit C:    A list of counsel of record

# EXHIBIT "A"

RUN DATE 05/06/03
RUN TIME 3:01 PM

GE REINSURANCE CORPORATION (''GE'') ET. AL.

INTERNATIONAL UNDERWRITERS GENERAL AGENCY

VS

00530301
HON. CHRISTOPHER LEE PHILIPPE
397-3 MCFADDEN DRIVE
BROWNSVILLE, TX          78521 0000

C L E R K ' S   E N T R I E S

(10).
APPLICATION FOR INJUNCTIVE RELIEF                    05    02    03

2003-05-072485-C

05/02/03   ORIGINAL PETITION FILED
05/02/03   CITATION: GE REINSURANCE CORPORATION
             (''GE'').
05/02/03   SERVE: 05/08/03
05/02/03   CITATION: SPENCER TUCKER
05/02/03   SERVED:
05/30/03   FILED: (''GE'') (SERVICE)
RULE 11 AGREEMENT

Citation for Personal Service - NON-RESIDENT NOTICE      Lit. Seq. # 5.002.01

No. 2003-05-002265-C

T H E   S T A T E   O F   T E X A S          **COPY**

NOTICE TO DEFENDANT: You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

TO: GE REINSURANCE CORPORATION (''GE'')
    SERVING REGISTERED AGENT
    CORPORATE SERVICE CORPORATION
    800 BRAZOS
    AUSTIN, TEXAS 78701

the _____ DEFENDANT _____ , GREETING:

You are commanded to appear by filing a written answer to the

PLAINTIFF'S ORIGINAL PETITION

at or before 10:00 o'clock a.m. of the Monday next after the expiration of 20 days after the date of service of this citation before the Honorable District Court 197th Judicial District of Cameron County, Texas at the Courthouse of said county in Brownsville, Texas. Said _____ PETITION _____ was filed on _____ . A copy of same accompanies this citation.

The file number of said suit being No. 2003-05-002265-C.

The style of the case is:

INTERNATIONAL UNDERWRITERS GENERAL AGENCY
VS.
GE REINSURANCE CORPORATION (''GE'') ET. AL,

Said petition was filed in said court by _____ HON. CHRISTOPHER LEE PHILLIPPE _____ (Attorney for _____ PLAINTIFF _____ ), whose address is 307-3 MCFADDEN DRIVE BROWNSVILLE, TX 78521 .

The nature of the demand is fully shown by a true and correct copy of the Petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to requirements of law, and the mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at Brownsville, Texas, this the 2nd day of _____ MAY _____ , A.D. 2003 .

AURORA DE LA GARZA      DISTRICT CLERK

NO. _2003-05-2265-C_

FILED __4:55__ O'CLOCK __
AURORA DE LA GARZA DIST.

MAY 0 2 2003

DISTRICT COURT OF CAMERON COUNTY, TE
_Kay Egez_ _TC_ DEPU.

| | |
|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY<br>Plaintiff, | IN THE DISTRICT COURT |
| | § |
| V. | § |
| | § |
| | § _197th_ JUDICIAL DISTRICT |
| GE REINSURANCE CORPORATION ("GE"), AND SPENCER TUCKER ("TUCKER") Defendants. | § |
| | § Of CAMERON COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR INJUNCTIVE RELIEF

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** INTERNATIONAL UNDERWRITERS GENERAL AGENCY (collectively "IUGA"), hereinafter called Plaintiff, complaining of and about GE REINSURANCE CORPORATION ("GE") and SPENCER TUCKER ("TUCKER") , hereinafter called Defendants, and for cause of action shows unto the Court the following:

## I.
## DISCOVERY CONTROL PLAN LEVEL

1.    Plaintiff intends that discovery be conducted under Discovery Level 2.

## II.
## PARTIES AND SERVICE

2.    Plaintiff, INTERNATIONAL UNDERWRITERS GENERAL AGENCY, is a Texas Corporation whose address is P.O. Box 3966, Brownsville, Texas 78520.

3.    Defendant GE REINSURANCE CORPORATION ("GE"), is an Illinois corporation doing business in Texas and may be served with process at Corporate Service Corporation, 800 Brazos, Austin, Texas 78701.

4.    Defendant SPENCER TUCKER ("TUCKER"), is an individual residing in the

State of Texas.  Said Defendant may be served with process at his home at the following address:  5400 Preston Oaks Road, Dallas, Texas 75240.

### III.
### JURISDICTION AND VENUE

5.     Venue is mandatory in Cameron County, Texas pursuant to Section 15.017, Texas Civil Remedies Code. Alternatively, venue is proper in Cameron County, Texas because: (1) all or a substantial part of the events or omissions giving rise to the claim occurred in Cameron County; (2) the agreements were performable in Cameron County; and (3) Plaintiff's principle office is located in Cameron County.

6.     All relief sought is within the jurisdictional limits of the Court.

### IV.
### FACTS

7.     IUGA is a wholesaler of certain types of casualty insurance. IUGA specializes in niche market, primarily selling non-resident commercial and personal automobile insurance for Mexican nationals crossing into the United States along the borders of Texas, New Mexico, Arizona, and Californis. IUGA has enjoyed success and steady growth until the events giving rise to this action occurred.

8.     GE is in the reinsurance business. During the relevant. time period, TUCKER was GE's primary agent, representative and vice-principal for GE's reinsurance program.

9.     GE agreed to provide reinsurance for some of IUGA's insurance products. The terms, conditions and commissions are negotiated.  Beginning in November of 2000, GE made various promises and representations to IUGA in regards to the reinsurance for its non-resident programs as well as its fledgling non-standard program.  In reliance upon GE's promises and representations, IUGA made crucial and strategic business decisions and investments.  For example, additional reinsurers

were not approached as is customary because GE had represented that it would continue on IUGA's book of business at renewal in March 1, 2001. IUGA also procured software programs valued at $250,000 based on GE's assertions and support for IUGA's plans to enter the non-standard auto market.

10.    Shortly after IUGA altered its business plan based on GE's commitments, GE "pulled the plug" and refused to provide the level of reinsurance it had promised to IUGA. Consequently, IUGA was unable to obtain alternative reinsurance coverage and was forced to write business through another managing general agency but at a substantially lower commission level and a drastic cut in market presence by causing IUGA to lose its wholesale status and being relegated to a retail agent level while supporting a base of over 600 agents. GE's actions subsequently caused IUGA to lose identity and market presence due to the loss of name brand recognition, prestige, and its main competitive edge in the market place. Additionally, since then, IUGA has been unable to procure another contract and has been unable to enter the non-standard auto market to this day.

11.    Thereafter, through written and verbal communications, IUGA made GE well aware of the impact of GE's betrayal would have on IUGA and its agents. Instead of rectifying its prior misconduct, GE began a vindictive and malicious campaign of harassment and interference with IUGA's business in obvious retaliation for IUGA's refusal to acquiesce to GE's conduct.

12.    For example, GE began wrongfully withholding claims relief payments, threatening IUGA and its policyholders with unnecessarily delayed payment of insurance claims and the threat of further damage through litigation. TUCKER is the individual most responsible for this conduct. Furthermore, GE initiated multiple and

unreasonable audits of IUGA. These unspecified audits were burdensome on IUGA, causing IUGA's productivity to suffer. The nature and scope of the audits unwarranted and calculated to harass, intimidate and injure IUGA.

## V.
## Causes of Action

### A. Fraud

**13.** Defendants conduct, as described herein, constitutes *fraud*. In particular, Defendants made representations to IUGA which they knew were false, or they were made with reckless disregard for the truth. Defendants' intended for IUGA to rely on Defendants promises and representations, which IUGA reasonably did to its detriment. Defendants' fraud has proximately caused harm to IUGA.

### B. Negligent Misrepresentation

**14.** Alternatively, Defendants negligently misrepresented material facts to IUGA. IUGA justifiably relied upon Defendants' promises and representations to IUGA's detriment. Defendants' conduct in this regard has proximately caused harm to IUGA.

### C. Breach of Duty of Good Faith

**15.** GE owed a duty of good faith and fair dealing to IUGA. As shown herein, GE breached the duty of good faith and fair dealing. GE's breach proximately caused harm to IUGA.

### D. Defamation/Business Disparagement

**16.** TUCKER and other representatives of GE have published written and immoral statements designed and calculated to injure IUGA and its reputation and saiiiding in the relevant community. These statements were false and were made with malice, and without privilege or legal excuse. Defendants' conduct in this regard has proximately

caused harm to IUGA.

### E. Insurance Code Violations

**17.** Defendants' conduct, as described herein, constitutes multiple violations of the Texas Insurance Code. These violations include Article 21.21 which prohibit an insurance carrier from engaging in false, misleading and deceptive conduct. Defendants' conduct in this regard is a producing cause of damages to IUGA.

### VI.

**18.** Defendants acts and omissions have caused IUGA actual damages well in excess of $2 million. These damages include lost profits, loss of commissions, loss of business opportunities, damage to good will and reputation and detrimental reliance damages. IUGA also seeks to recover exemplary damages, treble damages, statutory penalties and prejudgment interest.

### VII.
### Conditions Precedent/Capacities

**19.** All conditions precedent to bringing this lawsuit and to recovery have been performed or have occurred. Plaintiffs are suing Defendants in all capacities in which hey are entitled to recover.

### VIII.
### Application for Temporary Restraining Order
### and Temporary Injunction

**20.** IUGA pleads for a Temporary Restraining Order and Temporary Injunction. IUGA requests that the Court enter a temporary restraining order and a temporary injunction preventing Defendants from causing or requiring any further audits of IUGA absent further order of this Court. Further, IUGA requests that Defendants be prohibited, from terminating its reinsurance business in contravention of its previous agreements with IUGA and be required to continue to honor any funds due under

said agreements. It is probable that IUGA will recover from Defendants because Defendants have breached their fiduciary duties, committed fraud and misrepresentations, and violated Art. 21.21 of the Texas Insurance Code. IUGA only needs to show the Court a probable right of recovery and probable injury if injunctive relief is not granted and is not required to establish that it will finally prevail in the litigation. See *State v. Southwestern Bell Telephone Co.,* 526 S.W.2nd 526, 528 (Tex. 1975); *El Paso Development Company v. Berryman,* 729 S.W.2d 883, 886 (Tex.App.-Corpus Christi 1987, no writ). IUGA testifies to the harm it will suffer in an Affidavit in support of its application for injunctive relief. This Affidavit is attached and incorporated as Exhibit "A".

21. The harm to IUGA that will result if the requested injunctive relief is not granted is immediate and irreparable because it will further lose revenues, market share, goodwill, credit rating, reputation, and may be unable to meets its financial obligations and be unable to continue as a viable business. IUGA has no adequate remedy at law because many of these damages are intangible and not readily ascertainable. The injunctive relief requested will protect the status quo and will serve the public interest. The temporary restraining order must be issued without notice to Defendants because there is insufficient time for notice, and further, advance notice may cause Defendants to further retaliate against IUGA, as evidenced by Defendants' prior misconduct.

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer and, on final trial, have and recover from Defendants, jointly and severally, the following:

a. injunctive relief as requested herein;

b. actual damages;

c. exemplary damages;

d.  prejudgment and post-judgment interest;

e.  court costs; and

f.  general relief.

Respectfully submitted,

By: _____
Christopher Lee Philippe
Texas Bar No. 15915400
307-3 McFadden Drive
Brownsville, Texas  78521
Tel. (956)544-6096
Fax. (956)982-1921
Attorney for Plaintiff
INTERNATIONAL UNDERWRITERS

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

## AFFIDAVIT ALEJANDRO VILLARREAL ALBA

THE STATE OF TEXAS       §
                               §

COUNTY OF CAMERON     §

BEFORE ME, the undersigned authority, on this day personally appeared ALEJANDRO VILLARREAL ALBA, known to me, who being by me duly sworn, deposed and said on their oath that:

1.     My name is ALEJANDRO VILLARREAL ALBA. I am over the age of eighteen (18) years. I am capable of making this affidavit. I have never been convicted of a felony or a crime of moral turpitude. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.     I am President of International Underwriters General Agency, Inc. ("IUGA"). IUGA is a wholesaler of certain types of casualty insurance. IUGA specializes in a niche market, primarily selling non-resident commercial and personal automobile insurance for Mexican nationals crossing into the United States along the borders of Texas, New Mexico, Arizona, and California. IUGA has enjoyed success and steady growth until the events giving rise to this action occurred.

3.     GE is in the reinsurance business. During the relevant time period, Tucker was GE's primary agent, representative and vice-principal for GE's reinsurance program.

4.     GE agreed to provide reinsurance for some of IUGA's insurance products. The terms, conditions and commissions are negotiated. Beginning in November of 2000, GE made various promises and representations to IUGA in regards to the reinsurance for its non-resident programs as well as its fledgling non-standard program. In reliance upon GE's promises and representations, IUGA made crucial and strategic business decisions and investments. For example, additional reinsurers were not approached as is customary because GE had represented that it would continue on IUGA's book of business at renewal in March 1, 2001. IUGA also procured software programs valued at $250,000 based on GE's assertions and support for IUGA's plans to enter the non-standard auto market.

5.     Shortly after IUGA altered its business plan based on GE's commitments, GE "pulled the plug" and refused to provide the level of reinsurance it had

promised to IUGA. Consequently, IUGA was unable to obtain alternative reinsurance coverage and was forced to write business through another managing general agency but at a substantially lower commission level and a drastic cut in market presence by causing IUGA to lose its wholesale status and being relegated to a retail agent level while supporting a base of over 600 agents. GE's actions subsequently caused IUGA to lose identity and market presence due to the loss of name brand recognition, prestige, and its main competitive edge in the market place. Additionally, since then, IUGA has been unable to procure another contract and has been unable to enter the non-standard auto market to this day.

6.      Thereafter, through written and verbal communications, IUGA made GE well aware of the impact of GE's betrayal would have on IUGA and its agents. Instead of rectifying its prior misconduct, GE began a vindictive and malicious campaign of harassment and interference with IUGA's business in obvious retaliation for IUGA's refusal to acquiesce to GE's conduct.

7.      For example, GE began wrongfully withholding claims relief payments, threatening IUGA and its policyholders with unnecessarily delayed payment of claims and the threat of further damage through litigation. TUCKER is the individual most responsible for this conduct. Furthermore, GE initiated multiple and unreasonable audits of IUGA. The unspecified audits were burdensome on IUGA, causing IUGA's productivity to suffer. The nature and scope of the audits were unwarranted and calculated to harass, intimidate and injure IUGA.

SUBSCRIBED AND SWORN TO on this 30th day of April, 2003.

_____
ALEJANDRO VILLARREAL ALBA

SUBSCRIBED AND SWORN TO on this 30TH day of April, 2003, to certify which, my hand and seal of office.

_____
Notary Public, State of Texas

## Corporation Service Company
2711 Centerville Road Suite 400, Wilmington, DE, 19808
(302) 636-5400

United States Corporation Company                      The Prentice-Hall Corporation System, Inc.

### NOTICE OF SERVICE OF PROCESS

Date Processed: 09-MAY-03                      Transmittal #:  TX1732611C      ALL

To: MR. DAVID BRODNAN                          Redirect sent to:
    GE REINSURANCE CORPORATION
    540 WEST NORTHWEST HIGHWAY
    BARRINGTON IL 60010

### TYPE OF REPRESENTATION:   Statutory

*We enclose the following documents which were served upon:*
            Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company
*as registered agent in*   Texas            *for*
                          GE REINSURANCE CORPORATION (ID#:   1713945)
*Documents were served on   09-MAY-03      via Personal Service*        ID#:  N/A

Title of Action: INTERNATIONAL UNDERWRITERS GENERAL AGENCY        Case #: 2003-05-2265-C
            vs. GE REINSURANCE CORPORATION, ETC., ET AL
        Court: 197TH DISTRICT COURT IN CAMERON COUNTY, TX
Nature of Case:
            FRAUD

|   |   |   |   |   |   |
|---|---|---|---|---|---|
| X | Summons | ___ | Notice of Mechanic's Lien | ___ | A self-addressed stamped envelope enclosed |
| X | Complaint | ___ | Notice of Attorney's Lien | ___ | Duplicate copies of the Notice and Acknowledgement enclosed |
| ___ | Garnishment | ___ | Notice of Default Judgment |  |  |
| ___ | Subpoena |  |  |  |  |

_____ Other:

Answer Due: MONDAY NEXT FOLLOWING 20 DAYS AFTER SERVICE
Documents Sent: Federal Express          ID#: 634261790010
   Call Placed: No call placed            Spoke to: N/A
   Comments: N/A

Attorney for Claimant:
        CHRISTOPHER LEE PHILLIPPE
        307-3 MCFADDEN DRIVE
        BROWNSVILLE, TX 78521

        956-544-6096

Form Prepared By: Gloria Hudson

*Please acknowledge receipt of this notice and the enclosures by signing and returning the acknowledgement copy.*

### Original Client Copy - for your records

The information on this transmittal is provided for use in forwarding the attached documents. This information does not constitute a legal opinion as to the facts or details of this action. These should be obtained from the documents themselves. The receiver of this transmittal is responsible for interpreting the documents and for taking appropriate action. If you have received only a copy of the transmittal, you should be aware that the documents have been sent to the original addressee.

# Corporation Service Company
## 2711 Centerville Road Suite 400, Wilmington, DE, 19808
### (302) 636-5400

United States Corporation Company                    The Prentice-Hall Corporation System, Inc.

## NOTICE OF SERVICE OF PROCESS

---

**Date Processed:** 09-MAY-03                **Transmittal #:** TX1732611C          ALL

---

**To:** MR. DAVID BRODNAN                        **Redirect sent to:**
GE REINSURANCE CORPORATION
540 WEST NORTHWEST HIGHWAY
BARRINGTON IL 60010

---

**TYPE OF REPRESENTATION:**  Statutory

*We enclose the following documents which were served upon:*
Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company
*as registered agent in  Texas                  for*
GE REINSURANCE CORPORATION (ID#:  1713945)
*Documents were served on  09-MAY-03     via Personal Service*          **ID#:  N/A**

---

**Title of Action:** INTERNATIONAL UNDERWRITERS GENERAL AGENCY          **Case #:** 2003-05-2265-C
**vs.** GE REINSURANCE CORPORATION, ETC., ET AL
**Court:** 197TH DISTRICT COURT IN CAMERON COUNTY, TX
**Nature of Case:**
          FRAUD

---

| X | Summons | ____ | Notice of Mechanic's Lien | ____ | A self-addressed stamped |
|---|---------|------|---------------------------|------|--------------------------|
| X | Complaint | ____ | Notice of Attorney's Lien | | envelope enclosed |
| ____ | Garnishment | ____ | Notice of Default Judgment | ____ | Duplicate copies of the Notice |
| ____ | Subpoena | | | | and Acknowledgement enclosed |

____ Other:

---

**Answer Due:** MONDAY NEXT FOLLOWING 20 DAYS AFTER SERVICE
**Documents Sent:** Federal Express          **ID#:** 634261790010
**Call Placed:** No call placed          **Spoke to:** N/A
**Comments:** N/A

**Attorney for Claimant:**
          CHRISTOPHER LEE PHILLIPPE
          307-3 MCFADDEN DRIVE
          BROWNSVILLE, TX 78521

          956-544-6096

---

Form Prepared By:  Gloria Hudson
*Please acknowledge receipt of this notice and the enclosures by signing and returning this acknowledgement copy. A business reply envelope is enclosed for your convenience.*

**DATE RECEIVED:** 5/12/03  **CLIENT SIGNATURE:**
          Acknowledgement Copy - to be returned to the address above

---

The information on this transmittal is provided for use in forwarding the attached documents. This information does not constitute a legal opinion as to the facts or details of this action. These should be obtained from the documents themselves. The receiver of this transmittal is responsible for interpreting the documents and for taking appropriate action. If you have received only a copy of the transmittal, you should be aware that the documents have been sent to the original addressee.

05/29/HY.29.20033  8:18AM   AKIN GUMP PHILLIPPE HITCHES          NO. P   002

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

━━━━━━━━━━━━━━ Attorneys at Law

NADA L. ISMAIL
210.281.7166/fax 210.224.2035
nisha@akingump.com

FILED

AURORA

MAY 3 0 2003

DISTRICT COURT OF CAMERON

May 28, 2003

**VIA FACSIMILE**

Christopher Lee Phillippe
307-3 McFadden Drive
Brownsville, Texas 78521

Re: Cause No. 2003-05-002265-C, *International Underwriters General Agency v. GE Reinsurance Corporation* ("GE"), and *Spencer Tucker* ("Tucker"), in the 197th Judicial District Court of Cameron County, Texas

Dear Mr. Phillippe:

As you know,  Defendant GE Reinsurance ("GE") was served with Plaintiff's petition on May 9, 2003, thereby making its answer due Monday, June 2, 2003.  This letter is to confirm our Rule 11 Agreement to extend the deadline to file Defendant GE's answer until Monday, June 9, 2003.

If this letter accurately reflects our agreement, please sign in the appropriate place below; otherwise contact me immediately.  Once you sign this letter and return your signature to me, I will file it with the Court.

Sincerely,

Nada L. Ismail
Attorney for GE Reinsurance Corporation

Agreed:
_____
Christopher Lee Phillippe
State Bar No. 15915400
Attorney for Plaintiff International
      Underwriters General Agency

| 2. Article Number | COMPLETE THIS SECTION ON DELIVERY | |
|---|---|---|
| ‖‖‖‖‖‖‖‖‖‖‖ | A. Received by (Please Print Clearly) | B. Date of Delivery |
| | Pat Gore | 02/use/06 |
| 7160 3901 9844 1503 4588 | C. Signature X Pat Gore | ☑ Agent ☐ Addressee |
| 3. Service Type  **CERTIFIED MAIL** | D. Is delivery address different from item 1? If YES, enter delivery address below: | ☐ Yes ☐ No |
| 4. Restricted Delivery? *(Extra Fee)* ☐ Yes | | |

1. Article Addressed to:

Christopher Lee Phillippe
307-3 McFadden Drive
Brownsville, TX 78521

400203.0006 (GE Reinsurance)        N Ismail – Rule 11 Ltr Agrmt.

PS Form 3811, July 2001        Domestic Return Receipt

# AKIN GUMP
## STRAUSS HAUER & FELD LLP

**FILE COPY**

_____ Attorneys at Law

**NADA L. ISMAIL**
210.281.7166 fax: 210.224.2035
nitaha@akingump.com

June 6, 2003

VIA OVERNIGHT DELIVERY

Ms. Aurora de la Garza
District Clerk, Cameron County
974 E. Harrison St.
Brownsville, Texas 78520

Re:  Cause No. 2003-05-002265-C, *International Underwriters General Agency v. GE Reinsurance Corporation* ("GE"), and *Spencer Tucker* ("Tucker"); In the 197th Judicial District Court, Cameron County, Texas

Dear Ms. de la Garza:

Enclosed is an original and one copy of *Defendant's Motion to Transfer Venue, Original Answer (Subject to Motion to Transfer Venue), and Plea in Abatement (Subject to Motion to Transfer Venue)* with Exhibits 1-4 to be filed in the above-referenced case.  Please file-stamp one copy and return it to me in the enclosed self-addressed stamped envelope.

Sincerely,

Nada L. Ismail

Enclosures

cc:   Christopher Lee Phillippe (w/enclosure) Via Certified Mail, RRR
      Roberta J. Sharp [Firm]

**Certified Article Number**

7160 3901 9844 1504 4228

**SENDERS RECORD**

**AKIN GUMP**
**STRAUSS HAUER & FELD** LLP

Attorneys at Law

Ms. Aurora de la Garza
District Clerk, Cameron County
Page 2
June 6, 2003

bcc:   David Brodnan (w/enclosure)

No. 2003-05-2265-C

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS | § | IN THE DISTRICT COURT |
| GENERAL AGENCY, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 197TH JUDICIAL DISTRICT |
| | § | |
| GE REINSURANCE CORPORATION | § | |
| ("GE"), AND SPENCER TUCKER | § | |
| ("TUCKER") | § | |
| Defendants. | § | OF CAMERON COUNTY, TEXAS |

---

### DEFENDANT'S MOTION TO TRANSFER VENUE, ORIGINAL ANSWER (SUBJECT TO MOTION TO TRANSFER VENUE), AND PLEA IN ABATEMENT (SUBJECT TO MOTION TO TRANSFER VENUE)

---

TO THE HONORABLE JUDGE OF THIS COURT:

### I. MOTION TO TRANSFER VENUE

1.　Defendant GE Reinsurance Corporation ("GE") asserts that the county in which this suit was instituted is not a proper venue and objects on the ground that the mandatory venue of the action is prescribed by Texas Civil Practice and Remedies Code section 15.020(c)(2). TEX. CIV. PRAC. REM. CODE ANN. § 15.020(c)(2) (Vernon 2002).

2.　The transactions giving rise to this suit are the subject of, and governed by, four written agreements, true and correct copies of which are attached hereto as Exhibits 1-4 (referred to collectively as "the Agreements"):

(a) The General Agency Agreement between International Underwriters General Agency, Inc. ("IUGA") and State and County Mutual Fire Insurance Company (Exhibit 1);

(b) The General Agency Agreement between IUGA and State National Insurance Company, Inc. (Exhibit 2);

(c) The Quota Share Reinsurance Contract between State National Insurance Company and Kemper Reinsurance Company (Defendant GE is the successor in interest to Kemper) (Exhibit 3);

      (d) The 100% Quota Share Reinsurance Contract between State and County Mutual Fire Insurance Company and Kemper Reinsurance Company (Exhibit 4).

3.    Although Plaintiff carefully avoids referring to these written Agreements in its Petition, the rights and obligations of the parties to this suit arise directly from, and are governed exclusively by, these Agreements.

4.    Because this suit is governed by the above-mentioned Agreements, two of which contain forum selection clauses, venue is determined by Texas Civil Practice and Remedies Code section 15.020. *Id.* § 15.020. This section provides that "[a]n action arising from a major transaction shall be brought in a county if the party against whom the action is brought has agreed in writing that a suit arising from the transaction may be brought in that county." *Id.* § 15.020(b). A major transaction is one "evidenced by a written agreement under which a person pays or receives, or is obligated to pay or is entitled to receive, consideration with an aggregate stated value equal to or greater than $1 million." *Id.* § 15.020(a).

5.    Under the State and County General Agency Agreement, Plaintiff consented, in writing, that any controversy arising from a transaction governed by the Agreement shall be brought in Dallas County, Texas. Exhibit 1, § 10.05.[1]

6.    In addition, because the aggregate value of the transaction giving rise to this suit is well in excess of $1 million, the facts giving rise to this lawsuit constitute a "major transaction," as defined in Texas Civil Practice and Remedies Code section 15.020(a). *Id.* § 15.020(a).

---

[1] Under the State National Insurance Company General Agency Agreement, IUGA agreed in writing that an action arising from a transaction governed by that Agreement shall be brought in Tarrant County, Texas. Exhibit 2, § 9.05. However, Defendant seeks to transfer both cases to Dallas County because Defendant Spencer Tucker (who has not yet been served in this action) is a resident of Dallas County, Texas and because Defendant GE seeks to avoid the unnecessary severance of the claims under the State and County General Agency Agreement from the claims under the State National Insurance Company General Agency Agreement.

7. Because venue is determined by Texas Civil Practice and Remedies Code section 15.020, Defendant requests the Court to transfer this action to a District Court of Dallas County, Texas, which is the mandatory venue agreed to, in writing, by the parties.

8. Venue is not proper in Cameron County. Plaintiff attempts to establish mandatory venue pursuant to Texas Civil Practice and Remedies Code section 15.017. TEX. CIV. PRAC. REM. CODE ANN. § 15.017 (Vernon 2002). Under section 15.017, a suit for damages for libel, slander, or invasion of privacy shall be brought in (i) the county in which the plaintiff resided at the time the cause of action accrued, (ii) the county in which the defendant resided at the time the suit was filed, or (iii) the county in which any defendant resides (or the county in which any corporate defendant is domiciled). *Id.* Defendant specifically denies that it or any other defendant resided in Cameron County at the time suit was filed, or at any other relevant time.

9. Plaintiff's Petition does not state sufficient facts to support venue under section 15.017. The Petition does not state the alleged time, place, medium, content, or recipient of the alleged defamatory or disparaging statements. The Petition does not state when the alleged defamation took place, in order to establish when the alleged cause of action accrued. Defendant specifically denies that it has defamed or disparaged the business of International Underwriters General Agency at any place or at any time. In particular, Defendant specifically denies that Spence Tucker or anyone associated with GE Reinsurance has published or made any statement at all regarding Plaintiff within one year of the filing of this suit. Plaintiff's claims of defamation and business disparagement cannot possibly succeed and have been brought solely to defeat the venue affirmatively selected and agreed to by the parties at the inception of their relationship.

10. In the alternative, venue must be transferred to Dallas County under section 15.017 because Plaintiff affirmatively elected that the venue shall be maintained there. Under

section 15.017, a suit for damages for libel or slander can only be maintained in the county in which the plaintiff resided at the time the cause of action accrued, *or* in the county any defendant resides, *at the election of the plaintiff*. In this case, Plaintiff elected, in writing, Dallas County, Texas as the proper venue for any dispute arising from the Agreements. Dallas County, Texas is the county of residence of Defendant Spencer Tucker, and thus a proper venue under section 15.017. The Court should find that Plaintiff's written consent to Dallas County as the proper venue constitutes an election for the purpose of applying section 15.017.

## II. ORIGINAL ANSWER, SUBJECT TO MOTION TO TRANSFER VENUE

11. Subject to and without waiving Defendant's Motion to Transfer Venue, and pursuant to Texas Rules of Civil Procedure Rule 92, Defendant hereby exercises its rights to require Plaintiff to prove its allegations by a preponderance of the credible evidence.

## III. FIRST AFFIRMATIVE DEFENSE

12. Plaintiff's negligent misrepresentation claim is barred by the applicable statute of limitations.

## IV. SECOND AFFIRMATIVE DEFENSE

13. Plaintiff's breach of the duty of good faith and fair dealing claim is barred by the applicable statute of limitations.

## V. THIRD AFFIRMATIVE DEFENSE

14. Plaintiff's defamation and business disparagement claims are barred by the applicable statute of limitations.

## VI. FOURTH AFFIRMATIVE DEFENSE

15.    Plaintiff's Texas Insurance Code claims are barred by the applicable statute of limitations.

## VII. PLEA IN ABATEMENT, SUBJECT TO MOTION TO TRANSFER VENUE

16.    Subject to and without waiving Defendant's Motion to Transfer Venue, Defendant asks the Court to abate this suit because Plaintiff has not satisfied all conditions precedent. Specifically, Plaintiff failed to provide Defendant with sixty (60) days written notice of the claims against under Texas Insurance Code article 21.21. TEX. INS. CODE. ANN. article 21.21, § 16(e), (h) (Vernon Supp. 2002).

17.    Furthermore, subject to and without waiving Defendant's Motion to Transfer Venue, Defendant asks the Court to order the parties to arbitration and stay these proceedings pending the completion of that arbitration.

18.    In each of the Agreements, the parties agreed to arbitrate any dispute arising between the parties to the Agreements. *See* Exhibit 1, § 8.1; Exhibit 2, § 8.1; Exhibit 3, § 13.1; Exhibit 4, § 12.1.    In each of these Agreements, submission of the dispute to arbitration is a condition precedent to any right of action thereunder. Each of the allegations in Plaintiff's Petition is within the subject matter of these Agreements.

19.    Because the parties lawfully agreed to resolve all disputes arising from the parties' reinsurance and agency services through arbitration, this Court has no discretion but to compel arbitration and stay its proceedings pending arbitration. *Cantella & Co. v. Goodwin,* 924 S.W.2d 943, 944 (Tex. 1996) (per curiam).

## VIII. PRAYER

Defendant asks this Court to set a hearing for its Motion to Transfer Venue and, upon such hearing, transfer this matter to Dallas County, Texas. Subject to and without waiving its Motion to Transfer Venue, Defendant asks the Court to order Plaintiff to take nothing by this suit, and such other and further affirmative relief to which Defendant may be entitled. Finally, subject to and without waiving its Motion to Transfer Venue, Defendant asks the Court to abate the suit until such time Plaintiff properly provides the required notice of its claims under the Texas Insurance Code and then order the parties to submit this dispute to arbitration.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD, L.L.P
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 281-7000
Telecopier: (210) 224-2035

By: _____

R.H. ROSENBLUM
State Bar No. 17276100
ROBERTA J. SHARP
State Bar No. 00788400
NADA L. ISMAIL
State Bar No. 24036825

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on the counsel of record via certified mail, return receipt requested, on the $\underline{6}^{th}$ day of June, 2003:

Christopher Lee Phillippe
307-3 McFadden Drive
Brownsville, Texas 78521

NADA L. ISMAIL

JUN 06 2003 11:02 AM FI    E REINSURANCE    847 277 5365    912102242035    P.07

## VERIFICATION

STATE OF ILLINOIS        §
                                 §

COUNTY OF LAKE        §

On this day came before me Leonardo A. Casanas, who being duly sworn deposed, said

that he is the Casualty Team Leader of GE Reinsurance Corporation and is authorized to state

that the information contained in Defendant's Motion to Transfer Venue or, in the Alternative,

Plea in Abatement and Motion to Compel Arbitration Subject to Motion to Transfer Venue, and

Original Answer Subject to Motion to Transfer Venue is true and correct and within his personal

knowledge.

_____
LEONARDO A. CASANAS

SWORN TO and SUBSCRIBED before me on this 6th day of June, 2003.

_____
NOTARY PUBLIC in and for the State of Illinois

OFFICIAL SEAL
LINDA J HICKS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 02-24-07

** TOTAL PAGE.07 **

No. 2003-05-2265-C

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., | § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| v. | § § | 197TH JUDICIAL DISTRICT |
| GE REINSURANCE CORPORATION ("GE"), AND SPENCER TUCKER ("TUCKER") | § § § § | |
| Defendants. | § | OF CAMERON COUNTY, TEXAS |

---

### ORDER SETTING HEARING ON DEFENDANT'S MOTION TO TRANSFER VENUE

---

A hearing on Defendant's Motion to Transfer Venue shall be set for _____,

2003, at ____ o'clock ____ M. in the 197th District Court of Cameron County, Texas.

SIGNED on _____, 2003.


_____
JUDGE PRESIDING

No. 2003-05-2265-C

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS | § | IN THE DISTRICT COURT |
| GENERAL AGENCY, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 197TH JUDICIAL DISTRICT |
| | § | |
| GE REINSURANCE CORPORATION | § | |
| ("GE"), AND SPENCER TUCKER | § | |
| ("TUCKER") | § | |
| Defendants. | § | OF CAMERON COUNTY, TEXAS |

---

## ORDER GRANTING MOTION TO TRANSFER VENUE

---

On this day, the Court considered Defendant's Motion to Transfer Venue ("the Motion"). All parties appeared by counsel. After considering the application and the arguments of the parties, the Court is of the opinion the Motion should be GRANTED.

IT is therefore ORDERED that this case is transferred to Dallas County, Texas.

SIGNED on _____, 2003.


_____
JUDGE PRESIDING

No. 2003-05-2265-C

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., Plaintiff, | § § § § | IN THE DISTRICT COURT |
| v. | § § | 197TH JUDICIAL DISTRICT |
| GE REINSURANCE CORPORATION ("GE"), AND SPENCER TUCKER ("TUCKER") Defendants. | § § § § | OF CAMERON COUNTY, TEXAS |

## ORDER OF ABATEMENT

On this day, the Court considered Defendant's Pleas in Abatement ("the Plea"). All parties appeared by counsel. After considering the Plea, the response, the pleadings, the evidence, and arguments of counsel, the Court GRANTS the Plea.

It is therefore ORDERED that the parties submit this case to arbitration according to the parties' agreements. It is further ORDERED that all matters in this proceeding are abated until an arbitration award is entered.

SIGNED on _____, 2003.

_____
JUDGE PRESIDING

## GENERAL AGENCY AGREEMENT

THIS GENERAL AGENCY AGREEMENT (this "Agreement") is made and entered into as of MARCH 1, 1999, by and between STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY, an insurance company organized under the laws of the State of Texas ("Company") International Underwriters General Agency, Inc., a corporation organized under the laws of the State of Texas ("General Agent");

## WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

## PREAMBLE

The Company and the Subscribing Reinsurers ("Reinsurer"), have entered into that certain Quota Share Reinsurance Agreement dated as of March 1, 1999, a true and complete copy of which is attached hereto as Exhibit A and fully incorporated herein by this reference (the "Reinsurance Agreement"), which Reinsurance Agreement requires the appointment of the General Agent to perform certain specified acts on behalf of the Company and Reinsurer. The General Agent desires to perform the functions and duties necessary under the Reinsurance Agreement. It is therefore mutually agreed by the parties that the General Agent will perform all functions necessary for the production, service and management of policies reinsured under the Reinsurance Agreement in accordance with the terms and conditions set forth therein and herein. To the extent that there is any conflict between the terms of this Agreement and the Reinsurance Agreement, the Reinsurance Agreement shall govern. Notwithstanding any provisions to the contrary contained elsewhere herein or in any other document, it is expressly understood that the execution and delivery of this Agreement and the Company's performance hereunder shall not under any circumstances be interpreted to affect, weaken or modify the Reinsurer's obligation to indemnify and hold the Company harmless from and against the business, credit and insurance risks as set forth in the Reinsurance Agreement. The contractual assumption by the Reinsurer of these risks in the Reinsurance Agreement is a condition precedent to the Company's entering into this Agreement with the General Agent.

## ARTICLE I
## APPOINTMENT AND DUTIES

1.01 The Company hereby appoints the General Agent as its managing general agent for the purpose of producing and handling the business which is the subject of the Reinsurance Agreement issued or renewed on or after the effective date of this Agreement. The Company hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in Schedule I hereof; to secure, at its own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign policies, certificates, endorsements and binders which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

1.02 All activities of the General Agent pursuant to this Agreement shall be in strict compliance with the terms of the Reinsurance Agreement and all rules, regulations and instructions of the Company, including, but not limited to, all rules, instructions and specifications included in the Company's rate manuals, rate brochures and rate schedules.



EXHIBIT

1

1.03 The Company further authorizes the General Agent to perform all acts and duties under policies of insurance issued by the Company as would otherwise be performed by the Company, including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to the Company, and adjusting and paying losses or other claims. The Company grants to the General Agent the authority to settle claims on behalf of the Company. However, the maximum dollar amount of such authority per claim shall not exceed $30,000. For claims settlements in excess of $30,000, the General Agent may only settle such claims with prior approval of the Company and Reinsurer. Additionally, the General Agent must obtain the Reinsurer's prior approval for claims settlements in excess of the policy limits set forth in Section 1.09 hereof. The Company retains final authority to determine any disputes relating to claims settlement and setting of loss reserves. Should the Company be ordered or instructed by the Texas Department of Insurance or any other regulatory agency of competent jurisdiction to take any action or refrain from taking any action with regard to any claim, the General Agent shall be bound by and shall follow the order or instructions of such regulatory agency as though General Agent were the object of such order or instruction. The General Agent will exercise the authority granted hereunder in good faith and toward the end of paying any and all valid claims. The General Agent must send to the Company a report, within thirty (30) days of determination, that a claim (i) involves a coverage dispute; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) alleges a violation of the Texas Deceptive Trade Practices Act or other similar applicable statute; or (v) alleges a violation of the Texas Insurance Code, Article 21.21 (Unfair Competition and Unfair Practices) or other similar applicable statutes.

1.04 The General Agent is authorized to have claims adjusted through independent claims adjusters. The selection of independent claims adjusters shall be subject to prior written approval of the Company.

1.05 The Company shall not be responsible for the General Agent's expenses and costs, including, but not limited to, salaries, bonuses, rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, exchange, personal license fees, adjustment by the General Agent of losses under policies issued by the General Agent, or any other agency expenses whatsoever. The General Agent's sole compensation shall be the amounts payable to the General Agent in Article XIII of the Reinsurance Agreement and in Article III of this Agreement.

1.06 The General Agent understands and agrees that it has no power or authority granted to it by the Company independent of the Reinsurance Agreement, and that this Agreement and the General Agent's authority hereunder shall cease immediately upon termination, for any reason, of this Agreement or of the Reinsurance Agreement (excepting only the General Agent's responsibilities with regard to run-off and other matters as set forth herein or in the Reinsurance Agreement).

1.07 The General Agent shall not have the power to accept or bind risks other than as set forth herein or as may be subsequently authorized by the Company in writing. The General Agent may not bind or cede reinsurance or retrocession on behalf of the Company, may not commit the Company to participation in insurance or reinsurance syndicates, and may not commit the Company to a claim settlement with a reinsurer without the prior written approval of the Company. If such prior written approval is given, the General Agent shall forward promptly a report to the Company concerning such transaction and/or payment. The Company hereby authorizes the General Agent to collect payments for losses and loss adjustment expenses from a reinsurer. The General Agent shall send a report to the Company concerning such transactions promptly.

1.08 The General Agent acknowledges that, with respect to any state in which business is permitted to be written under this Agreement, this Agreement shall not become effective until the General Agent is duly appointed by the Company and on file with the insurance department of

2

such state. The General Agent agrees that any producing agent receiving commission pursuant to this Agreement shall first be duly appointed by the Company and said appointment on file with any applicable state insurance department. The General Agent further agrees to be responsible for the payment of any penalty assessed to the Company for any violation by the General Agent or any producing agent or broker appointed by the General Agent pursuant to the provisions of Article IV hereof of any license or appointment provision of the Texas Insurance Code or the rules and regulations promulgated thereunder.

1.09    The authority and limitations of the General Agent to issue policies are as follows:

(a) the maximum annual premium volume the General Agent may produce under this Agreement is $ 8 million.

(b) the basis of the rates charged are as provided in the Company's rate manuals, rate brochures and rate schedules which the General Agent shall follow;

(c) the only classes of business the General Agent is authorized to produce and handle under this Agreement are the classes of business specified in Schedule I hereto;

(d) the maximum limits of liability for policies to be produced pursuant to this Agreement are as follows:

    (1)    Mexican National Private Passenger Automobile Liability

| | | | |
|---|---|---|---|
| (i) | Bodily Injury | $100,066 | each person |
| | | $300,066 | each occurrence |
| (ii) | Property Damage | $ 50,066 | each occurrence |

    (2)    Mexican National Commercial Automobile Liability

| | | |
|---|---|---|
| Combined Single Limit (CSL) | $1,000,066 | each occurrence |
| | $1,000,066 | each policy |

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect plus $66.

(e) the General Agent may issue policies under this Agreement only to domiciled in the State of Texas; but this limitation shall not apply to losses if said policies provide coverage outside the aforesaid territorial limit;

(f) the General Agent shall only cancel policies as set forth in the policy form for the policies produced hereunder or as otherwise permitted by applicable law;

(g) the maximum term for any policy issued hereunder shall be twelve (12) months;

(h) the General Agent shall employ all reasonable and appropriate measures to control and keep a record of the issuance of the Company's insurance policies hereunder, including, but not limited to, keeping records of policy numbers issued and maintaining policy inventories; and

(i) the excluded risks are those set forth in the Reinsurance Agreement.



In underwriting policies, the General Agent shall follow the underwriting guidelines developed by the General Agent and the Company, and these guidelines are herein incorporated by reference.

## ARTICLE II
## PREMIUMS

2.01    It is expressly agreed and understood that all premiums collected by the General Agent are collected on behalf of the Company; that such premiums are the property of the Company and the Reinsurer as their respective interests may appear pursuant to the Reinsurance Agreement, less such commissions and fees as are due the General Agent as specified herein and in the Reinsurance Agreement. All premiums collected by the General Agent on the business produced under this Agreement shall be deposited in a bank account separate and apart from all other bank accounts of the General Agent which reflects ownership of the account by the Company. The only disbursements from such account shall be the payment of claims, claims expenses, return premiums, commission due the General Agent as authorized herein and in the Reinsurance Agreement, remittance of premiums to the Reinsurer. The General Agent shall not make personal use of any funds in this separate account. The commissions payable to the General Agent under the Reinsurance Agreement are debts due to the General Agent by the Reinsurer and the privilege herein granted of deducting commissions from said premiums should not be taken as a waiver by the Company of its exclusive ownership rights of premiums as provided herein. Should any dispute arise between the Company, the Reinsurer and/or the General Agent regarding payment of premium, the General Agent shall remit immediately all money and property, without deductions for commissions, to the segregated account with full reservation of any and all rights reserved by the parties.

2.02    The General Agent shall furnish to the Company and the Reinsurer all necessary premium and loss data (in a form acceptable to the Reinsurer and the Company) no later than thirty (30) days following the end of the month during which the business is written or losses are incurred to enable the Company to record statistics required by statutes, regulation or upon call by authorities having competent jurisdiction. Such data shall include, but is not limited to, premiums written and unearned premium. Said data shall be segregated by lines of insurance and location of risk.

2.03    The keeping of an account with the General Agent on the Company's books as a creditor and debtor account is declared a record memorandum of business transacted and neither such keeping of an account, nor alteration in commission rate, nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account, shall be held to waive assertion of the trust relation as to premiums collected by the General Agent.

2.04    The General Agent shall be liable for the payment of all original and advance premiums upon all policies of insurance written through the General Agent or any sub-agents of the General Agent.

2.05    The General Agent shall remit to the Reinsurer any funds of or due to the Company under this Agreement at the earlier of the following: (1) fifty (50) days from the end of the month in which premium is recorded; or (2) ninety (90) days from the end of the month in which the coverage under this Agreement is issued.

2.06    The General Agent shall hold all funds of or due the Company in a fiduciary capacity.

 

### ARTICLE III
### COMPENSATION TO THE GENERAL AGENT

3.01   In partial compensation for the services rendered hereunder and under the Reinsurance Agreement the General Agent is entitled to the commission payable by the Reinsurer specified in Article XIII at the Reinsurance Agreement.  The General Agent shall pay to the Company ceding fees and premium taxes from the commissions received by the General Agent hereunder and under the Reinsurance Agreement, as more particularly specified in Article XIII of the Reinsurance Agreement. The General Agent shall allow the Company return commission on return premiums at the same rates as received by the General Agent.

3.02   The General Agent's commission on premiums ceded to the Reinsurer is subject to adjustment as specified in Section 13.4 of the Reinsurance Agreement.

3.03   The General Agent shall be allowed to retain all policy and reinstatement fees derived from Policies issued or renewed under the Reinsurance Agreement.

3.04   The Company shall not be liable for or responsible for any commissions or other monies payable by the Reinsurer to the General Agent. The General Agent shall not sue or seek arbitration against the Company for any actions by, or debts owing from, the Reinsurer.

3.05   In the event the Company or the Reinsurer, during the continuance of this Agreement or after its termination, refunds premiums under any policy of insurance by reasons of cancellation or otherwise, the General Agent agrees immediately to return to the Company or the Reinsurer, as applicable, the commission previously received by it on the portion of the premium refunded. The General Agent shall not be required to return, as commission or return commission, monies greater than the total commission paid or otherwise payable to the General Agent.

### ARTICLE IV
### SUB-AGENTS

4.01 The General Agent may appoint such producing agents as shall be reasonably approved by the Reinsurer and the Company.  The General Agent may not terminate the appointment of such agents without the written authorization of the Company.

4.02   The General Agent shall comply with, and shall be responsible to insure the compliance by, all such producing agents with the terms of this Agreement and the Reinsurance Agreement and all other written rules and regulations of the Company, and treat as confidential and use only in the interest of the Company all instructions, information and materials received from the Company.

4.03   The General Agent shall be solely responsible for the performances of any producing agents under all of the terms and provisions hereof, including, but not limited to, the collections of premiums and refunds of premiums.

4.04   Each such producing agent must receive any appointment required by applicable law as an agent of the Company or the General Agent through the appropriate regulatory body of the State of Texas before any application shall be accepted from him or other insurance performances on behalf of the Company are performed. The General Agent shall be ultimately responsible for the obligation of the producing agent to obtain any required appointment as provided herein. The General Agent shall have each producing agent appointed with the Company.

 

4.05   It is also specified that the General Agent shall be responsible for all commissions payable to any producing agents. The General Agent and any producing agent shall not seek to hold the Company liable through litigation, arbitration or otherwise for commissions payable to such producing agents.

4.06   The Company, in its sole discretion with or without cause, and without prior written notice, may terminate the appointment of any producing agent.

### ARTICLE V
### ADDITIONAL DUTIES OF AGENT

5.01   The General Agent shall, at all times during the period of this Agreement, comply with all applicable laws of the states in which it is producing business under this Agreement and all orders, policy decisions or other requirements of the Texas Department of Insurance.

5.02   All books, records, accounts, documents and correspondence of the General Agent and any producing agent pertaining to the Company's and Reinsurer's business shall, at all times, be open to examination by any authorized representative of the Company or Reinsurer. The General Agent shall make copies of records available upon request by the Company or Reinsurer, whether such request is before or after termination of this Agreement or the Reinsurance Agreement. The General Agent must maintain separate records of business, including, but not limited to, underwriting files for each insurer for whom it acts as a general agent pursuant to the Texas Insurance Code, Article 21.07-3, Section 3C(b) or any amendment or successor thereto. Such records must be maintained for five (5) years or until the completion of a financial examination by the insurance department of the state in which the Company is domiciled, whichever is longer.

5.03   The General Agent shall maintain adequate accounting procedures and systems, at no cost or expense to the Company, and shall provide statistics in a timely manner for all reporting requirements under the Reinsurance Agreement or as shall be required from time to time by the regulatory authorities of the State of Texas or any other applicable governmental agency or authority. Such statistical information shall be provided to the Company by the General Agent at the General Agent's sole cost and expense.

5.04   The General Agent shall forward to the Company, no later than the 30th day of the month following the month being accounted for, a report in detail of all policies of Insurance written or placed, or liability increased or decreased, or policies continued or renewed or canceled by or through the General Agent during the month being accounted for, which shall include all premiums due thereon whether collected or not. Such report shall show the net amount due to the Company and Reinsurer on all such business on the lines of business authorized to be written by the General Agent and the amounts paid in losses, loss adjustment expenses and commissions. Such report shall also include, to the extent not already included, both insurance and reinsurance transactions and all transactions pursuant to Texas Insurance Code, Article 21.07-3, Section 3C(a) including:

(a)      statement of written, earned and unearned premiums;

(b)      losses and loss expenses outstanding;

(c)      losses incurred but not reported; and

(d)      any management fees.

The report shall be received by or confirmed to the Company no later than thirty (30) days from the close of the month for which business is reported. The Company shall maintain such account reports on file for at least three (3) years and shall make the account reports available to the Commissioner of Insurance of the State of Texas (the "Commissioner") for review upon request.

5.05   The General Agent shall account for and furnish to the Company, upon request, complete copies of all policies issued, copies of all spoiled, voided or otherwise unissued policies, and copies of all claim files created with respect to all loss occurrences under any policy issued under this Agreement.

5.06   The title of all undelivered policies, books, supplies, or other property related to the reinsured business is in the Company, and these shall be delivered to the Company by the General Agent immediately upon the termination of this Agreement. The General Agent agrees to surrender peaceably the same without compelling the Company to resort to any legal proceedings whatsoever.

5.07   The General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company. The General Agent shall establish and maintain records of any such advertising as required by the applicable laws of the states in which it is doing business.

5.08   The General Agent shall maintain on behalf of the Company and Reinsurer complete copies of all policies issued hereunder and copies of all claim files created with respect to all loss occurrences thereunder. Any or all policies and/or claim files required to be maintained by General Agent pursuant to this Section 5.08 may be maintained in electronic data storage form accessible by computer and if so stored in this fashion, no physical copy of such items need be maintained. Where electronic claims files are maintained by the General Agent, any data from such files requested or required by the Company shall be provided within thirty (30) days or less if so requested by the Company.

5.09   The General Agent shall pay to the Reinsurer the positive balance, if any, no later than forty-five (45) days following the end of the month during which the business was written net written premiums hereunder (being defined as premiums written less return premiums) less the General Agent's commissions and less loss adjustment expenses and loss payments. Should such balance be a negative amount, the Reinsurer shall promptly pay the General Agent upon receipt and verification of the amount due as reported by the General Agent.

5.10   The General Agent shall be solely responsible for procuring any renewal, extension, or new policy of insurance that may be required by any state or rule or regulation of any state insurance department with respect to policies originally written directly for the Company. The General Agent shall indemnify the Company and hold it harmless from any loss, damage, cost, claim or expense whatsoever that the Company may incur, or for which it may become liable, as a result of the said General Agent's failure, refusal or neglect to fulfill said responsibility.

5.11   The General Agent agrees that its duties and obligations under this Agreement shall be due and owing also to the Company's and Reinsurer's successors and assigns.

5.12   Nothing in this Article V shall be construed as requiring the Company to monitor the book of business which is the subject of the Reinsurance Agreement for the benefit of the Reinsurer.

5.13   The Company shall conduct or cause to be conducted a semi-annual examination of the General Agent, on behalf of the Company, in compliance with 28 TAC §19.1204(b)(19). Furthermore, if the Company's aggregate premium volume increases by thirty (30) percent in any

7

thirty (30) day period, the Reinsurer at no expense to the Company, and on behalf of the Company, shall examine or cause to be examined within ninety (90) days the General Agent if it writes more than twenty (20) percent of the Company's volume and has also experienced a twenty (20) percent increase in premium volume during that same thirty (30) day period in compliance with 28 TAC §19.1204(b)(19).

The examinations required under the preceding paragraph shall adequately provide the Commissioner with the information outlined in (a) through (e) below, shall be made available to the Commissioner for review, shall remain on file with the Company for a minimum of three (3) years and shall, at a minimum, contain information concerning the following:

    (a)  claims procedures of the General Agent;

    (b)  timeliness of claims payments by the General Agent (i.e., lag time between date claim is reported and date claim is paid);

    (c)  timeliness of premium reporting and collection by the General Agent;

    (d)  compliance by the General Agent with underwriting guidelines under Section 1.09 hereof; and

    (e)  reconciliation of policy inventory.

5.14    The General Agent shall return any unearned premium due insured or other persons on the business, which is the subject of the Reinsurance Agreement. If for any reason, the General Agent does not return such unearned premium, then the Reinsurer shall pay such amount and/or amounts.

5.15    The General Agent shall be duly licensed as a managing general agent or its equivalent as required under Texas law.

5.16    Should the Texas Department of Insurance make a request to the Company for any data required to comply with a statistical data call, the General Agent shall be solely responsible to provide the Company with such data. Should the request from the Texas Department of Insurance require the Company to contract the services of an outside source, such as an actuarial firm, to compile the data required, the General Agent shall be responsible for its proportionate share of the total cost for services rendered.

## ARTICLE VI
## TERM AND TERMINATION

6.01    The effective date of this Agency Agreement is 12:01 a.m., Central Standard Time, on March 1, 1999, and shall remain continuously in force unless canceled as follows:

    (a)  This Agreement may be canceled by either party giving at least ninety (90) days prior written notice to the other party. Notice shall be provided by registered mail, return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

    (b)  Immediately by mutual consent of the Company and General Agent.

    (c)  At any time, by the Company, without prior notice in the event at the General Agent declaring bankruptcy or being declared or found bankrupt or insolvent, or being the

8

subject of a cease and desist order, corrective order, or being placed in, or subject to, a proceeding of supervision, conservation, rehabilitation or liquidation.

(d) Immediately upon written notice by the Company in the event of the cancellation or non-renewal of the General Agent's license by the Texas Department of Insurance.

(e) Immediately upon written notice by the General Agent in the event any action against the Company is commenced by Texas Department of Insurance or other applicable state insurance department pursuant to rehabilitation or liquidation. The Company agrees to furnish notice of such action immediately to the General Agent.

(f) If the General Agent shall default in making remittance for net premiums then this Agreement shall be terminated according to the terms provided in Section 4.5(d) of the Reinsurance Agreement.

(g) If the General Agent shall defraud or attempt to defraud the Company; or any policyholder, then the Company may at its sole discretion cancel this contract by giving the General Agent written notice of cancellation served personally or by mail, which shall be effective immediately.

(h) Automatically and immediately, without notice upon cancellation or termination of the Reinsurance Agreement.

(i) Automatically and immediately, without notice upon cancellation or termination of the Reinsurance Agreement, including, but not limited to, termination of the Reinsurance Agreement by the Company as provided in Section 4.5(g) of the Reinsurance Agreement.

6.02   This Agreement shall automatically become renewed from year to year upon the renewal of the license or certificate of authority granted to the Company by the Texas Department of Insurance, provided this Agreement shall not be otherwise canceled.

6.03   It is expressly agreed and understood that nothing in this Article VI authorizes the General Agent to write any new business under this Agreement should the Reinsurance Agreement terminate, except the business that is required to be renewed or issued because of applicable law or regulation, as provided in Article IV of the Reinsurance Agreement.

6.04   The Company shall have no liability to the General Agent by virtue of the Company's termination of this Agreement as set forth in this Article; it being expressly understood that partial consideration for the Company's grant of agency authority to the General Agent is the General Agent's promise that the Company shall not be responsible for any damages which might arise by virtue of any termination of this Agreement.

6.05   In the event of termination of this Agreement, after the General Agent having promptly accounted for and paid over premiums for which it may be liable, the General Agent's records, use and control of expirations shall remain the property of the General Agent and left in its undisputed possession.

6.06   In the event that this Agreement is terminated, the General Agent, for no additional fee, shall have the authority (unless revoked by the Company for cause in which case the Reinsurer shall appoint a successor at no cost to the Company) as provided in this Agreement to continue to perform all of its duties under this Agreement on the remaining policies during the run-off period. The General Agent's duties during the run-off period shall include handling and servicing of all policies through their natural expiration, together with any policy renewals required to be made by the provisions of applicable law, whether or not the effective date of such renewal is subsequent to

9

the effective date of cancellation of this Agreement. Further, upon termination of this Agreement, the General Agent shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to the outstanding insurance business under this Agreement existing on the date at such termination. The Company and the General Agent will cooperate in handling all such business until the business has expired either by cancellation or by the terms of the policies and all outstanding losses and loss adjustment expenses have been settled.

6.07    As the Reinsurance Agreement provides for termination on a run-off basis, the relevant provisions of this Agreement shall apply to business being run-off. It is also expressly agreed that the terms, conditions and obligations of the Preamble and Articles I, II, IV and V, Sections 6.04, 6.05, 6.06, 6.07 and 6.08, Article VII, Article VIII and Sections 9.02, 9.06, 9.07, 9.10 and 9.11 herein shall survive termination of this Agreement.

6.08 The Company may suspend the authority of the General Agent during the pendency of any dispute regarding any event of default by the General Agent.

**ARTICLE VII**
**HOLD HARMLESS AND INDEMNIFICATION**

The General Agent agrees to and does hereby indemnify and hold the Company harmless from and against any and all actions, causes of actions, suits, arbitrations, or proceedings of any kind, liabilities, losses, claims, damages, costs, or expenses (including attorneys' fees and expenses), incurred by the Company by reason of, arising out of, or relating in any way to this Agreement or any action taken or inaction by the General Agent in breach of the terms of this Agreement or the terms of the Reinsurance Agreement, or which is not in full compliance therewith.

**ARTICLE VIII**
**ARBITRATION**

8.1    As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising between the Company, on the one hand, and the General Agent, on the other hand, with respect to this Agreement or with respect to the General Agent's and/or the Company's obligations hereunder, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

8.2    The Company shall choose one arbiter (an "Arbiter") and the General Agent shall choose one Arbiter. An umpire (an "Umpire") shall be chosen by the two Arbiters, all of whom shall be active or retired, disinterested executive officers of property and casualty insurance or reinsurance companies.

8.3    Both the General Agent and the Company shall choose an Arbiter within 30 days following a written request by one party to the other to name an Arbiter. In the event either the Company or the General Agent fails to choose an Arbiter within this time period, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. if the Arbiters fail to agree upon the selection for the Umpire within 30 days following their appointment, each Arbiter shall name three nominees, of whom the other shall decline two and the decision shall be made by drawing lots.

8.4    Each side shall present its case to the Arbiters and Umpire, in a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the

Arbiters and Umpire when filed with the Company and the General Agent shall be final and binding. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

8.5    In the event of a dispute between the Company and the General Agent concerning this Agreement and the Quota Share Reinsurance Agreement between the Company and the Reinsurer, regardless of whether either party has claims against the Reinsurer, the entire dispute between the Company and the General Agent shall be subject to arbitration as provided under this Article VIII.

8.6    The costs of the arbitration, including the fees of the Arbiters and the Umpire, shall be borne equally by the sides unless the Arbiters and Umpire shall decide otherwise.

8.7    This Agreement shall be interpreted under the laws of Texas and the arbitration shall be governed by the Texas General Arbitration Act.

### ARTICLE IX
### T.B.A. INSURANCE

The Company has contracted with T.B.A. Insurance, Inc. ("TBA") to perform certain duties on the Company's behalf and to issue certain checks on behalf of the Company in exchange for certain fees. The General Agent and Reinsurer agree that TBA is to bear no business, credit or insurance risk and no liability whatsoever to the General Agent. TBA shall be and is hereby granted all protections from, and indemnities against, all liabilities contained herein for the benefit of the Company.

### ARTICLE X
### MISCELLANEOUS

10.01    This Agreement has been made and entered into in the State of Texas and shall be governed by and construed in accordance with the laws of the State of Texas.

10.02    This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns.

10.03    This Agreement is not exclusive and the Company reserves the right to appoint other agents in the territory covered by this Agreement and the General Agent reserves the right to act as General Agent for other insurers or reinsurers.

10.04    The Company shall have no right of control over the General Agent as to time, means or manner of the General Agent's conduct within the terms of the Agreement and the Reinsurance Agreement and the authority herein granted and nothing herein is intended or shall be deemed to constitute the General Agent an employee or servant of the Company. The General Agent shall at all times be an independent contractor.

10.05    This Agreement shall be deemed performable at the Company's administrative office in Fort Worth, Texas, and it is agreed that the venue of any controversy arising out of this Agreement, or for the breach thereof, shall be in Dallas County, Texas.

10.06    The General Agent shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company. No verbal modification will be recognized by any party hereto and this Agreement cannot be modified by any subsequent practices or course of dealing by the parties inconsistent herewith. If the Company or the General Agent shall fail to take

advantage of a breach, if any, by another party of the terms, conditions, covenants, or any of them herein contained, such failure shall not be deemed to constitute, or be construed as, a waiver of any rights on the part of the General Agent or Company to thereafter enforce any of the said terms, conditions or covenants.

10.07 This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto. All such amendments or changes shall specify the effective date of such amendments or changes.

10.08 This Agreement supersedes any and all provisions, terms and/or conditions of any other general agency agreements, whether oral or written, by between and among the parties.

10.09 The General Agent shall notify the Company in writing within thirty (30) days when there is a change in the ownership of 10% or more of the outstanding stock in the General Agent or when there is any change in the General Agent's principal officers or directors.

10.10 The General Agent shall not offset balances due under this Agreement against balances due or owing under any other contract.

10.11 This Agreement shall be interpreted in conformance with applicable Texas law and regulation. If it is found or ordered by a court or regulatory body that any provision or term of this Agreement does not conform to such law or regulation then this Agreement shall be deemed to be amended, and modified to be in accordance with such law. However, where this Agreement is found not to comply with applicable law or regulations, the Company may in its sole discretion terminate this Agreement immediately and without prior notice.

IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above written.

DATED: _____  STATE AND COUNTY MUTUAL FIRE
              INSURANCE COMPANY

              BY: _____

              ITS: _____


DATED: _____  INTERNATIONAL UNDERWRITERS GENERAL
              AGENCY, INC.

              BY: _____

              ITS: _____

Y:\COMPLIANCE\Private\Miriam\AGREMENT\MGA\IntlUndwrtr\agcyscm.doc

12



Schedule I

The Term "Business" and/or "line of business" as used in the attached Quota Share Reinsurance Agreement shall mean:

Mexican National Private Passenger Liability Policies covering private passenger automobiles principally garaged and registered in the Republic of Mexico which includes:

    a.   Liability

Mexican National Commercial Vehicle Liability Policies covering commercial vehicles principally garaged and registered in the Republic of Mexico which includes:

    a.   Liability



## GENERAL AGENCY AGREEMENT

THIS GENERAL AGENCY AGREEMENT (this "Agreement") is made and entered into as of March 1, 1999, by and between STATE NATIONAL INSURANCE COMPANY, INC., an insurance company organized under the laws of the State of Texas ("Company") and INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., a corporation organized under the laws of the State of Texas ("General Agent");

## W I T N E S S E T H :

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

## PREAMBLE

The Company and the Subscribing Reinsurers ("Reinsurer"), have entered into that certain Quota Share Reinsurance Agreement dated as of March 1, 1999, a true and complete copy of which is attached hereto as Exhibit A and fully incorporated herein by this reference (the "Reinsurance Agreement"), which Reinsurance Agreement requires the appointment of the General Agent to perform certain specified acts on behalf of the Company and Reinsurer. The General Agent desires to perform the functions and duties necessary under the Reinsurance Agreement. It is therefore mutually agreed by the parties that the General Agent will perform all functions necessary for the production, service and management of policies reinsured under the Reinsurance Agreement in accordance with the terms and conditions set forth therein and herein. To the extent that there is any conflict between the terms of this Agreement and the Reinsurance Agreement, the Reinsurance Agreement shall govern. Notwithstanding any provisions to the contrary contained elsewhere herein or in any other document, it is expressly understood that the execution and delivery of this Agreement and the Company's performance hereunder shall not under any circumstances be interpreted to affect, weaken or modify the Reinsurer's obligation to indemnify and hold the Company harmless from and against the business, credit and insurance risks as set forth in the Reinsurance Agreement. The contractual assumption by the Reinsurer of these risks in the Reinsurance Agreement is a condition precedent to the Company's entering into this Agreement with the General Agent.

## ARTICLE I
## APPOINTMENT AND DUTIES

1.01  The Company hereby appoints the General Agent as its managing general agent for the purpose of producing and handling the business which is the subject of the Reinsurance Agreement issued or renewed on or after the effective date of this Agreement. The Company hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in Schedule I hereof; to secure, at its own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign policies, certificates, endorsements and binders which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

1.02  All activities of the General Agent pursuant to this Agreement shall be in strict compliance with the terms of the Reinsurance Agreement and all rules, regulations and instructions of the Company, including, but not limited to, all rules, instructions and specifications included in the Company's rate manuals, rate brochures and rate schedules.



EXHIBIT
**2**



1.03  The Company further authorizes the General Agent to perform all acts and duties under policies of insurance issued by the Company as would otherwise be performed by the Company, including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to the Company, and adjusting and paying losses or other claims. The Company grants to the General Agent the authority to settle claims on behalf of the Company.  However, the maximum dollar amount of such authority per claim shall not exceed $30,000.  For claims settlements in excess of $30,000, the General Agent may only settle such claims with prior approval of the Company and Reinsurer.  Additionally, the General Agent must obtain the Reinsurer's prior approval for claims settlements in excess of the policy limits set forth in Section 1.09 hereof.  The Company retains final authority to determine any disputes relating to claims settlement and setting of loss reserves.   Should the Company be ordered or instructed by the Texas Department of Insurance or any other regulatory agency of competent jurisdiction to take any action or refrain from taking any action with regard to any claim, the General Agent shall be bound by and shall follow the order or instructions of such regulatory agency as though General Agent were the object of such order or instruction.  The General Agent will exercise the authority granted hereunder in good faith and toward the end of paying any and all valid claims.  The General Agent must send to the Company a report, within thirty (30) days of determination, that a claim (i) involves a coverage dispute; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) alleges a violation of the Texas Deceptive Trade Practices Act or other similar applicable statute; or (v) alleges a violation of the Texas Insurance Code, Article 21.21 (Unfair Competition and Unfair Practices) or other similar applicable statutes.

1.04   The General Agent is authorized to have claims adjusted through independent claims adjusters.  The selection of independent claims adjusters shall be subject to prior written approval of the Company.

1.05  The Company shall not be responsible for the General Agent's expenses and costs, including, but not limited to, salaries, bonuses, rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, exchange, personal license fees, adjustment by the General Agent of losses under policies issued by the General Agent, or any other agency expenses whatsoever.  The General Agent's sole compensation shall be the amounts payable to the General Agent in Article XIV of the Reinsurance Agreement and in Article III of this Agreement.

1.06  The General Agent understands and agrees that it has no power or authority granted to it by the Company independent of the Reinsurance Agreement, and that this Agreement and the General Agent's authority hereunder shall cease immediately upon termination, for any reason, of this Agreement or of the Reinsurance Agreement (excepting only the General Agent's responsibilities with regard to run-off and other matters as set forth herein or in the Reinsurance Agreement).

1.07  The General Agent shall not have the power to accept or bind risks other than as set forth herein or as may be subsequently authorized by the Company in writing.  The General Agent may not bind or cede reinsurance or retrocession on behalf of the Company, may not commit the Company to participation in insurance or reinsurance syndicates, and may not commit the Company to a claim settlement with a reinsurer without the prior written approval of the Company.  If such prior written approval is given, the General Agent shall forward promptly a report to the Company concerning such transaction and/or payment.  The Company hereby authorizes the General Agent to collect payments for losses and loss adjustment expenses from a reinsurer.  The General Agent shall send a report to the Company concerning such transactions promptly.

1.08 The General Agent acknowledges that, with respect to any state in which business is permitted to be written under this Agreement, this Agreement shall not become effective until the General

-2-



Agent is duly appointed by the Company and on file with the insurance department of such state. The General Agent agrees that any producing agent receiving commission pursuant to this Agreement shall first be duly appointed by the Company and said appointment on file with any applicable state insurance department. The General Agent further agrees to be responsible for the payment of any penalty assessed to the Company for any violation by the General Agent or any producing agent or broker appointed by the General Agent pursuant to the provisions of Article IV hereof of any license or appointment provision of the Texas Insurance Code or the rules and regulations promulgated thereunder.

1.09  The authority and limitations of the General Agent to issue policies are as follows:

(a) the maximum annual premium volume the General Agent may produce under this Agreement is $8 million.

(b) the basis of the rates charged are as provided in the Company's rate manuals, rate brochures and rate schedules which the General Agent shall follow;

(c) the only classes of business the General Agent is authorized to produce and handle under this Agreement are the classes of business specified in Schedule I hereto;

(d) the maximum limits of liability for policies to be produced pursuant to this Agreement are as follows:

(1)  Mexican National Private Passenger Automobile Liability

| (i) | Bodily Injury | $100,000 | each person |
| | | $300,000 | each occurrence |
| (ii) | Property Damage | $ 50,000 | each occurrence |

(2)  Mexican National Commercial Automobile Liability

| Combined Single Limit (CSL) | $1,000,000 | each occurrence |
| | $1,000,000 | each policy |

(e) the General Agent may issue policies under this Agreement only to insureds resident in the states in which business is permitted to be produced under Schedule I; but this limitation shall not apply to losses if said policies provide coverage outside the aforesaid territorial limit;

(f) the General Agent shall only cancel policies as set forth in the policy form for the policies produced hereunder or as otherwise permitted by applicable law;

(g) the maximum term for any policy issued hereunder shall be twelve (12) months; and

(h) the General Agent shall employ all reasonable and appropriate measures to control and keep a record of the issuance of the Company's insurance policies hereunder, including, but not limited to, keeping records of policy numbers issued and maintaining policy inventories.

In underwriting policies, the General Agent shall follow the underwriting guidelines developed by the General Agent and the Company, and these guidelines are herein incorporated by reference.



## ARTICLE II
## PREMIUMS

2.01  It is expressly agreed and understood that all premiums collected by the General Agent are collected on behalf of the Company; that such premiums are the property of the Company and the Reinsurer as their respective interests may appear pursuant to the Reinsurance Agreement, less such commissions and fees as are due the General Agent as specified herein and in the Reinsurance Agreement. All premiums collected by the General Agent on the business produced under this Agreement shall be deposited in a bank account separate and apart from all other bank accounts of the General Agent which reflects ownership of the account by the Company. The only disbursements from such account shall be the payment of claims, claims expenses, return premiums, commission due the General Agent as authorized herein and in the Reinsurance Agreement, remittance of premiums to the Reinsurer and the Company and payment of premiums, on behalf of the Company, under the related Excess Stop Loss Reinsurance Agreement dated effective March 1, 1999, by and between the Company and the Reinsurer (the "Stop Loss Agreement"). The General Agent shall not make personal use of any funds in this separate account. The commissions payable to the General Agent under the Reinsurance Agreement are debts due to the General Agent by the Reinsurer and the privilege herein granted of deducting commissions from said premiums should not be taken as a waiver by the Company of its exclusive ownership rights of premiums as provided herein. Should any dispute arise between the Company, the Reinsurer and/or the General Agent regarding payment of premium, the General Agent shall remit immediately all money and property, without deductions for commissions, to the segregated account with full reservation of any and all rights reserved by the parties.

2.02  The General Agent shall furnish to the Company and the Reinsurer all necessary premium and loss data (in a form acceptable to the Reinsurer and the Company) no later than thirty (30) days following the end of the month during which the business is written or losses are incurred to enable the Company to record statistics required by statutes, regulation or upon call by authorities having competent jurisdiction. Such data shall include, but is not limited to, premiums written and unearned premium. Said data shall be segregated by lines of insurance and location of risk.

2.03  The keeping of an account with the General Agent on the Company's books as a creditor and debtor account is declared a record memorandum of business transacted and neither such keeping of an account, nor alteration in commission rate, nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account, shall be held to waive assertion of the trust relation as to premiums collected by the General Agent.

2.04  The General Agent shall be liable for the payment of all original and advance premiums upon all policies of insurance written through the General Agent or any sub-agents of the General Agent.

2.05  The General Agent shall remit to the Reinsurer any funds of or due to the Company under this Agreement at the earlier of the following: (1) fifty (50) days from the end of the month in which premium is recorded; or (2) ninety (90) days from the end of the month in which the coverage under this Agreement is issued.

2.06  The General Agent shall hold all funds of or due the Company in a fiduciary capacity.



### ARTICLE III
### COMPENSATION TO THE GENERAL AGENT

3.01    In partial compensation for the services rendered hereunder and under the Reinsurance Agreement the General Agent is entitled to the commission payable by the Reinsurer specified in Article XI at the Reinsurance Agreement. The General Agent shall pay to the Company ceding fees and premium taxes from the commissions received by the General Agent hereunder and under the Reinsurance Agreement, as more particularly specified in Article XI of the Reinsurance Agreement. The General Agent shall allow the Company return commission on return premiums at the same rates as received by the General Agent.

3.02    The General Agent's commission on premiums ceded to the Reinsurer is subject to adjustment as specified in Section 14.3 of the Reinsurance Agreement.

3.03    The General Agent shall be allowed to retain all policy and reinstatement fees derived from Policies issued or renewed under the Reinsurance Agreement.

3.04    The Company shall not be liable for or responsible for any commissions or other monies payable by the Reinsurer to the General Agent. The General Agent shall not sue or seek arbitration against the Company for any actions by, or debts owing from, the Reinsurer.

3.05    In the event the Company or the Reinsurer, during the continuance of this Agreement or after its termination, refunds premiums under any policy of insurance by reasons of cancellation or otherwise, the General Agent agrees immediately to return to the Company or the Reinsurer, as applicable, the commission previously received by it on the portion of the premium refunded. The General Agent shall not be required to return, as commission or return commission, monies greater than the total commission paid or otherwise payable to the General Agent.

### ARTICLE IV
### SUB-AGENTS

4.01    The General Agent shall comply with, and shall be responsible to insure the compliance by, all such producing agents with the terms of this Agreement and the Reinsurance Agreement and all other written rules and regulations of the Company, and treat as confidential and use only in the interest of the Company all instructions, information and materials received from the Company.

4.02    The General Agent shall be solely responsible for the performances of any producing agents under all of the terms and provisions hereof, including, but not limited to, the collections of premiums and refunds of premiums.

4.03    Each such producing agent must receive any appointment required by applicable law as an agent of the Company or the General Agent through the appropriate regulatory body of the State of Texas before any application shall be accepted from him or other insurance performances on behalf of the Company are performed. The General Agent shall be ultimately responsible for the obligation of the producing agent to obtain any required appointment as provided herein.

4.04    It is also specified that the General Agent shall be responsible for all commissions payable to any producing agents. The General Agent and any producing agent shall not seek to hold the Company liable through litigation, arbitration or otherwise for commissions payable to such producing agents.

4.05   The Company, in its sole discretion with or without cause, and without prior written notice, may terminate the appointment of any producing agent.

## ARTICLE V
## ADDITIONAL DUTIES OF AGENT

5.01  The General Agent shall, at all times during the period of this Agreement, comply with all applicable laws of the states in which it is producing business under this Agreement and all orders, policy decisions or other requirements of the corresponding state insurance departments.

5.02  All books, records, accounts, documents and correspondence of the General Agent and any producing agent pertaining to the Company's and Reinsurer's business shall, at all times, be open to examination by any authorized representative of the Company or Reinsurer. The General Agent shall make copies of records available upon request by the Company or Reinsurer, whether such request is before or after termination of this Agreement or the Reinsurance Agreement. The General Agent must maintain separate records of business, including, but not limited to, underwriting files for each insurer for whom it acts as a general agent pursuant to the Texas Insurance Code, Article 21.07-3, Section 3C(b) or any amendment or successor thereto. Such records must be maintained for five (5) years or until the completion of a financial examination by the insurance department of the state in which the Company is domiciled, whichever is longer.

5.03  The General Agent shall maintain adequate accounting procedures and systems, at no cost or expense to the Company, and shall provide statistics in a timely manner for all reporting requirements under the Reinsurance Agreement or as shall be required from time to time by the regulatory authorities of the State of Texas or any other applicable governmental agency or authority. Such statistical information shall be provided to the Company by the General Agent at the General Agent's sole cost and expense.

5.04  The General Agent shall forward to the Company, no later than the 30th day of the month following the month being accounted for, a report in detail of all policies of insurance written or placed, or liability increased or decreased, or policies continued or renewed or canceled by or through the General Agent during the month being accounted for, which shall include all premiums due thereon whether collected or not. Such report shall show the net amount due to the Company and Reinsurer on all such business on the lines of business authorized to be written by the General Agent and the amounts paid in losses, loss adjustment expenses and commissions. Such report shall also include, to the extent not already included, both insurance and reinsurance transactions and all transactions pursuant to Texas Insurance Code, Article 21.07-3, Section 3C(a) including:

     (i)     statement of written, earned and unearned premiums;

     (ii)    losses and loss expenses outstanding;

     (iii)   losses incurred but not reported; and

     (iv)   any management fees.

The report shall be received by or confirmed to the Company no later than thirty (30) days from the close of the month for which business is reported. The Company shall maintain such account reports on file for at least three (3) years and shall make the account reports available to the Commissioner of Insurance of the State of Texas (the "Commissioner") for review upon request.



5.05 The General Agent shall account for and furnish to the Company, upon request, complete copies of all policies issued, copies of all spoiled, voided or otherwise unissued policies, and copies of all claim files created with respect to all loss occurrences under any policy issued under this Agreement.

5.06 The title of all undelivered policies, books, supplies, or other property related to the reinsured business is in the Company, and these shall be delivered to the Company by the General Agent immediately upon the termination of this Agreement. The General Agent agrees to surrender peaceably the same without compelling the Company to resort to any legal proceedings whatsoever.

5.07 The General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company. The General Agent shall establish and maintain records of any such advertising as required by the applicable laws of the states in which it is doing business.

5.08 The General Agent shall maintain on behalf of the Company and Reinsurer complete copies of all policies issued hereunder and copies of all claim files created with respect to all loss occurrences thereunder. Any or all policies and/or claim files required to be maintained by General Agent pursuant to this Section 5.08 may be maintained in electronic data storage form accessible by computer and if so stored in this fashion, no physical copy of such items need be maintained. Where electronic claims files are maintained by the General Agent, any data from such files requested or required by the Company shall be provided within thirty (30) days or less if so requested by the Company.

5.09 The General Agent shall pay to the Reinsurer the positive balance, if any, no later than forty five (45) days following the end of the month during which the business was written net written premiums hereunder (being defined as premiums written less return premiums) less the General Agent's commissions and less loss adjustment expenses and loss payments. Should such balance be a negative amount, the Reinsurer shall promptly pay the General Agent upon receipt and verification of the amount due as reported by the General Agent.

5.10 The General Agent shall be solely responsible for procuring any renewal, extension, or new policy of insurance that may be required by any state or rule or regulation of any state insurance department with respect to policies originally written directly for the Company. The General Agent shall indemnify the Company and hold it harmless from any loss, damage, cost, claim or expense whatsoever that the Company may incur, or for which it may become liable, as a result of the said General Agent's failure, refusal or neglect to fulfill said responsibility.

5.11 The General Agent agrees that its duties and obligations under this Agreement shall be due and owing also to the Company's and Reinsurer's successors and assigns.

5.12 Nothing in this Article V shall be construed as requiring the Company to monitor the book of business which is the subject of the Reinsurance Agreement for the benefit of the Reinsurer.

5.13 The Company shall conduct or cause to be conducted a semi-annual examination of the General Agent, on behalf of the Company, in compliance with 28 TAC · 19.1204(b)(19). Furthermore, if the Company's aggregate premium volume increases by thirty (30) percent in any thirty (30) day period, the Reinsurer at no expense to the Company, and on behalf of the Company, shall examine or cause to be examined within ninety (90) days the General Agent if it writes more than twenty (20) percent of the Company's volume and has also experienced a twenty (20) percent

increase in premium volume during that same thirty (30) day period in compliance with 28 TAC ' 19.1204(b)(19).

The examinations required under the preceding paragraph shall adequately provide the Commissioner with the information outlined in (a) through (e) below, shall be made available to the Commissioner for review, shall remain on file with the Company for a minimum of three (3) years and shall, at a minimum, contain information concerning the following:

    (a)    claims procedures of the General Agent;

    (b)    timeliness of claims payments by the General Agent (i.e., lag time between date claim is reported and date claim is paid);

    (c)    timeliness of premium reporting and collection by the General Agent;

    (d)    compliance by the General Agent with underwriting guidelines under Section 1.09 hereof; and

    (e)    reconciliation of policy inventory.

5.14 The General Agent shall return any unearned premium due insured or other persons on the business which is the subject of the Reinsurance Agreement; if for any reason, the General Agent does not return such unearned premium, then the Reinsurer shall pay such amount and/or amounts.

5.15 The General Agent shall be duly licensed as a managing general agent or its equivalent as required under applicable law.

5.16 Should any state insurance department make a request to the Company for any data required to comply with a statistical data call, the General Agent shall be solely responsible to provide the Company with such data. Should the request from such state insurance department require the Company to contract the services of an outside source, such as an actuarial firm, to compile the data required, the General Agent shall be responsible for its proportionate share of the total cost for services rendered.

## ARTICLE VI
## TERM AND TERMINATION

6.01 The effective date of this Agency Agreement is 12:01 a.m., Central Standard Time, on March 1, 1999, and shall remain continuously in force unless canceled as follows:

    (a)    This Agreement may be canceled by either party giving at least ninety (90) days prior written notice to the other party. Notice shall be provided by registered mail, return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

    (b)    Immediately by mutual consent of the Company and General Agent.

    (c)    At any time, by the Company, without prior notice in the event of the General Agent declaring bankruptcy or being declared or found bankrupt or insolvent, or being the subject of a cease and desist order, corrective order, or being placed in, or subject to, a proceeding of supervision, conservation, rehabilitation or liquidation.



(d)      Immediately upon written notice by the Company in the event of the cancellation or non-renewal of the General Agent's license by the Texas Department of Insurance.

(e)      Immediately upon written notice by the General Agent in the event any action against the Company is commenced by Texas Department of Insurance or other applicable state insurance department pursuant to rehabilitation or liquidation.  The Company agrees to furnish notice of such action immediately to the General Agent.

(f)      If the General Agent shall default in making remittance for net premiums then this Agreement shall be terminated according to the terms provided in Section 4.5(b) of the Reinsurance Agreement.

(g)      If the General Agent shall defraud or attempt to defraud the Company; or any policyholder, then the Company may at its sole discretion cancel this contract by giving the General Agent written notice of cancellation served personally or by mail, which shall be effective immediately.

(h)      Automatically and immediately, without notice upon cancellation or termination of the Reinsurance Agreement or the Stop Loss Agreement.

6.02 This Agreement shall automatically become renewed from year to year upon the renewal of the license or certificate of authority granted to the Company by the Texas Department of Insurance, provided this Agreement shall not be otherwise canceled.

6.03  It is expressly agreed and understood that nothing in this Article VI authorizes the General Agent to write any new business under this Agreement should the Reinsurance Agreement terminate, except the business that is required to be renewed or issued because of applicable law or regulation, as provided in Section 4.3 of the Reinsurance Agreement.

6.04   The Company shall have no liability to the General Agent by virtue of the Company's termination of this Agreement as set forth in this Article; it being expressly understood that partial consideration for the Company's grant of agency authority to the General Agent is the General Agent's promise that the Company shall not be responsible for any damages which might arise by virtue of any termination of this Agreement.

6.05   In the event of termination of this Agreement, after the General Agent having promptly accounted for and paid over premiums for which it may be liable, the General Agent's records, use and control of expirations shall remain the property of the General Agent and left in its undisputed possession.

6.06  In the event that this Agreement is terminated, the General Agent, for no additional fee, shall have the authority (unless revoked by the Company for cause in which case the Reinsurer shall appoint a successor at no cost to the Company) as provided in this Agreement to continue to perform all of its duties under this Agreement on the remaining policies during the run-off period.  The General Agent's duties during the run-off period shall include handling and servicing of all policies through their natural expiration, together with any policy renewals required to be made by the provisions of applicable law, whether or not the effective date of such renewal is subsequent to the effective date of cancellation of this Agreement.  Further, upon termination of this Agreement, the General Agent shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to the outstanding insurance business under this Agreement existing on the date of such termination.  The

Company and the General Agent will cooperate in handling all such business until the business has expired either by cancellation or by the terms of the policies and all outstanding losses and loss adjustment expenses have been settled.

6.07  As the Reinsurance Agreement provides for termination on a run-off basis, the relevant provisions of this Agreement shall apply to business being run-off. It is also expressly agreed that the terms, conditions and obligations of the Preamble and Articles I, II, IV and V, Sections 6.04, 6.05, 6.06, 6.07 and 6.08, Article VII, Article VIII and Section 9.11 herein shall survive termination of this Agreement.

6.08  The Company may suspend the authority of the General Agent during the pendency of any dispute regarding any event of default by the General Agent.

**ARTICLE VII**
**HOLD HARMLESS AND INDEMNIFICATION**

The General Agent agrees to and does hereby indemnify and hold the Company harmless from and against any and all actions, causes of actions, suits, arbitrations, or proceedings of any kind, liabilities, losses, claims, damages, costs, or expenses (including attorneys' fees and expenses), incurred by the Company by reason of, arising out of, or relating in any way to this Agreement or any action taken or inaction by the General Agent in breach of the terms of this Agreement or the terms of the Reinsurance Agreement, or which is not in full compliance therewith.

**ARTICLE VIII**
**ARBITRATION**

8.1  As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising between the Company, on the one hand, and the General Agent, on the other hand, with respect to this Agreement or with respect to the General Agent's and/or the Company's obligations hereunder, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

8.2  The Company shall choose one arbiter (an "Arbiter") and the General Agent shall choose one Arbiter. An umpire (an "Umpire") shall be chosen by the two Arbiters, all of whom shall be active or retired disinterested executive officers of property and casualty insurance or reinsurance companies.

8.3  Both the General Agent and the Company shall choose an Arbiter within 30 days following a written request by one party to the other to name an Arbiter. In the event either the Company or the General Agent fails to choose an Arbiter within this time period, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within 30 days following their appointment, each Arbiter shall name three nominees, of whom the other shall decline two and the decision shall be made by drawing lots.

8.4  Each side shall present its case to the Arbiters and Umpire, in a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Company and the General Agent shall be final and binding.



Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

8.5    In the event of a dispute between the Company and the General Agent concerning this Agreement and the Quota Share Reinsurance Agreement between the Company and the Reinsurer, regardless of whether either party has claims against the Reinsurer, the entire dispute between the Company and the General Agent shall be subject to arbitration as provided under this Article VIII.

8.6    The costs of the arbitration, including the fees of the Arbiters and the Umpire, shall be borne equally by the sides unless the Arbiters and Umpire shall decide otherwise.

8.7    This Agreement shall be interpreted under the laws of Texas and the arbitration shall be governed by the Texas General Arbitration Act.

## ARTICLE IX
## MISCELLANEOUS

9.01  This Agreement has been made and entered into in the State of Texas and shall be governed by and construed in accordance with the laws of the State of Texas.

9.02  This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns.

9.03  This Agreement is not exclusive and the Company reserves the right to appoint other agents in the territory covered by this Agreement and the General Agent reserves the right to act as General Agent for other insurers or reinsurers.

9.04  The Company shall have no right of control over the General Agent as to time, means or manner of the General Agent's conduct within the terms of the Agreement and the Reinsurance Agreement and the authority herein granted and nothing herein is intended or shall be deemed to constitute the General Agent an employee or servant of the Company. The General Agent shall at all times be an independent contractor.

9.05  This Agreement shall be deemed performable at the Company's administrative office in Fort Worth, Texas, and it is agreed that the venue of any controversy arising out of this Agreement, or for the breach thereof, shall be in Tarrant County, Texas.

9.06  The General Agent shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company. No verbal modification will be recognized by any party hereto and this Agreement cannot be modified by any subsequent practices or course of dealing by the parties inconsistent herewith. If the Company or the General Agent shall fail to take advantage of a breach, if any, by another party of the terms, conditions, covenants, or any of them herein contained, such failure shall not be deemed to constitute, or be construed as, a waiver of any rights on the part of the General Agent or Company to thereafter enforce any of the said terms, conditions or covenants.

9.07  This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto. All such amendments or changes shall specify the effective date of such amendments or changes.

-11-

9.08  This Agreement supersedes any and all provisions, terms and/or conditions of any other general agency agreements, whether oral or written, by between and among the parties.

9.09  The General Agent shall notify the Company in writing within thirty (30) days when there is a change in the ownership of 10% or more of the outstanding stock in the General Agent or when there is any change in the General Agent's principal officers or directors.

9.10  The General Agent shall not offset balances due under this Agreement against balances due or owing under any other contract.

9.11  This Agreement shall be interpreted in conformance with applicable Texas law and regulation. If it is found or ordered by a court or regulatory body that any provision or term of this Agreement does not conform to such law or regulation then this Agreement shall be deemed to be amended, and modified to be in accordance with such law.


          IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above written.


DATED:_____          STATE NATIONAL INSURANCE COMPANY, INC.


                                       BY:_____

                                       ITS:_____


DATED:_____          INTERNATIONAL  UNDERWRITERS  GENERAL
                                       AGENCY, INC.


                                       BY:_____

                                       ITS:_____

Y:\COMPLIANCE\Private\Miriam\AGREEMENT\NGOA\AccessYGncagcyt wpd

-12-

**Schedule I**

The Term "Business" and/or "line of business" as used in the attached Quota Share Reinsurance Agreement shall mean:

Mexican National Private Passenger Liability Policies covering private passenger automobiles principally garaged and registered in the Republic of Mexico which includes:

    a. Liability

Mexican National Commercial Vehicle Liability Policies covering commercial vehicles principally garaged and registered in the Republic of Mexico which includes:

    a. Liability

## INTERESTS AND LIABILITIES CONTRACT

of

**KEMPER REINSURANCE COMPANY**
Long Grove, Illinois
(hereinafter referred to as the "SUBSCRIBING REINSURER")

attached to and forming part of the

**QUOTA SHARE
REINSURANCE CONTRACT**
Effective: March 1, 1999

issued to and duly executed by

**STATE NATIONAL INSURANCE COMPANY, INC.**
Fort Worth, Texas

The SUBSCRIBING REINSURER hereby accepts a 75% share in the interests and liabilities of the "Reinsurer" under the Agreement referenced above.

This Contract shall become effective on March 1, 1999 at 12:01 a.m., Central Time, and shall continue in force until terminated in accordance with the provisions of the Agreement referenced above.

The SUBSCRIBING REINSURER'S share in the referenced Agreement shall be several and not joint with the shares of the other reinsurers, it being understood that the SUBSCRIBING REINSURER shall in no event participate in the interests and liabilities of the other reinsurers.

IN WITNESS WHEREOF, the SUBSCRIBING REINSURER has caused this Contract to be executed by its duly authorized representative at:

Lincolnshire, Illinois, this ___7___ day of ___November___, 2000

_____ 23471-2,
~~ard A. Clymer, Vice President Ret.
GE REINSURANCE CORPORATION, FORMERLY
KEMPER REINSURANCE COMPANY

COLLINS
A S S O C I A

EXHIBIT
3

9/30/99 __36661272

**QUOTA SHARE REINSURANCE AGREEMENT**

**BETWEEN**

**STATE NATIONAL INSURANCE COMPANY, INC.**

**AND**

**SUBSCRIBING REINSURERS EXECUTING THE INTERESTS AND LIABILITIES CONTRACTS**

**EFFECTIVE: March 1, 1999**

COLLINS

A S S O C I A T E S

**QUOTA SHARE REINSURANCE AGREEMENT**
**EFFECTIVE: March 1, 1999**

**Issued to**

**STATE NATIONAL INSURANCE COMPANY, INC.**

**1999 SUBSCRIBING REINSURERS**

| | |
|---|---|
| Kemper Reinsurance Company | 75% |
| Partner Reinsurance Company of the U.S. | 25% |
| | **100%** |



## Table of Contents

| Article | | Page |
|---|---|---|
| | Preamble | 1 |
| I | Business Reinsured | 1 |
| II | Exclusions | 1 |
| III | Obligatory Agreement | 2 |
| IV | Term and Condition | 3 |
| V | Territory | 5 |
| VI | Currency | 5 |
| VII | Consideration | 5 |
| VIII | Loss and Loss Adjustment Expense | 5 |
| IX | Statistical Data | 7 |
| X | Reports and Remittances | 7 |
| XI | Errors and Omissions | 8 |
| XII | Inspection of Records | 9 |
| XIII | Arbitration | 9 |
| XIV | Fees, Commissions, Premium Taxes and Policy Fees | 10 |
| XV | Assessments, Assignments, Fines and Penalties | 12 |
| XVI | Insolvency of Company | 13 |
| XVII | Hold Harmless | 13 |
| XVIII | Regulatory Matters | 15 |
| XIX | The General Agent | 15 |
| XX | Loss in Excess of Policy Limits/ECO | 15 |
| XXI | Loss and Unearned Premium Reserve Funding | 16 |
| XXII | Savings Clause | 16 |
| XXIII | Miscellaneous | 16 |
| XXIV | Original Conditions | 17 |
| XXV | Intermediary | 17 |



### QUOTA SHARE REINSURANCE AGREEMENT

THIS QUOTA SHARE REINSURANCE AGREEMENT (this "Agreement") is made and entered into as of the 1st day of March, 1999, by and between the Subscribing Reinsurers executing the Interests and Liabilities Contracts attaching to and forming a part of this Agreement (collectively "Reinsurer"), and STATE NATIONAL INSURANCE COMPANY, INC., an insurance company organized under the laws of the State of Texas ("Company");

### W I T N E S S E T H:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

### PREAMBLE

It is understood that the Company and the Reinsurer (hereinafter identified collectively as the "Parties") hereto wish to enter into a reinsurance arrangement through which the Company is to bear no business, credit or insurance risk whatsoever (save the risk of the Reinsurer's insolvency). The Reinsurer shall hold the Company harmless and indemnify it for these and all risks. The sole consideration provided by the Company, in exchange for the fees set forth in Article XIV herein, is to permit the Policies (as hereinafter defined) which are reinsured under this Agreement and under that certain Excess Stop Loss Reinsurance Agreement dated effective March 1, 1999, by and between the Parties (the "Stop Loss Agreement"), to be issued in the name of the Company. All provisions of this Agreement shall be interpreted so as to be in accord with this Preamble.

### ARTICLE I
### BUSINESS REINSURED

1.1     The Reinsurer hereby reinsures the Company, in the manner and to the extent set forth herein, under the Company's policies, certificates, binders, contracts or agreements (herein called "Policies") in force on the effective date hereof or issued or renewed on or after that date on behalf of the Company by International Underwriters General Agency, Inc., a Texas corporation ("General Agent"), and classified by the Company, in its discretion, as a line of business which is authorized in the General Agency Agreement dated as of the date hereof, between the Company and the General Agent (the "General Agency Agreement"), which is attached hereto and made a part hereof for all purposes.

1.2     For purposes of this Agreement, the term "in force" shall mean the business written under that certain Quota Share Reinsurance Agreement dated effective March 1, 1998, by and among the Company, the General Agent, Underwriters MGA, Inc. and the subscribing reinsurers identified therein, which is in force at the effective date and time of this Agreement.

### ARTICLE II
### EXCLUSIONS

The following risks, perils and classes of business are specifically excluded:

2.01     If the General Agent binds or issues any business excluded, the Company shall notify the Reinsurer promptly upon actual knowledge of such business being bound or issued. The Reinsurer shall provide coverage for any such risk bound until canceled by the Company at any Reinsurer's request.

COLLINS
A S S O C I A T E S



> (a) All business not specifically described as business covered under Schedule I of the General Agency Agreement.
>
> (b) Business written on a co-surety or co-indemnity basis when the issuing company is not the controlling carrier.
>
> (c) War Risks as excluded in the attached North American War Exclusion Clause (Reinsurance).
>
> (d) Business excluded by the attached Nuclear Exclusion Clauses – Liability – Reinsurance – U.S.A., Physical Damage – Reinsurance – U.S.A., Liability – Reinsurance – Canada, and Physical Damage – Reinsurance – Canada.
>
> (e) Financial Guarantee.
>
> (f) Racing automobiles, and government law enforcement vehicles.
>
> (g) As respects the Mexican National program:
>
>> 1. Vehicles garaged in the United States;
>> 2. Motorcycles, Travel Trailers and Motor Homes.

2.02 The foregoing exclusions list, other than c and d, shall not apply when the operations or exposures are only incidental to a comparatively small part of the original insured's major activities.

2.03 Errors and omissions notwithstanding, if without the knowledge and contrary to the instructions of its supervisory personnel, the Company is bound on a risk specifically excluded hereunder (other than c and d), or by an existing insured extending its operations, such reinsurance as would have been afforded but for the exclusion shall apply for a period of 30 days following receipt of said underwriting personnel of knowledge thereof.

### ARTICLE III
### OBLIGATORY AGREEMENT

3.1 Effective as of the effective date of this Agreement, the Company obligates itself to cede to the Reinsurer, and the Reinsurer obligates itself to accept, all of the Company's gross liability under all Policies issued by and on behalf of the Company by the General Agent; provided, however, that the Company shall retain and be liable for, and only for, 20% of the underwriting risk under such Policies (it is understood that the Company has purchased stop loss coverage under the Stop Loss Agreement to insure this underwriting risk). The liability of the Reinsurer shall commence obligatorily and simultaneously with that of the Company, subject to the terms, conditions and limitations set forth in this Agreement.

3.2 Business ceded hereunder shall include every original policy, rewrite, renewal or extension (whether before or after the termination of this Agreement) required by applicable statute, or by rule or regulation of any policy of insurance ceded hereunder by the Company to the Reinsurer.

3.3 The maximum Policy limits subject to this Agreement are as follows:

> (a) Mexican National Private Passenger Automobile Liability

COLLINS
A S S O C I A T E S



|     |                  |           |                |
|-----|------------------|-----------|----------------|
| (1) | Bodily Injury    | $100,000  | each person    |
|     |                  | $300,000  | each occurrence |
| (2) | Property Damage  | $ 50,000  | each occurrence |

(b)    **Mexican National Commercial Automobile Liability**

|                           |             |                |
|---------------------------|-------------|----------------|
| Combined Single Limit (CSL) | $1,000,000 | each occurrence |
|                           | $1,000,000  | each policy    |

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect.

## ARTICLE IV
## TERM AND CONDITION

4.1    This Agreement shall become effective on the 1st of March, 1999, at 12:01 a.m., Central Time, as respects losses arising out of occurrences commencing under Policies in force, issued or renewed on or after such date at the offices of the Company, and shall remain continuously in force unless terminated by any party hereto.

4.2    This Agreement shall continue from the effective date and shall be automatically renewed for a term of one year from year to year unless terminated as set forth in this section. Any party hereto may cancel this Agreement with at least ninety (90) days prior written notice to the other party.

4.3    When this Agreement terminates for any reason, reinsurance hereunder shall continue to apply to the business in force at the time and date of termination until expiration or cancellation of such business. It is understood that any Policies with effective dates prior to the termination date but issued after the termination date are covered under this Agreement. Additionally, the reinsurance hereunder shall continue to apply as to Policies which must be issued or renewed, as a matter of state law or regulation or because a sub-agent has not been timely canceled, until the expiration dates on said Policies.

4.4    Upon termination of this Agreement, the Reinsurer, the General Agent and the Company shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to outstanding insurance business under this Agreement existing on the date of such termination. The Parties expressly covenant and agree that they will cooperate with each other in the handling of all such run-off insurance business until all Policies have expired either by cancellation or by terms of such Policies and all outstanding losses and loss adjustment expenses have been settled. While by law and regulation, the Company recognizes its primary obligations to its policyholders, the Reinsurer recognizes that to the extent possible there shall be no cost or involvement by the Company in servicing this run-off. All costs and expenses associated with the handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent and, to the extent not borne by the General Agent, solely by the Reinsurer. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while this Agreement is still in effect), then, consistent with this Agreement, the Reinsurer's obligation with respect to such run-off business shall continue and the Reinsurer shall either service such run-off business directly or appoint, at the Reinsurer's expense, a successor to the General Agent, subject to the approval of the Company, which approval shall not be unreasonably withheld. Such successor


COLLINS
A S S O C I A T E S

shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business.

4.5     In addition to the provisions set forth in Section 4.2 herein, this Agreement may be terminated at any time in accordance with the following terms and conditions:

(a)     Immediately upon written notice by the Reinsurer or the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas;

(b)     By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder and due under the Stop Loss Agreement; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(c)     After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(d)     Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed. By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed;

(e)     By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department having jurisdiction requires cancellation or disallows credit for this reinsurance or the reinsurance provided in the Stop Loss Agreement;

(f)     Immediately and automatically upon termination of the Stop Loss Agreement;

(g)     After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(h)     After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 17.1 and/or Section 20.1 of this Agreement.

4.6     Notices hereunder shall be provided by certified or registered mail return receipt requested, and notice shall be deemed to have been provided on the date of mailing.



4.7    This Agreement provides for termination on a runoff basis.  The relevant provisions of this Agreement shall apply to the business being run off.  It is expressly agreed that the terms, conditions and obligations of the Preamble; Sections 4.3, 4.4, 4.6 and 4.7; Articles VII-XXII; Sections 23.2, 23.3, 23.5, 23.7, 23.8; and Articles XXIV and XXV shall survive termination of this Agreement.

4.8    Upon termination, the Company, at its option, may elect to terminate the Reinsurer's liability for all losses occurring subsequent to termination. The Reinsurer will return to the Company a portfolio representing the unearned premium reserve under this Agreement appropriate to the mode of termination.

**ARTICLE V**
**TERRITORY**

This Agreement will cover wherever the Company's Policies cover.

**ARTICLE VI**
**CURRENCY**

The currency to be used for all purposes of this Agreement shall be United States of America currency.

**ARTICLE VII**
**CONSIDERATION**

In consideration of these premises, the Reinsurer is entitled to eighty percent (80%) of the Net Premiums received by the General Agent or the Reinsurer on Policies reinsured less the commission paid to the General Agent.  "Net Premiums" shall mean the gross premiums (excluding policy fees) charged on all original and renewal policies written on behalf of the Company less return premiums.

**ARTICLE VIII**
**LOSS AND LOSS ADJUSTMENT EXPENSE**

8.1    Subject to Section 1.03 of the General Agency Agreement, all loss settlements made by the Company or the General Agent under the terms of this Agreement, whether under strict policy conditions or by way of compromise, shall be unconditionally binding upon the Reinsurer in proportion to its participation, and the Reinsurer shall benefit proportionately in all salvage and recoveries.  The Reinsurer shall assume and be liable for and pay on behalf of the Company, 80% of all losses incurred in connection with the risks covered by this Agreement, including, but not limited to, judgments (including interest thereon) and settlements in connection therewith.  The Reinsurer shall also be liable for and pay on behalf of the Company 80% of 7.5% of earned premium to cover loss adjustment expense, except that the Reinsurer shall pay on behalf of the Company 80% of the following fees:

(a)    Legal fees;
(b)    Court reporter fees, unless used by an adjuster in the investigation of claims;
(c)    Court costs;
(d)    Expert witness fees;
(e)    Expert testimony fees;

**COLLINS**
A S S O C I A T E S



(f)     Fees for commercial photographs requested by an attorney and will include photographs taken by the adjuster or commercial photographs requested by the adjuster while investigating the claim;

(g)     Fees for court maps or any diagram drawn to scale by a professional map maker;

(h)     Fees for medical examinations and reports;

(i)     Private detectives or investigators' fees;

(j)     Medical audit fees;

(k)     Appraisal fees; and

(l)     Declaratory judgment or injunctive action fees.

8.2     In the event the Reinsurer's liability for loss adjustment expenses incurred for any Agreement Year (as defined in Article XIV) exceeds 7.5% of premiums earned for the same Agreement Year, the General Agent shall offset the difference through a reduction of commission otherwise due the General Agent hereunder in accordance with the provisions of Article XIV. Notwithstanding the foregoing, if for any reason the General Agent fails to remit such difference, the Reinsurer agrees to hold the Company harmless for said difference and shall reimburse the Company for the amount of the insufficiency. The Reinsurer and the General Agent (as applicable) shall be credited with any recovery of loss adjustment expense previously paid.

8.3     The Reinsurer's 80% share of losses, expense and loss recovery shall be carried into the monthly accounting for which provision is hereinafter made. When, as the result of any one loss or other casualty covered by Policies of the Company, the total amount of such loss shall be due from the Reinsurer, the Reinsurer upon demand by the Company shall remit forthwith to the Company.

8.4     All records pertaining to claims arising under insurance policies issued on behalf of the Company through or by the General Agent subject to this Agreement shall be deemed to be jointly owned records of the Company and the Reinsurer, and shall be made available to the Company or the Reinsurer or their respective representatives or any duly appointed examiner for any state within the United States; and these records shall be kept in the State of Texas or such other jurisdiction as may be required by applicable state law or regulation. Notwithstanding the foregoing, the Reinsurer is authorized to maintain duplicate working files of all such records outside the State of Texas. The Company, the Reinsurer and the General Agent each agree that it will not destroy any such records in its possession without the prior written approval of the other parties except that the Company shall not be required to retain files longer than required by the guidelines set forth by any applicable state department of insurance.

8.5     The Reinsurer shall, or shall cause the General Agent to, establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or General Agent, with such claims register to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense. Such claim register shall be kept in a manner whereby the Company can, at any time, determine the status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon.

8.6     The General Agent will advise the Reinsurer by separate report, regardless of any question of liability or coverage, any claim involving the following:

(a)     Fatalities.



(b)    Bodily injuries involving:

    (i)    Brain stem, quadriplegic, paraplegic or severe paralysis;
    (ii)    Serious burns;
    (iii)    Amputations of major limbs;
    (iv)    Serious impairment of vision.

(c)    Potential coverage disputes or bad faith situations which may give rise to a payment for excess of Policy limits or extra contractual obligations.

(d)    Any claims that do not fall within these categories, but have a potential of significant liability to the Reinsurer.

## ARTICLE IX
## STATISTICAL DATA

In lieu of the Company furnishing the Reinsurer with bordereaux showing the particulars of all reinsurance ceded hereunder, the General Agent shall furnish, or cause to be furnished, to the Company as soon as practicable after the close of each of the respective periods indicated below (on forms agreeable to the parties hereto) with monthly, quarterly and annual reports showing the following statistical data in respect of the business reinsured hereunder.

(a)    Monthly, with the data segregated by line of business

    (i)    Net premiums written (i.e., gross premiums less returns during the month) and unearned premium at the end of the month.

    (ii)    Net losses paid (i.e., gross losses less salvages and other recoveries) and adjustment expenses paid during the month and loss reserves outstanding at the end of the month.

(b)    Annually, with the data segregated by line of business; annual summaries of net premiums written, net losses paid, net adjusting expenses paid during the year in such form so as to enable the Company to record such data in its annual convention statement. In force and unearned premium segregated as to advance premiums, premiums running twelve (12) months or less from inception date of policy, and premiums running more than (12) months from inception date of policy in such form as to enable Company to record such data in its annual convention statement.

(c)    Periodic, with data segregated by line of business, statistical or other data as may be requested from time to time by regulatory authorities.

## ARTICLE X
## REPORTS AND REMITTANCES

10.1    The Company will cede to the Reinsurer its 100% share of the unearned premium on the business in force at the inception of this Contract. The General Agent shall report to the Reinsurer the following:

(a)    Ceded unearned premium;

- 7 -







(b)    General Agent's commission thereon;

(c)    Ceding fee to the Company as provided in Section 14.1.

10.2    The General Agent shall remit the balance due to the Reinsurer.
Within 30 days after the end of each month, the General Agent shall report to the Reinsurer the following:

(a)    Ceded net written premium for the month;

(b)    General Agent's commission thereon;

(c)    Ceding fee to the Company as provided in Section 14.1;

(d)    Ceded paid losses and loss adjustment expenses for the month of account, provided such losses and loss adjustment expenses have not been reported by the Company in any previous monthly report;

(e)    Ceded unearned premium at the end of the month;

(f)    Ceded outstanding losses and loss adjustment expenses outstanding at the end of the month.

10.3    Within 45 days after the end of each month, the General Agent shall remit to the Reinsurer the following:

(a)    Ceded net written premium during the month, less;

(b)    General Agent's commission thereon, less;

(c)    Paid losses and loss adjustment expenses paid, provided such losses and loss adjustment expenses have not been deducted on behalf of the Company in any previous monthly report.

The positive balance of (a) less (b) less (c) shall be remitted by the General Agent with its report. Any balance shown to be due the Company shall be remitted by the Reinsurer as promptly as possible after receipt and verification of the General Agent's report.

## ARTICLE XI
## ERRORS AND OMISSIONS

11.1    The Company shall not be prejudiced in any way by any omission through clerical error, accident or oversight to cede to the Reinsurer any reinsurance rightly falling under the terms of this Agreement, or by erroneous cancellation, either partial or total, of any cession, or by omission to report, or by erroneously reporting any losses, or by any other error or omission, but any such error or omission shall be corrected immediately upon discovery.

11.2    Should the Company suffer any loss whatsoever, the Reinsurer shall assume loss for its own account and save and hold the Company harmless therefor.

**COLLINS**
A S S O C I A T E S

## ARTICLE XII
## INSPECTION OF RECORDS

The books and records pertaining to liability and losses under this Agreement maintained by any party hereto shall at all times be subject to the inspection by an authorized representative of any other party hereto. This provision shall survive the termination of this Agreement.

## ARTICLE XIII
## ARBITRATION

13.1    As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereinafter arising between the Company and the Reinsurer with respect to this Agreement or with respect to these Parties' obligations hereunder, whether such dispute arises before or after termination of this Agreement, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

13.2    One arbiter (an "Arbiter") shall be chosen by the Company and one Arbiter shall be chosen by the Reinsurer and an umpire (an "Umpire") shall be chosen by the Arbiters, all of whom shall be active or retired disinterested executive officers of property and casualty insurance or reinsurance companies.

13.3    In the event that a party fails to choose an Arbiter within thirty (30) days following a written request by either party to the other to name an Arbiter, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within thirty (30) days following their appointment, either party may petition the American Arbitration Association to appoint an Umpire.

13.4    Each party shall present its case to the Arbiters and Umpire within thirty (30) days after the selection of the Umpire, unless the period is extended by the Arbiters and the Umpire in writing, and/or at a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Parties shall be final and binding on the parties; provided, however, that the Arbiters and Umpire shall have no authority to award punitive damages to one party in respect of the actions or inactions of the other party. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

13.5    Each party shall pay the expenses of its Arbiter and attorneys and one-half of the fees of the Umpire and the common expenses of the arbitration, unless a majority of the Arbiters and Umpire determine otherwise.

13.6    In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including in such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. Any such written election must be provided to the other party within ten (10) business days of the receipt by such party of any documents wherein the amount of the claim or counterclaim is first stated to be in excess of Two Million Dollars ($2,000,000). In the event of any such litigation


COLLINS
A S S O C I A T E S



between the Company and the Reinsurer, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

## ARTICLE XIV
### FEES, COMMISSIONS, PREMIUM TAXES AND POLICY FEES

14.1    The Reinsurer shall guarantee payment to the Company of its ceding fee on all premiums reinsured hereunder (prior to deduction of premiums, if any, ceded by the Company for inuring reinsurance), and in addition guarantees those amounts described in Section 14.4 of this Agreement and is directly responsible for payment of the amount described in Article XV. The Company shall allow return ceding fees on return premiums at the same rates. Such ceding fee shall be 5% of Net Premiums and Net Policy Fees. Notwithstanding anything else contained herein to the contrary, regardless of the amount of Net Premiums, the minimum ceding fee due the Company shall be (i) $33,334 for the 4-month period ending June 30, 1999 and (ii) $50,000 for each 6-month period thereafter during the term of this Agreement. However, the minimum ceding fee for any such period will be pro-rated for any 6-month period, as applicable, in which this Agreement is terminated prior to any June 30th or December 31st. The minimum ceding fee for each period shall be paid within 60 days after the end of such period. For these purposes, a Policy's entire premium shall be applied to the period in which the Policy is written.

The General Agent shall pay to the Company its ceding fee based on Net Premiums, and premium taxes described in Section 14.4 on Net Premiums. In the event that the ceding fee and premium taxes are not so paid by the General Agent within 60 days following the end of the month, the unpaid balance shall be paid directly to the Company by the Reinsurer.

14.2    The Reinsurer shall allow the General Agent a provisional commission of 31.50% on all premiums ceded to the Reinsurer hereunder. The General Agent shall allow the Reinsurer return commission on return premiums at the same rate. This is an obligation owing directly from the Reinsurer to the General Agent. The General Agent shall not seek to recover from the Company, any commissions due and the Reinsurer shall not seek to recover from the Company, any return commissions due.

14.3    The commission allowed the General Agent shall be adjusted for each Agreement Year in accordance with the provisions set forth below:

    (a)    The adjusted commission rate shall be calculated as follows and be applied to premiums earned for the period under consideration:

        (1)    If the ratio of losses incurred to premiums earned is 62.0% or greater, the adjusted commission rate for the period under consideration shall be 31.50%.

        (2)    If the ratio of losses incurred to premiums earned is less than 62.0%, but not less than 35.0%, the adjusted commission rate for the period under consideration shall be 31.50%, plus 58.33% of the difference in percentage points between 62.0% and the actual ratio of losses incurred to premiums earned.

        (3)    If the ratio of losses incurred to premiums earned is 35.0% or less, the adjusted commission rate for the period under consideration shall be 47.25%.

COLLINS
A S S O C I A T E S



(b)      If the ratio of losses incurred to premiums earned for any period is greater than 62.0%, the difference in percentage points between the actual ratio of losses incurred to premiums earned and 62.0% shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a debit (additional) to losses incurred. If the ratio of losses incurred to premiums earned for any period is less than 35.0%, the difference in percentage points between 35.0% and the actual ratio of losses incurred to premiums earned shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a credit to losses incurred.

(c)      Except as provided in Subparagraph (d), the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the end of each adjustment period, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the adjustment period as of the date of adjustment is less than commission previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the adjustment period of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

(d)      As respects the final adjustment period, the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the date of termination, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

(e)      "Net policy fees" shall mean gross policy fees charged on all original and renewal policies written on behalf of Company, less return policy fees.

(f)      "Losses incurred" as used herein shall mean the balance of the following, all as respects losses and loss adjustment expenses ceded under this Agreement:

(i)      Ceded losses and loss adjustment expenses paid as of the effective date of calculation; plus

COLLINS
A S S O C I A T E S

(ii)     The ceded reserves for losses and loss adjustment expenses outstanding as of the effective date of calculation; plus

(iii)    As respects second and each subsequent Agreement Year hereunder, plus (minus) the debit (credit) from the preceding Agreement Year as set forth in paragraph (b) above; plus

(iv)    Any assignments and/or assessments as set forth in Article XV.

(g)    "Ceded premiums earned" or "premiums earned" as used herein shall mean ceded net written premiums allocated to the Agreement Year (i.e., net of cancellations and return premiums), less the unearned portion thereof as of the effective date of calculation, all as respects premiums ceded under this Agreement.

(h)    "Agreement Year" as used herein shall mean the period from March 1, 1999 to February 29, 2000, both days inclusive, and each subsequent twelve-month period thereafter that this Agreement continues in force.

14.4    It is expressly agreed that the commission allowed the General Agent includes provision for premium taxes and ceding fees. General Agent shall pay to the Company all premium taxes payable for policies subject to reinsurance hereunder.

14.5    It is expressly agreed that, for purposes of calculating the developed commission rate, the results of the State and County Mutual Fire Insurance Company Quota Share Reinsurance Agreement shall be combined with the results of the business hereunder. However, should the results of one program be in a deficit position, while the other program develops a commission in excess of the provisional commission, no additional commission will be payable until the deficit has first been eliminated.

## ARTICLE XV
## ASSESSMENTS, ASSIGNMENTS, FINES AND PENALTIES

15.1    The Reinsurer hereby assumes liability for any and all assessments and assignments imposed as a result of Policies reinsured hereunder (whether before or after the termination of this Agreement). The Reinsurer shall immediately reimburse the Company for any assessments made against the Company pursuant to those laws and regulations creating obligatory funds (including, but not limited to, insurance guaranty and insolvency funds), pools, joint underwriting associations, FAIR plans and similar plans. Amounts owed by the Reinsurer under this Section shall be payable directly by the Reinsurer to the Company. The Reinsurer shall be entitled to receive from the Company on or prior to the 31st day of March of each year thereafter (or such date on which such premium taxes are paid) a sum equal to the premium tax credit that is allowed to the Company with respect to such assessments. The premium tax credit allowed the Reinsurer hereunder is to be on a pro-rata and first-in, first-out basis. The Company shall promptly return to the Reinsurer any amount of assessment refunded to or credited to the Company.

15.2    This Agreement shall apply to risks assigned to the Company under any assigned risk plan if, in the reasonable judgment of the Company, such risks were assigned to the Company because of the business written and reinsured hereunder.

COLLINS
A S S O C I A T E S



15.3    The Reinsurer shall also pay promptly and directly to the Company any fines, penalties and/or any other charge incurred by the Company as respects the business reinsured hereunder arising out of the actions or inactions of the General Agent unless such fines, penalties and/or any other charge was a direct result of any willful misconduct on the part of the Company.

**ARTICLE XVI**
**INSOLVENCY OF COMPANY**

16.1    In the event of the insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, the portion assumed by the Reinsurer shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the Company without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claim.

16.2    It is agreed and understood that in the event of the insolvency of the Company, the liquidator or receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim is filed in the insolvency proceeding; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

16.3    It is further agreed and understood that as to all reinsurance made, ceded, renewed or otherwise becoming effective hereunder, the reinsurance shall be payable by the Reinsurer directly to the Company or its liquidator, receiver or statutory successor, except where the Reinsurer has expressly assumed in writing such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policy and in substitution for the obligation of the Company to such payees.

**ARTICLE XVII**
**HOLD HARMLESS**

17.1    In consideration of these presents and the reciprocal benefits derived by the Company and the Reinsurer hereunder, the Reinsurer hereby holds the Company harmless from, and assumes all liability for, every claim, demand, liability, loss, damage, cost, charge, attorneys' fees, expense of suit, order, judgment and adjudication of whatever kind or character incurred by the Company in connection with this Agreement or any contract or transaction related thereto, including, but not limited to, all costs and fees incurred by the Company in asserting its rights hereunder.  The Reinsurer's obligations hereto relate to, but are not limited to the following:  all liability for agents' balances, return premiums and commissions, deceptive trade practice liability, premiums, policy fees, premium taxes or other charges (whether collected or not); all actions or inactions by the General Agent, its sub-agents or any independent claims adjusters relating to this Agreement and the General Agency Agreement; and any agreement with a premium finance company, and all fees owing to the General Agent under this and the aforementioned related agreements.

**COLLINS**
A S S O C I A T E S

Notwithstanding anything to the contrary, this provision shall not apply to:

(a) fraud, dishonesty, theft or collusion on the part of any director, officer or employee of the Company, or

(b) policies not reinsured hereunder, or

(c) the Company's failure to perform its duties and obligations under this Agreement due to the Company's willful misconduct, or

(d) 20% of the underwriting risk retained by the Company pursuant to Article III hereof, or

(e) expenses incurred by the Company under Section 13.5 hereof, or

(f) costs and fees incurred by the Company in connection with litigation under Section 13.6 hereof wherein the Reinsurer is the prevailing party.

17.2   In the event any provision, term and/or condition of this Agreement (other than the Preamble hereof) is inconsistent with the provision, terms and/or conditions of Section 17.1 above, the provisions, terms and/or conditions of said Section 17.1 above shall control over and supersede such inconsistent provisions, terms and/or conditions.

17.3   The Company shall not be liable to the Reinsurer for premiums unless the Company itself has actually received those premiums and wrongfully not remitted them to the Reinsurer.   The Reinsurer may not offset any balances on account of losses, loss adjustment expenses or any other amounts due except as to premiums actually received by the Company itself (as distinct from premiums not collected, or premiums collected by the General Agent, or premium placed in the premium trust account pursuant to the General Agency Agreement) which have wrongfully not been transmitted to the Reinsurer.

17.4   If for any reason the General Agent fails or is unable to administer the Policies reinsured hereunder (whether the Agreement is still in effect or the business is being run-off), the Reinsurer shall appoint a party (acceptable and approved by the Company) to administer the business and the Reinsurer shall be responsible for 80% of the cost of said administration.   If return premiums or other funds need to be returned to premium finance companies, policyholders or sub-agents, the Reinsurer shall pay these amounts if the successor or General Agent does not.

17.5   The Reinsurer shall not sue, or seek arbitration, against the Company for any acts of the General Agent for any monies which the General Agent owes unless the Company has actually received those monies and has wrongfully not remitted them to the Reinsurer; and the Reinsurer shall indemnify the Company for any damages, liabilities and expenses incurred by reason of the General Agent's acts or failure to act.   The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement and the General Agent shall not sue, or seek arbitration against, the Company for any actions by, or debts owing from, the Reinsurer.   The Reinsurer shall not seek to recover from, or offset against, the Company any sums, whether premiums or other monies, which the General Agent was unable or unwilling to remit to the Company or the Reinsurer.

COLLINS
A S S O C I A T E S



## ARTICLE XVIII
## REGULATORY MATTERS

18.1    It is the Parties' understanding that any premiums which are overdue from the General Agent to the Company may be deemed non-admitted assets. In confirmation of the liabilities assumed by the Reinsurer under this Agreement, the Reinsurer hereby assumes 100% of all liability and responsibility for all premiums in the course of collection.

18.2    The Reinsurer shall agree, at no cost to the Company, to take those actions (including, but not limited to, modifications in how funds are handled and how accounts are cleared, settled and the manner in which incurred losses are accounted for) and agree to those arrangements necessary to ensure that the Company suffers no adverse impact because of this reinsurance program and is in compliance with any applicable laws of a state insurance department, insofar as this reinsurance program is concerned.

## ARTICLE XIX
## THE GENERAL AGENT

The Reinsurer has selected the General Agent to administer the business reinsured hereunder. While for regulatory purposes, the General Agent will need to be appointed as the Company's agent, it is recognized that the General Agent is acting on behalf of the Reinsurer and that the Reinsurer shall be responsible for monitoring the General Agent's compliance with the provisions of the Agreement and the General Agency Agreement. The Company is making no evaluation of the General Agent's qualifications and has no obligation to furnish reports or statistics to the Reinsurer. The Company shall file with each applicable state all reports requested by such state based upon information received from the General Agent and Reinsurer.

## ARTICLE XX
## LOSS IN EXCESS OF POLICY LIMITS/ECO

20.1    In the event the Company pays or is held liable to pay an amount of loss in excess of its policy limit, but otherwise within the terms of its policy (hereinafter called "loss in excess of policy limits") or any punitive, exemplary, compensatory or consequential damages, other than loss in excess of policy limits (hereinafter called "extra contractual obligations") because of alleged or actual bad faith or negligence on its part in rejecting a settlement within policy limits, or in discharging its duty to defend or prepare the defense in the trial of an action against its policyholder, or in discharging its duty to prepare or prosecute an appeal consequent upon such an action, or in otherwise handling a claim under a policy subject to this Agreement, 80% of the loss in excess of policy limits and/or 80% of the extra contractual obligations shall be added to the Company's loss, if any, under the Policy involved, and the sum thereof shall be reinsured 80% under this Agreement.

20.2    An extra contractual obligation shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

20.3    Notwithstanding anything stated herein, this Agreement shall not apply to any loss incurred by the Company as a result of any fraudulent and/or criminal act which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals, by any officer or director of the Company acting individually or collectively or in collusion with any individual, corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

COLLINS
A S S O C I A T E S



## ARTICLE XXI
## LOSS AND UNEARNED PREMIUM RESERVE FUNDING

In the event that either (i) the Texas Department of Insurance or other regulatory entity having authority over this Agreement requires cancellation or disallows credit for this reinsurance or (ii) the Reinsurer's A.M. Best rating at any time is lower than A-, the Reinsurer will immediately secure its obligations under this Agreement via a security fund agreement to be executed by the Reinsurer and the Company, which security fund agreement shall be in form and content acceptable to the Company.

## ARTICLE XXII
## SAVINGS CLAUSE

22.1   If any law or regulation of any Federal, State or local government of the United States of America, or the ruling of officials having supervision over insurance companies, should prohibit or render illegal this Agreement, or any portion thereof, as to risks or properties located in the jurisdiction of such authority, either the Company or the Reinsurer may upon written notice to the other suspend or abrogate this Agreement insofar as it relates to risks or properties located within such jurisdiction to such extent as may be necessary to comply with such law, regulations or ruling. Such illegality shall in no way affect any other portion thereof; provided, however, that the Reinsurer or the Company may terminate or suspend this Agreement insofar as it relates to the business to which such law or regulation may apply.

22.2   This Agreement shall be interpreted in accordance with the laws of the State of Texas. All provisions of this Agreement are intended to be enforced to the fullest extent permitted. Accordingly, should a court of competent jurisdiction or arbitration panel determine that the scope of any provision is too broad to be enforced as written, the Parties intend that the court or arbitration panel should reform the provision to such narrower scope as it determines to be enforceable under present or future law; such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance.

## ARTICLE XXIII
## MISCELLANEOUS

23.1   This Agreement has been made and entered into in the State of Texas.

23.2   All notices required to be given hereunder shall be deemed to have been duly given by personally delivering such notice in writing or by mailing it, certified mail, return receipt requested, with postage prepaid. Any party may change the address to which notices and other communications hereunder are to be sent to such party by giving the other party written notice thereof in accordance with this provision.

23.3   This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns. The Reinsurer shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.

23.4   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

COLLINS
A S S O C I A T E S

23.5    This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto.

23.6    This Agreement is the entire agreement between the parties and supersedes any and all previous agreements, written or oral, and amendments thereto.

23.7    A waiver by the Company or the Reinsurer of any breach or default by the other party under this Agreement shall not constitute a continuing waiver or a waiver by the Company or the Reinsurer of any subsequent act in breach or of default hereunder.

23.8    Headings used in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement.

23.9    This Agreement is not exclusive and the Company reserves the right to appoint or contract with other reinsurers, agents and/or managing agents in the territory covered by this Agreement and General Agent may contract and represent other insurers.

23.10    The Reinsurer or General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company. The Reinsurer and/or General Agent shall establish and maintain records of any such advertising as required by applicable statute and regulation.

## ARTICLE XXIV
## ORIGINAL CONDITIONS

24.1    All reinsurance under this Agreement shall be subject to the same rates, terms, conditions and waivers, and to the same modifications and alterations as the respective policies of the Company.   The Reinsurer shall be credited with its exact proportion of the original premiums received by the Company, prior to disbursement of any dividends, but after deduction of premiums, if any, ceded by the Company for insuring reinsurance.

24.2    Except as provided in Article XVI, nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not parties to this Agreement.

## ARTICLE XXV
## INTERMEDIARY

John B. Collins Associates, Inc. is hereby recognized as the intermediary negotiating this Contract.  All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvage and loss settlements) relating hereto shall be transmitted to the Company and the Reinsurer through John B. Collins Associates, Inc., 8300 Norman Center Drive, Minneapolis, Minnesota 55437. Payments by the Company to John B. Collins Associates, Inc. shall be deemed to constitute payment to the Reinsurer.

COLLINS
A S S O C I A T E S

Payments by the Reinsurer to John B. Collins Associates, Inc. shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above mentioned.

DATED: _____          STATE NATIONAL INSURANCE COMPANY, INC.

BY: _____

ITS: _____

COLLINS
A S S O C I A T E S

INTERESTS AND LIABILITIES CONTRACT

of

**KEMPER REINSURANCE COMPANY**
**Long Grove, Illinois**
**(hereinafter referred to as the "SUBSCRIBING REINSURER")**

attached to and forming part of the

**100% QUOTA SHARE**
**REINSURANCE CONTRACT**
**Effective: March 1, 1999**

issued to and duly executed by

**STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY**
**Fort Worth, Texas**

The SUBSCRIBING REINSURER hereby accepts a 75% share in the interests and liabilities of the "Reinsurer" under the Agreement referenced above.

This Contract shall become effective on March 1, 1999 at 12:01 a.m., Central Time, and shall continue in force until terminated in accordance with the provisions of the Agreement referenced above.

The SUBSCRIBING REINSURER'S share in the referenced Agreement shall be several and not joint with the shares of the other reinsurers, it being understood that the SUBSCRIBING REINSURER shall in no event participate in the interests and liabilities of the other reinsurers.

IN WITNESS WHEREOF, the SUBSCRIBING REINSURER has caused this Contract to be executed by its duly authorized representative at:

Lincolnshire Illinois, this ___7___ day of ___November___ , 2000.

Richard A. Clymer, Vice President Ref , 23472-1
GE REINSURANCE CORPORATION, FORMERLY
KEMPER REINSURANCE COMPANY

9/29/99 __36641272

COLLINS
A S S O C I A

EXHIBIT
4

100% QUOTA SHARE REINSURANCE AGREEMENT

BETWEEN

STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY

AND

SUBSCRIBING REINSURERS EXECUTING THE INTERESTS AND LIABILITIES CONTRACTS

EFFECTIVE: MARCH 1, 1999

COLLINS

A S S O C I A T E S



## Table of Contents

| Article | | Page |
|---|---|---|
| | Preamble | |
| I | Business Reinsured | 1 |
| II | Exclusions | 1 |
| III | Obligatory Agreement | 2 |
| IV | Term and Condition | 3 |
| V | Territory | 5 |
| VI | Currency | 5 |
| VII | Loss and Loss Adjustment Expense | 5 |
| VIII | Statistical Data | 7 |
| IX | Reports and Remittances | 8 |
| X | Errors and Omissions | 9 |
| XI | Inspection of Records | 9 |
| XII | Arbitration | 9 |
| XIII | Fees, Commissions, Premium Taxes and Policy Fees | 10 |
| XIV | Assessments, Assignments, Fines and Penalties | 13 |
| XV | Insolvency of Company | 13 |
| XVI | Hold Harmless | 14 |
| XVII | Regulatory Matters | 15 |
| XVIII | The General Agent | 15 |
| XIX | Loss in Excess of Policy Limits/ECO | 15 |
| XX | Loss and Unearned Premium Reserve Funding | 16 |
| XXI | Savings Clause | 16 |
| XXII | Miscellaneous | 17 |
| XXIII | Original Conditions | 17 |
| XXIV | Intermediary | 18 |

COLLINS
A S S O C I A T E S

**100% QUOTA SHARE REINSURANCE AGREEMENT**
**EFFECTIVE: MARCH 1, 1999**

**Issued to**

**STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY**

**1999 SUBSCRIBING REINSURERS**

| | |
|---|---|
| Kemper Reinsurance Company | 75% |
| Partner Reinsurance Company of the U.S. | 25% |
| | 100% |

COLLINS
A S S O C I A T E S



## 100% QUOTA SHARE REINSURANCE AGREEMENT

THIS 100% QUOTA SHARE REINSURANCE AGREEMENT (this "Agreement") is made and entered into as of the 1st day of March, 1999, by and between Subscribing Reinsurers executing the Interests and Liabilities Contracts attaching to and forming a part of this Agreement ("Reinsurer") and STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY, an insurance company organized under the laws of the State of Texas ("Company");

### WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

### PREAMBLE

It is understood that the Company and the Reinsurer (hereinafter identified collectively as the "Parties") hereto wish to enter into a reinsurance arrangement through which the Company is to bear no business, credit or insurance risk whatsoever (save the risk of the Reinsurer's insolvency). The Reinsurer shall hold the Company harmless and indemnify it for these and all risks. The sole consideration provided by the Company, in exchange for the fees set forth in Article XIII herein, is to permit the Policies (as hereinafter defined) which are 100% reinsured under this Agreement to be issued in the name of the Company. All provisions of this Agreement shall be interpreted so as to be in accord with this Preamble.

### ARTICLE I
### BUSINESS REINSURED

1.1    The Reinsurer hereby reinsures the Company, in the manner and to the extent set forth herein, under the Company's policies, certificates, binders, contracts or agreements (herein called "Policies") in force on the effective date hereof or, issued or renewed on or after that date on behalf of the Company by International Underwriters General Agency, Inc., a Texas corporation ("General Agent"), and classified by the Company, in its discretion, as a line of business which is authorized in the General Agency Agreement dated as of the date hereof, between the Company and the General Agent (the "General Agency Agreement"), which is attached hereto and made a part hereof for all purposes.

1.2    For purposes of this Agreement, the term "in force" shall mean the business written under that certain Quota Share Reinsurance Agreement dated effective March 1, 1998, by and among the Company, the General Agent, Underwriters MGA, Inc. and the subscribing reinsurers identified therein, which is in force at the effective date and time of this Agreement.

### ARTICLE II
### EXCLUSIONS

The following risks, perils and classes of business are specifically excluded:

2.1    If the General Agent binds or issues any business excluded, the Company shall notify the Reinsurer promptly upon actual knowledge of such business being bound or issued. The Reinsurer shall provide coverage for any such risk bound until canceled by the Company at any Reinsurer's request.

**COLLINS**
A S S O C I A T E S

 

(a) All business not specifically described as business covered under Schedule I of the General Agency Agreement.

(b) Business written on a co-surety or co-indemnity basis when the issuing company is not the controlling carrier.

(c) War Risks as excluded in the attached North American War Exclusion Clause (Reinsurance).

(d) Business excluded by the attached Nuclear Exclusion Clauses – Liability – Reinsurance – U.S.A., Physical Damage – Reinsurance – U.S.A., Liability – Reinsurance – Canada, and Physical Damage – Reinsurance – Canada.

(e) Financial Guarantee.

(f) Racing automobiles, and government law enforcement vehicles.

(g) As respects the Mexican National program:

  1. Vehicles garaged in the United States;
  2. Motorcycles, Travel Trailers and Motor Homes.

2.2 The foregoing exclusions list, other than c and d, shall not apply when the operations or exposures are only incidental to a comparatively small part of the original insured's major activities.

2.3 Errors and omissions notwithstanding, if without the knowledge and contrary to the instructions of its supervisory personnel, the Company is bound on a risk specifically excluded hereunder (other than c and d), or by an existing insured extending its operations, such reinsurance as would have been afforded but for the exclusion shall apply for a period of 30 days following receipt of said underwriting personnel of knowledge thereof.

ARTICLE III
OBLIGATORY AGREEMENT

3.1 Effective as of the effective date of this Agreement, the Company obligates itself to cede to the Reinsurer, and the Reinsurer obligates itself to accept, 100% of the Company's gross liability under all Policies issued by and on behalf of the Company by the General Agent in the State of Texas. The liability of the Reinsurer shall commence obligatorily and simultaneously with that of the Company, subject to the terms, conditions and limitations set forth in this Agreement.

3.2 Business ceded hereunder shall include every original policy, rewrite, renewal or extension (whether before or after the termination of this Agreement) required by applicable statute, or by rule or regulation of any policy of insurance ceded hereunder by the Company to the Reinsurer.

3.3 The maximum Policy limits subject to this Agreement are as follows:

(a) Mexican National Private Passenger Automobile Liability

  (1) Bodily Injury   $100,066 each person
            $300,066 each occurrence
  (2) Property Damage  $ 50,066 each occurrence

COLLINS
A S S O C I A T E S



(b)    Mexican National Commercial Automobile Liability

Combined Single Limit (CSL)        $1,000,066    each occurrence
                                   $1,000,066    each policy

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect plus $66.

## ARTICLE IV
## TERM AND CONDITION

4.1.    This Agreement shall become effective on the 1st of March, 1999, at 12:01 a.m., Central Time, as respects losses arising out of occurrences commencing under Policies in force, issued or renewed on or after such date at the offices of the Company, and shall remain continuously in force unless terminated by any party hereto.

4.2    This Agreement shall continue from the effective date and shall be automatically renewed for a term of one year from year to year unless terminated as set forth in this section. Any party hereto may cancel this Agreement with at least ninety (90) days prior written notice to the other party.

4.3    When this Agreement terminates for any reason, reinsurance hereunder shall continue to apply to the business in force at the time and date of termination until expiration or cancellation of such business. It is understood that any Policies with effective dates prior to the termination date but issued after the termination date are covered under this Agreement. Additionally, the reinsurance hereunder shall continue to apply as to Policies which must be issued or renewed, as a matter of state law or regulation or because a sub-agent has not been timely canceled, until the expiration dates of said Policies.

4.4    Upon termination of this Agreement, the Reinsurer, the General Agent and the Company shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to outstanding insurance business under this Agreement existing on the date of such termination. The Parties expressly covenant and agree that they will cooperate with each other in the handling of all such run-off insurance business until all Policies have expired either by cancellation or by terms of such Policies and all outstanding losses and loss adjustment expenses have been settled. While by law and regulation, the Company recognizes its primary obligations to its policyholders, the Reinsurer recognizes that to the extent possible there shall be no cost or involvement by the Company in servicing this run-off. All costs and expenses associated with the handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent and, to the extent not borne by the General Agent, solely by the Reinsurer. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while this Agreement is still in effect), then, consistent with this Agreement, the Reinsurer's obligation with respect to such run-off business shall continue and the Reinsurer shall either service such run-off business directly or appoint, at the Reinsurer's expense, a successor to the General Agent, subject to the approval of the Company, which approval shall not be unreasonably withheld. Such successor shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business.

COLLINS
A S S O C I A T E S




4.5    In addition to the provisions set forth in Section 4.2 herein, this Agreement may be terminated at any time in accordance with the following terms and conditions:

(a)    Immediately upon written notice by the Reinsurer or the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas;

(b)    Immediately by mutual consent of the Company and Reinsurer;

(c)    As provided in Section 21.1 of this Agreement;

(d)    By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(e)    After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(f)    Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed. By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed;

(g)    By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department having jurisdiction requires cancellation or disallows credit for this reinsurance;

(h)    After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(i)    After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 16.1 and/or Section 19.1 of this Agreement.

4.6    Notices hereunder shall be provided by certified or registered mail return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

4.7    In the event this Agreement is terminated, the Reinsurer shall remain liable to and shall, immediately upon request, reimburse the Company for any assessment made upon the Company by the Commissioner of Insurance of the State of Texas under Article 21.28-C (Texas Property and Casualty Insurance Guaranty Act) of the Texas Insurance Code, which applies to the risks

COLLINS
A S S O C I A T E S

reinsured hereunder to the effective date of termination. The Company shall likewise remain liable for, and account to the Reinsurer for any recovery of such assessment under Section 20 of said Article, or any credit allowed to it against its premium tax pursuant to Section 21 thereof, applicable to the risks reinsured hereunder.

4.8    The title and ownership of all undelivered Policies, books, supplies or other property related to the reinsured business is in the Company, and upon termination these shall be delivered immediately by the Reinsurer to the Company, without compelling the Company to resort to any legal proceedings to secure the aforesaid described property of the Company.

4.9    This Agreement provides for termination on runoff basis. The relevant provisions of this Agreement shall apply to the business being run off. It is expressly agreed that the terms, conditions and obligations of the Preamble; Sections 4.3, 4.4, 4.6, 4.7, 4.8 and 4.9; Articles VII-XXI; Sections 22.2, 22.3, 22.5, 22.7, 22.8; and Articles XXIII and XXIV shall survive termination of this Agreement.

4.10    Upon termination, the Company, at its option, may elect to terminate the Reinsurer's liability for all losses occurring subsequent to termination. The Reinsurer will return to the Company a portfolio representing the unearned premium reserve under this Agreement appropriate to the mode of termination.

ARTICLE V
TERRITORY

This Agreement will cover wherever the Company's Policies cover.

ARTICLE VI
CURRENCY

The currency to be used for all purposes of this Agreement shall be United States of America currency.

ARTICLE VII
LOSS AND LOSS ADJUSTMENT EXPENSE

7.1    Subject to Section 1.03 of the General Agency Agreement, all loss settlements made by the Company or the General Agent under the terms of this Agreement, whether under strict policy conditions or by way of compromise, shall be unconditionally binding upon the Reinsurer in proportion to its participation, and the Reinsurer shall benefit proportionately in all salvage and recoveries. The Reinsurer shall assume and be liable for and pay on behalf of the Company, 100% of all losses incurred in connection with the risks covered by this Agreement, including, but not limited to, judgments (including interest thereon) and settlements in connection therewith. The Reinsurer shall also be liable for and pay on behalf of the Company 7.5% of earned premium to cover loss adjustment expense, except that the Reinsurer shall pay on behalf of the Company 100% of the following fees:

(a)    Legal fees;
(b)    Court reporter fees, unless used by an adjuster in the investigation of claims;
(c)    Court costs;
(d)    Expert witness fees;

COLLINS
A S S O C I A T E S




(e)     Expert testimony fees;
(f)     Fees for commercial photographs requested by an attorney and will include photographs taken by the adjuster or commercial photographs requested by the adjuster while investigating the claim;
(g)     Fees for court maps or any diagram drawn to scale by a professional map maker;
(h)     Fees for medical examinations and reports;
(i)     Private detectives or investigators' fees;
(j)     Medical audit fees;
(k)     Appraisal fees; and
(l)     Declaratory judgment or injunctive action fees.

7.2     In the event the commission allowed the General Agent is adjusted downwards (as defined in Section 13.4), the General Agent shall offset the difference through a reduction of commission otherwise due the General Agent hereunder in accordance with the provisions of Section 13.4. Notwithstanding the foregoing, if for any reason the General Agent fails to remit such difference, the Reinsurer agrees to hold the Company harmless for said difference and shall reimburse the Company for the amount of the insufficiency. The Reinsurer and the General Agent (as applicable) shall be credited with any recovery of loss adjustment expense previously paid.

7.3     In the event the Reinsurer's liability for loss adjustment expenses incurred for any Agreement Year (as defined in Article XIII) exceeds 7.5% of premiums earned for the same Agreement Year, the General Agent shall offset the difference through a reduction of commission otherwise due the General Agent hereunder in accordance with the provisions of Article XIII. Notwithstanding the foregoing, if for any reason the General Agent fails to remit such difference, the Reinsurer agrees to hold the Company harmless for said difference and shall reimburse the Company for the amount of the insufficiency. The Reinsurer and the General Agent (as applicable) shall be credited with any recovery of loss adjustment expense previously paid.

7.4     The Reinsurer's 100% share of losses, expense and loss recovery shall be carried into the monthly accounting for which provision is hereinafter made. When, as the result of any one loss or other casualty covered by Policies of the Company, the total amount of such loss shall be due from the Reinsurer, the Reinsurer upon demand by the Company shall remit forthwith to the Company.

7.5     All records pertaining to claims arising under insurance policies issued on behalf of the Company through or by the General Agent subject to this Agreement shall be deemed to be jointly owned records of the Company and the Reinsurer, and shall be made available to the Company or the Reinsurer or their respective representatives or any duly appointed examiner for any state within the United States; and these records shall be kept in the State of Texas or such other jurisdiction as may be required by applicable state law or regulation. Notwithstanding the foregoing, the Reinsurer is authorized to maintain duplicate working files of all such records outside the State of Texas. The Company, the Reinsurer and the General Agent each agree that it will not destroy any such records in its possession without the prior written approval of the other parties except that the Company shall not be required to retain files longer than required by the guidelines set forth by any applicable state department of insurance.

7.6     The Reinsurer shall, or shall cause the General Agent to, establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or General Agent, with such claims register to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense. Such claim register shall be kept in a manner whereby the Company can, at any time, determine the

COLLINS
A S S O C I A T E S



status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon.

7.7     The General Agent will advise the Reinsurer by separate report, regardless of any question of liability or coverage, any claim involving the following:

    (a)     Fatalities.

    (b)     Bodily injuries involving:

        (1)     Brain stem, quadriplegic, paraplegic or severe paralysis;
        (2)     Serious burns;
        (3)     Amputations of major limbs;
        (4)     Serious impairment of vision.

    (c)     Potential coverage disputes or bad faith situations which may give rise to a payment for excess of Policy limits or extra contractual obligations.

    (d)     Any claims that do not fall within these categories, but have a potential of significant liability to the Reinsurer.

ARTICLE VIII
STATISTICAL DATA

In lieu of the Company furnishing the Reinsurer with bordereaux showing the particulars of all reinsurance ceded hereunder, the General Agent shall furnish, or cause to be furnished, to the Company as soon as practicable after the close of each of the respective periods indicated below (on forms agreeable to the parties hereto) with monthly, quarterly and annual reports showing the following statistical data in respect of the business reinsured hereunder.

    (a)     Monthly, with the data segregated by line of business

        (1)     Net premiums written (i.e., gross premiums less returns during the month) and unearned premium at the end of the month.

        (2)     Net losses paid (i.e., gross losses less salvages and other recoveries) and adjustment expenses paid during the month and loss reserves outstanding at the end of the month.

    (b)     Annually, with the data segregated by line of business; annual summaries of net premiums written, net losses paid, net adjusting expenses paid during the year in such form so as to enable the Company to record such data in its annual convention statement. In force and unearned premium segregated as to advance premiums, premiums running twelve (12) months or less from inception date of policy, and premiums running more than (12) months from inception date of policy in such form as to enable Company to record such data in its annual convention statement.

COLLINS
A S S O C I A T E S

(c)   Periodic, with data segregated by line of business, statistical or other data as may be requested from time to time by regulatory authorities.

## ARTICLE IX
## REPORTS AND REMITTANCES

9.1   The Company will cede to the Reinsurer its 100% share of the unearned premium on the business in force at the inception of this Contract. The General Agent shall report to the Reinsurer the following:

(a)   Ceded unearned premium;

(b)   General Agent's commission thereon;

(c)   Ceding fee to the Company as provided in Section 13.2.

The General Agent shall remit the balance due to the Reinsurer.

9.2   Within 30 days after the end of each month, the General Agent shall report to the Reinsurer the following:

(a)   Ceded net written premium for the month;

(b)   General Agent's commission thereon;

(c)   Ceding fee to the Company as provided in Section 13.2;

(d)   Ceded paid losses and loss adjustment expenses for the month of account, provided such losses and loss adjustment expenses have not been reported by the Company in any previous monthly report;

(e)   Ceded unearned premium at the end of the month;

(f)   Ceded outstanding losses and loss adjustment expenses outstanding at the end of the month.

9.3   Within 45 days after the end of each month, the General Agent shall remit to the Reinsurer the following:

(a)   Ceded net written premium during the month, less;

(b)   General Agent's commission thereon, less;

(c)   Paid losses and loss adjustment expenses paid, provided such losses and loss adjustment expenses have not been deducted on behalf of the Company in any previous monthly report.

COLLINS
A S S O C I A T E S

 

The positive balance of (a) less (b) less (c) shall be remitted by the General Agent with its report. Any balance shown to be due the Company shall be remitted by the Reinsurer as promptly as possible after receipt and verification of the General Agent's report.

## ARTICLE X
## ERRORS AND OMISSIONS

10.1   The Company shall not be prejudiced in any way by any omission through clerical error, accident or oversight to cede to the Reinsurer any reinsurance rightly falling under the terms of this Agreement, or by erroneous cancellation, either partial or total, of any cession, or by omission to report, or by erroneously reporting any losses, or by any other error or omission, but any such error or omission shall be corrected immediately upon discovery.

10.2   Should the Company suffer any loss whatsoever, the Reinsurer shall assume loss for its own account and save and hold the Company harmless therefor.

## ARTICLE XI
## INSPECTION OF RECORDS

The books and records pertaining to liability and losses under this Agreement maintained by any party hereto shall at all times be subject to the inspection by an authorized representative of any other party hereto. This provision shall survive the termination of this Agreement.

## ARTICLE XII
## ARBITRATION

12.1   As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereinafter arising between the Company and the Reinsurer with respect to this Agreement or with respect to these Parties' obligations hereunder, whether such dispute arises before or after termination of this Agreement, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

12.2   One arbiter (an "Arbiter") shall be chosen by the Company and one Arbiter shall be chosen by the Reinsurer and an umpire (an "Umpire") shall be chosen by the Arbiters, all of whom shall be active or retired, disinterested executive officers of property and casualty insurance or reinsurance companies.

12.3   In the event that a party fails to choose an Arbiter within thirty (30) days following a written request by either party to the other to name an Arbiter, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within thirty (30) days following their appointment, either party may petition the American Arbitration Association to appoint an Umpire.

12.4   Each party shall present its case to the Arbiters and Umpire within thirty (30) days after the selection of the Umpire, unless the period is extended by the Arbiters and the Umpire in writing, and/or at a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Parties shall be final and binding on the parties; provided, however, that the Arbiters and Umpire shall have no authority to

COLLINS
A S S O C I A T E S



award punitive damages to one party in respect of the actions or inactions of the other party. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

12.5    Each party shall pay the expenses of its Arbiter and attorneys and one-half of the fees of the Umpire and the common expenses of the arbitration, unless a majority of the Arbiters and Umpire determine otherwise.

12.6    In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including in such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. Any such written election must be provided to the other party within ten (10) business days of the receipt by such party of any documents wherein the amount of the claim or counterclaim is first stated to be in excess of Two Million Dollars ($2,000,000). In the event of any such litigation between the Company and the Reinsurer, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

## ARTICLE XIII
### FEES, COMMISSIONS, PREMIUM TAXES AND POLICY FEES

13.1    In consideration of the acceptance by the Reinsurer of one hundred percent (100%) of the Company's liability on insurance business reinsured hereunder, the Reinsurer is entitled to one hundred percent (100%) of the Net Premiums (as hereinafter defined) received by the General Agent or the Reinsurer on Policies reinsured less (i) the ceding fee allowed the Company pursuant to Section 13.2 hereof, (ii) the commission paid to the General Agent and (iii) premium taxes on Policies subject to reinsurance hereunder. "Net Premiums" shall mean the gross premiums (excluding policy fees) charged on all original and renewal Policies written on behalf of the Company, less return premiums.  Such amounts as provided in Section 5.09 of the General Agency Agreement shall be paid to the Reinsurer or received from the Reinsurer by the General Agent on behalf of the Company.

13.2    It is understood that the Reinsurer shall pay the Company directly a fee within forty-five (45) days following the end of each month (to the Company's designated agent, T.B.A. Insurance, Inc. ("TBA"), as a ceding fee), 5% of Net Premiums and Net Policy Fees, plus the amount of assessments and state premium taxes as provided in this Article XIII. (The ceding fee amount shall be computed on a calendar year basis based on premium written in each annual period ended December 31st.)   Notwithstanding anything else contained herein to the contrary, regardless of the amount of Net Premiums, the minimum ceding fee due the Company shall be $50,000 for each six-month period of each calendar year ended December 31st during which the Agreement is in effect, plus the aforementioned assessments and state premium taxes. The minimum ceding fee payable to the Company for the four-month period from March 1, 1999 to June 30, 1999 shall be $33,334. (This minimum ceding fee applicable to each successive six-month period shall not be affected by the amounts of Net Premiums written in other six-month periods and shall not be reduced by reason of payments in excess of the minimum in other periods.  The minimum ceding fee for each period shall be paid within sixty (60) days of the end of each period.  For these purposes, a policy's entire premium shall be applied to the period in which the policy is written.)

13.3    The Reinsurer shall allow the General Agent a provisional commission of 31.50% on all premiums ceded to the Reinsurer hereunder. The General Agent shall allow the Reinsurer return

COLLINS
A S S O C I A T E S



commission on return premiums at the same rate. This is an obligation owing directly from the Reinsurer to the General Agent. The General Agent shall not seek to recover from the Company, any commissions due and the Reinsurer shall not seek to recover from the Company, any return commissions due.

13.4    The commission allowed the General Agent shall be adjusted for each Agreement Year in accordance with the provisions set forth below:

(a)    The adjusted commission rate shall be calculated as follows and be applied to premiums earned for the period under consideration:

(1)    If the ratio of losses incurred to premiums earned is 62.0% or greater, the adjusted commission rate for the period under consideration shall be 31.50%.

(2)    If the ratio of losses incurred to premiums earned is less than 62.0%, but not less than 35.0%, the adjusted commission rate for the period under consideration shall be 31.50%, plus 66.7% of the difference in percentage points between 62.0% and the actual ratio of losses incurred to premiums earned.

(3)    If the ratio of losses incurred to premiums earned is 35.0% or less, the adjusted commission rate for the period under consideration shall be 49.50%.

(b)    If the ratio of losses incurred to premiums earned for any period is greater than 62.0%, the difference in percentage points between the actual ratio of losses incurred to premiums earned and 62.0% shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a debit (additional) to losses incurred. If the ratio of losses incurred to premiums earned for any period is less than 35.0%, the difference in percentage points between 35.0% and the actual ratio of losses incurred to premiums earned shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a credit to losses incurred.

(c)    Except as provided in Subparagraph (d), the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the end of each adjustment period, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the adjustment period as of the date of adjustment is less than commission previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the adjustment period of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

COLLINS
A S S O C I A T E S



(d)    As respects the final adjustment period, the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the date of termination, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

(e)    "Net policy fees" shall mean gross policy fees charged on all original and renewal policies written on behalf of Company, less return policy fees.

(f)    "Losses incurred" as used herein shall mean the balance of the following, all as respects losses and loss adjustment expenses ceded under this Agreement:

　　(1)    Ceded losses and loss adjustment expenses paid as of the effective date of calculation; plus

　　(2)    The ceded reserves for losses and loss adjustment expenses outstanding as of the effective date of calculation; plus

　　(3)    As respects second and each subsequent Agreement Year hereunder, plus (minus) the debit (credit) from the preceding Agreement Year as set forth in paragraph (b) above; plus

　　(4)    Any assignments and/or assessments as set forth in Article XIV.

(g)    "Ceded premiums earned" or "premiums earned" as used herein shall mean ceded net written premiums allocated to the Agreement Year (i.e., net of cancellations and return premiums), less the unearned portion thereof as of the effective date of calculation, all as respects premiums ceded under this Agreement.

(h)    "Agreement Year" as used herein shall mean the period from March 1, 1999 to February 29, 2000, both days inclusive, and each subsequent twelve month period thereafter that this Agreement continues in force.

13.5    It is expressly agreed that the commission allowed the General Agent includes provision for premium taxes and ceding fees. General Agent shall pay to the Company all premium taxes payable for policies subject to reinsurance hereunder.

13.6    It is expressly agreed that, for purposes of calculating the developed commission rate, the results of the State National Insurance Company, Inc. Quota Share Reinsurance Agreement shall be combined with the results of the business hereunder.  However, should the results of one program be in a deficit position, while the other program develops a commission in excess of the

3/9/00__3664.doc                                                    - 12 -



 

provisional commission, no additional commission will be payable until the deficit has first been eliminated.

## ARTICLE XIV
## ASSESSMENTS, ASSIGNMENTS, FINES AND PENALTIES

14.1 The Reinsurer hereby assumes liability for any and all assessments and assignments imposed as a result of Policies reinsured hereunder (whether before or after the termination of this Agreement). The Reinsurer shall immediately reimburse the Company for any assessments made against the Company pursuant to those laws and regulations creating obligatory funds (including, but not limited to, insurance guaranty and insolvency funds), pools, joint underwriting associations, FAIR plans and similar plans. Amounts owed by the Reinsurer under this Section shall be payable directly by the Reinsurer to the Company. The Reinsurer shall be entitled to receive from the Company on or prior to the 31st day of March of each year thereafter (or such date on which such premium taxes are paid) a sum equal to the premium tax credit that is allowed to the Company with respect to such assessments. The premium tax credit allowed the Reinsurer hereunder is to be on a pro-rata and first-in, first-out basis. The Company shall promptly return to the Reinsurer any amount of assessment refunded to or credited to the Company.

14.2 This Agreement shall apply to risks assigned to the Company under any assigned risk plan if, in the reasonable judgment of the Company, such risks were assigned to the Company because of the business written and reinsured hereunder.

14.3 The Reinsurer shall also pay promptly and directly to the Company any fines, penalties and/or any other charge incurred by the Company as respects the business reinsured hereunder arising out of the actions or inactions of the General Agent unless such fines, penalties and/or any other charge was a direct result of any willful misconduct on the part of the Company.

## ARTICLE XV
## INSOLVENCY OF COMPANY

15.1 In the event of the insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, the portion assumed by the Reinsurer shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the Company without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claim.

15.2 It is agreed and understood that in the event of the insolvency of the Company, the liquidator or receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim is filed in the insolvency proceeding; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

15.3 It is further agreed and understood that as to all reinsurance made, ceded, renewed or otherwise becoming effective hereunder, the reinsurance shall be payable by the Reinsurer directly

**COLLINS**
A S S O C I A T E S




to the Company or its liquidator, receiver or statutory successor, except where the Reinsurer has expressly assumed in writing such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policy and in substitution for the obligation of the Company to such payees.

### ARTICLE XVI
### HOLD HARMLESS

16.1   In consideration of these presents and the reciprocal benefits derived by the Company and the Reinsurer hereunder, the Reinsurer hereby holds the Company harmless from, and assumes all liability for, every claim, demand, liability, loss, damage, cost, charge, attorneys' fees, expense of suit, order, judgment and adjudication of whatever kind or character incurred by the Company in connection with this Agreement or any contract or transaction related thereto, including, but not limited to, all costs and fees incurred by the Company in asserting its rights hereunder. The Reinsurer's obligations hereto relate to, but are not limited to, the following: all liability for agents' balances, return premiums and commissions, deceptive trade practice liability, premiums, policy fees, premium taxes or other charges (whether collected or not); all actions or inactions by the General Agent, its sub-agents or any independent claims adjusters relating to this Agreement and the General Agency Agreement; and any agreement with a premium finance company, and all fees owing to the General Agent under this and the aforementioned related agreements.

Notwithstanding anything to the contrary, this provision shall not apply to:

(a)   Fraud, dishonesty, theft or collusion on the part of any director, officer or employee of the Company, or

(b)   Policies not reinsured hereunder, or the Company's failure to perform its duties and obligations under this Agreement due to the Company's willful misconduct, or

(c)   Expenses incurred by the Company under Section 12.5 hereof, or

(d)   Costs and fees incurred by the Company in connection with litigation under Section 12.6 hereof wherein the Reinsurer is the prevailing party.

16.2   In the event any provision, term and/or condition of this Agreement (other than the Preamble hereof) is inconsistent with the provision terms and/or conditions of Section 16.1 above, the provisions, terms and/or conditions of said Section 16.1 above shall control over and supersede such inconsistent provisions, terms and/or conditions.

16.3   The Company shall not be liable to the Reinsurer for premiums unless the Company itself has actually received those premium and wrongfully not remitted them to the Reinsurer. The Reinsurer may not offset any balances on account of losses, loss adjustment expenses or any other amounts due except as to premiums actually received by the Company itself (as distinct from premiums not collected, or premiums collected by the General Agent, or premium placed in the premium trust account pursuant to the General Agency Agreement) which have wrongfully not been transmitted to the Reinsurer.

16.4   If for any reason the General Agent fails or is unable to administer the Policies reinsured hereunder (whether the Agreement is still in effect or the business is being run-off), the Reinsurer shall appoint a party (acceptable and approved by the Company) to administer the business and the Reinsurer shall be responsible for 100% of the cost of said administration. If return premiums or





other funds need to be returned to premium finance companies, policyholders or sub-agents, the Reinsurer shall pay these amounts if the successor or General Agent does not.

16.5    The Reinsurer shall not sue, or seek arbitration, against the Company for any acts of the General Agent for any monies which the General Agent owes unless the Company has actually received those monies and has wrongfully not remitted them to the Reinsurer; and the Reinsurer shall indemnity the Company for any damages, liabilities and expenses incurred by reason of the General Agent's acts or failure to act. The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement and the General Agent shall not sue, or seek arbitration against, the Company for any actions by, or debts owing from, the Reinsurer. The Reinsurer shall not seek to recover from, or offset against, the Company any sums, whether premiums or other monies, which the General Agent was unable or unwilling to remit to the Company or the Reinsurer.

ARTICLE XVII
**REGULATORY MATTERS**

17.1    It is the Parties' understanding that any premiums which are overdue from the General Agent to the Company may be deemed non-admitted assets. In confirmation of the liabilities assumed by the Reinsurer under this Agreement, the Reinsurer hereby assumes 100% of all liability and responsibility for all premiums in the course of collection.

17.2    The Reinsurer shall agree, at no cost to the company, to take those actions (including, but not limited to, modifications in how funds are handled and how accounts are cleared, settled and the manner in which incurred losses are accounted for) and agree to those arrangements necessary to ensure that the Company suffers no adverse impact because of this reinsurance program and is in compliance with any applicable laws of a state insurance department, insofar as this reinsurance program is concerned.

ARTICLE XVIII
**THE GENERAL AGENT**

The Reinsurer has selected the General Agent to administer the business reinsured hereunder. While for regulatory purposes, the General Agent will need to be appointed as the Company's agent, it is recognized that the General Agent is acting on behalf of the Reinsurer and that the Reinsurer shall be responsible for monitoring the General Agent's compliance with the provisions of the Agreement and the General Agency Agreement. The Company is making no evaluation of the General Agent's qualifications and has no obligation to furnish reports or statistics to the Reinsurer. The Company shall file with each applicable state all reports requested by such state based upon information received from the General Agent and Reinsurer.

ARTICLE XIX
**LOSS IN EXCESS OF POLICY LIMITS/ECO**

19.1    In the event the Company pays or is held liable to pay an amount of loss in excess of its policy limit, but otherwise within the terms of its policy (hereinafter called "loss in excess of policy limits") or any punitive, exemplary, compensatory or consequential damages, other than loss in excess of policy limits (hereinafter called "extra contractual obligations") because of alleged or actual bad faith or negligence on its part in rejecting a settlement within policy limits, or in discharging its duty to defend or prepare the defense in the trial of an action against its policyholder, or in discharging its duty to prepare or prosecute an appeal consequent upon such an

COLLINS
A  S  S  O  C  I  A  T  E  S



action, or in otherwise handling a claim under a policy subject to this Agreement, 100% of the loss in excess of policy limits and/or 100% of the extra contractual obligations shall be added to the Company's loss, if any, under the Policy involved, and the sum thereof shall be reinsured 100% under this Agreement.

19.2    An extra contractual obligation shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

19.3    Notwithstanding anything stated herein, this Agreement shall not apply to any loss incurred by the Company as a result of any fraudulent and/or criminal act which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals, by any officer or director of the Company acting individually or collectively or in collusion with any individual, corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

### ARTICLE XX
### LOSS AND UNEARNED PREMIUM RESERVE FUNDING

In the event that either (i) the Texas Department of Insurance or other regulatory entity having authority over this Agreement requires cancellation or disallows credit for this reinsurance or (ii) the Reinsurer's A.M. Best rating at any time is lower than A-, the Reinsurer will immediately secure its obligations under this Agreement via a security fund agreement to be executed by the Reinsurer and the Company, which security fund agreement shall be in form and content acceptable to the Company.

### ARTICLE XXI
### SAVINGS CLAUSE

21.1    If any law or regulation of any Federal, State or local government of the United States of America, or the ruling of officials having supervision over insurance companies, should prohibit or render illegal this Agreement, or any portion thereof, as to risks or properties located in the jurisdiction of such authority, either the Company or the Reinsurer may upon written notice to the other suspend or abrogate this Agreement insofar as it relates to risks or properties located within such jurisdiction to such extent as may be necessary to comply with such law, regulations or ruling. Such illegality shall in no way affect any other portion thereof; provided, however, that the Reinsurer or the Company may terminate or suspend this Agreement insofar as it relates to the business to which such law or regulation may apply.

21.2    This Agreement shall be interpreted in accordance with the laws of the State of Texas. All provisions of this Agreement are intended to be enforced to the fullest extent permitted. Accordingly, should a court of competent jurisdiction or arbitration panel determine that the scope of any provision is too broad to be enforced as written, the Parties intend that the court or arbitration panel should reform the provision to such narrower scope as it determines to be enforceable under present or future law; such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance.

COLLINS
A S S O C I A T E S



23.2    Except as provided in Article XV, nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not parties to this Agreement.

ARTICLE XXIV
**INTERMEDIARY**

John B. Collins Associates, Inc. is hereby recognized as the intermediary negotiating this Contract.  All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvage and loss settlements) relating hereto shall be transmitted to the Company and the Reinsurer through John B. Collins Associates, Inc., 8300 Norman Center Drive, Minneapolis, Minnesota 55437.  Payments by the Company to John B. Collins Associates, Inc. shall be deemed to constitute payment to the Reinsurer.  Payments by the Reinsurer to John B. Collins Associates, Inc. shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

IN WITNESS WHEREOF, the Company by its duly authorized representative has executed this Agreement in duplicate as of the date first above mentioned.

DATED: _____          STATE AND COUNTY MUTUAL FIRE
                                     INSURANCE COMPANY

                                     BY:_____

                                     ITS._____



**EXHIBIT "B"**

No. 2003-05-2265-C

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC. | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § § | |
| v. | § | 197TH  JUDICIAL DISTRICT |
| GE REINSURANCE CORPORATION ("GE"), AND SPENCER TUCKER ("TUCKER") | § § § § § § | |
| Defendants. | § | CAMERON COUNTY, TEXAS |

---

### GE REINSURANCE CORPORATION'S NOTICE OF REMOVAL

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

**PLEASE   TAKE   NOTICE,** that on June 9, 2003, GE REINSURANCE CORPORATION removed this action to the United States District Court for the Southern District of Texas. A copy of the Notice of Removal is attached hereto. This Court should proceed no further concerning this lawsuit.

Respectfully submitted,

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
300 Convent Street, Suite 1500
San Antonio, Texas 78205
Telephone: (210) 281-7000
Telecopier: (210) 224-2035

RICK H. ROSENBLUM
Attorney-in-Charge

1

State Bar No. 17276100
ROBERTA J. SHARP
State Bar No. 00788400
NADA L. ISMAIL
State Bar No. 24036825

ATTORNEYS FOR DEFENDANT
GE REINSURANCE CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on the counsel of record by facsimile and certified mail, return receipt requested, on the ___ day of June, 2003.

Christopher Lee Phillippe
307-3 McFadden Drive
Brownsville, Texas  78521

NADA L. ISMAIL

4002003.0006 SAN ANTONIO 324965 v1

**EXHIBIT "C"**

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. _____ |
| V. | § § | |
| GE REINSURANCE CORPORATION ("GE") AND SPENCER TUCKER ("TUCKER") | § § § § | |
| Defendants. | § § | |

## LIST OF ALL COUNSEL OF RECORD

Party

Attorney(s)

Plaintiff:
International Underwriters General Agency

Christopher Lee Phillippe
307-3 McFadden Drive
Brownsville, Texas  78521
Telephone: (956) 544-6096
Telecopier: (956) 982-1921

Defendants:
GE Reinsurance Corporation
Spencer Tucker

Rick H. Rosenblum
Roberta Sharp
AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
300 Convent, Suite 1500
San Antonio, Texas 78212
Telephone: (210) 281-7000
Telecopier: (210) 224-2035