**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

PM 2:08

United States District Court
Southern District of Texas
FILED

FEB 1 7 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. B-03-108 |
| GE REINSURANCE CORPORATION AND SPENCER TUCKER, | § § § § | |
| Defendants. | § § | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S**
**FIRST SUPPLEMENTAL MOTION TO REMAND**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Plaintiff submitted this First Supplemental Opposed Motion to Remand ("Supplemental Motion") in a further attempt to argue that Court should not exercise diversity jurisdiction over this case.[1] More specifically, Plaintiff supplemented its original Motion to Remand to assert that Texas Insurance Code Article 21.21 is applicable to Spencer Tucker because he is "person" engaged in the business of insurance, as defined under Texas Insurance Code Article 21.21, section 2.

By lodging this new argument, Plaintiff apparently hopes to show that there is a possible cause of action against Tucker under the Texas Insurance Code. Nevertheless, a close examination of this new argument in Plaintiff's Supplemental Motion, reveals that like Plaintiff's previous motion, this Motion states no basis to challenge the Court's exercise of diversity

---

[1] Defendant incorporates by reference the arguments and authorities in its original Opposition to Plaintiff's Motion to Remand, which was filed on July 29, 2003 (See Docket Entry # 8).

jurisdiction. Accordingly, Defendant asks the Court to deny Plaintiff's Opposed Motion to Abstain and to Remand, deny its Supplemental Motion, dismiss Spencer Tucker from this suit, and exercise diversity jurisdiction in this case.

**I.**   **SPENCER TUCKER ["TUCKER"] WAS FRAUDULENTLY JOINED IN THIS ACTION BECAUSE THERE IS NO POSSIBILITY OF ESTABLISHING AN ARTICLE 21.21 CAUSE OF ACTION AGAINST HIM.**

**A.**   **Plaintiff's Petition Fails to Allege Tucker is a "Person" under Article 21.21, section 2.**

Plaintiff supplemented its Motion to Remand to contend, for the first time, that Article 21.21 is applicable to Tucker because he is a "person" engaged in the business of insurance, as defined under Texas Insurance Code Article 21.21, section 2. Plaintiff's petition, however, does include any such allegation. Rather, in its petition, Plaintiff merely alleges that "Defendants' conduct, described herein, constitutes multiple violations of the Texas Insurance Code."[2] Plaintiff further asserts that "these violations include Article 21.21 which prohibits an insurance carrier from engaging in false, misleading and deceptive conduct."[3]

Under the law, a fraudulent joinder determination hinges on an analysis of the causes of action alleged in Plaintiff's petition *at the time of removal. See Tedder v. F.M.C. Corp.*, 590 F.2d 115, 116-17 (5th Cir. 1979) (emphasis added). But there is simply nothing in Plaintiff's petition placing Defendant on notice of its allegation that Tucker is a "person" under Article 21.21, section 2. Plaintiff cannot now rely on conclusory allegations in its Supplemental Motion to overcome the deficiencies in its petition in an effort to convince the Court that a remand is appropriate. *See Badon v. NJR Nabisco, Inc,* 224 F.3d 382, 392-93 (5th Cir. 2000). Therefore,

---

[2]   *See* Exhibit J, *Plaintiff's Original Petition and Application for Injunctive Relief,* ¶17.

[3]   *Id.*

Plaintiff's new allegations in its Supplemental Motion should be disregarded in determining whether Tucker was fraudulently joined in this action.

**B.    Plaintiff Has Failed to Allege Any Facts Showing that Tucker is Liable Under Article 21.21.**

Even if Plaintiff's petition had asserted its theory that Article 21.21 is applicable to Tucker, Plaintiff has still failed to allege any specific actions by Tucker that have violated Article 21.21. To remedy this obvious defect, Plaintiff argued at the hearing, for the first time, that Tucker had violated Article 21.21, section 4(11) because he made misrepresentations regarding an insurance policy.[4]

But Plaintiff's desperate attempt to show that Tucker's actions somehow violated the Texas Insurance Code cannot succeed. Article 21.21, section 4(11) provides that a person is in violation of Article 21.21 if he "misrepresent[s] an insurance policy by: (a) making an untrue statement of material fact; (b) failing to state a material fact that is necessary to make other statements made not misleading, considering the circumstances under which the statements were made; (c) making a statement in such manner as to mislead a reasonably prudent person to a false conclusion or material fact; (d) making a material misstatement of law, or (e) failing to disclose any matter required by law to be disclosed, including a failure to make a disclosure in accordance with another provision of this code." TEX. INS. CODE. art. 21.21, §4(11) (Vernon Supp. 2003). The plain language of this section clearly requires the showing that an insurance policy is at issue. *See Id.*

Here, Plaintiff cannot meet the fundamental requirement for asserting this cause of action, as it is undisputed Defendant never issued an insurance policy to Plaintiff.[5] Plaintiff, in

---

[4]    *See* Transcript of Hearing held on January 26, 2004, Docket Entry #25. The transcript is on Order and will be submitted as soon as it is received.

[5]    *See id.*

fact, admitted at the hearing that Tucker never misrepresented terms of an insurance policy and agreed that the real dispute centers on Defendant's failure to renew a line of reinsurance to State National Insurance and State and County Mutual Fire Insurance Company.[6]  This concession is consistent with the factual allegations in Plaintiff's petition.[7]

Because Plaintiff's petition and the arguments it asserted at the hearing fail to show that Defendant issued an insurance policy to Plaintiff and that Tucker made any misrepresentations about an insurance policy, Plaintiff cannot establish that there is a viable Article 21.21, section 4(11) cause of action against Tucker.

**C.     Statute of Limitations has Expired on Any Article 21.21 Claim Plaintiff May Have Against Tucker.**

Moreover, even if Plaintiff's factual allegations were sufficient to a Texas Insurance Code claim against Tucker, there is no possibility Plaintiff could succeed on this claim because any Texas Insurance Code claim it may have had is barred by the statute of limitations.

Based on the skeletal facts asserted in Plaintiff's petition, it appears all of Plaintiff's complaints arise from the cancellation of the three reinsurance contracts.[8]  The three reinsurance

---

[6]    *Id;*  For the reinsurance agreements between Defendant and State National Insurance and State and County Mutual Fire Insurance Company see Exhibits E, F, and G.  Plaintiff was not a party to either one of those contracts. *See Id.*

[7]    *See* Exhibit J, *Plaintiff's Original Petition and Application for Injunctive Relief,* ¶¶9, 10.

[8]    In Defendant's answer and previous pleadings, it mistakenly referred to only four contracts.  However, the transactions giving rise to this suit are the subject of, and governed by, five, not four, written agreements.  Three of those agreements relate to the line of reinsurance issued by Defendant.  The following are the agreements at issue in this case:

   (a)  The General Agency Agreement between International Underwriters General Agency, Inc. ("IUGA") and State and County Mutual Fire Insurance Company;

   (b)  The General Agency Agreement between IUGA and State National Insurance Company, Inc;

   (c)  The Quota Share Reinsurance Contract between State National Insurance Company and Kemper Reinsurance Company (Defendant GE is the successor in interest to Kemper);

   (d)  The 100% Quota Share Reinsurance Contract between State and County Mutual Fire Insurance Company and Kemper Reinsurance Company; and

   (e)  The Excess Stop Loss Reinsurance Agreement.

Again, note that there is no agreement between Defendant and Plaintiff.  True and correct copies of these agreements are attached hereto as Exhibits C-G, respectively.

contracts in question were terminated by the end of April 2001.[9]  In Texas, a claim brought under the Texas Insurance Code must be filed within two years of the date the allegedly unfair act or practice occurred.  TEX. INS. CODE ANN. Art. 21.21, §16(d) (Vernon Supp. 2003).  Here, Plaintiff filed suit on May 2, 2003, which was more than two years after the contracts were terminated.

In conclusion, any possible claim of a violation of the Texas Insurance Code arose some time between February and April 2001.  Because Plaintiff filed suit on May 2, 2003, there is simply no possibility of recovery against Tucker on any Texas Insurance Code claim.

## II.    PLAINTIFF'S REQUEST FOR SANCTIONS IS IMPROPER AND SHOULD BE DENIED.

Finally, Plaintiff asks this Court to grant sanctions against Defendant because it removed this case on the basis that diversity jurisdiction existed because Spencer Tucker was fraudulently joined.  This request is simply frivolous, as it is without any support in fact or in law.  Plaintiff fails to cite to any statute and provides no authority to support its assertion that sanctions are appropriate in this situation.  Further, Plaintiff fails to cite to any specific conduct by Defendant that would be subject to sanctions.  Instead, Plaintiff states, in a conclusory manner, Defendant had no plausible basis for claiming this Court had jurisdiction.

Contrary to this unfounded assertion, Defendant's responses both to Plaintiff's original Motion to Remand and Plaintiff's Supplemental Motion show there are both factual and good faith legal bases to argue Tucker was fraudulently joined and diversity jurisdiction exists in this case.  Accordingly, Defendants asks this Court to deny Plaintiff's request for sanctions.

---

[9]    *See* Exhibits A and B for letters dated November 29, 2000 and February 19, 2001.  See also Exhibit K for the Affidavit of David Brodnan, ¶¶4-7.  In fact, Alejandro Villarreal Alba's affidavit asserts the alleged actions, about which he is complaining, occurred on March 1, 2001.  *See* Exhibit I for the Affidavit of Alejandro Villarreal Alba, President of International Underwriters General Agency.

# EXHIBIT A



**GE Reinsurance**

GE Reinsurance Corporation
475 Half Day Road, Suite 300
Lincolnshire, IL 60069
847 876-1500, Fax: 847 876-1599
www.gereinsurance.com

CERTIFIED MAIL

November 29, 2000

Mr. Sean McCrary
John B. Collins Associates
5550 LBJ Freeway, Suite 355
Dallas, Texas 75240-6217

RE:    State National Insurance Company
       Commercial Auto Quota Share/Commercial Auto XOL
       Our Reference 23471-2/23473-0

Dear Sean,

Please accept this letter as our Notice of Cancellation to be effective February 28, 2001 in accordance with the captioned treaty.

We have issued this notice to protect our interests, while nevertheless anticipating that we will be afforded an opportunity and sufficient time to review and negotiate the terms and conditions of a renewal when such are available.

Should there be any overdue accounting matters, either original reporting or subsequent cash settlements, or any outstanding contract documentation, these issues would have to be resolved prior to continuation negotiations.

Please acknowledge receipt of this notice and transmittal to the cedent by signing and returning the duplicate of this letter.

Sincerely,

*Craig R. Ospalik*

Craig R. Ospalik
Program Manager

CRO:amd

**IUGA/GERE
00251**

I hereby acknowledge receipt of this notice and transmittal.

_____          12/6/00
Signature                          Date



**COLLINS**

A S S O C I A T E S

**CERTIFIED MAIL**

December 7, 2000

Mr. Craig R. Ospalik
GE Reinsurance Corporation
475 Half Day Road, Suite 300
Lincolnshire, IL  60069

Re:    State National Insurance Company
       State & County Mutual Fire Insurance Company
       Mexican National Private Passenger & Commercial
            Automobile Reinsurance Program
       Effective:  March 1, 2000

Dear Craig,

Per your request, please find enclosed Sean McCrary's signature acknowledging GE Re's provisional Notice of Cancellation effective February 28, 2001 on the captioned program.

If you should have any questions, please contact Andy Justice, Sean McCrary or me.

Sincerely,

Kelly Ahrens

Kelly M. Ahrens
Account Assistant

Enclosure

**IUGA/GERE
00250**

JOHN B. COLLINS ASSOCIATES, INC.

THREE LINCOLN CENTRE

KA12-1006.doc   5430 LBJ FREEWAY, SUITE 950   DALLAS, TEXAS 75240   972.392.0022   FAX 972 392 2266

BOSTON • CHICAGO • COLUMBIA, SC • DALLAS • HARTFORD • LONDON • MINNEAPOLIS • MUNICH • SAN FRANCISCO

# EXHIBIT B

  

**GE Reinsurance**

GE Reinsurance Corporation
475 Half Day Road, Suite 300, Lincolnshire, IL 60069
847 876-1500, Fax· 847 876-1599
www.gereinsurance.com

February 19, 2001

Pat Rastiello
Aon Re
1201 Elm Street
Suite 5320
Dallas, TX 75270

**RE: RESCISSION OF NOTICE OF TERMINATION and SUBSEQUENT
STIPULATION OF TERMINATION of State National / International
Underwriters MGA Mexican Nationals Auto Quota Share and XOL
Our Reference Numbers 23471-2 and 23473-0**

Dear Pat:

The notice of termination dated November 29, 2000 , issued by GE Reinsurance
Corporation with respect to the captioned treaties is hereby rescinded and both parties
agree that said treaties shall be extended with a revised termination date of April 30,
2001, subject to the condition below:

1. That International Underwriters MGA will limit premium production to no more than
   $300,000 per month for the extension period.

Please indicate your receipt of and agreement to the conditions of this letter by signing
below or by having the appropriate officer of International Underwriters MGA sign.
Return one copy to me and please forward to the State National companies.

(Please note that the State and County contract (our Reference Number 23472-1) remains
terminated effective February 29, 2001.)

Best regards,

Spencer W. Tucker

**IUGA/GERE
00013**

SP00113

The parties below have caused this Rescission of Notice of Termination and Subsequent Stipulation of Termination to be executed in duplicate.

| GE Reinsurance Corporation | On behalf of International Underwriters MGA |
|---|---|
| Name | Name |
| Title | Title |
| Date: 2/15/01 | Date: |

IUGA/GERE
00014

SP00113

# EXHIBIT C

# GENERAL AGENCY AGREEMENT

THIS GENERAL AGENCY AGREEMENT (this "Agreement") is made and entered into as of March 1, 1999, by and between STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY, an insurance company organized under the laws of the State of Texas ("Company") International Underwriters General Agency, Inc., a corporation organized under the laws of the State of Texas ("General Agent");

## WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

## PREAMBLE

The Company and the Subscribing Reinsurers ("Reinsurer"), have entered into that certain Quota Share Reinsurance Agreement dated as of March 1, 1999, a true and complete copy of which is attached hereto as Exhibit A and fully incorporated herein by this reference (the "Reinsurance Agreement"), which Reinsurance Agreement requires the appointment of the General Agent to perform certain specified acts on behalf of the Company and Reinsurer. The General Agent desires to perform the functions and duties necessary under the Reinsurance Agreement. It is therefore mutually agreed by the parties that the General Agent will perform all functions necessary for the production, service and management of policies reinsured under the Reinsurance Agreement in accordance with the terms and conditions set forth therein and herein. To the extent that there is any conflict between the terms of this Agreement and the Reinsurance Agreement, the Reinsurance Agreement shall govern. Notwithstanding any provisions to the contrary contained elsewhere herein or in any other document, it is expressly understood that the execution and delivery of this Agreement and the Company's performance hereunder shall not under any circumstances be interpreted to affect, weaken or modify the Reinsurer's obligation to indemnify and hold the Company harmless from and against the business, credit and insurance risks as set forth in the Reinsurance Agreement. The contractual assumption by the Reinsurer of these risks in the Reinsurance Agreement is a condition precedent to the Company's entering into this Agreement with the General Agent.

## ARTICLE I
## APPOINTMENT AND DUTIES

1.01    The Company hereby appoints the General Agent as its managing general agent for the purpose of producing and handling the business which is the subject of the Reinsurance Agreement issued or renewed on or after the effective date of this Agreement. The Company hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in Schedule I hereof; to secure, at its own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign policies, certificates, endorsements and binders which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

1.02    All activities of the General Agent pursuant to this Agreement shall be in strict compliance with the terms of the Reinsurance Agreement and all rules, regulations and instructions of the Company, including, but not limited to, all rules, instructions and specifications included in the Company's rate manuals, rate brochures and rate schedules.

1.03    The Company further authorizes the General Agent to perform all acts and duties under policies of insurance issued by the Company as would otherwise be performed by the Company, including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to the Company, and adjusting and paying losses or other claims. The Company grants to the General Agent the authority to settle claims on behalf of the Company. However, the maximum dollar amount of such authority per claim shall not exceed $30,000. For claims settlements in excess of $30,000, the General Agent may only settle such claims with prior approval of the Company and Reinsurer. Additionally, the General Agent must obtain the Reinsurer's prior approval for claims settlements in excess of the policy limits set forth in Section 1.09 hereof. The Company retains final authority to determine any disputes relating to claims settlement and setting of loss reserves. Should the Company be ordered or instructed by the Texas Department of Insurance or any other regulatory agency of competent jurisdiction to take any action or refrain from taking any action with regard to any claim, the General Agent shall be bound by and shall follow the order or instructions of such regulatory agency as though General Agent were the object of such order or instruction. The General Agent will exercise the authority granted hereunder in good faith and toward the end of paying any and all valid claims. The General Agent must send to the Company a report, within thirty (30) days of determination, that a claim (i) involves a coverage dispute; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) alleges a violation of the Texas Deceptive Trade Practices Act or other similar applicable statute; or (v) alleges a violation of the Texas Insurance Code, Article 21.21 (Unfair Competition and Unfair Practices) or other similar applicable statutes.

1.04    The General Agent is authorized to have claims adjusted through independent claims adjusters. The selection of independent claims adjusters shall be subject to prior written approval of the Company.

1.05    The Company shall not be responsible for the General Agent's expenses and costs, including, but not limited to, salaries, bonuses, rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, exchange, personal license fees, adjustment by the General Agent of losses under policies issued by the General Agent, or any other agency expenses whatsoever. The General Agent's sole compensation shall be the amounts payable to the General Agent in Article XIII of the Reinsurance Agreement and in Article III of this Agreement.

1.06    The General Agent understands and agrees that it has no power or authority granted to it by the Company independent of the Reinsurance Agreement, and that this Agreement and the General Agent's authority hereunder shall cease immediately upon termination, for any reason, of this Agreement or of the Reinsurance Agreement (excepting only the General Agent's responsibilities with regard to run-off and other matters as set forth herein or in the Reinsurance Agreement).

1.07    The General Agent shall not have the power to accept or bind risks other than as set forth herein or as may be subsequently authorized by the Company in writing. The General Agent may not bind or cede reinsurance or retrocession on behalf of the Company, may not commit the Company to participation in insurance or reinsurance syndicates, and may not commit the Company to a claim settlement with a reinsurer without the prior written approval of the Company. If such prior written approval is given, the General Agent shall forward promptly a report to the Company concerning such transaction and/or payment. The Company hereby authorizes the General Agent to collect payments for losses and loss adjustment expenses from a reinsurer. The General Agent shall send a report to the Company concerning such transactions promptly.

1.08    The General Agent acknowledges that, with respect to any state in which business is permitted to be written under this Agreement, this Agreement shall not become effective until the General Agent is duly appointed by the Company and on file with the insurance department of

2

such state. The General Agent agrees that any producing agent receiving commission pursuant to this Agreement shall first be duly appointed by the Company and said appointment on file with any applicable state insurance department. The General Agent further agrees to be responsible for the payment of any penalty assessed to the Company for any violation by the General Agent or any producing agent or broker appointed by the General Agent pursuant to the provisions of Article IV hereof of any license or appointment provision of the Texas Insurance Code or the rules and regulations promulgated thereunder.

1.09    The authority and limitations of the General Agent to issue policies are as follows:

(a) the maximum annual premium volume the General Agent may produce under this Agreement is $ 8 million.

(b) the basis of the rates charged are as provided in the Company's rate manuals, rate brochures and rate schedules which the General Agent shall follow;

(c) the only classes of business the General Agent is authorized to produce and handle under this Agreement are the classes of business specified in Schedule I hereto;

(d) the maximum limits of liability for policies to be produced pursuant to this Agreement are as follows:

    (1)    Mexican National Private Passenger Automobile Liability

| | | | | |
|---|---|---|---|---|
| (i) | Bodily Injury | $100,066 | each person |
| | | $300,066 | each occurrence |
| (ii) | Property Damage | $ 50,066 | each occurrence |

    (2)    Mexican National Commercial Automobile Liability

| | | |
|---|---|---|
| Combined Single Limit (CSL) | $1,000,066 | each occurrence |
| | $1,000,066 | each policy |

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect plus $66.

(e) the General Agent may issue policies under this Agreement only to domiciled in the State of Texas; but this limitation shall not apply to losses if said policies provide coverage outside the aforesaid territorial limit;

(f) the General Agent shall only cancel policies as set forth in the policy form for the policies produced hereunder or as otherwise permitted by applicable law;

(g) the maximum term for any policy issued hereunder shall be twelve (12) months;

(h) the General Agent shall employ all reasonable and appropriate measures to control and keep a record of the issuance of the Company's insurance policies hereunder, including, but not limited to, keeping records of policy numbers issued and maintaining policy inventories; and

(i) the excluded risks are those set forth in the Reinsurance Agreement.



In underwriting policies, the General Agent shall follow the underwriting guidelines developed by the General Agent and the Company, and these guidelines are herein incorporated by reference.

ARTICLE II
PREMIUMS

2.01    It is expressly agreed and understood that all premiums collected by the General Agent are collected on behalf of the Company; that such premiums are the property of the Company and the Reinsurer as their respective interests may appear pursuant to the Reinsurance Agreement, less such commissions and fees as are due the General Agent as specified herein and in the Reinsurance Agreement. All premiums collected by the General Agent on the business produced under this Agreement shall be deposited in a bank account separate and apart from all other bank accounts of the General Agent which reflects ownership of the account by the Company. The only disbursements from such account shall be the payment of claims, claims expenses, return premiums, commission due the General Agent as authorized herein and in the Reinsurance Agreement, remittance of premiums to the Reinsurer. The General Agent shall not make personal use of any funds in this separate account. The commissions payable to the General Agent under the Reinsurance Agreement are debts due to the General Agent by the Reinsurer and the privilege herein granted of deducting commissions from said premiums should not be taken as a waiver by the Company of its exclusive ownership rights of premiums as provided herein. Should any dispute arise between the Company, the Reinsurer and/or the General Agent regarding payment of premium, the General Agent shall remit immediately all money and property, without deductions for commissions, to the segregated account with full reservation of any and all rights reserved by the parties.

2.02    The General Agent shall furnish to the Company and the Reinsurer all necessary premium and loss data (in a form acceptable to the Reinsurer and the Company) no later than thirty (30) days following the end of the month during which the business is written or losses are incurred to enable the Company to record statistics required by statutes, regulation or upon call by authorities having competent jurisdiction. Such data shall include, but is not limited to, premiums written and unearned premium. Said data shall be segregated by lines of insurance and location of risk.

2.03    The keeping of an account with the General Agent on the Company's books as a creditor and debtor account is declared a record memorandum of business transacted and neither such keeping of an account, nor alteration in commission rate, nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account, shall be held to waive assertion of the trust relation as to premiums collected by the General Agent.

2.04    The General Agent shall be liable for the payment of all original and advance premiums upon all policies of insurance written through the General Agent or any sub-agents of the General Agent.

2.05    The General Agent shall remit to the Reinsurer any funds of or due to the Company under this Agreement at the earlier of the following: (1) fifty (50) days from the end of the month in which premium is recorded; or (2) ninety (90) days from the end of the month in which the coverage under this Agreement is issued.

2.06    The General Agent shall hold all funds of or due the Company in a fiduciary capacity.

4

## ARTICLE III
## COMPENSATION TO THE GENERAL AGENT

3.01    In partial compensation for the services rendered hereunder and under the Reinsurance Agreement the General Agent is entitled to the commission payable by the Reinsurer specified in Article XIII at the Reinsurance Agreement. The General Agent shall pay to the Company ceding fees and premium taxes from the commissions received by the General Agent hereunder and under the Reinsurance Agreement, as more particularly specified in Article XIII of the Reinsurance Agreement. The General Agent shall allow the Company return commission on return premiums at the same rates as received by the General Agent.

3.02    The General Agent's commission on premiums ceded to the Reinsurer is subject to adjustment as specified in Section 13.4 of the Reinsurance Agreement.

3.03    The General Agent shall be allowed to retain all policy and reinstatement fees derived from Policies issued or renewed under the Reinsurance Agreement.

3.04    The Company shall not be liable for or responsible for any commissions or other monies payable by the Reinsurer to the General Agent. The General Agent shall not sue or seek arbitration against the Company for any actions by, or debts owing from, the Reinsurer.

3.05    In the event the Company or the Reinsurer, during the continuance of this Agreement or after its termination, refunds premiums under any policy of insurance by reasons of cancellation or otherwise, the General Agent agrees immediately to return to the Company or the Reinsurer, as applicable, the commission previously received by it on the portion of the premium refunded. The General Agent shall not be required to return, as commission or return commission, monies greater than the total commission paid or otherwise payable to the General Agent.

## ARTICLE IV
## SUB-AGENTS

4.01 The General Agent may appoint such producing agents as shall be reasonably approved by the Reinsurer and the Company. The General Agent may not terminate the appointment of such agents without the written authorization of the Company.

4.02    The General Agent shall comply with, and shall be responsible to insure the compliance by, all such producing agents with the terms of this Agreement and the Reinsurance Agreement and all other written rules and regulations of the Company, and treat as confidential and use only in the interest of the Company all instructions, information and materials received from the Company.

4.03    The General Agent shall be solely responsible for the performances of any producing agents under all of the terms and provisions hereof, including, but not limited to, the collections of premiums and refunds of premiums.

4.04    Each such producing agent must receive any appointment required by applicable law as an agent of the Company or the General Agent through the appropriate regulatory body of the State of Texas before any application shall be accepted from him or other insurance performances on behalf of the Company are performed. The General Agent shall be ultimately responsible for the obligation of the producing agent to obtain any required appointment as provided herein. The General Agent shall have each producing agent appointed with the Company.

5

4.05   It is also specified that the General Agent shall be responsible for all commissions payable to any producing agents. The General Agent and any producing agent shall not seek to hold the Company liable through litigation, arbitration or otherwise for commissions payable to such producing agents.

4.06   The Company, in its sole discretion with or without cause, and without prior written notice, may terminate the appointment of any producing agent.

### ARTICLE V
### ADDITIONAL DUTIES OF AGENT

5.01   The General Agent shall, at all times during the period of this Agreement, comply with all applicable laws of the states in which it is producing business under this Agreement and all orders, policy decisions or other requirements of the Texas Department of Insurance.

5.02   All books, records, accounts, documents and correspondence of the General Agent and any producing agent pertaining to the Company's and Reinsurer's business shall, at all times, be open to examination by any authorized representative of the Company or Reinsurer. The General Agent shall make copies of records available upon request by the Company or Reinsurer, whether such request is before or after termination of this Agreement or the Reinsurance Agreement. The General Agent must maintain separate records of business, including, but not limited to, underwriting files for each insurer for whom it acts as a general agent pursuant to the Texas Insurance Code, Article 21.07-3, Section 3C(b) or any amendment or successor thereto. Such records must be maintained for five (5) years or until the completion of a financial examination by the insurance department of the state in which the Company is domiciled, whichever is longer.

5.03   The General Agent shall maintain adequate accounting procedures and systems, at no cost or expense to the Company, and shall provide statistics in a timely manner for all reporting requirements under the Reinsurance Agreement or as shall be required from time to time by the regulatory authorities of the State of Texas or any other applicable governmental agency or authority. Such statistical information shall be provided to the Company by the General Agent at the General Agent's sole cost and expense.

5.04   The General Agent shall forward to the Company, no later than the 30th day of the month following the month being accounted for, a report in detail of all policies of Insurance written or placed, or liability increased or decreased, or policies continued or renewed or canceled by or through the General Agent during the month being accounted for, which shall include all premiums due thereon whether collected or not. Such report shall show the net amount due to the Company and Reinsurer on all such business on the lines of business authorized to be written by the General Agent and the amounts paid in losses, loss adjustment expenses and commissions. Such report shall also include, to the extent not already included, both insurance and reinsurance transactions and all transactions pursuant to Texas Insurance Code, Article 21.07-3, Section 3C(a) including:

    (a)    statement of written, earned and unearned premiums;

    (b)    losses and loss expenses outstanding;

    (c)    losses incurred but not reported; and

    (d)    any management fees.

6

The report shall be received by or confirmed to the Company no later than thirty (30) days from the close of the month for which business is reported. The Company shall maintain such account reports on file for at least three (3) years and shall make the account reports available to the Commissioner of Insurance of the State of Texas (the "Commissioner") for review upon request.

5.05   The General Agent shall account for and furnish to the Company, upon request, complete copies of all policies issued, copies of all spoiled, voided or otherwise unissued policies, and copies of all claim files created with respect to all loss occurrences under any policy issued under this Agreement.

5.06   The title of all undelivered policies, books, supplies, or other property related to the reinsured business is in the Company, and these shall be delivered to the Company by the General Agent immediately upon the termination of this Agreement. The General Agent agrees to surrender peaceably the same without compelling the Company to resort to any legal proceedings whatsoever.

5.07   The General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company. The General Agent shall establish and maintain records of any such advertising as required by the applicable laws of the states in which it is doing business.

5.08   The General Agent shall maintain on behalf of the Company and Reinsurer complete copies of all policies issued hereunder and copies of all claim files created with respect to all loss occurrences thereunder. Any or all policies and/or claim files required to be maintained by General Agent pursuant to this Section 5.08 may be maintained in electronic data storage form accessible by computer and if so stored in this fashion, no physical copy of such items need be maintained. Where electronic claims files are maintained by the General Agent, any data from such files requested or required by the Company shall be provided within thirty (30) days or less if so requested by the Company.

5.09   The General Agent shall pay to the Reinsurer the positive balance, if any, no later than forty-five (45) days following the end of the month during which the business was written net written premiums hereunder (being defined as premiums written less return premiums) less the General Agent's commissions and less loss adjustment expenses and loss payments. Should such balance be a negative amount, the Reinsurer shall promptly pay the General Agent upon receipt and verification of the amount due as reported by the General Agent.

5.10   The General Agent shall be solely responsible for procuring any renewal, extension, or new policy of insurance that may be required by any state or rule or regulation of any state insurance department with respect to policies originally written directly for the Company. The General Agent shall indemnify the Company and hold it harmless from any loss, damage, cost, claim or expense whatsoever that the Company may incur, or for which it may become liable, as a result of the said General Agent's failure, refusal or neglect to fulfill said responsibility.

5.11   The General Agent agrees that its duties and obligations under this Agreement shall be due and owing also to the Company's and Reinsurer's successors and assigns.

5.12   Nothing in this Article V shall be construed as requiring the Company to monitor the book of business which is the subject of the Reinsurance Agreement for the benefit of the Reinsurer.

5.13   The Company shall conduct or cause to be conducted a semi-annual examination of the General Agent, on behalf of the Company, in compliance with 28 TAC §19.1204(b)(19). Furthermore, if the Company's aggregate premium volume increases by thirty (30) percent in any

7

thirty (30) day period, the Reinsurer at no expense to the Company, and on behalf of the Company, shall examine or cause to be examined within ninety (90) days the General Agent if it writes more than twenty (20) percent of the Company's volume and has also experienced a twenty (20) percent increase in premium volume during that same thirty (30) day period in compliance with 28 TAC §19.1204(b)(19).

The examinations required under the preceding paragraph shall adequately provide the Commissioner with the information outlined in (a) through (e) below, shall be made available to the Commissioner for review, shall remain on file with the Company for a minimum of three (3) years and shall, at a minimum, contain information concerning the following:

(a)  claims procedures of the General Agent;

(b)  timeliness of claims payments by the General Agent (i.e., lag time between date claim is reported and date claim is paid);

(c)  timeliness of premium reporting and collection by the General Agent;

(d)  compliance by the General Agent with underwriting guidelines under Section 1.09 hereof; and

(e)  reconciliation of policy inventory.

5.14    The General Agent shall return any unearned premium due insured or other persons on the business, which is the subject of the Reinsurance Agreement. If for any reason, the General Agent does not return such unearned premium, then the Reinsurer shall pay such amount and/or amounts.

5.15    The General Agent shall be duly licensed as a managing general agent or its equivalent as required under Texas law.

5.16    Should the Texas Department of Insurance make a request to the Company for any data required to comply with a statistical data call, the General Agent shall be solely responsible to provide the Company with such data. Should the request from the Texas Department of Insurance require the Company to contract the services of an outside source, such as an actuarial firm, to compile the data required, the General Agent shall be responsible for its proportionate share of the total cost for services rendered.

**ARTICLE VI**
**TERM AND TERMINATION**

6.01    The effective date of this Agency Agreement is 12:01 a.m., Central Standard Time, on March 1, 1999, and shall remain continuously in force unless canceled as follows:

(a)  This Agreement may be canceled by either party giving at least ninety (90) days prior written notice to the other party. Notice shall be provided by registered mail, return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

(b)  Immediately by mutual consent of the Company and General Agent.

(c)  At any time, by the Company, without prior notice in the event at the General Agent declaring bankruptcy or being declared or found bankrupt or insolvent, or being the

8

subject of a cease and desist order, corrective order, or being placed in, or subject to, a proceeding of supervision, conservation, rehabilitation or liquidation.

(d) Immediately upon written notice by the Company in the event of the cancellation or non-renewal of the General Agent's license by the Texas Department of Insurance.

(e) Immediately upon written notice by the General Agent in the event any action against the Company is commenced by Texas Department of Insurance or other applicable state insurance department pursuant to rehabilitation or liquidation. The Company agrees to furnish notice of such action immediately to the General Agent.

(f) If the General Agent shall default in making remittance for net premiums then this Agreement shall be terminated according to the terms provided in Section 4.5(d) of the Reinsurance Agreement.

(g) If the General Agent shall defraud or attempt to defraud the Company; or any policyholder, then the Company may at its sole discretion cancel this contract by giving the General Agent written notice of cancellation served personally or by mail, which shall be effective immediately.

(h) Automatically and immediately, without notice upon cancellation or termination of the Reinsurance Agreement.

(i) Automatically and immediately, without notice upon cancellation or termination of the Reinsurance Agreement, including, but not limited to, termination of the Reinsurance Agreement by the Company as provided in Section 4.5(g) of the Reinsurance Agreement.

6.02    This Agreement shall automatically become renewed from year to year upon the renewal of the license or certificate of authority granted to the Company by the Texas Department of Insurance, provided this Agreement shall not be otherwise canceled.

6.03    It is expressly agreed and understood that nothing in this Article VI authorizes the General Agent to write any new business under this Agreement should the Reinsurance Agreement terminate, except the business that is required to be renewed or issued because of applicable law or regulation, as provided in Article IV of the Reinsurance Agreement.

6.04    The Company shall have no liability to the General Agent by virtue of the Company's termination of this Agreement as set forth in this Article; it being expressly understood that partial consideration for the Company's grant of agency authority to the General Agent is the General Agent's promise that the Company shall not be responsible for any damages which might arise by virtue of any termination of this Agreement.

6.05    In the event of termination of this Agreement, after the General Agent having promptly accounted for and paid over premiums for which it may be liable, the General Agent's records, use and control of expirations shall remain the property of the General Agent and left in its undisputed possession.

6.06    In the event that this Agreement is terminated, the General Agent, for no additional fee, shall have the authority (unless revoked by the Company for cause in which case the Reinsurer shall appoint a successor at no cost to the Company) as provided in this Agreement to continue to perform all of its duties under this Agreement on the remaining policies during the run-off period. The General Agent's duties during the run-off period shall include handling and servicing of all policies through their natural expiration, together with any policy renewals required to be made by the provisions of applicable law, whether or not the effective date of such renewal is subsequent to

9

the effective date of cancellation of this Agreement. Further, upon termination of this Agreement, the General Agent shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to the outstanding insurance business under this Agreement existing on the date at such termination. The Company and the General Agent will cooperate in handling all such business until the business has expired either by cancellation or by the terms of the policies and all outstanding losses and loss adjustment expenses have been settled.

6.07    As the Reinsurance Agreement provides for termination on a run-off basis, the relevant provisions of this Agreement shall apply to business being run-off. It is also expressly agreed that the terms, conditions and obligations of the Preamble and Articles I, II, IV and V, Sections 6.04, 6.05, 6.06, 6.07 and 6.08, Article VII, Article VIII and Sections 9.02, 9.06, 9.07, 9.10 and 9.11 herein shall survive termination of this Agreement.

6.08 The Company may suspend the authority of the General Agent during the pendency of any dispute regarding any event of default by the General Agent.

**ARTICLE VII**
**HOLD HARMLESS AND INDEMNIFICATION**

The General Agent agrees to and does hereby indemnify and hold the Company harmless from and against any and all actions, causes of actions, suits, arbitrations, or proceedings of any kind, liabilities, losses, claims, damages, costs, or expenses (including attorneys' fees and expenses), incurred by the Company by reason of, arising out of, or relating in any way to this Agreement or any action taken or inaction by the General Agent in breach of the terms of this Agreement or the terms of the Reinsurance Agreement, or which is not in full compliance therewith.

**ARTICLE VIII**
**ARBITRATION**

8.1    As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising between the Company, on the one hand, and the General Agent, on the other hand, with respect to this Agreement or with respect to the General Agent's and/or the Company's obligations hereunder, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

8.2    The Company shall choose one arbiter (an "Arbiter") and the General Agent shall choose one Arbiter. An umpire (an "Umpire") shall be chosen by the two Arbiters, all of whom shall be active or retired, disinterested executive officers of property and casualty insurance or reinsurance companies.

8.3    Both the General Agent and the Company shall choose an Arbiter within 30 days following a written request by one party to the other to name an Arbiter. In the event either the Company or the General Agent fails to choose an Arbiter within this time period, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within 30 days following their appointment, each Arbiter shall name three nominees, of whom the other shall decline two and the decision shall be made by drawing lots.

8.4    Each side shall present its case to the Arbiters and Umpire, in a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the

10

Arbiters and Umpire when filed with the Company and the General Agent shall be final and binding. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

8.5    In the event of a dispute between the Company and the General Agent concerning this Agreement and the Quota Share Reinsurance Agreement between the Company and the Reinsurer, regardless of whether either party has claims against the Reinsurer, the entire dispute between the Company and the General Agent shall be subject to arbitration as provided under this Article VIII.

8.6    The costs of the arbitration, including the fees of the Arbiters and the Umpire, shall be borne equally by the sides unless the Arbiters and Umpire shall decide otherwise.

8.7    This Agreement shall be interpreted under the laws of Texas and the arbitration shall be governed by the Texas General Arbitration Act.

## ARTICLE IX
## T.B.A. INSURANCE

The Company has contracted with T.B.A. Insurance, Inc. ("TBA") to perform certain duties on the Company's behalf and to issue certain checks on behalf of the Company in exchange for certain fees. The General Agent and Reinsurer agree that TBA is to bear no business, credit or insurance risk and no liability whatsoever to the General Agent. TBA shall be and is hereby granted all protections from, and indemnities against, all liabilities contained herein for the benefit of the Company.

## ARTICLE X
## MISCELLANEOUS

10.01  This Agreement has been made and entered into in the State of Texas and shall be governed by and construed in accordance with the laws of the State of Texas.

10.02  This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns.

10.03  This Agreement is not exclusive and the Company reserves the right to appoint other agents in the territory covered by this Agreement and the General Agent reserves the right to act as General Agent for other insurers or reinsurers.

10.04  The Company shall have no right of control over the General Agent as to time, means or manner of the General Agent's conduct within the terms of the Agreement and the Reinsurance Agreement and the authority herein granted and nothing herein is intended or shall be deemed to constitute the General Agent an employee or servant of the Company. The General Agent shall at all times be an independent contractor.

10.05  This Agreement shall be deemed performable at the Company's administrative office in Fort Worth, Texas, and it is agreed that the venue of any controversy arising out of this Agreement, or for the breach thereof, shall be in Dallas County, Texas.

10.06  The General Agent shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company. No verbal modification will be recognized by any party hereto and this Agreement cannot be modified by any subsequent practices or course of dealing by the parties inconsistent herewith. If the Company or the General Agent shall fail to take

11

advantage of a breach, if any, by another party of the terms, conditions, covenants, or any of them herein contained, such failure shall not be deemed to constitute, or be construed as, a waiver of any rights on the part of the General Agent or Company to thereafter enforce any of the said terms, conditions or covenants.

10.07  This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto. All such amendments or changes shall specify the effective date of such amendments or changes.

10.08  This Agreement supersedes any and all provisions, terms and/or conditions of any other general agency agreements, whether oral or written, by between and among the parties.

10.09  The General Agent shall notify the Company in writing within thirty (30) days when there is a change in the ownership of 10% or more of the outstanding stock in the General Agent or when there is any change in the General Agent's principal officers or directors.

10.10  The General Agent shall not offset balances due under this Agreement against balances due or owing under any other contract.

10.11  This Agreement shall be interpreted in conformance with applicable Texas law and regulation. If it is found or ordered by a court or regulatory body that any provision or term of this Agreement does not conform to such law or regulation then this Agreement shall be deemed to be amended, and modified to be in accordance with such law. However, where this Agreement is found not to comply with applicable law or regulations, the Company may in its sole discretion terminate this Agreement immediately and without prior notice.


        IN  WITNESS  WHEREOF,  the  Parties  hereto  by  their  respective  duly  authorized representatives have executed this Agreement in duplicate as of the date first above written.


DATED: _____          STATE AND COUNTY MUTUAL FIRE
                                     INSURANCE COMPANY

                                     BY: _____

                                     ITS: _____



DATED: _____          INTERNATIONAL UNDERWRITERS GENERAL
                                     AGENCY, INC.

                                     BY: _____

                                     ITS: _____


Y:\COMPLIANCE\Private\Miriam\AGREMENT\MGA\IntlUndwrtr\agcyscm.doc


12

Schedule I

The Term "Business" and/or "line of business" as used in the attached Quota Share Reinsurance Agreement shall mean:

Mexican National Private Passenger Liability Policies covering private passenger automobiles principally garaged and registered in the Republic of Mexico which includes:

    a.   Liability

Mexican National Commercial Vehicle Liability Policies covering commercial vehicles principally garaged and registered in the Republic of Mexico which includes:

    a.   Liability

# EXHIBIT D

## GENERAL AGENCY AGREEMENT

THIS GENERAL AGENCY AGREEMENT (this "Agreement") is made and entered into as of March 1, 1999, by and between STATE NATIONAL INSURANCE COMPANY, INC., an insurance company organized under the laws of the State of Texas ("Company") and INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., a corporation organized under the laws of the State of Texas ("General Agent");

## WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

## PREAMBLE

The Company and the Subscribing Reinsurers ("Reinsurer"), have entered into that certain Quota Share Reinsurance Agreement dated as of March 1, 1999, a true and complete copy of which is attached hereto as Exhibit A and fully incorporated herein by this reference (the "Reinsurance Agreement"), which Reinsurance Agreement requires the appointment of the General Agent to perform certain specified acts on behalf of the Company and Reinsurer. The General Agent desires to perform the functions and duties necessary under the Reinsurance Agreement. It is therefore mutually agreed by the parties that the General Agent will perform all functions necessary for the production, service and management of policies reinsured under the Reinsurance Agreement in accordance with the terms and conditions set forth therein and herein. To the extent that there is any conflict between the terms of this Agreement and the Reinsurance Agreement, the Reinsurance Agreement shall govern. Notwithstanding any provisions to the contrary contained elsewhere herein or in any other document, it is expressly understood that the execution and delivery of this Agreement and the Company's performance hereunder shall not under any circumstances be interpreted to affect, weaken or modify the Reinsurer's obligation to indemnify and hold the Company harmless from and against the business, credit and insurance risks as set forth in the Reinsurance Agreement. The contractual assumption by the Reinsurer of these risks in the Reinsurance Agreement is a condition precedent to the Company's entering into this Agreement with the General Agent.

## ARTICLE I
## APPOINTMENT AND DUTIES

1.01  The Company hereby appoints the General Agent as its managing general agent for the purpose of producing and handling the business which is the subject of the Reinsurance Agreement issued or renewed on or after the effective date of this Agreement. The Company hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in Schedule I hereof; to secure, at its own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign policies, certificates, endorsements and binders which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

1.02  All activities of the General Agent pursuant to this Agreement shall be in strict compliance with the terms of the Reinsurance Agreement and all rules, regulations and instructions of the Company, including, but not limited to, all rules, instructions and specifications included in the Company's rate manuals, rate brochures and rate schedules.

1.03  The Company further authorizes the General Agent to perform all acts and duties under policies of insurance issued by the Company as would otherwise be performed by the Company, including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to the Company, and adjusting and paying losses or other claims. The Company grants to the General Agent the authority to settle claims on behalf of the Company. However, the maximum dollar amount of such authority per claim shall not exceed $30,000. For claims settlements in excess of $30,000, the General Agent may only settle such claims with prior approval of the Company and Reinsurer. Additionally, the General Agent must obtain the Reinsurer's prior approval for claims settlements in excess of the policy limits set forth in Section 1.09 hereof. The Company retains final authority to determine any disputes relating to claims settlement and setting of loss reserves. Should the Company be ordered or instructed by the Texas Department of Insurance or any other regulatory agency of competent jurisdiction to take any action or refrain from taking any action with regard to any claim, the General Agent shall be bound by and shall follow the order or instructions of such regulatory agency as though General Agent were the object of such order or instruction. The General Agent will exercise the authority granted hereunder in good faith and toward the end of paying any and all valid claims. The General Agent must send to the Company a report, within thirty (30) days of determination, that a claim (i) involves a coverage dispute; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) alleges a violation of the Texas Deceptive Trade Practices Act or other similar applicable statute; or (v) alleges a violation of the Texas Insurance Code, Article 21.21 (Unfair Competition and Unfair Practices) or other similar applicable statutes.

1.04  The General Agent is authorized to have claims adjusted through independent claims adjusters. The selection of independent claims adjusters shall be subject to prior written approval of the Company.

1.05  The Company shall not be responsible for the General Agent's expenses and costs, including, but not limited to, salaries, bonuses, rentals, transportation facilities, clerk hire, solicitors' fees, postage, advertising, exchange, personal license fees, adjustment by the General Agent of losses under policies issued by the General Agent, or any other agency expenses whatsoever. The General Agent's sole compensation shall be the amounts payable to the General Agent in Article XIV of the Reinsurance Agreement and in Article III of this Agreement.

1.06  The General Agent understands and agrees that it has no power or authority granted to it by the Company independent of the Reinsurance Agreement, and that this Agreement and the General Agent's authority hereunder shall cease immediately upon termination, for any reason, of this Agreement or of the Reinsurance Agreement (excepting only the General Agent's responsibilities with regard to run-off and other matters as set forth herein or in the Reinsurance Agreement).

1.07  The General Agent shall not have the power to accept or bind risks other than as set forth herein or as may be subsequently authorized by the Company in writing. The General Agent may not bind or cede reinsurance or retrocession on behalf of the Company, may not commit the Company to participation in insurance or reinsurance syndicates, and may not commit the Company to a claim settlement with a reinsurer without the prior written approval of the Company. If such prior written approval is given, the General Agent shall forward promptly a report to the Company concerning such transaction and/or payment. The Company hereby authorizes the General Agent to collect payments for losses and loss adjustment expenses from a reinsurer. The General Agent shall send a report to the Company concerning such transactions promptly.

1.08  The General Agent acknowledges that, with respect to any state in which business is permitted to be written under this Agreement, this Agreement shall not become effective until the General

-2-

Agent is duly appointed by the Company and on file with the insurance department of such state. The General Agent agrees that any producing agent receiving commission pursuant to this Agreement shall first be duly appointed by the Company and said appointment on file with any applicable state insurance department. The General Agent further agrees to be responsible for the payment of any penalty assessed to the Company for any violation by the General Agent or any producing agent or broker appointed by the General Agent pursuant to the provisions of Article IV hereof of any license or appointment provision of the Texas Insurance Code or the rules and regulations promulgated thereunder.

1.09  The authority and limitations of the General Agent to issue policies are as follows:

(a)  the maximum annual premium volume the General Agent may produce under this Agreement is $8 million.

(b)  the basis of the rates charged are as provided in the Company's rate manuals, rate brochures and rate schedules which the General Agent shall follow;

(c)  the only classes of business the General Agent is authorized to produce and handle under this Agreement are the classes of business specified in Schedule I hereto;

(d)  the maximum limits of liability for policies to be produced pursuant to this Agreement are as follows:

(1)    Mexican National Private Passenger Automobile Liability

| | | | |
|---|---|---|---|
| (i) | Bodily Injury | $100,000 | each person |
| | | $300,000 | each occurrence |
| (ii) | Property Damage | $ 50,000 | each occurrence |

(2)    Mexican National Commercial Automobile Liability

| | | |
|---|---|---|
| Combined Single Limit (CSL) | $1,000,000 | each occurrence |
| | $1,000,000 | each policy |

(e)  the General Agent may issue policies under this Agreement only to insureds resident in the states in which business is permitted to be produced under Schedule I; but this limitation shall not apply to losses if said policies provide coverage outside the aforesaid territorial limit;

(f)  the General Agent shall only cancel policies as set forth in the policy form for the policies produced hereunder or as otherwise permitted by applicable law;

(g)  the maximum term for any policy issued hereunder shall be twelve (12) months; and

(h)  the General Agent shall employ all reasonable and appropriate measures to control and keep a record of the issuance of the Company's insurance policies hereunder, including, but not limited to, keeping records of policy numbers issued and maintaining policy inventories.

In underwriting policies, the General Agent shall follow the underwriting guidelines developed by the General Agent and the Company, and these guidelines are herein incorporated by reference.

-3-

## ARTICLE II
## PREMIUMS

2.01  It is expressly agreed and understood that all premiums collected by the General Agent are collected on behalf of the Company; that such premiums are the property of the Company and the Reinsurer as their respective interests may appear pursuant to the Reinsurance Agreement, less such commissions and fees as are due the General Agent as specified herein and in the Reinsurance Agreement.  All premiums collected by the General Agent on the business produced under this Agreement shall be deposited in a bank account separate and apart from all other bank accounts of the General Agent which reflects ownership of the account by the Company.  The only disbursements from such account shall be the payment of claims, claims expenses, return premiums, commission due the General Agent as authorized herein and in the Reinsurance Agreement, remittance of premiums to the Reinsurer and the Company and payment of premiums, on behalf of the Company, under the related Excess Stop Loss Reinsurance Agreement dated effective March 1, 1999, by and between the Company and the Reinsurer (the "Stop Loss Agreement").  The General Agent shall not make personal use of any funds in this separate account.  The commissions payable to the General Agent under the Reinsurance Agreement are debts due to the General Agent by the Reinsurer and the privilege herein granted of deducting commissions from said premiums should not be taken as a waiver by the Company of its exclusive ownership rights of premiums as provided herein.  Should any dispute arise between the Company, the Reinsurer and/or the General Agent regarding payment of premium, the General Agent shall remit immediately all money and property, without deductions for commissions, to the segregated account with full reservation of any and all rights reserved by the parties.

2.02  The General Agent shall furnish to the Company and the Reinsurer all necessary premium and loss data (in a form acceptable to the Reinsurer and the Company) no later than thirty (30) days following the end of the month during which the business is written or losses are incurred to enable the Company to record statistics required by statutes, regulation or upon call by authorities having competent jurisdiction.  Such data shall include, but is not limited to, premiums written and unearned premium.  Said data shall be segregated by lines of insurance and location of risk.

2.03  The keeping of an account with the General Agent on the Company's books as a creditor and debtor account is declared a record memorandum of business transacted and neither such keeping of an account, nor alteration in commission rate, nor failure to enforce prompt remittance or compromise or settlement or declaration of balance of account, shall be held to waive assertion of the trust relation as to premiums collected by the General Agent.

2.04  The General Agent shall be liable for the payment of all original and advance premiums upon all policies of insurance written through the General Agent or any sub-agents of the General Agent.

2.05  The General Agent shall remit to the Reinsurer any funds of or due to the Company under this Agreement at the earlier of the following:  (1) fifty (50) days from the end of the month in which premium is recorded;  or (2) ninety (90) days from the end of the month in which the coverage under this Agreement is issued.

2.06  The General Agent shall hold all funds of or due the Company in a fiduciary capacity.

-4-

## ARTICLE III
## COMPENSATION TO THE GENERAL AGENT

3.01    In partial compensation for the services rendered hereunder and under the Reinsurance Agreement the General Agent is entitled to the commission payable by the Reinsurer specified in Article XI at the Reinsurance Agreement. The General Agent shall pay to the Company ceding fees and premium taxes from the commissions received by the General Agent hereunder and under the Reinsurance Agreement, as more particularly specified in Article XI of the Reinsurance Agreement. The General Agent shall allow the Company return commission on return premiums at the same rates as received by the General Agent.

3.02    The General Agent's commission on premiums ceded to the Reinsurer is subject to adjustment as specified in Section 14.3 of the Reinsurance Agreement.

3.03    The General Agent shall be allowed to retain all policy and reinstatement fees derived from Policies issued or renewed under the Reinsurance Agreement.

3.04    The Company shall not be liable for or responsible for any commissions or other monies payable by the Reinsurer to the General Agent. The General Agent shall not sue or seek arbitration against the Company for any actions by, or debts owing from, the Reinsurer.

3.05    In the event the Company or the Reinsurer, during the continuance of this Agreement or after its termination, refunds premiums under any policy of insurance by reasons of cancellation or otherwise, the General Agent agrees immediately to return to the Company or the Reinsurer, as applicable, the commission previously received by it on the portion of the premium refunded. The General Agent shall not be required to return, as commission or return commission, monies greater than the total commission paid or otherwise payable to the General Agent.

## ARTICLE IV
## SUB-AGENTS

4.01    The General Agent shall comply with, and shall be responsible to insure the compliance by, all such producing agents with the terms of this Agreement and the Reinsurance Agreement and all other written rules and regulations of the Company, and treat as confidential and use only in the interest of the Company all instructions, information and materials received from the Company.

4.02    The General Agent shall be solely responsible for the performances of any producing agents under all of the terms and provisions hereof, including, but not limited to, the collections of premiums and refunds of premiums.

4.03    Each such producing agent must receive any appointment required by applicable law as an agent of the Company or the General Agent through the appropriate regulatory body of the State of Texas before any application shall be accepted from him or other insurance performances on behalf of the Company are performed. The General Agent shall be ultimately responsible for the obligation of the producing agent to obtain any required appointment as provided herein.

4.04    It is also specified that the General Agent shall be responsible for all commissions payable to any producing agents. The General Agent and any producing agent shall not seek to hold the Company liable through litigation, arbitration or otherwise for commissions payable to such producing agents.



4.05    The Company, in its sole discretion with or without cause, and without prior written notice, may terminate the appointment of any producing agent.

**ARTICLE V**
**ADDITIONAL DUTIES OF AGENT**

5.01  The General Agent shall, at all times during the period of this Agreement, comply with all applicable laws of the states in which it is producing business under this Agreement and all orders, policy decisions or other requirements of the corresponding state insurance departments.

5.02  All books, records, accounts, documents and correspondence of the General Agent and any producing agent pertaining to the Company's and Reinsurer's business shall, at all times, be open to examination by any authorized representative of the Company or Reinsurer. The General Agent shall make copies of records available upon request by the Company or Reinsurer, whether such request is before or after termination of this Agreement or the Reinsurance Agreement. The General Agent must maintain separate records of business, including, but not limited to, underwriting files for each insurer for whom it acts as a general agent pursuant to the Texas Insurance Code, Article 21.07-3, Section 3C(b) or any amendment or successor thereto. Such records must be maintained for five (5) years or until the completion of a financial examination by the insurance department of the state in which the Company is domiciled, whichever is longer.

5.03  The General Agent shall maintain adequate accounting procedures and systems, at no cost or expense to the Company, and shall provide statistics in a timely manner for all reporting requirements under the Reinsurance Agreement or as shall be required from time to time by the regulatory authorities of the State of Texas or any other applicable governmental agency or authority. Such statistical information shall be provided to the Company by the General Agent at the General Agent's sole cost and expense.

5.04  The General Agent shall forward to the Company, no later than the 30th day of the month following the month being accounted for, a report in detail of all policies of insurance written or placed, or liability increased or decreased, or policies continued or renewed or canceled by or through the General Agent during the month being accounted for, which shall include all premiums due thereon whether collected or not. Such report shall show the net amount due to the Company and Reinsurer on all such business on the lines of business authorized to be written by the General Agent and the amounts paid in losses, loss adjustment expenses and commissions. Such report shall also include, to the extent not already included, both insurance and reinsurance transactions and all transactions pursuant to Texas Insurance Code, Article 21.07-3, Section 3C(a) including:

      (i)      statement of written, earned and unearned premiums;

      (ii)     losses and loss expenses outstanding;

      (iii)    losses incurred but not reported; and

      (iv)    any management fees.

The report shall be received by or confirmed to the Company no later than thirty (30) days from the close of the month for which business is reported. The Company shall maintain such account reports on file for at least three (3) years and shall make the account reports available to the Commissioner of Insurance of the State of Texas (the "Commissioner") for review upon request.

-6-

5.05  The General Agent shall account for and furnish to the Company, upon request, complete copies of all policies issued, copies of all spoiled, voided or otherwise unissued policies, and copies of all claim files created with respect to all loss occurrences under any policy issued under this Agreement.

5.06  The title of all undelivered policies, books, supplies, or other property related to the reinsured business is in the Company, and these shall be delivered to the Company by the General Agent immediately upon the termination of this Agreement.  The General Agent agrees to surrender peaceably the same without compelling the Company to resort to any legal proceedings whatsoever.

5.07  The General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company.  The General Agent shall establish and maintain records of any such advertising as required by the applicable laws of the states in which it is doing business.

5.08  The General Agent shall maintain on behalf of the Company and Reinsurer complete copies of all policies issued hereunder and copies of all claim files created with respect to all loss occurrences thereunder.  Any or all policies and/or claim files required to be maintained by General Agent pursuant to this Section 5.08 may be maintained in electronic data storage form accessible by computer and if so stored in this fashion, no physical copy of such items need be maintained.  Where electronic claims files are maintained by the General Agent, any data from such files requested or required by the Company shall be provided within thirty (30) days or less if so requested by the Company.

5.09  The General Agent shall pay to the Reinsurer the positive balance, if any, no later than forty five (45) days following the end of the month during which the business was written net written premiums hereunder (being defined as premiums written less return premiums) less the General Agent's commissions and less loss adjustment expenses and loss payments. Should such balance be a negative amount, the Reinsurer shall promptly pay the General Agent upon receipt and verification of the amount due as reported by the General Agent.

5.10  The General Agent shall be solely responsible for procuring any renewal, extension, or new policy of insurance that may be required by any state or rule or regulation of any state insurance department with respect to policies originally written directly for the Company.  The General Agent shall indemnify the Company and hold it harmless from any loss, damage, cost, claim or expense whatsoever that the Company may incur, or for which it may become liable, as a result of the said General Agent's failure, refusal or neglect to fulfill said responsibility.

5.11  The General Agent agrees that its duties and obligations under this Agreement shall be due and owing also to the Company's and Reinsurer's successors and assigns.

5.12  Nothing in this Article V shall be construed as requiring the Company to monitor the book of business which is the subject of the Reinsurance Agreement for the benefit of the Reinsurer.

5.13  The Company shall conduct or cause to be conducted a semi-annual examination of the General Agent, on behalf of the Company, in compliance with 28 TAC '19.1204(b)(19). Furthermore, if the Company's aggregate premium volume increases by thirty (30) percent in any thirty (30) day period, the Reinsurer at no expense to the Company, and on behalf of the Company, shall examine or cause to be examined within ninety (90) days the General Agent if it writes more than twenty (20) percent of the Company's volume and has also experienced a twenty (20) percent

-7-

increase in premium volume during that same thirty (30) day period in compliance with 28 TAC ' 19.1204(b)(19).

The examinations required under the preceding paragraph shall adequately provide the Commissioner with the information outlined in (a) through (e) below, shall be made available to the Commissioner for review, shall remain on file with the Company for a minimum of three (3) years and shall, at a minimum, contain information concerning the following:

    (a)    claims procedures of the General Agent;

    (b)    timeliness of claims payments by the General Agent (i.e., lag time between date claim is reported and date claim is paid);

    (c)    timeliness of premium reporting and collection by the General Agent;

    (d)    compliance by the General Agent with underwriting guidelines under Section 1.09 hereof; and

    (e)    reconciliation of policy inventory.

5.14 The General Agent shall return any unearned premium due insured or other persons on the business which is the subject of the Reinsurance Agreement; if for any reason, the General Agent does not return such unearned premium, then the Reinsurer shall pay such amount and/or amounts.

5.15 The General Agent shall be duly licensed as a managing general agent or its equivalent as required under applicable law.

5.16 Should any state insurance department make a request to the Company for any data required to comply with a statistical data call, the General Agent shall be solely responsible to provide the Company with such data. Should the request from such state insurance department require the Company to contract the services of an outside source, such as an actuarial firm, to compile the data required, the General Agent shall be responsible for its proportionate share of the total cost for services rendered.

## ARTICLE VI
## TERM AND TERMINATION

6.01 The effective date of this Agency Agreement is 12:01 a.m., Central Standard Time, on March 1, 1999, and shall remain continuously in force unless canceled as follows:

    (a)    This Agreement may be canceled by either party giving at least ninety (90) days prior written notice to the other party. Notice shall be provided by registered mail, return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

    (b)    Immediately by mutual consent of the Company and General Agent.

    (c)    At any time, by the Company, without prior notice in the event of the General Agent declaring bankruptcy or being declared or found bankrupt or insolvent, or being the subject of a cease and desist order, corrective order, or being placed in, or subject to, a proceeding of supervision, conservation, rehabilitation or liquidation.



(d)    Immediately upon written notice by the Company in the event of the cancellation or non-renewal of the General Agent's license by the Texas Department of Insurance.

(e)    Immediately upon written notice by the General Agent in the event any action against the Company is commenced by Texas Department of Insurance or other applicable state insurance department pursuant to rehabilitation or liquidation.  The Company agrees to furnish notice of such action immediately to the General Agent.

(f)    If the General Agent shall default in making remittance for net premiums then this Agreement shall be terminated according to the terms provided in Section 4.5(b) of the Reinsurance Agreement.

(g)    If the General Agent shall defraud or attempt to defraud the Company; or any policyholder, then the Company may at its sole discretion cancel this contract by giving the General Agent written notice of cancellation served personally or by mail, which shall be effective immediately.

(h)    Automatically and immediately, without notice upon cancellation or termination of the Reinsurance Agreement or the Stop Loss Agreement.

6.02 This Agreement shall automatically become renewed from year to year upon the renewal of the license or certificate of authority granted to the Company by the Texas Department of Insurance, provided this Agreement shall not be otherwise canceled.

6.03 It is expressly agreed and understood that nothing in this Article VI authorizes the General Agent to write any new business under this Agreement should the Reinsurance Agreement terminate, except the business that is required to be renewed or issued because of applicable law or regulation, as provided in Section 4.3 of the Reinsurance Agreement.

6.04   The Company shall have no liability to the General Agent by virtue of the Company's termination of this Agreement as set forth in this Article; it being expressly understood that partial consideration for the Company's grant of agency authority to the General Agent is the General Agent's promise that the Company shall not be responsible for any damages which might arise by virtue of any termination of this Agreement.

6.05   In the event of termination of this Agreement, after the General Agent having promptly accounted for and paid over premiums for which it may be liable, the General Agent's records, use and control of expirations shall remain the property of the General Agent and left in its undisputed possession.

6.06 In the event that this Agreement is terminated, the General Agent, for no additional fee, shall have the authority (unless revoked by the Company for cause in which case the Reinsurer shall appoint a successor at no cost to the Company) as provided in this Agreement to continue to perform all of its duties under this Agreement on the remaining policies during the run-off period.  The General Agent's duties during the run-off period shall include handling and servicing of all policies through their natural expiration, together with any policy renewals required to be made by the provisions of applicable law, whether or not the effective date of such renewal is subsequent to the effective date of cancellation of this Agreement.  Further, upon termination of this Agreement, the General Agent shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to the outstanding insurance business under this Agreement existing on the date of such termination.  The

-9-

Company and the General Agent will cooperate in handling all such business until the business has expired either by cancellation or by the terms of the policies and all outstanding losses and loss adjustment expenses have been settled.

6.07  As the Reinsurance Agreement provides for termination on a run-off basis, the relevant provisions of this Agreement shall apply to business being run-off. It is also expressly agreed that the terms, conditions and obligations of the Preamble and Articles I, II, IV and V, Sections 6.04, 6.05, 6.06, 6.07 and 6.08, Article VII, Article VIII and Section 9.11 herein shall survive termination of this Agreement.

6.08  The Company may suspend the authority of the General Agent during the pendency of any dispute regarding any event of default by the General Agent.

## ARTICLE VII
## HOLD HARMLESS AND INDEMNIFICATION

The General Agent agrees to and does hereby indemnify and hold the Company harmless from and against any and all actions, causes of actions, suits, arbitrations, or proceedings of any kind, liabilities, losses, claims, damages, costs, or expenses (including attorneys' fees and expenses), incurred by the Company by reason of, arising out of, or relating in any way to this Agreement or any action taken or inaction by the General Agent in breach of the terms of this Agreement or the terms of the Reinsurance Agreement, or which is not in full compliance therewith.

## ARTICLE VIII
## ARBITRATION

8.1    As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising between the Company, on the one hand, and the General Agent, on the other hand, with respect to this Agreement or with respect to the General Agent's and/or the Company's obligations hereunder, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

8.2    The Company shall choose one arbiter (an "Arbiter") and the General Agent shall choose one Arbiter. An umpire (an "Umpire") shall be chosen by the two Arbiters, all of whom shall be active or retired disinterested executive officers of property and casualty insurance or reinsurance companies.

8.3    Both the General Agent and the Company shall choose an Arbiter within 30 days following a written request by one party to the other to name an Arbiter. In the event either the Company or the General Agent fails to choose an Arbiter within this time period, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within 30 days following their appointment, each Arbiter shall name three nominees, of whom the other shall decline two and the decision shall be made by drawing lots.

8.4    Each side shall present its case to the Arbiters and Umpire, in a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Company and the General Agent shall be final and binding.

Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

8.5     In the event of a dispute between the Company and the General Agent concerning this Agreement and the Quota Share Reinsurance Agreement between the Company and the Reinsurer, regardless of whether either party has claims against the Reinsurer, the entire dispute between the Company and the General Agent shall be subject to arbitration as provided under this Article VIII.

8.6     The costs of the arbitration, including the fees of the Arbiters and the Umpire, shall be borne equally by the sides unless the Arbiters and Umpire shall decide otherwise.

8.7     This Agreement shall be interpreted under the laws of Texas and the arbitration shall be governed by the Texas General Arbitration Act.

**ARTICLE IX**
**MISCELLANEOUS**

9.01  This Agreement has been made and entered into in the State of Texas and shall be governed by and construed in accordance with the laws of the State of Texas.

9.02  This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns.

9.03  This Agreement is not exclusive and the Company reserves the right to appoint other agents in the territory covered by this Agreement and the General Agent reserves the right to act as General Agent for other insurers or reinsurers.

9.04  The Company shall have no right of control over the General Agent as to time, means or manner of the General Agent's conduct within the terms of the Agreement and the Reinsurance Agreement and the authority herein granted and nothing herein is intended or shall be deemed to constitute the General Agent an employee or servant of the Company.  The General Agent shall at all times be an independent contractor.

9.05  This Agreement shall be deemed performable at the Company's administrative office in Fort Worth, Texas, and it is agreed that the venue of any controversy arising out of this Agreement, or for the breach thereof, shall be in Tarrant County, Texas.

9.06  The General Agent shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.  No verbal modification will be recognized by any party hereto and this Agreement cannot be modified by any subsequent practices or course of dealing by the parties inconsistent herewith.  If the Company or the General Agent shall fail to take advantage of a breach, if any, by another party of the terms, conditions, covenants, or any of them herein contained, such failure shall not be deemed to constitute, or be construed as, a waiver of any rights on the part of the General Agent or Company to thereafter enforce any of the said terms, conditions or covenants.

9.07  This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto.  All such amendments or changes shall specify the effective date of such amendments or changes.

-11-

9.08  This Agreement supersedes any and all provisions, terms and/or conditions of any other general agency agreements, whether oral or written, by between and among the parties.

9.09  The General Agent shall notify the Company in writing within thirty (30) days when there is a change in the ownership of 10% or more of the outstanding stock in the General Agent or when there is any change in the General Agent's principal officers or directors.

9.10  The General Agent shall not offset balances due under this Agreement against balances due or owing under any other contract.

9.11  This Agreement shall be interpreted in conformance with applicable Texas law and regulation. If it is found or ordered by a court or regulatory body that any provision or term of this Agreement does not conform to such law or regulation then this Agreement shall be deemed to be amended, and modified to be in accordance with such law.


IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above written.


DATED:_____        STATE NATIONAL INSURANCE COMPANY, INC.


                                   BY:_____

                                   ITS:_____


DATED:_____        INTERNATIONAL  UNDERWRITERS  GENERAL
                                   AGENCY, INC.


                                   BY:_____

                                   ITS:_____

-12-

**Schedule I**

The Term "Business" and/or "line of business" as used in the attached Quota Share Reinsurance Agreement shall mean:

Mexican National Private Passenger Liability Policies covering private passenger automobiles principally garaged and registered in the Republic of Mexico which includes:

    a. Liability

Mexican National Commercial Vehicle Liability Policies covering commercial vehicles principally garaged and registered in the Republic of Mexico which includes:

    a. Liability

# EXHIBIT E

INTERESTS AND LIABILITIES CONTRACT

of

KEMPER REINSURANCE COMPANY
Long Grove, Illinois
(hereinafter referred to as the "SUBSCRIBING REINSURER")

attached to and forming part of the

QUOTA SHARE
REINSURANCE CONTRACT
Effective: March 1, 1999

issued to and duly executed by

STATE NATIONAL INSURANCE COMPANY, INC.
Fort Worth, Texas

The SUBSCRIBING REINSURER hereby accepts a 75% share in the interests and liabilities of the "Reinsurer" under the Agreement referenced above.

This Contract shall become effective on March 1, 1999 at 12:01 a.m., Central Time, and shall continue in force until terminated in accordance with the provisions of the Agreement referenced above.

The SUBSCRIBING REINSURER'S share in the referenced Agreement shall be several and not joint with the shares of the other reinsurers, it being understood that the SUBSCRIBING REINSURER shall in no event participate in the interests and liabilities of the other reinsurers.

IN WITNESS WHEREOF, the SUBSCRIBING REINSURER has caused this Contract to be executed by its duly authorized representative at:

Lincolnshire, Illinois, this ___7___ day of __November_____, 2000

_____
~hard A. Clymer, Vice President Ret. 23471-2,
GE REINSURANCE CORPORATION, FORMERLY
KEMPER REINSURANCE COMPANY

COLLINS
A S S O C I A

9/30/99__36661272

QUOTA SHARE REINSURANCE AGREEMENT

BETWEEN

STATE NATIONAL INSURANCE COMPANY, INC.

AND

SUBSCRIBING REINSURERS EXECUTING THE INTERESTS AND LIABILITIES CONTRACTS

EFFECTIVE: March 1, 1999

COLLINS

A S S O C I A T E S

**QUOTA SHARE REINSURANCE AGREEMENT**
**EFFECTIVE: March 1, 1999**

**Issued to**

**STATE NATIONAL INSURANCE COMPANY, INC.**

**1999 SUBSCRIBING REINSURERS**

| | |
|---|---|
| Kemper Reinsurance Company | 75% |
| Partner Reinsurance Company of the U.S. | 25% |
| | **100%** |

## Table of Contents

| Article | | Page |
|---|---|---|
| | Preamble | 1 |
| I | Business Reinsured | 1 |
| II | Exclusions | 1 |
| III | Obligatory Agreement | 2 |
| IV | Term and Condition | 3 |
| V | Territory | 5 |
| VI | Currency | 5 |
| VII | Consideration | 5 |
| VIII | Loss and Loss Adjustment Expense | 5 |
| IX | Statistical Data | 7 |
| X | Reports and Remittances | 7 |
| XI | Errors and Omissions | 8 |
| XII | Inspection of Records | 9 |
| XIII | Arbitration | 9 |
| XIV | Fees, Commissions, Premium Taxes and Policy Fees | 10 |
| XV | Assessments, Assignments, Fines and Penalties | 12 |
| XVI | Insolvency of Company | 13 |
| XVII | Hold Harmless | 13 |
| XVIII | Regulatory Matters | 15 |
| XIX | The General Agent | 15 |
| XX | Loss in Excess of Policy Limits/ECO | 15 |
| XXI | Loss and Unearned Premium Reserve Funding | 16 |
| XXII | Savings Clause | 16 |
| XXIII | Miscellaneous | 16 |
| XXIV | Original Conditions | 17 |
| XXV | Intermediary | 17 |

## QUOTA SHARE REINSURANCE AGREEMENT

THIS QUOTA SHARE REINSURANCE AGREEMENT (this "Agreement") is made and entered into as of the 1st day of March, 1999, by and between the Subscribing Reinsurers executing the Interests and Liabilities Contracts attaching to and forming a part of this Agreement (collectively "Reinsurer"), and STATE NATIONAL INSURANCE COMPANY, INC., an insurance company organized under the laws of the State of Texas ("Company");

## WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

## PREAMBLE

It is understood that the Company and the Reinsurer (hereinafter identified collectively as the "Parties") hereto wish to enter into a reinsurance arrangement through which the Company is to bear no business, credit or insurance risk whatsoever (save the risk of the Reinsurer's insolvency). The Reinsurer shall hold the Company harmless and indemnify it for these and all risks. The sole consideration provided by the Company, in exchange for the fees set forth in Article XIV herein, is to permit the Policies (as hereinafter defined) which are reinsured under this Agreement and under that certain Excess Stop Loss Reinsurance Agreement dated effective March 1, 1999, by and between the Parties (the "Stop Loss Agreement"), to be issued in the name of the Company. All provisions of this Agreement shall be interpreted so as to be in accord with this Preamble.

## ARTICLE I
## BUSINESS REINSURED

1.1     The Reinsurer hereby reinsures the Company, in the manner and to the extent set forth herein, under the Company's policies, certificates, binders, contracts or agreements (herein called "Policies") in force on the effective date hereof or issued or renewed on or after that date on behalf of the Company by International Underwriters General Agency, Inc., a Texas corporation ("General Agent"), and classified by the Company, in its discretion, as a line of business which is authorized in the General Agency Agreement dated as of the date hereof, between the Company and the General Agent (the "General Agency Agreement"), which is attached hereto and made a part hereof for all purposes.

1.2     For purposes of this Agreement, the term "in force" shall mean the business written under that certain Quota Share Reinsurance Agreement dated effective March 1, 1998, by and among the Company, the General Agent, Underwriters MGA, Inc. and the subscribing reinsurers identified therein, which is in force at the effective date and time of this Agreement.

## ARTICLE II
## EXCLUSIONS

The following risks, perils and classes of business are specifically excluded:

2.01    If the General Agent binds or issues any business excluded, the Company shall notify the Reinsurer promptly upon actual knowledge of such business being bound or issued. The Reinsurer shall provide coverage for any such risk bound until canceled by the Company at any Reinsurer's request.

**COLLINS**
A S S O C I A T E S

9/30/99 __3566.doc

- 1 -

(a)    All business not specifically described as business covered under Schedule I of the General Agency Agreement.

(b)    Business written on a co-surety or co-indemnity basis when the issuing company is not the controlling carrier.

(c)    War Risks as excluded in the attached North American War Exclusion Clause (Reinsurance).

(d)    Business excluded by the attached Nuclear Exclusion Clauses – Liability – Reinsurance – U.S.A., Physical Damage – Reinsurance – U.S.A., Liability – Reinsurance – Canada, and Physical Damage – Reinsurance – Canada.

(e)    Financial Guarantee.

(f)    Racing automobiles, and government law enforcement vehicles.

(g)    As respects the Mexican National program:

    1.   Vehicles garaged in the United States;
    2.   Motorcycles, Travel Trailers and Motor Homes.

2.02    The foregoing exclusions list, other than c and d, shall not apply when the operations or exposures are only incidental to a comparatively small part of the original insured's major activities.

2.03    Errors and omissions notwithstanding, if without the knowledge and contrary to the instructions of its supervisory personnel, the Company is bound on a risk specifically excluded hereunder (other than c and d), or by an existing insured extending its operations, such reinsurance as would have been afforded but for the exclusion shall apply for a period of 30 days following receipt of said underwriting personnel of knowledge thereof.

### ARTICLE III
### OBLIGATORY AGREEMENT

3.1    Effective as of the effective date of this Agreement, the Company obligates itself to cede to the Reinsurer, and the Reinsurer obligates itself to accept, all of the Company's gross liability under all Policies issued by and on behalf of the Company by the General Agent; provided, however, that the Company shall retain and be liable for, and only for, 20% of the underwriting risk under such Policies (it is understood that the Company has purchased stop loss coverage under the Stop Loss Agreement to insure this underwriting risk). The liability of the Reinsurer shall commence obligatorily and simultaneously with that of the Company, subject to the terms, conditions and limitations set forth in this Agreement.

3.2    Business ceded hereunder shall include every original policy, rewrite, renewal or extension (whether before or after the termination of this Agreement) required by applicable statute, or by rule or regulation of any policy of insurance ceded hereunder by the Company to the Reinsurer.

3.3    The maximum Policy limits subject to this Agreement are as follows:

(a)    Mexican National Private Passenger Automobile Liability

COLLINS
A S S O C I A T E S

|     |     |     |     |
|-----|-----|-----|-----|
| (1) | Bodily Injury | $100,000 | each person |
|     |               | $300,000 | each occurrence |
| (2) | Property Damage | $ 50,000 | each occurrence |

(b)    Mexican National Commercial Automobile Liability

Combined Single Limit (CSL)        $1,000,000    each occurrence
                                   $1,000,000    each policy

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect.

## ARTICLE IV
## TERM AND CONDITION

4.1    This Agreement shall become effective on the 1st of March, 1999, at 12:01 a.m., Central Time, as respects losses arising out of occurrences commencing under Policies in force, issued or renewed on or after such date at the offices of the Company, and shall remain continuously in force unless terminated by any party hereto.

4.2    This Agreement shall continue from the effective date and shall be automatically renewed for a term of one year from year to year unless terminated as set forth in this section. Any party hereto may cancel this Agreement with at least ninety (90) days prior written notice to the other party.

4.3    When this Agreement terminates for any reason, reinsurance hereunder shall continue to apply to the business in force at the time and date of termination until expiration or cancellation of such business. It is understood that any Policies with effective dates prior to the termination date but issued after the termination date are covered under this Agreement. Additionally, the reinsurance hereunder shall continue to apply as to Policies which must be issued or renewed, as a matter of state law or regulation or because a sub-agent has not been timely canceled, until the expiration dates on said Policies.

4.4    Upon termination of this Agreement, the Reinsurer, the General Agent and the Company shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to outstanding insurance business under this Agreement existing on the date of such termination. The Parties expressly covenant and agree that they will cooperate with each other in the handling of all such run-off insurance business until all Policies have expired either by cancellation or by terms of such Policies and all outstanding losses and loss adjustment expenses have been settled. While by law and regulation, the Company recognizes its primary obligations to its policyholders, the Reinsurer recognizes that to the extent possible there shall be no cost or involvement by the Company in servicing this run-off. All costs and expenses associated with the handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent and, to the extent not borne by the General Agent, solely by the Reinsurer. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while this Agreement is still in effect), then, consistent with this Agreement, the Reinsurer's obligation with respect to such run-off business shall continue and the Reinsurer shall either service such run-off business directly or appoint, at the Reinsurer's expense, a successor to the General Agent, subject to the approval of the Company, which approval shall not be unreasonably withheld. Such successor

**COLLINS**
A S S O C I A T E S



shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business.

4.5    In addition to the provisions set forth in Section 4.4 herein, this Agreement may be terminated at any time in accordance with one of the following conditions:

(a)    Immediately upon written notice by the Reinsurer to the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas;

(b)    By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder and due under the Stop Loss Agreement; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(c)    After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(d)    Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed.  By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed;

(e)    By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department having jurisdiction requires cancellation or disallows credit for this reinsurance or the reinsurance provided in the Stop Loss Agreement;

(f)    Immediately and automatically upon termination of the Stop Loss Agreement;

(g)    After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(h)    After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 17.1 and/or Section 20.1 of this Agreement.

4.6    Notices hereunder shall be provided by certified or registered mail return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

COLLINS
A S S O C I A T E S

3/9/00__3688.doc

- 4 -





shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business.

4.5    In addition to the provisions set forth in Section 4.4 herein, this Agreement may be terminated at any time in accordance with one of the following conditions:

(a)    Immediately upon written notice by the Reinsurer to the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas;

(b)    By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder and due under the Stop Loss Agreement; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(c)    After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(d)    Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed.  By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed;

(e)    By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department having jurisdiction requires cancellation or disallows credit for this reinsurance or the reinsurance provided in the Stop Loss Agreement;

(f)    Immediately and automatically upon termination of the Stop Loss Agreement;

(g)    After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(h)    After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 17.1 and/or Section 20.1 of this Agreement.

4.6    Notices hereunder shall be provided by certified or registered mail return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

COLLINS
A S S O C I A T E S

4.7     This Agreement provides for termination on a runoff basis.  The relevant provisions of this Agreement shall apply to the business being run off.  It is expressly agreed that the terms, conditions and obligations of the Preamble; Sections 4.3, 4.4, 4.6 and 4.7; Articles VII-XXII; Sections 23.2, 23.3, 23.5, 23.7, 23.8; and Articles XXIV and XXV shall survive termination of this Agreement.

4.8     Upon termination, the Company, at its option, may elect to terminate the Reinsurer's liability



(f)    Fees for commercial photographs requested by an attorney and will include photographs taken by the adjuster or commercial photographs requested by the adjuster while investigating the claim;

(g)    Fees for court maps or any diagram drawn to scale by a professional map maker;

(h)    Fees for medical examinations and reports;

(i)    Private detectives or investigators' fees;

(j)    Medical audit fees;

(k)    Appraisal fees; and

(l)    Declaratory judgment or injunctive action fees.

8.2    In the event the Reinsurer's liability for loss adjustment expenses incurred for any Agreement Year (as defined in Article XIV) exceeds 7.5% of premiums earned for the same Agreement Year, the General Agent shall offset the difference through a reduction of commission otherwise due the General Agent hereunder in accordance with the provisions of Article XIV.  Notwithstanding the foregoing, if for any reason the General Agent fails to remit such difference, the Reinsurer agrees to hold the Company harmless for said difference and shall reimburse the Company for the amount of the insufficiency.  The Reinsurer and the General Agent (as applicable) shall be credited with any recovery of loss adjustment expense previously paid.

8.3    The Reinsurer's 80% share of losses, expense and loss recovery shall be carried into the monthly accounting for which provision is hereinafter made.  When, as the result of any one loss or other casualty covered by Policies of the Company, the total amount of such loss shall be due from the Reinsurer, the Reinsurer upon demand by the Company shall remit forthwith to the Company.

8.4    All records pertaining to claims arising under insurance policies issued on behalf of the Company through or by the General Agent subject to this Agreement shall be deemed to be jointly owned records of the Company and the Reinsurer, and shall be made available to the Company or the Reinsurer or their respective representatives or any duly appointed examiner for any state within the United States; and these records shall be kept in the State of Texas or such other jurisdiction as may be required by applicable state law or regulation.   Notwithstanding the foregoing, the Reinsurer is authorized to maintain duplicate working files of all such records outside the State of Texas. The Company, the Reinsurer and the General Agent each agree that it will not destroy any such records in its possession without the prior written approval of the other parties except that the Company shall not be required to retain files longer than required by the guidelines set forth by any applicable state department of insurance.

8.5    The Reinsurer shall, or shall cause the General Agent to, establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or General Agent, with such claims register to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense.  Such claim register shall be kept in a manner whereby the Company can, at any time, determine the status of any claim arising under Policies covered by this Agreement.  Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon.

8.6    The General Agent will advise the Reinsurer by separate report, regardless of any question of liability or coverage, any claim involving the following:

(a)    Fatalities.



    (b)      Bodily injuries involving:

                (i)      Brain stem, quadriplegic, paraplegic or severe paralysis;
                (ii)     Serious burns;
                (iii)    Amputations of major limbs;
                (iv)    Serious impairment of vision.

    (c)      Potential coverage disputes or bad faith situations which may give rise to a payment for excess of Policy limits or extra contractual obligations.

    (d)      Any claims that do not fall within these categories, but have a potential of significant liability to the Reinsurer.

## ARTICLE IX
## STATISTICAL DATA

In lieu of the Company furnishing the Reinsurer with bordereaux showing the particulars of all reinsurance ceded hereunder, the General Agent shall furnish, or cause to be furnished, to the Company as soon as practicable after the close of each of the respective periods indicated below (on forms agreeable to the parties hereto) with monthly, quarterly and annual reports showing the following statistical data in respect of the business reinsured hereunder.

    (a)      Monthly, with the data segregated by line of business

            (i)      Net premiums written (i.e., gross premiums less returns during the month) and unearned premium at the end of the month.

            (ii)     Net losses paid (i.e., gross losses less salvages and other recoveries) and adjustment expenses paid during the month and loss reserves outstanding at the end of the month.

    (b)      Annually, with the data segregated by line of business; annual summaries of net premiums written, net losses paid, net adjusting expenses paid during the year in such form so as to enable the Company to record such data in its annual convention statement. In force and unearned premium segregated as to advance premiums, premiums running twelve (12) months or less from inception date of policy, and premiums running more than (12) months from inception date of policy in such form as to enable Company to record such data in its annual convention statement.

    (c)      Periodic, with data segregated by line of business, statistical or other data as may be requested from time to time by regulatory authorities.

## ARTICLE X
## REPORTS AND REMITTANCES

10.1    The Company will cede to the Reinsurer its 100% share of the unearned premium on the business in force at the inception of this Contract. The General Agent shall report to the Reinsurer the following:

    (a)      Ceded unearned premium;

**COLLINS**
A S S O C I A T E S

(b)    General Agent's commission thereon;

(c)    Ceding fee to the Company as provided in Section 14.1.

10.2    The General Agent shall remit the balance due to the Reinsurer. Within 30 days after the end of each month, the General Agent shall report to the Reinsurer the following:

(a)    Ceded net written premium for the month;

(b)    General Agent's commission thereon;

(c)    Ceding fee to the Company as provided in Section 14.1;

(d)    Ceded paid losses and loss adjustment expenses for the month of account, provided such losses and loss adjustment expenses have not been reported by the Company in any previous monthly report;

(e)    Ceded unearned premium at the end of the month;

(f)    Ceded outstanding losses and loss adjustment expenses outstanding at the end of the month.

10.3    Within 45 days after the end of each month, the General Agent shall remit to the Reinsurer the following:

(a)    Ceded net written premium during the month, less;

(b)    General Agent's commission thereon, less;

(c)    Paid losses and loss adjustment expenses paid, provided such losses and loss adjustment expenses have not been deducted on behalf of the Company in any previous monthly report.

The positive balance of (a) less (b) less (c) shall be remitted by the General Agent with its report. Any balance shown to be due the Company shall be remitted by the Reinsurer as promptly as possible after receipt and verification of the General Agent's report.

**ARTICLE XI**
**ERRORS AND OMISSIONS**

11.1    The Company shall not be prejudiced in any way by any omission through clerical error, accident or oversight to cede to the Reinsurer any reinsurance rightly falling under the terms of this Agreement, or by erroneous cancellation, either partial or total, of any cession, or by omission to report, or by erroneously reporting any losses, or by any other error or omission, but any such error or omission shall be corrected immediately upon discovery.

11.2    Should the Company suffer any loss whatsoever, the Reinsurer shall assume loss for its own account and save and hold the Company harmless therefor.

**COLLINS**
A S S O C I A T E S

## ARTICLE XII
## INSPECTION OF RECORDS

The books and records pertaining to liability and losses under this Agreement maintained by any party hereto shall at all times be subject to the inspection by an authorized representative of any other party hereto.  This provision shall survive the termination of this Agreement.

## ARTICLE XIII
## ARBITRATION

13.1   As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereinafter arising between the Company and the Reinsurer with respect to this Agreement or with respect to these Parties' obligations hereunder, whether such dispute arises before or after termination of this Agreement, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

13.2   One arbiter (an "Arbiter") shall be chosen by the Company and one Arbiter shall be chosen by the Reinsurer and an umpire (an "Umpire") shall be chosen by the Arbiters, all of whom shall be active or retired disinterested executive officers of property and casualty insurance or reinsurance companies.

13.3   In the event that a party fails to choose an Arbiter within thirty (30) days following a written request by either party to the other to name an Arbiter, the party who has chosen its Arbiter may choose the unchosen Arbiter.  Thereafter, the Arbiters shall choose an Umpire before entering  upon arbitration.  If the Arbiters fail to agree upon the selection for the Umpire within thirty (30) days following their appointment, either party may petition the American Arbitration Association to appoint an Umpire.

13.4   Each party shall present its case to the Arbiters and Umpire within thirty (30) days after the selection of the Umpire, unless the period is extended by the Arbiters and the Umpire in writing, and/or at a hearing in Dallas, Texas.  The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence.  The decision in writing by a majority of the Arbiters and Umpire when filed with the Parties shall be final and binding on the parties; provided, however, that the Arbiters and Umpire shall have no authority to award punitive damages to one party in respect of the actions or inactions of the other party.  Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

13.5   Each party shall pay the expenses of its Arbiter and attorneys and one-half of the fees of the Umpire and the common expenses of the arbitration, unless a majority of the Arbiters and Umpire determine otherwise.

13.6   In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including in such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim.  Any such written election must be provided to the other party within ten (10) business days of the receipt by such party of any documents wherein the amount of the claim or counterclaim is first stated to be in excess of Two Million Dollars ($2,000,000).  In the event of any such litigation

COLLINS
A S S O C I A T E S

between the Company and the Reinsurer, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

## ARTICLE XIV
## FEES, COMMISSIONS, PREMIUM TAXES AND POLICY FEES

14.1    The Reinsurer shall guarantee payment to the Company of its ceding fee on all premiums reinsured hereunder (prior to deduction of premiums, if any, ceded by the Company for inuring reinsurance), and in addition guarantees those amounts described in Section 14.4 of this Agreement and is directly responsible for payment of the amount described in Article XV.  The Company shall allow return ceding fees on return premiums at the same rates.  Such ceding fee shall be 5% of Net Premiums and Net Policy Fees.  Notwithstanding anything else contained herein to the contrary, regardless of the amount of Net Premiums, the minimum ceding fee due the Company shall be (i) $33,334 for the 4-month period ending June 30, 1999 and (ii) $50,000 for each 6-month period thereafter during the term of this Agreement.  However, the minimum ceding fee for any such period will be pro-rated for any 6-month period, as applicable, in which this Agreement is terminated prior to any June 30th or December 31st.  The minimum ceding fee for each period shall be paid within 60 days after the end of such period.  For these purposes, a Policy's entire premium shall be applied to the period in which the Policy is written.

The General Agent shall pay to the Company its ceding fee based on Net Premiums, and premium taxes described in Section 14.4 on Net Premiums.  In the event that the ceding fee and premium taxes are not so paid by the General Agent within 60 days following the end of the month, the unpaid balance shall be paid directly to the Company by the Reinsurer.

14.2    The Reinsurer shall allow the General Agent a provisional commission of 31.50% on all premiums ceded to the Reinsurer hereunder. The General Agent shall allow the Reinsurer return commission on return premiums at the same rate. This is an obligation owing directly from the Reinsurer to the General Agent. The General Agent shall not seek to recover from the Company, any commissions due and the Reinsurer shall not seek to recover from the Company, any return commissions due.

14.3    The commission allowed the General Agent shall be adjusted for each Agreement Year in accordance with the provisions set forth below:

    (a)    The adjusted commission rate shall be calculated as follows and be applied to premiums earned for the period under consideration:

        (1)    If the ratio of losses incurred to premiums earned is 62.0% or greater, the adjusted commission rate for the period under consideration shall be 31.50%.

        (2)    If the ratio of losses incurred to premiums earned is less than 62.0%, but not less than 35.0%, the adjusted commission rate for the period under consideration shall be 31.50%, plus 58.33% of the difference in percentage points between 62.0% and the actual ratio of losses incurred to premiums earned.

        (3)    If the ratio of losses incurred to premiums earned is 35.0% or less, the adjusted commission rate for the period under consideration shall be 47.25%.

**COLLINS**
A S S O C I A T E S

(b)     If the ratio of losses incurred to premiums earned for any period is greater than 62.0%, the difference in percentage points between the actual ratio of losses incurred to premiums earned and 62.0% shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a debit (additional) to losses incurred. If the ratio of losses incurred to premiums earned for any period is less than 36.0%, the difference in percentage points between 36.0% and the actual ratio of losses incurred to premiums earned shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a credit to losses incurred.

(c)     Except as provided in Subparagraph (d), the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the end of each adjustment period, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the adjustment period as of the date of adjustment is less than commission previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the adjustment period of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

(d)     As respects the final adjustment period, the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the date of termination, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

(e)     "Net policy fees" shall mean gross policy fees charged on all original and renewal policies written on behalf of Company, less return policy fees.

(f)     "Losses incurred" as used herein shall mean the balance of the following, all as respects losses and loss adjustment expenses ceded under this Agreement:

(i)     Ceded losses and loss adjustment expenses paid as of the effective date of calculation; plus

**COLLINS**
A S S O C I A T E S

      (ii)    The ceded reserves for losses and loss adjustment expenses outstanding as of the effective date of calculation; plus

      (iii)   As respects second and each subsequent Agreement Year hereunder, plus (minus) the debit (credit) from the preceding Agreement Year as set forth in paragraph (b) above; plus

      (iv)   Any assignments and/or assessments as set forth in Article XV.

   (g)   "Ceded premiums earned" or "premiums earned" as used herein shall mean ceded net written premiums allocated to the Agreement Year (i.e., net of cancellations and return premiums), less the unearned portion thereof as of the effective date of calculation, all as respects premiums ceded under this Agreement.

   (h)   "Agreement Year" as used herein shall mean the period from March 1, 1999 to February 29, 2000, both days inclusive, and each subsequent twelve-month period thereafter that this Agreement continues in force.

14.4   It is expressly agreed that the commission allowed the General Agent includes provision for premium taxes and ceding fees. General Agent shall pay to the Company all premium taxes payable for policies subject to reinsurance hereunder.

14.5   It is expressly agreed that, for purposes of calculating the developed commission rate, the results of the State and County Mutual Fire Insurance Company Quota Share Reinsurance Agreement shall be combined with the results of the business hereunder. However, should the results of one program be in a deficit position, while the other program develops a commission in excess of the provisional commission, no additional commission will be payable until the deficit has first been eliminated.

## ARTICLE XV
## ASSESSMENTS, ASSIGNMENTS, FINES AND PENALTIES

15.1   The Reinsurer hereby assumes liability for any and all assessments and assignments imposed as a result of Policies reinsured hereunder (whether before or after the termination of this Agreement). The Reinsurer shall immediately reimburse the Company for any assessments made against the Company pursuant to those laws and regulations creating obligatory funds (including, but not limited to, insurance guaranty and insolvency funds), pools, joint underwriting associations, FAIR plans and similar plans. Amounts owed by the Reinsurer under this Section shall be payable directly by the Reinsurer to the Company. The Reinsurer shall be entitled to receive from the Company on or prior to the 31st day of March of each year thereafter (or such date on which such premium taxes are paid) a sum equal to the premium tax credit that is allowed to the Company with respect to such assessments. The premium tax credit allowed the Reinsurer hereunder is to be on a pro-rata and first-in, first-out basis. The Company shall promptly return to the Reinsurer any amount of assessment refunded to or credited to the Company.

15.2   This Agreement shall apply to risks assigned to the Company under any assigned risk plan if, in the reasonable judgment of the Company, such risks were assigned to the Company because of the business written and reinsured hereunder.

**COLLINS**
A S S O C I A T E S

15.3    The Reinsurer shall also pay promptly and directly to the Company any fines, penalties and/or any other charge incurred by the Company as respects the business reinsured hereunder arising out of the actions or inactions of the General Agent unless such fines, penalties and/or any other charge was a direct result of any willful misconduct on the part of the Company.

### ARTICLE XVI
### INSOLVENCY OF COMPANY

16.1    In the event of the insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, the portion assumed by the Reinsurer shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the Company without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claim.

16.2    It is agreed and understood that in the event of the insolvency of the Company, the liquidator or receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim is filed in the insolvency proceeding; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

16.3    It is further agreed and understood that as to all reinsurance made, ceded, renewed or otherwise becoming effective hereunder, the reinsurance shall be payable by the Reinsurer directly to the Company or its liquidator, receiver or statutory successor, except where the Reinsurer has expressly assumed in writing such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policy and in substitution for the obligation of the Company to such payees.

### ARTICLE XVII
### HOLD HARMLESS

17.1    In consideration of these presents and the reciprocal benefits derived by the Company and the Reinsurer hereunder, the Reinsurer hereby holds the Company harmless from, and assumes all liability for, every claim, demand, liability, loss, damage, cost, charge, attorneys' fees, expense of suit, order, judgment and adjudication of whatever kind or character incurred by the Company in connection with this Agreement or any contract or transaction related thereto, including, but not limited to, all costs and fees incurred by the Company in asserting its rights hereunder.  The Reinsurer's obligations hereto relate to, but are not limited to the following:  all liability for agents' balances, return premiums and commissions, deceptive trade practice liability, premiums, policy fees, premium taxes or other charges (whether collected or not); all actions or inactions by the General Agent, its sub-agents or any independent claims adjusters relating to this Agreement and the General Agency Agreement; and any agreement with a premium finance company, and all fees owing to the General Agent under this and the aforementioned related agreements.

**COLLINS**
A S S O C I A T E S

3/9/00__3666.doc                    - 13 -

Notwithstanding anything to the contrary, this provision shall not apply to:

(a)     fraud, dishonesty, theft or collusion on the part of any director, officer or employee of the Company, or

(b)     policies not reinsured hereunder, or

(c)     the Company's failure to perform its duties and obligations under this Agreement due to the Company's willful misconduct, or

(d)     20% of the underwriting risk retained by the Company pursuant to Article III hereof, or

(e)     expenses incurred by the Company under Section 13.5 hereof, or

(f)     costs and fees incurred by the Company in connection with litigation under Section 13.6 hereof wherein the Reinsurer is the prevailing party.

17.2    In the event any provision, term and/or condition of this Agreement (other than the Preamble hereof) is inconsistent with the provision, terms and/or conditions of Section 17.1 above, the provisions, terms and/or conditions of said Section 17.1 above shall control over and supersede such inconsistent provisions, terms and/or conditions.

17.3    The Company shall not be liable to the Reinsurer for premiums unless the Company itself has actually received those premiums and wrongfully not remitted them to the Reinsurer. The Reinsurer may not offset any balances on account of losses, loss adjustment expenses or any other amounts due except as to premiums actually received by the Company itself (as distinct from premiums not collected, or premiums collected by the General Agent, or premium placed in the premium trust account pursuant to the General Agency Agreement) which have wrongfully not been transmitted to the Reinsurer.

17.4    If for any reason the General Agent fails or is unable to administer the Policies reinsured hereunder (whether the Agreement is still in effect or the business is being run-off), the Reinsurer shall appoint a party (acceptable and approved by the Company) to administer the business and the Reinsurer shall be responsible for 80% of the cost of said administration. If return premiums or other funds need to be returned to premium finance companies, policyholders or sub-agents, the Reinsurer shall pay these amounts if the successor or General Agent does not.

17.5    The Reinsurer shall not sue, or seek arbitration, against the Company for any acts of the General Agent for any monies which the General Agent owes unless the Company has actually received those monies and has wrongfully not remitted them to the Reinsurer; and the Reinsurer shall indemnify the Company for any damages, liabilities and expenses incurred by reason of the General Agent's acts or failure to act. The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement and the General Agent shall not sue, or seek arbitration against, the Company for any actions by, or debts owing from, the Reinsurer. The Reinsurer shall not seek to recover from, or offset against, the Company any sums, whether premiums or other monies, which the General Agent was unable or unwilling to remit to the Company or the Reinsurer.



## ARTICLE XVIII
## REGULATORY MATTERS

**18.1**   It is the Parties' understanding that any premiums which are overdue from the General Agent to the Company may be deemed non-admitted assets.  In confirmation of the liabilities assumed by the Reinsurer under this Agreement, the Reinsurer hereby assumes 100% of all liability and responsibility for all premiums in the course of collection.

**18.2**   The Reinsurer shall agree, at no cost to the Company, to take those actions (including, but not limited to, modifications in how funds are handled and how accounts are cleared, settled and the manner in which incurred losses are accounted for)  and agree to those arrangements necessary to ensure that the Company suffers no adverse impact because of this reinsurance program and is in compliance with any applicable laws of a state insurance department, insofar as this reinsurance program is concerned.

## ARTICLE XIX
## THE GENERAL AGENT

The Reinsurer has selected the General Agent to administer the business reinsured hereunder.  While for regulatory purposes, the General Agent will need to be appointed as the Company's agent, it is recognized that the General Agent is acting on behalf of the Reinsurer and that the Reinsurer shall be responsible for monitoring the General Agent's compliance with the provisions of the Agreement and the General Agency Agreement.  The Company is making no evaluation of the General Agent's qualifications and has no obligation to furnish reports or statistics to the Reinsurer.  The Company shall file with each applicable state all reports requested by such state based upon information received from the General Agent and Reinsurer.

## ARTICLE XX
## LOSS IN EXCESS OF POLICY LIMITS/ECO

**20.1**   In the event the Company pays or is held liable to pay an amount of loss in excess of its policy limit, but otherwise within the terms of its policy (hereinafter called "loss in excess of policy limits") or any punitive, exemplary, compensatory or consequential damages, other than loss in excess of policy limits (hereinafter called "extra contractual obligations") because of alleged or actual bad faith or negligence on its part in rejecting a settlement within policy limits, or in discharging its duty to defend or prepare the defense in the trial of an action against its policyholder, or in discharging its duty to prepare or prosecute an appeal consequent upon such an action, or in otherwise handling a claim under a policy subject to this Agreement, 80% of the loss in excess of policy limits and/or 80% of the extra contractual obligations shall be added to the Company's loss, if any, under the Policy involved, and the sum thereof shall be reinsured 80% under this Agreement.

**20.2**   An extra contractual obligation shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

**20.3**   Notwithstanding anything stated herein, this Agreement shall not apply to any loss incurred by the Company as a result of any fraudulent and/or criminal act which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals, by any officer or director of the Company acting individually or collectively or in collusion with any individual, corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

COLLINS
A  S  S  O  C  I  A  T  E  S

## ARTICLE XXI
### LOSS AND UNEARNED PREMIUM RESERVE FUNDING

In the event that either (i) the Texas Department of Insurance or other regulatory entity having authority over this Agreement requires cancellation or disallows credit for this reinsurance or (ii) the Reinsurer's A.M. Best rating at any time is lower than A-, the Reinsurer will immediately secure its obligations under this Agreement via a security fund agreement to be executed by the Reinsurer and the Company, which security fund agreement shall be in form and content acceptable to the Company.

## ARTICLE XXII
### SAVINGS CLAUSE

22.1　If any law or regulation of any Federal, State or local government of the United States of America, or the ruling of officials having supervision over Insurance companies, should prohibit or render illegal this Agreement, or any portion thereof, as to risks or properties located in the jurisdiction of such authority, either the Company or the Reinsurer may upon written notice to the other suspend or abrogate this Agreement insofar as it relates to risks or properties located within such jurisdiction to such extent as may be necessary to comply with such law, regulations or ruling. Such illegality shall in no way affect any other portion thereof; provided, however, that the Reinsurer or the Company may terminate or suspend this Agreement insofar as it relates to the business to which such law or regulation may apply.

22.2　This Agreement shall be interpreted in accordance with the laws of the State of Texas. All provisions of this Agreement are intended to be enforced to the fullest extent permitted. Accordingly, should a court of competent jurisdiction or arbitration panel determine that the scope of any provision is too broad to be enforced as written, the Parties intend that the court or arbitration panel should reform the provision to such narrower scope as it determines to be enforceable under present or future law; such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance.

## ARTICLE XXIII
### MISCELLANEOUS

23.1　This Agreement has been made and entered into in the State of Texas.

23.2　All notices required to be given hereunder shall be deemed to have been duly given by personally delivering such notice in writing or by mailing it, certified mail, return receipt requested, with postage prepaid. Any party may change the address to which notices and other communications hereunder are to be sent to such party by giving the other party written notice thereof in accordance with this provision.

23.3　This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns. The Reinsurer shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.

23.4　This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**COLLINS**
A S S O C I A T E S

23.5    This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto.

23.6    This Agreement is the entire agreement between the parties and supersedes any and all previous agreements, written or oral, and amendments thereto.

23.7    A waiver by the Company or the Reinsurer of any breach or default by the other party under this Agreement shall not constitute a continuing waiver or a waiver by the Company or the Reinsurer of any subsequent act in breach or of default hereunder.

23.8    Headings used in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement.

23.9    This Agreement is not exclusive and the Company reserves the right to appoint or contract with other reinsurers, agents and/or managing agents in the territory covered by this Agreement and General Agent may contract and represent other insurers.

23.10   The Reinsurer or General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company.  The Reinsurer and/or General Agent shall establish and maintain records of any such advertising as required by applicable statute and regulation.

## ARTICLE XXIV
## ORIGINAL CONDITIONS

24.1    All reinsurance under this Agreement shall be subject to the same rates, terms, conditions and waivers, and to the same modifications and alterations as the respective policies of the Company.  The Reinsurer shall be credited with its exact proportion of the original premiums received by the Company, prior to disbursement of any dividends, but after deduction of premiums, if any, ceded by the Company for inuring reinsurance.

24.2    Except as provided in Article XVI, nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not parties to this Agreement.

## ARTICLE XXV
## INTERMEDIARY

    John B. Collins Associates, Inc. is hereby recognized as the intermediary negotiating this Contract.  All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvage and loss settlements) relating hereto shall be transmitted to the Company and the Reinsurer through John B. Collins Associates, Inc., 8300 Norman Center Drive, Minneapolis, Minnesota 55437.  Payments by the Company to John B. Collins Associates, Inc. shall be deemed to constitute payment to the Reinsurer.

COLLINS
A S S O C I A T E S

Payments by the Reinsurer to John B. Collins Associates, Inc. shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above mentioned.

DATED: _____          STATE NATIONAL INSURANCE COMPANY, INC.

BY: _____

ITS: _____

COLLINS
A S S O C I A T E S

3/9/00 __ 3666.doc                    - 18 -

# EXHIBIT F

**INTERESTS AND LIABILITIES CONTRACT**

of

**KEMPER REINSURANCE COMPANY**
**Long Grove, Illinois**
**(hereinafter referred to as the "SUBSCRIBING REINSURER")**

attached to and forming part of the

**100% QUOTA SHARE**
**REINSURANCE CONTRACT**
**Effective: March 1, 1999**

issued to and duly executed by

**STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY**
**Fort Worth, Texas**

The SUBSCRIBING REINSURER hereby accepts a 75% share in the interests and liabilities of the "Reinsurer" under the Agreement referenced above.

This Contract shall become effective on March 1, 1999 at 12:01 a.m., Central Time, and shall continue in force until terminated in accordance with the provisions of the Agreement referenced above.

The SUBSCRIBING REINSURER'S share in the referenced Agreement shall be several and not joint with the shares of the other reinsurers, it being understood that the SUBSCRIBING REINSURER shall in no event participate in the interests and liabilities of the other reinsurers.

IN WITNESS WHEREOF, the SUBSCRIBING REINSURER has caused this Contract to be executed by its duly authorized representative at:

Lincolnshire, Illinois, this ___7___ day of ___November___, 2000.

Richard A. Clymer, Vice President Ref ___, 23472-1___
GE REINSURANCE CORPORATION, FORMERLY
KEMPER REINSURANCE COMPANY

**COLLINS**
A S S O C I A

9/29/99___36641272

**100% QUOTA SHARE REINSURANCE AGREEMENT**

**BETWEEN**

**STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY**

**AND**

**SUBSCRIBING REINSURERS EXECUTING THE INTERESTS AND LIABILITIES CONTRACTS**

**EFFECTIVE: MARCH 1, 1999**

**COLLINS**
A S S O C I A T E S

## Table of Contents

| Article | | Page |
|---|---|---|
| | Preamble | |
| I | Business Reinsured | 1 |
| II | Exclusions | 1 |
| III | Obligatory Agreement | 2 |
| IV | Term and Condition | 3 |
| V | Territory | 5 |
| VI | Currency | 5 |
| VII | Loss and Loss Adjustment Expense | 5 |
| VIII | Statistical Data | 7 |
| IX | Reports and Remittances | 8 |
| X | Errors and Omissions | 9 |
| XI | Inspection of Records | 9 |
| XII | Arbitration | 9 |
| XIII | Fees, Commissions, Premium Taxes and Policy Fees | 10 |
| XIV | Assessments, Assignments, Fines and Penalties | 13 |
| XV | Insolvency of Company | 13 |
| XVI | Hold Harmless | 14 |
| XVII | Regulatory Matters | 15 |
| XVIII | The General Agent | 15 |
| XIX | Loss in Excess of Policy Limits/ECO | 15 |
| XX | Loss and Unearned Premium Reserve Funding | 16 |
| XXI | Savings Clause | 16 |
| XXII | Miscellaneous | 17 |
| XXIII | Original Conditions | 17 |
| XXIV | Intermediary | 18 |



**COLLINS**

A S S O C I A T E S

**100% QUOTA SHARE REINSURANCE AGREEMENT**
**EFFECTIVE: MARCH 1, 1999**

**Issued to**

**STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY**

**1999 SUBSCRIBING REINSURERS**

| | |
|---|---|
| Kemper Reinsurance Company | 75% |
| Partner Reinsurance Company of the U.S. | 25% |
| | 100% |

COLLINS
A S S O C I A T E S

 

## 100% QUOTA SHARE REINSURANCE AGREEMENT

THIS 100% QUOTA SHARE REINSURANCE AGREEMENT (this "Agreement") is made and entered into as of the 1st day of March, 1999, by and between Subscribing Reinsurers executing the Interests and Liabilities Contracts attaching to and forming a part of this Agreement ("Reinsurer") and STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY, an insurance company organized under the laws of the State of Texas ("Company");

### WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

### PREAMBLE

It is understood that the Company and the Reinsurer (hereinafter identified collectively as the "Parties") hereto wish to enter into a reinsurance arrangement through which the Company is to bear no business, credit or insurance risk whatsoever (save the risk of the Reinsurer's insolvency). The Reinsurer shall hold the Company harmless and indemnify it for these and all risks. The sole consideration provided by the Company, in exchange for the fees set forth in Article XIII herein, is to permit the Policies (as hereinafter defined) which are 100% reinsured under this Agreement to be issued in the name of the Company. All provisions of this Agreement shall be interpreted so as to be in accord with this Preamble.

### ARTICLE I
### BUSINESS REINSURED

1.1    The Reinsurer hereby reinsures the Company, in the manner and to the extent set forth herein, under the Company's policies, certificates, binders, contracts or agreements (herein called "Policies") in force on the effective date hereof or, issued or renewed on or after that date on behalf of the Company by International Underwriters General Agency, Inc., a Texas corporation ("General Agent"), and classified by the Company, in its discretion, as a line of business which is authorized in the General Agency Agreement dated as of the date hereof, between the Company and the General Agent (the "General Agency Agreement"), which is attached hereto and made a part hereof for all purposes.

1.2    For purposes of this Agreement, the term "in force" shall mean the business written under that certain Quota Share Reinsurance Agreement dated effective March 1, 1998, by and among the Company, the General Agent, Underwriters MGA, Inc. and the subscribing reinsurers identified therein, which is in force at the effective date and time of this Agreement.

### ARTICLE II
### EXCLUSIONS

The following risks, perils and classes of business are specifically excluded:

2.1    If the General Agent binds or issues any business excluded, the Company shall notify the Reinsurer promptly upon actual knowledge of such business being bound or issued.   The Reinsurer shall provide coverage for any such risk bound until canceled by the Company at any Reinsurer's request.

9/29/99 _3664.doc                    - 1 -

**COLLINS**
A S S O C I A T E S



(a)     All business not specifically described as business covered under Schedule I of the General Agency Agreement.

(b)     Business written on a co-surety or co-indemnity basis when the issuing company is not the controlling carrier.

(c)     War Risks as excluded in the attached North American War Exclusion Clause (Reinsurance).

(d)     Business excluded by the attached Nuclear Exclusion Clauses – Liability – Reinsurance – U.S.A., Physical Damage – Reinsurance – U.S.A., Liability – Reinsurance – Canada, and Physical Damage – Reinsurance – Canada.

(e)     Financial Guarantee.

(f)     Racing automobiles, and government law enforcement vehicles.

(g)     As respects the Mexican National program:

1.     Vehicles garaged in the United States;
2.     Motorcycles, Travel Trailers and Motor Homes.

2.2     The foregoing exclusions list, other than c and d, shall not apply when the operations or exposures are only incidental to a comparatively small part of the original insured's major activities.

2.3     Errors and omissions notwithstanding, if without the knowledge and contrary to the instructions of its supervisory personnel, the Company is bound on a risk specifically excluded hereunder (other than c and d), or by an existing insured extending its operations, such reinsurance as would have been afforded but for the exclusion shall apply for a period of 30 days following receipt of said underwriting personnel of knowledge thereof.

## ARTICLE III
## OBLIGATORY AGREEMENT

3.1     Effective as of the effective date of this Agreement, the Company obligates itself to cede to the Reinsurer, and the Reinsurer obligates itself to accept, 100% of the Company's gross liability under all Policies issued by and on behalf of the Company by the General Agent in the State of Texas. The liability of the Reinsurer shall commence obligatorily and simultaneously with that of the Company, subject to the terms, conditions and limitations set forth in this Agreement.

3.2     Business ceded hereunder shall include every original policy, rewrite, renewal or extension (whether before or after the termination of this Agreement) required by applicable statute, or by rule or regulation of any policy of insurance ceded hereunder by the Company to the Reinsurer.

3.3     The maximum Policy limits subject to this Agreement are as follows:

(a)     Mexican National Private Passenger Automobile Liability

| | | | |
|---|---|---|---|
| (1) | Bodily Injury | $100,066 | each person |
| | | $300,066 | each occurrence |
| (2) | Property Damage | $ 50,066 | each occurrence |

**COLLINS**
A S S O C I A T E S



(b)     Mexican National Commercial Automobile Liability

Combined Single Limit (CSL)         $1,000,066     each occurrence
                                     $1,000,066     each policy

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect plus $66.

## ARTICLE IV
## TERM AND CONDITION

4.1.     This Agreement shall become effective on the 1st of March, 1999, at 12:01 a.m., Central Time, as respects losses arising out of occurrences commencing under Policies in force, issued or renewed on or after such date at the offices of the Company, and shall remain continuously in force unless terminated by any party hereto.

4.2     This Agreement shall continue from the effective date and shall be automatically renewed for a term of one year from year to year unless terminated as set forth in this section. Any party hereto may cancel this Agreement with at least ninety (90) days prior written notice to the other party.

4.3     When this Agreement terminates for any reason, reinsurance hereunder shall continue to apply to the business in force at the time and date of termination until expiration or cancellation of such business. It is understood that any Policies with effective dates prior to the termination date but issued after the termination date are covered under this Agreement. Additionally, the reinsurance hereunder shall continue to apply as to Policies which must be issued or renewed, as a matter of state law or regulation or because a sub-agent has not been timely canceled, until the expiration dates of said Policies.

4.4     Upon termination of this Agreement, the Reinsurer, the General Agent and the Company shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to outstanding insurance business under this Agreement existing on the date of such termination. The Parties expressly covenant and agree that they will cooperate with each other in the handling of all such run-off insurance business until all Policies have expired either by cancellation or by terms of such Policies and all outstanding losses and loss adjustment expenses have been settled. While by law and regulation, the Company recognizes its primary obligations to its policyholders, the Reinsurer recognizes that to the extent possible there shall be no cost or involvement by the Company in servicing this run-off. All costs and expenses associated with the handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent and, to the extent not borne by the General Agent, solely by the Reinsurer. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while this Agreement is still in effect), then, consistent with this Agreement, the Reinsurer's obligation with respect to such run-off business shall continue and the Reinsurer shall either service such run-off business directly or appoint, at the Reinsurer's expense, a successor to the General Agent, subject to the approval of the Company, which approval shall not be unreasonably withheld. Such successor shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business.

**COLLINS**
A S S O C I A T E S



4.5    In addition to the provisions set forth in Section 4.2 herein, this Agreement may be terminated at any time in accordance with the following terms and conditions:

(a)    Immediately upon written notice by the Reinsurer or the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas;

(b)    Immediately by mutual consent of the Company and Reinsurer;

(c)    As provided in Section 21.1 of this Agreement;

(d)    By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(e)    After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(f)    Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed. By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed;

(g)    By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department having jurisdiction requires cancellation or disallows credit for this reinsurance;

(h)    After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(i)    After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 16.1 and/or Section 19.1 of this Agreement.

4.6    Notices hereunder shall be provided by certified or registered mail return receipt requested, and notice shall be deemed to have been provided on the date of mailing.

4.7    In the event this Agreement is terminated, the Reinsurer shall remain liable to and shall, immediately upon request, reimburse the Company for any assessment made upon the Company by the Commissioner of Insurance of the State of Texas under Article 21.28-C (Texas Property and Casualty Insurance Guaranty Act) of the Texas Insurance Code, which applies to the risks

**COLLINS**
A S S O C I A T E S



reinsured hereunder to the effective date of termination. The Company shall likewise remain liable for, and account to the Reinsurer for any recovery of such assessment under Section 20 of said Article, or any credit allowed to it against its premium tax pursuant to Section 21 thereof, applicable to the risks reinsured hereunder.

4.8    The title and ownership of all undelivered Policies, books, supplies or other property related to the reinsured business is in the Company, and upon termination these shall be delivered immediately by the Reinsurer to the Company, without compelling the Company to resort to any legal proceedings to secure the aforesaid described property of the Company.

4.9    This Agreement provides for termination on runoff basis. The relevant provisions of this Agreement shall apply to the business being run off. It is expressly agreed that the terms, conditions and obligations of the Preamble; Sections 4.3, 4.4, 4.6, 4.7, 4.8 and 4.9; Articles VII-XXI; Sections 22.2, 22.3, 22.5, 22.7, 22.8; and Articles XXIII and XXIV shall survive termination of this Agreement.

4.10    Upon termination, the Company, at its option, may elect to terminate the Reinsurer's liability for all losses occurring subsequent to termination. The Reinsurer will return to the Company a portfolio representing the unearned premium reserve under this Agreement appropriate to the mode of termination.

### ARTICLE V
### TERRITORY

This Agreement will cover wherever the Company's Policies cover.

### ARTICLE VI
### CURRENCY

The currency to be used for all purposes of this Agreement shall be United States of America currency.

### ARTICLE VII
### LOSS AND LOSS ADJUSTMENT EXPENSE

7.1    Subject to Section 1.03 of the General Agency Agreement, all loss settlements made by the Company or the General Agent under the terms of this Agreement, whether under strict policy conditions or by way of compromise, shall be unconditionally binding upon the Reinsurer in proportion to its participation, and the Reinsurer shall benefit proportionately in all salvage and recoveries. The Reinsurer shall assume and be liable for and pay on behalf of the Company, 100% of all losses incurred in connection with the risks covered by this Agreement, including, but not limited to, judgments (including interest thereon) and settlements in connection therewith. The Reinsurer shall also be liable for and pay on behalf of the Company 7.5% of earned premium to cover loss adjustment expense, except that the Reinsurer shall pay on behalf of the Company 100% of the following fees:

    (a)    Legal fees;
    (b)    Court reporter fees, unless used by an adjuster in the investigation of claims;
    (c)    Court costs;
    (d)    Expert witness fees;

COLLINS
A S S O C I A T E S

(e)    Expert testimony fees;
(f)    Fees for commercial photographs requested by an attorney and will include photographs taken by the adjuster or commercial photographs requested by the adjuster while investigating the claim;
(g)    Fees for court maps or any diagram drawn to scale by a professional map maker;
(h)    Fees for medical examinations and reports;
(i)    Private detectives or investigators' fees;
(j)    Medical audit fees;
(k)    Appraisal fees; and
(l)    Declaratory judgment or injunctive action fees.

7.2    In the event the commission allowed the General Agent is adjusted downwards (as defined in Section 13.4), the General Agent shall offset the difference through a reduction of commission

status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon.

7.7    The General Agent will advise the Reinsurer by separate report, regardless of any question of liability or coverage, any claim involving the following:

(a)    Fatalities.

(b)    Bodily injuries involving:

(1)    Brain stem, quadriplegic, paraplegic or severe paralysis;
(2)    Serious burns;
(3)    Amputations of major limbs;
(4)    Serious impairment of vision.

(c)    Potential coverage disputes or bad faith situations which may give rise to a payment for excess of Policy limits or extra contractual obligations.

(d)    Any claims that do not fall within these categories, but have a potential of significant liability to the Reinsurer.

### ARTICLE VIII
### STATISTICAL DATA

In lieu of the Company furnishing the Reinsurer with bordereaux showing the particulars of all reinsurance ceded hereunder, the General Agent shall furnish, or cause to be furnished, to the Company as soon as practicable after the close of each of the respective periods indicated below (on forms agreeable to the parties hereto) with monthly, quarterly and annual reports showing the following statistical data in respect of the business reinsured hereunder.

(a)    Monthly, with the data segregated by line of business

(1)    Net premiums written (i.e., gross premiums less returns during the month) and unearned premium at the end of the month.

(2)    Net losses paid (i.e., gross losses less salvages and other recoveries) and adjustment expenses paid during the month and loss reserves outstanding at the end of the month.

(b)    Annually, with the data segregated by line of business; annual summaries of net premiums written, net losses paid, net adjusting expenses paid during the year in such form so as to enable the Company to record such data in its annual convention statement. In force and unearned premium segregated as to advance premiums, premiums running twelve (12) months or less from inception date of policy, and premiums running more than (12) months from inception date of policy in such form as to enable Company to record such data in its annual convention statement.

**COLLINS**
A S S O C I A T E S

(c)     Periodic, with data segregated by line of business, statistical or other data as may be requested from time to time by regulatory authorities.

## ARTICLE IX
## REPORTS AND REMITTANCES

9.1     The Company will cede to the Reinsurer its 100% share of the unearned premium on the business in force at the inception of this Contract. The General Agent shall report to the Reinsurer the following:

(a)     Ceded unearned premium;

(b)     General Agent's commission thereon;

(c)     Ceding fee to the Company as provided in Section 13.2.

The General Agent shall remit the balance due to the Reinsurer.

9.2     Within 30 days after the end of each month, the General Agent shall report to the Reinsurer the following:

(a)     Ceded net written premium for the month;

(b)     General Agent's commission thereon;

(c)     Ceding fee to the Company as provided in Section 13.2;

(d)     Ceded paid losses and loss adjustment expenses for the month of account, provided such losses and loss adjustment expenses have not been reported by the Company in any previous monthly report;

(e)     Ceded unearned premium at the end of the month;

(f)     Ceded outstanding losses and loss adjustment expenses outstanding at the end of the month.

9.3     Within 45 days after the end of each month, the General Agent shall remit to the Reinsurer the following:

(a)     Ceded net written premium during the month, less;

(b)     General Agent's commission thereon, less;

(c)     Paid losses and loss adjustment expenses paid, provided such losses and loss adjustment expenses have not been deducted on behalf of the Company in any previous monthly report.

COLLINS
A S S O C I A T E S

The positive balance of (a) less (b) less (c) shall be remitted by the General Agent with its report. Any balance shown to be due the Company shall be remitted by the Reinsurer as promptly as possible after receipt and verification of the General Agent's report.

### ARTICLE X
### ERRORS AND OMISSIONS

10.1    The Company shall not be prejudiced in any way by any omission through clerical error, accident or oversight to cede to the Reinsurer any reinsurance rightly falling under the terms of this Agreement, or by erroneous cancellation, either partial or total, of any cession, or by omission to report, or by erroneously reporting any losses, or by any other error or omission, but any such error or omission shall be corrected immediately upon discovery.

10.2    Should the Company suffer any loss whatsoever, the Reinsurer shall assume loss for its own account and save and hold the Company harmless therefor.

### ARTICLE XI
### INSPECTION OF RECORDS

The books and records pertaining to liability and losses under this Agreement maintained by any party hereto shall at all times be subject to the inspection by an authorized representative of any other party hereto. This provision shall survive the termination of this Agreement.

### ARTICLE XII
### ARBITRATION

12.1    As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereinafter arising between the Company and the Reinsurer with respect to this Agreement or with respect to these Parties' obligations hereunder, whether such dispute arises before or after termination of this Agreement, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration.

12.2    One arbiter (an "Arbiter") shall be chosen by the Company and one Arbiter shall be chosen by the Reinsurer and an umpire (an "Umpire") shall be chosen by the Arbiters, all of whom shall be active or retired, disinterested executive officers of property and casualty insurance or reinsurance companies.

12.3    In the event that a party fails to choose an Arbiter within thirty (30) days following a written request by either party to the other to name an Arbiter, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within thirty (30) days following their appointment, either party may petition the American Arbitration Association to appoint an Umpire.

12.4    Each party shall present its case to the Arbiters and Umpire within thirty (30) days after the selection of the Umpire, unless the period is extended by the Arbiters and the Umpire in writing, and/or at a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Parties shall be final and binding on the parties; provided, however, that the Arbiters and Umpire shall have no authority to

**COLLINS**
A S S O C I A T E S



award punitive damages to one party in respect of the actions or inactions of the other party. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

12.5    Each party shall pay the expenses of its Arbiter and attorneys and one-half of the fees of the Umpire and the common expenses of the arbitration, unless a majority of the Arbiters and Umpire determine otherwise.

12.6    In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including in such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. Any such written election must be provided to the other party within ten (10) business days of the receipt by such party of any documents wherein the amount of the claim or counterclaim is first stated to be in excess of Two Million Dollars ($2,000,000). In the event of any such litigation between the Company and the Reinsurer, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

## ARTICLE XIII
### FEES, COMMISSIONS, PREMIUM TAXES AND POLICY FEES

13.1.    In consideration of the acceptance by the Reinsurer of one hundred percent (100%) of the Company's liability on insurance business reinsured hereunder, the Reinsurer is entitled to one hundred percent (100%) of the Net Premiums (as hereinafter defined) received by the General Agent or the Reinsurer on Policies reinsured less (i) the ceding fee allowed the Company pursuant to Section 13.2 hereof, (ii) the commission paid to the General Agent and (iii) premium taxes on Policies subject to reinsurance hereunder.    "Net Premiums" shall mean the gross premiums (excluding policy fees) charged on all original and renewal Policies written on behalf of the Company, less return premiums.    Such amounts as provided in Section 5.09 of the General Agency Agreement shall be paid to the Reinsurer or received from the Reinsurer by the General Agent on behalf of the Company.

13.2    It is understood that the Reinsurer shall pay the Company directly a fee within forty-five (45) days following the end of each month (to the Company's designated agent, T.B.A. Insurance, Inc. ("TBA"), as a ceding fee), 5% of Net Premiums and Net Policy Fees, plus the amount of assessments and state premium taxes as provided in this Article XIII.    (The ceding fee amount shall be computed on a calendar year basis based on premium written in each annual period ended December 31st.)    Notwithstanding anything else contained herein to the contrary, regardless of the amount of Net Premiums, the minimum ceding fee due the Company shall be $50,000 for each six-month period of each calendar year ended December 31st during which the Agreement is in effect, plus the aforementioned assessments and state premium taxes. The minimum ceding fee payable to the Company for the four-month period from March 1, 1999 to June 30, 1999 shall be $33,334. (This minimum ceding fee applicable to each successive six-month period shall not be affected by the amounts of Net Premiums written in other six-month periods and shall not be reduced by reason of payments in excess of the minimum in other periods.  The minimum ceding fee for each period shall be paid within sixty (60) days of the end of each period.  For these purposes, a policy's entire premium shall be applied to the period in which the policy is written.)

13.3    The Reinsurer shall allow the General Agent a provisional commission of 31.50% on all premiums ceded to the Reinsurer hereunder. The General Agent shall allow the Reinsurer return

COLLINS
A S S O C I A T E S

commission on return premiums at the same rate. This is an obligation owing directly from the Reinsurer to the General Agent. The General Agent shall not seek to recover from the Company, any commissions due and the Reinsurer shall not seek to recover from the Company, any return commissions due.

13.4    The commission allowed the General Agent shall be adjusted for each Agreement Year in accordance with the provisions set forth below:

    (a)    The adjusted commission rate shall be calculated as follows and be applied to premiums earned for the period under consideration:

        (1)    If the ratio of losses incurred to premiums earned is 62.0% or greater, the adjusted commission rate for the period under consideration shall be 31.50%.

        (2)    If the ratio of losses incurred to premiums earned is less than 62.0%, but not less than 35.0%, the adjusted commission rate for the period under consideration shall be 31.50%, plus 66.7% of the difference in percentage points between 62.0% and the actual ratio of losses incurred to premiums earned.

        (3)    If the ratio of losses incurred to premiums earned is 35.0% or less, the adjusted commission rate for the period under consideration shall be 49.50%.

    (b)    If the ratio of losses incurred to premiums earned for any period is greater than 62.0%, the difference in percentage points between the actual ratio of losses incurred to premiums earned and 62.0% shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a debit (additional) to losses incurred. If the ratio of losses incurred to premiums earned for any period is less than 35.0%, the difference in percentage points between 35.0% and the actual ratio of losses incurred to premiums earned shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a credit to losses incurred.

    (c)    Except as provided in Subparagraph (d), the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the end of each adjustment period, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the adjustment period as of the date of adjustment is less than commission previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the adjustment period of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

**COLLINS**
A S S O C I A T E S

(d)    As respects the final adjustment period, the General Agent shall calculate and report the adjusted commission on premiums earned within sixty (60) days after the date of termination, and within sixty (60) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is greater than commissions previously allowed by the Reinsurer on premiums earned for the same period, the Reinsurer shall remit the difference to the General Agent as promptly as possible after receipt and verification of the General Agent's report.

(e)    "Net policy fees" shall mean gross policy fees charged on all original and renewal policies written on behalf of Company, less return policy fees.

(f)    "Losses incurred" as used herein shall mean the balance of the following, all as respects losses and loss adjustment expenses ceded under this Agreement:

   (1)    Ceded losses and loss adjustment expenses paid as of the effective date of calculation; plus

   (2)    The ceded reserves for losses and loss adjustment expenses outstanding as of the effective date of calculation; plus

   (3)    As respects second and each subsequent Agreement Year hereunder, plus (minus) the debit (credit) from the preceding Agreement Year as set forth in paragraph (b) above; plus

   (4)    Any assignments and/or assessments as set forth in Article XIV.

(g)    "Ceded premiums earned" or "premiums earned" as used herein shall mean ceded net written premiums allocated to the Agreement Year (i.e., net of cancellations and return premiums), less the unearned portion thereof as of the effective date of calculation, all as respects premiums ceded under this Agreement.

(h)    "Agreement Year" as used herein shall mean the period from March 1, 1999 to February 29, 2000, both days inclusive, and each subsequent twelve month period thereafter that this Agreement continues in force.

13.5    It is expressly agreed that the commission allowed the General Agent includes provision for premium taxes and ceding fees. General Agent shall pay to the Company all premium taxes payable for policies subject to reinsurance hereunder.

13.6    It is expressly agreed that, for purposes of calculating the developed commission rate, the results of the State National Insurance Company, Inc. Quota Share Reinsurance Agreement shall be combined with the results of the business hereunder. However, should the results of one program be in a deficit position, while the other program develops a commission in excess of the

**COLLINS**
A S S O C I A T E S



provisional commission, no additional commission will be payable until the deficit has first been eliminated.

**ARTICLE XIV**
**ASSESSMENTS, ASSIGNMENTS, FINES AND PENALTIES**

**14.1**    The Reinsurer hereby assumes liability for any and all assessments and assignments imposed as a result of Policies reinsured hereunder (whether before or after the termination of this Agreement). The Reinsurer shall immediately reimburse the Company for any assessments made against the Company pursuant to those laws and regulations creating obligatory funds (including, but not limited to, insurance guaranty and insolvency funds), pools, joint underwriting associations, FAIR plans and similar plans. Amounts owed by the Reinsurer under this Section shall be payable directly by the Reinsurer to the Company. The Reinsurer shall be entitled to receive from the Company on or prior to the 31st day of March of each year thereafter (or such date on which such premium taxes are paid) a sum equal to the premium tax credit that is allowed to the Company with respect to such assessments. The premium tax credit allowed the Reinsurer hereunder is to be on a pro-rata and first-in, first-out basis. The Company shall promptly return to the Reinsurer any amount of assessment refunded to or credited to the Company.

**14.2**    This Agreement shall apply to risks assigned to the Company under any assigned risk plan if, in the reasonable judgment of the Company, such risks were assigned to the Company because of the business written and reinsured hereunder.

**14.3**    The Reinsurer shall also pay promptly and directly to the Company any fines, penalties and/or any other charge incurred by the Company as respects the business reinsured hereunder arising out of the actions or inactions of the General Agent unless such fines, penalties and/or any other charge was a direct result of any willful misconduct on the part of the Company.

**ARTICLE XV**
**INSOLVENCY OF COMPANY**

**15.1**    In the event of the insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, the portion assumed by the Reinsurer shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the Company without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claim.

**15.2**    It is agreed and understood that in the event of the insolvency of the Company, the liquidator or receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim is filed in the insolvency proceeding; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

**15.3**    It is further agreed and understood that as to all reinsurance made, ceded, renewed or otherwise becoming effective hereunder, the reinsurance shall be payable by the Reinsurer directly

**COLLINS**
A S S O C I A T E S



to the Company or its liquidator, receiver or statutory successor, except where the Reinsurer has expressly assumed in writing such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policy and in substitution for the obligation of the Company to such payees.

**ARTICLE XVI**
**HOLD HARMLESS**

16.1    In consideration of these presents and the reciprocal benefits derived by the Company and the Reinsurer hereunder, the Reinsurer hereby holds the Company harmless from, and assumes all liability for, every claim, demand, liability, loss, damage, cost, charge, attorneys' fees, expense of suit, order, judgment and adjudication of whatever kind or character incurred by the Company in connection with this Agreement or any contract or transaction related thereto, including, but not limited to, all costs and fees incurred by the Company in asserting its rights hereunder. The Reinsurer's obligations hereto relate to, but are not limited to, the following: all liability for agents' balances, return premiums and commissions, deceptive trade practice liability, premiums, policy fees, premium taxes or other charges (whether collected or not); all actions or inactions by the General Agent, its sub-agents or any independent claims adjusters relating to this Agreement and the General Agency Agreement; and any agreement with a premium finance company, and all fees owing to the General Agent under this and the aforementioned related agreements.

Notwithstanding anything to the contrary, this provision shall not apply to:

     (a)     Fraud, dishonesty, theft or collusion on the part of any director, officer or employee of the Company, or

     (b)     Policies not reinsured hereunder, or the Company's failure to perform its duties and obligations under this Agreement due to the Company's willful misconduct, or

     (c)     Expenses incurred by the Company under Section 12.5 hereof, or

     (d)     Costs and fees incurred by the Company in connection with litigation under Section 12.6 hereof wherein the Reinsurer is the prevailing party.

16.2    In the event any provision, term and/or condition of this Agreement (other than the Preamble hereof) is inconsistent with the provision terms and/or conditions of Section 16.1 above, the provisions, terms and/or conditions of said Section 16.1 above shall control over and supersede such inconsistent provisions, terms and/or conditions.

16.3    The Company shall not be liable to the Reinsurer for premiums unless the Company itself has actually received those premium and wrongfully not remitted them to the Reinsurer. The Reinsurer may not offset any balances on account of losses, loss adjustment expenses or any other amounts due except as to premiums actually received by the Company itself (as distinct from premiums not collected, or premiums collected by the General Agent, or premium placed in the premium trust account pursuant to the General Agency Agreement) which have wrongfully not been transmitted to the Reinsurer.

16.4    If for any reason the General Agent fails or is unable to administer the Policies reinsured hereunder (whether the Agreement is still in effect or the business is being run-off), the Reinsurer shall appoint a party (acceptable and approved by the Company) to administer the business and the Reinsurer shall be responsible for 100% of the cost of said administration. If return premiums or

**COLLINS**
A S S O C I A T E S



other funds need to be returned to premium finance companies, policyholders or sub-agents, the Reinsurer shall pay these amounts if the successor or General Agent does not.

16.5    The Reinsurer shall not sue, or seek arbitration, against the Company for any acts of the General Agent for any monies which the General Agent owes unless the Company has actually received those monies and has wrongfully not remitted them to the Reinsurer; and the Reinsurer shall indemnity the Company for any damages, liabilities and expenses incurred by reason of the General Agent's acts or failure to act. The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement and the General Agent shall not sue, or seek arbitration against, the Company for any actions by, or debts owing from, the Reinsurer. The Reinsurer shall not seek to recover from, or offset against, the Company any sums, whether premiums or other monies, which the General Agent was unable or unwilling to remit to the Company or the Reinsurer.

ARTICLE XVII
REGULATORY MATTERS

17.1    It is the Parties' understanding that any premiums which are overdue from the General Agent to the Company may be deemed non-admitted assets. In confirmation of the liabilities assumed by the Reinsurer under this Agreement, the Reinsurer hereby assumes 100% of all liability and responsibility for all premiums in the course of collection.

17.2    The Reinsurer shall agree, at no cost to the company, to take those actions (including, but not limited to, modifications in how funds are handled and how accounts are cleared, settled and the manner in which incurred losses are accounted for) and agree to those arrangements necessary to ensure that the Company suffers no adverse impact because of this reinsurance program and is in compliance with any applicable laws of a state insurance department, insofar as this reinsurance program is concerned.

ARTICLE XVIII
THE GENERAL AGENT

The Reinsurer has selected the General Agent to administer the business reinsured hereunder. While for regulatory purposes, the General Agent will need to be appointed as the Company's agent, it is recognized that the General Agent is acting on behalf of the Reinsurer and that the Reinsurer shall be responsible for monitoring the General Agent's compliance with the provisions of the Agreement and the General Agency Agreement. The Company is making no evaluation of the General Agent's qualifications and has no obligation to furnish reports or statistics to the Reinsurer. The Company shall file with each applicable state all reports requested by such state based upon information received from the General Agent and Reinsurer.

ARTICLE XIX
LOSS IN EXCESS OF POLICY LIMITS/ECO

19.1    In the event the Company pays or is held liable to pay an amount of loss in excess of its policy limit, but otherwise within the terms of its policy (hereinafter called "loss in excess of policy limits") or any punitive, exemplary, compensatory or consequential damages, other than loss in excess of policy limits (hereinafter called "extra contractual obligations") because of alleged or actual bad faith or negligence on its part in rejecting a settlement within policy limits, or in discharging its duty to defend or prepare the defense in the trial of an action against its policyholder, or in discharging its duty to prepare or prosecute an appeal consequent upon such an

- 15 -

**COLLINS**
A S S O C I A T E S

action, or in otherwise handling a claim under a policy subject to this Agreement, 100% of the loss in excess of policy limits and/or 100% of the extra contractual obligations shall be added to the Company's loss, if any, under the Policy involved, and the sum thereof shall be reinsured 100% under this Agreement.

19.2    An extra contractual obligation shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

19.3    Notwithstanding anything stated herein, this Agreement shall not apply to any loss incurred by the Company as a result of any fraudulent and/or criminal act which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals, by any officer or director of the Company acting individually or collectively or in collusion with any individual, corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

### ARTICLE XX
### LOSS AND UNEARNED PREMIUM RESERVE FUNDING

In the event that either (i) the Texas Department of Insurance or other regulatory entity having authority over this Agreement requires cancellation or disallows credit for this reinsurance or (ii) the Reinsurer's A.M. Best rating at any time is lower than A-, the Reinsurer will immediately secure its obligations under this Agreement via a security fund agreement to be executed by the Reinsurer and the Company, which security fund agreement shall be in form and content acceptable to the Company.

### ARTICLE XXI
### SAVINGS CLAUSE

21.1    If any law or regulation of any Federal, State or local government of the United States of America, or the ruling of officials having supervision over insurance companies, should prohibit or render illegal this Agreement, or any portion thereof, as to risks or properties located in the jurisdiction of such authority, either the Company or the Reinsurer may upon written notice to the other suspend or abrogate this Agreement insofar as it relates to risks or properties located within such jurisdiction to such extent as may be necessary to comply with such law, regulations or ruling. Such illegality shall in no way affect any other portion thereof; provided, however, that the Reinsurer or the Company may terminate or suspend this Agreement insofar as it relates to the business to which such law or regulation may apply.

21.2    This Agreement shall be interpreted in accordance with the laws of the State of Texas. All provisions of this Agreement are intended to be enforced to the fullest extent permitted. Accordingly, should a court of competent jurisdiction or arbitration panel determine that the scope of any provision is too broad to be enforced as written, the Parties intend that the court or arbitration panel should reform the provision to such narrower scope as it determines to be enforceable under present or future law; such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance.

COLLINS
A S S O C I A T E S

23.2    Except as provided in Article XV, nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not parties to this Agreement.

**ARTICLE XXIV**
**INTERMEDIARY**

John B. Collins Associates, Inc. is hereby recognized as the intermediary negotiating this Contract.  All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvage and loss settlements) relating hereto shall be transmitted to the Company and the Reinsurer through John B. Collins Associates, Inc., 8300 Norman Center Drive, Minneapolis, Minnesota 55437.  Payments by the Company to John B. Collins Associates, Inc. shall be deemed to constitute payment to the Reinsurer.  Payments by the Reinsurer to John B. Collins Associates, Inc. shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

IN WITNESS WHEREOF, the Company by its duly authorized representative has executed this Agreement in duplicate as of the date first above mentioned.

DATED: _____          STATE AND COUNTY MUTUAL FIRE
                                    INSURANCE COMPANY

                                    BY:_____

                                    ITS._____

**COLLINS**
A S S O C I A T E S

# EXHIBIT G



INTERESTS AND LIABILITIES CONTRACT

of

KEMPER REINSURANCE COMPANY
Long Grove, Illinois
(hereinafter referred to as the "SUBSCRIBING REINSURER")

attached to and forming part of the

EXCESS STOP LOSS
REINSURANCE AGREEMENT
Effective:  March 1, 1999

issued to and duly executed by

STATE NATIONAL INSURANCE COMPANY, INC.
Fort Worth, Texas

The SUBSCRIBING REINSURER hereby accepts a 75% share in the interests and liabilities of the "Reinsurer" under the Agreement referenced above.

This Contract shall become effective on March 1, 1999 at 12:01 a.m., Central Time and shall continue in force until terminated in accordance with the provisions of the Agreement referenced above

The SUBSCRIBING REINSURER'S share in the referenced Agreement shall be several and not joint with the shares of the other reinsurers, it being understood that the SUBSCRIBING REINSURER shall in no event participate in the interests and liabilities of the other reinsurers.

IN WITNESS WHEREOF, the SUBSCRIBING REINSURER has caused this Contract to be executed by its duly authorized representative at:

Long Grove, Illinois, this ___19___ day of ___October___ , 199_9_.

KEMPER REINSURANCE COMPANY
Richard A. Clymer, Vice President Ref: 23473-0

IUGA/GERE
00601

COLLINS

9/30/99 _36851272

EXCESS STOP LOSS REINSURANCE AGREEMENT

BETWEEN

STATE NATIONAL INSURANCE COMPANY, INC.

AND

SUBSCRIBING REINSURERS EXECUTING THE INTERESTS AND LIABILITIES
CONTRACTS

EFFECTIVE: MARCH 1, 1999

IUGA/GERE
00602

COLLINS

**EXCESS STOP LOSS REINSURANCE AGREEMENT**
**EFFECTIVE: MARCH 1, 1999**

**Issued to**

**STATE NATIONAL INSURANCE COMPANY, INC.**

**1999 SUBSCRIBING REINSURERS**

| | |
|---|---|
| Kemper Reinsurance Company | 75% |
| Partner Reinsurance Company of the U.S. | 25% |
| | 100% |

IUGA/GERE
00603

COLLINS



Table of Contents

| Article | | Page |
|---|---|---|
| I | Business Reinsured | 1 |
| II | Exclusions | 1 |
| III | Retention and Limit | 2 |
| IV | Term and Condition | 3 |
| V | Territory | 5 |
| VI | Currency | 5 |
| VII | Consideration | 5 |
| VIII | Loss Notices and Settlements | 5 |
| IX | Errors and Omissions | 6 |
| X | Inspection of Records | 6 |
| XI | Arbitration | 6 |
| XII | Assessments, Assignments, Fines and Penalties | 7 |
| XIII | Insolvency of Company | 8 |
| XIV | Regulatory Matters | 8 |
| XV | Loss in Excess of Policy Limits/ECO | 9 |
| XVI | Hold Harmless | 9 |
| XVII | Savings Clause | 10 |
| XVIII | Miscellaneous | 11 |
| XIX | Liability of the Reinsurer | 12 |
| XX | Net Retained Lines | 12 |
| XXI | Loss and Unearned Premium Reserve Funding | 12 |
| XXII | Intermediary | 13 |

COLLINS
ASSOCIATES

### EXCESS STOP LOSS REINSURANCE AGREEMENT

THIS EXCESS STOP LOSS REINSURANCE AGREEMENT (this "Agreement") is made and entered into as of the 1st day of March, 1999, by and among the Subscribing Reinsurers executing the Interests and Liabilities Contracts attaching to and forming a part of this Agreement ("Reinsurer"), and STATE NATIONAL INSURANCE COMPANY, INC., a corporation organized under the terms of the State of Texas (Company);

### W I T N E S S E T H :

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions herein below set forth, the parties hereto agree as follows:

### ARTICLE I
### BUSINESS REINSURED

The Reinsurer hereby reinsures the excess liability, including, but not limited to, losses and loss adjustment expenses, which may accrue to the Company under policies, certificates, binders, contracts or agreements (herein called "Policies") in force on the effective date hereof or, issued or renewed on or after that date on behalf of the Company under that certain Quota Share Reinsurance Agreement dated effective March 1, 1999, by and between the parties hereto (the "Quota Share Agreement"), and pertaining to business produced by International Underwriters General Agency, Inc., a Texas corporation (General Agent), a copy of which Quota Share Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

### ARTICLE II
### EXCLUSIONS

The following risks, perils and classes of business are specifically excluded:

2.01   If the General Agent binds or issues any business excluded, the Company shall notify the Reinsurer promptly upon actual knowledge of such business being bound or issued.   The Reinsurer shall provide coverage for any such risk bound until canceled by the Company at any Reinsurer's request.

     (a)     All business not specifically described as business covered under Schedule I of the General Agency Agreement.

     (b)     Business written on a co-surety or co-indemnity basis when the issuing company is not the controlling carrier.

     (c)     War Risks as excluded in the attached North American War Exclusion Clause (Reinsurance).

     (d)     Business excluded by the attached Nuclear Exclusion Clauses – Liability – Reinsurance – U.S.A., Physical Damage – Reinsurance – U.S.A., Liability – Reinsurance – Canada, and Physical Damage – Reinsurance – Canada.

     (e)     Pools, Association, Syndicates and Insolvency Funds per the attached Pools, Associations, Syndicates and Insolvency Funds Exclusion Clause.



**IUGA/GERE
00605**

(f)    Financial Guarantee.

(g)    Racing automobiles, and government law enforcement vehicles.

(h)    As respects the Mexican National program:

1.  Vehicles garaged in the United States;
2.  Motorcycles, Travel Trailers and Motor Homes.

2.02   The foregoing exclusions list, other than c and d, shall not apply when the operations or exposures are only incidental to a comparatively small part of the original insured's major activities.

2.03   Errors and omissions notwithstanding, if without the knowledge and contrary to the instructions of its supervisory personnel, the Company is bound on a risk specifically excluded hereunder (other than c and d), or by an existing insured extending its operations, such reinsurance as would have been afforded but for the exclusion shall apply for a period of 30 days following receipt of said underwriting personnel of knowledge thereof.

### ARTICLE III
### RETENTION AND LIMIT

3.1    No claim shall be made hereunder in respect of any Agreement Year unless and until the Company's loss ratio for that Agreement Year exceeds 62%. The Reinsurer shall then be liable for an amount equal to (a) the Company's subject net earned premium for the subject Agreement Year multiplied by (b) the difference in percentage points between the Company's actual loss ratio for such Agreement Year and 62%.

3.2    "Loss ratio" as used herein shall mean the ratio of the Company's net paid losses for any one Agreement Year to its subject net earned premium for the same Agreement Year.

3.3    "Subject net earned premium" as used herein shall mean the Company's unearned premium at the inception of this Agreement, plus the Company's net written premium allocated to the Agreement Year (i.e., net of cancellations and return amounts and net of amounts ceded by the Company for reinsurance which inures to the benefit of this Agreement), less the unearned portion thereof as of the effective date of calculation.

3.4    "Net paid losses" as used herein shall mean net losses and loss adjustment expenses paid as of the effective date of calculation which are allocated to the Agreement Year (i.e., net of all claims and recoveries on inuring insurance or reinsurance, whether collectible or not), including loss in excess of policy limits and extra contractual obligations, as defined in Article XV, plus any assignments and/or assessments as defined in Article XII, plus any amounts paid under Article XVI.

3.5    "Agreement Year" as used in this Agreement shall mean the period from March 1, 1999 to February 29, 2000, both days inclusive, and each subsequent twelve-month period thereafter that this Agreement continues in force.

3.6    The maximum Policy limits subject to this Agreement are as follows:

(a)    Mexican National Private Passenger Automobile Liability

**IUGA/GERE
00606**



| | (1) | Bodily Injury | $100,000 | each person |
| | | | $300,000 | each occurrence |
| | (2) | Property Damage | $ 50,000 | each occurrence |

(b)   Mexican National Commercial Automobile Liability

| | Combined Single Limit (CSL) | $1,000,000 | each occurrence |
| | | $1,000,000 | each policy |

In the event of a statutory increase in limits by the State of Texas, or travel by an insured to a state with greater statutory requirements, the maximum policy limits shall be increased to statutory limits in effect.

**ARTICLE IV**
**TERM AND CONDITION**

4.1    This Agreement shall become effective on the 1st day of March, 1999, at 12:01 a.m., Central Standard Time, as respects losses arising out of occurrences commencing under Policies in force, issued or renewed on or after such date at the offices of the Company, and shall remain continuously in force unless terminated as provided herein.

4.2    This Agreement shall continue from the effective date and thereafter until termination of the Quota Share Agreement. The parties may not cancel this Agreement independent of the Quota Share Agreement, and this Agreement shall terminate automatically and only upon termination of the Quota Share Agreement.

4.3    When this Agreement terminates for any reason, reinsurance hereunder shall continue to apply to the business in force at the time and date of termination until expiration or cancellation of such business. It is understood that any Policies with effective dates prior to the termination date but issued after the termination date are covered under this Agreement. Additionally, the reinsurance hereunder shall continue to apply as to Policies which must be issued or renewed, as a matter of state law or regulation or because a sub-agent has not been timely canceled, until the expiration dates on said Policies.

4.4    Upon termination of this Agreement, the Reinsurer and the Company shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to outstanding insurance business under this Agreement existing on the date of such termination. The parties hereto expressly covenant and agree that they will cooperate with each other in the handling of all such run-off insurance business until all policies have expired either by cancellation or by terms of such policies and all outstanding losses and loss adjustment expenses have been settled. While by law and regulation, the Company recognizes its primary obligations to its policyholders, the Reinsurer recognizes that to the extent possible there shall be no cost or involvement by the Company in servicing this run-off. All costs and expenses associated with handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent and, to the extent not borne by the General Agent, solely by Reinsurer. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while this Agreement is still in effect), including the payment of claims, then consistent with this Agreement, the Reinsurer's obligation with respect to such run-off business shall continue and the Reinsurer shall either service such run-off business directly or appoint, at the Reinsurer's expense, a successor to the General Agent, subject

**IUGA/GERE**
**00607**

COLLINS

to the approval of the Company, which approval shall not be unreasonably withheld.  Such successor shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business including the payment of claims.

4.5     This Agreement provides for termination on a runoff basis.  The relevant provisions of this Agreement shall apply to business being run off.  It is expressly agreed that the terms, conditions and obligations of Sections 4.3, 4.4 and 4.5; Articles VII through XVII; Sections 18.2, 18.3, 18.5, 18.7, and 18.8; and Articles XIX, XX, XXI and XXII shall survive termination of this Agreement.

4.6     In addition to the provisions set forth in Section 4.2 herein, this Agreement may be terminated at any time in accordance with the following terms and conditions:

(a)     Immediately upon written notice by the Reinsurer or the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas;

(b)     By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder and due under the Stop Loss Agreement; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(c)     After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(d)     Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed.  By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed:

(e)     By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department having jurisdiction requires cancellation or disallows credit for this reinsurance or the reinsurance provided in the Stop Loss Agreement;

(f)     Immediately and automatically upon termination of the Stop Loss Agreement;

(g)     After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(h)     After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 15.01 and/or Section 18.1 of this Agreement.



IUGA/GERE
00608

## ARTICLE V
## TERRITORY

This Agreement will cover wherever the Company's Policies cover.


## ARTICLE VI
## CURRENCY

The currency to be used for all purposes of this Agreement shall be United States of America currency.


## ARTICLE VII
## CONSIDERATION

7.1     In consideration of the acceptance by the Reinsurer of reinsurance provided hereunder, the Reinsurer is entitled to 6.5% of the net written premium on Policies reinsured hereunder less return amounts.

7.2     Within 60 days after the end of each month, the General Agent shall report to the Reinsurer the Company's net written premium for the month of account.  The premium due the Reinsurer, at the rate set forth in Section 7.1 above, shall be remitted by the General Agent with its report.

7.3     Net written premium shall mean the gross premiums (excluding policy fees) charged on all original and renewal policies written by the Company less return premiums and less premiums ceded by the Company for reinsurance under the Quota Share Agreement which inures to the benefit of this Agreement.

## ARTICLE VIII
## LOSS NOTICES AND SETTLEMENTS

8.1     Subject to Section 1.03 of the General Agency Agreement between the Company and the General Agent, all loss settlements made by the Company or the General Agent under the terms of this Agreement whether under strict policy conditions or by way of compromise, shall be unconditionally binding upon the Reinsurer and the Reinsurer agrees to pay all amounts for which it may be liable as hereinafter provided.

8.2     Within 30 days after the end of each month, the General Agent shall report to the Reinsurer the Company's net paid losses for the month, and the Company's loss ratio as of the end of the month for the then current Agreement Year.  If the Company's loss ratio at any time during any Agreement Year exceeds an amount equal to the Company's retention hereunder based on an estimate of the Company's net written premium for the Agreement Year, the Reinsurer shall pay its portion of such estimated excess, but any such payment shall be provisional, subject to adjustment when the Company's actual net paid loss and subject net earned premium for the Agreement Year have been determined.

8.3     As promptly as possible after the Company determines its loss ratio for each Agreement Year, the Company shall make a final report to the Reinsurer of the amount (if any) due from the Reinsurer hereunder for the Agreement Year, less any amounts previously paid. Any amount due either party shall be remitted promptly.

IUGA/GERE
00609

COLLINS
A S S O C I A T E S

8.4    All records pertaining to claims arising under insurance policies issued on behalf of the Company through or by the General Agent subject to this Agreement shall be deemed to be jointly owned records of the Company and the Reinsurer, and shall be made available to the Company or the Reinsurer or their respective representatives or any duly appointed examiner for any State within the United States; and these records shall be kept in the State of Texas or such other jurisdiction as may be required by applicable state law or regulation. Notwithstanding the foregoing, the Reinsurer is authorized to maintain duplicate working files of all such records outside the State of Texas. The Company, the Reinsurer and the General Agent each agree that it will not destroy any such records in its possession without the prior written approval of the other parties except that the Company shall not be required to retain files longer than required by the guidelines set forth by any applicable state department of insurance.

8.5    The Reinsurer shall, or shall cause the General Agent to, establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or General Agent, with such claims register to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense. Such claim register shall be kept in a manner whereby the Company can, at any time, determine the status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon.

## ARTICLE IX
## ERRORS AND OMISSIONS

The Company shall not be prejudiced in any way by any omission through clerical error, accident or oversight to cede to the Reinsurer any reinsurance rightly falling under the terms of this Agreement, or by erroneous cancellation, either partial or total, of any cession, or by omission to report, or by erroneously reporting any losses, or by any other error or omission. but any such error or omission shall be corrected immediately upon discovery.

## ARTICLE X
## INSPECTION OF RECORDS

The books and records pertaining to liability and losses under this Agreement maintained by any party hereto shall at all times be subject to the inspection by an authorized representative of any other party hereto. This provision shall survive the termination of this Agreement.

## ARTICLE XI
## ARBITRATION

11.1    As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereinafter arising between the Company and the Reinsurer with respect to this Agreement or with respect to these Parties' obligations hereunder, whether such dispute arises before or after termination of this Agreement, it is hereby mutually agreed that such dispute of difference of opinion shall be submitted to arbitration.

11.2    One arbiter (an "Arbiter") shall be chosen by the Company and one Arbiter shall be chosen by the Reinsurer and an umpire (an "Umpire") shall be chosen by the Arbiters, all of whom shall be

COLLINS

active or retired disinterested executive officers of property and casualty insurance or reinsurance companies.

11.3   In the event that a party fails to choose an Arbiter within thirty (30) days following a written request by either party to the other to name an Arbiter, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within thirty (30) days following their appointment, either party may petition the American Arbitration Association to appoint an Umpire.

11.4   Each party shall present its case to the Arbiters and Umpire within thirty (30) days after the selection of the Umpire, unless the period is extended by the Arbiters and the Umpire in writing, and/or at a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Parties shall be final and binding on the parties; provided, however, that the Arbiters and Umpire shall have no authority to award punitive damages to one party in respect of the actions or inactions of the other party. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

11.5   Each party shall pay the expenses of its Arbiter and attorneys and one-half of the fees of the Umpire and the common expenses of the arbitration, unless a majority of the Arbiters and Umpire determine otherwise.

11.6   In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including in such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. Any such written election must be provided to the other party within ten (10) business days of the receipt by such party of any documents wherein the amount of the claim or counterclaim is first stated to be in excess of Two Million Dollars ($2,000,000). In the event of any such litigation between the Company and the Reinsurer, the prevailing party shall be entitled to recover its reasonable attorneys fees and expenses.

## ARTICLES XII
## ASSESSMENTS, ASSIGNMENTS, FINES AND PENALTIES

12.1   The Reinsurer hereby assumes liability for any and all assessments and assignments imposed as a result of Policies reinsured hereunder (whether before or after the termination of this Agreement). The Reinsurer shall immediately reimburse the Company for any assessments made against the Company pursuant to those laws and regulations creating obligatory funds (including, but not limited to, insurance guaranty and insolvency funds), pools, joint underwriting associations, FAIR plans and similar plans. Amounts owed by the Reinsurer under this Section 10.1 shall be payable directly by the Reinsurer to the Company. The Reinsurer shall be entitled to receive from the Company on or prior to the 31st day of March of each year thereafter (or such date on which such premium taxes are paid) a sum equal to the premium tax credit that is allowed to the Company with respect to such assessments. The premium tax credit allowed the Reinsurer hereunder is to be on a pro-rata and first-in, first-out basis. The Company shall promptly return to the Reinsurer any amount of assessment refunded to or credited to the Company.

COLLINS

12.2    This Agreement shall apply to risks assigned to the Company under any assigned risk plan if, in the reasonable judgment of the Company, such risks were assigned to the Company because of the business written and reinsured hereunder.

12.3    The Reinsurer shall also pay promptly and directly to the Company any fines, penalties and/or any other charge incurred by the Company as respects the business reinsured hereunder arising out of the actions or inactions of the General Agent unless such fines, penalties and/or any other charge was a direct result of any willful misconduct on the part of the Company.

### ARTICLE XIII
### INSOLVENCY OF COMPANY

13.1    In the event of the insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, the portion assumed by the Reinsurer shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the Company without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claim.

13.2    It is agreed and understood that in the event of the insolvency of the Company, the liquidator or receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim in filed in the insolvency proceeding; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

13.3    It is further agreed and understood that as to all reinsurance made, ceded, renewed or otherwise becoming effective hereunder, the reinsurance shall be payable by the Reinsurer directly to the Company or to its liquidators, receiver or statutory successor, except where the Reinsurer has expressly assumed in writing such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policy and in substitution for the obligation of the Company to such payees.

### ARTICLE XIV
### REGULATORY MATTERS

The Reinsurer shall agree, at no cost to the Company, to take those actions (including, but not limited to, modifications in how funds are handled and how accounts are cleared, settled and the manner in which incurred losses are accounted for) and agree to those arrangements necessary to ensure that the Company suffers no adverse impact because of this reinsurance program and is in compliance with any applicable laws of a state insurance department, in so far as this reinsurance program is concerned.

IUGA/GERE
00612



## ARTICLE XV
## LOSS IN EXCESS OF POLICY LIMITS/ECO

15.1    In the event the Company pays or is held liable to pay an amount of loss in excess of its policy limit, but otherwise within the terms of its policy (hereinafter called "loss in excess of policy limits") or any punitive, exemplary, compensatory or consequential damages, other than loss in excess of policy limits (hereinafter called "extra contractual obligations") because of alleged or actual bad faith or negligence on its part in rejecting a settlement within policy limits, or in discharging its duty to defend or prepare the defense in the trial of an action against its policyholder, or in discharging its duty to prepare or prosecute an appeal consequent upon such an action, or in otherwise handling a claim under a policy subject to this Agreement, 100% of the loss in excess of policy limits and/or 100% of the extra contractual obligations shall be added to the Company's loss, if any, under the Policy involved, and the sum thereof shall be reinsured 100% under this Agreement.

15.2    An extra contractual obligation shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

15.3    Notwithstanding anything stated herein, this Agreement shall not apply to any loss incurred by the Company as a result of any fraudulent and/or criminal act which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals, by any officer or director of the Company acting individually or collectively or in collusion with any individual, corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

## ARTICLE XVI
## HOLD HARMLESS

16.1    In consideration of these presents and the reciprocal benefits derived by the Company and the Reinsurer hereunder, the Reinsurer hereby holds the Company harmless from, and assumes all liability for, every claim, demand, liability, loss, damage, cost, charge, attorneys' fees, expense of suit, order, judgment and adjudication of whatever kind or character incurred by the Company in connection with this Agreement or any contract or transaction related thereto, including, but not limited to, all costs and fees incurred by the Company in asserting its rights hereunder. The Reinsurer's obligations hereto relate to, but are not limited to the following: all liability for agents' balances, return premiums and commissions, deceptive trade practice liability, premiums, policy fees, premium taxes or other charges (whether collected or not); all actions or inactions by the General Agent, its sub-agents or any independent claims adjusters relating to this Agreement and the General Agency Agreement; and any agreement with a premium finance company, and all fees owing to the General Agent under this and the aforementioned related agreements.

Notwithstanding anything to the contrary, this provision shall not apply to:

     (a)     fraud, dishonesty, theft or collusion on the part of any director, officer or employee of the Company, or

     (b)     policies not reinsured hereunder, or

IUGA/GERE
00613



(c)    the Company's failure to perform its duties and obligations under this Agreement due to the Company's willful misconduct, or

(d)    expenses incurred by the Company under Section 11.5 hereof, or

(e)    costs and fees incurred by the Company in connection with litigation under Section 9.6 hereof wherein the Reinsurer is the prevailing party.

16.2    In the event any provision, term and/or condition of this Agreement is inconsistent with the provision, terms and/or conditions of Section 14.1 above, the provisions, terms and/or conditions of said Section 16.1 above shall control over and supersede such inconsistent provisions, terms and/or conditions.

16.3    The Company shall not be liable to the Reinsurer for premiums unless the Company itself has actually received those premiums and wrongfully not remitted them to the Reinsurer. The Reinsurer may not offset any balances on account of losses, loss adjustment expenses or any other amounts due except as to premiums actually received by the Company itself (as distinct from premiums not collected, or premiums collected by the General Agent, or premium placed in the premium trust account pursuant to the General Agency Agreement) which have wrongfully not been transmitted to the Reinsurer.

16.4    If for any reason the General Agent fails or is unable to administer the Policies reinsured hereunder (whether the Agreement is still in effect or the business is being run-off), the Reinsurer shall appoint a party (acceptable and approved by the Company) to administer the business and the Reinsurer shall be responsible for 100% of the cost of said administration. If return premiums or other funds need to be returned to premium finance companies, policyholders or sub-agents, the Reinsurer shall pay these amounts if the successor or General Agent does not.

16.5    The Reinsurer shall not sue, or seek arbitration, against the Company for any acts of the General Agent for any monies which the General Agent owes unless the Company has actually received those monies and has wrongfully not remitted them to the Reinsurer; and the Reinsurer shall indemnify the Company for any damages, liabilities and expenses incurred by reason of the General Agent's acts or failure to act. The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement and the General Agent shall not sue, or seek arbitration against, the Company for any actions by, or debts owing from, the Reinsurer. The Reinsurer shall not seek to recover from, or offset against, the Company any sums, whether premiums or other monies, which the General Agent was unable or unwilling to remit to the Company or the Reinsurer.

**IUGA/GERE**
**00614**

**ARTICLE XVII**
**SAVINGS CLAUSE**

17.1    If any law or regulation of any Federal, State or local government of the United States of America, or the ruling of officials having supervision over insurance companies, should prohibit or render illegal this Agreement, or any portion thereof, as to risks or properties located in the jurisdiction of such authority, either the Company or the Reinsurer may upon written notice to the other suspend or abrogate this Agreement insofar as it relates to risks or properties located within such jurisdiction to such extent as may be necessary to comply with such law, regulations or ruling.

COLLINS

Such illegality shall in no way affect any other portion thereof; provided, however, that the Reinsurer or the Company may terminate or suspend this Agreement insofar as it relates to the business to which such law or regulation may apply.

17.2    This Agreement shall be interpreted in accordance with the laws of the State of Texas. All provisions of this Agreement are intended to be enforced to the fullest extent permitted. Accordingly, should a court of competent jurisdiction or arbitration panel determine that the scope of any provision is too broad to be enforced as written, the parties intend that the court or arbitration panel should reform the provision to such narrower scope as it determines to be enforceable under present or future law; such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance.

## ARTICLE XVIII
## MISCELLANEOUS

18.1    This Agreement has been made and entered into in the State of Texas.

18.2    All notices required to be given hereunder shall be deemed to have been duly given by personally delivering such notice in writing or by mailing it, Certified Mail, return receipt requested, with postage prepaid. Any party may change the address to which notices and other communications hereunder are to be sent to such party by giving the other party written notice thereof in accordance with this provision.

18.3    This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns. The Reinsurer shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.

18.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

18.5    This Agreement may be amended, modified or supplemented only by a written instrument executed by all parties hereto.

18.6    This Agreement is the entire agreement between the parties and supersedes any and all previous agreements, written or oral, and amendments thereto.

18.7    A waiver by the Company, the Reinsurer of any breach or default by the other party under this Agreement shall not constitute a continuing waiver or a waiver by the Company or the Reinsurer of any subsequent act in breach or of default hereunder.

18.8    Headings used in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement.

18.9    This Agreement is not exclusive and the Company reserves the right to appoint or contract with other reinsurers, agents and/or managing agents in the territory covered by this Agreement and General Agent may contract and represent other insurers.

18.10   The Reinsurer or General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper

COLLINS
ASSOCIATES

**IUGA/GERE**
**00615**

**ARTICLE XXII**
**INTERMEDIARY**

John B. Collins Associates, Inc. is hereby recognized as the intermediary negotiating this Contract. All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvage and loss settlements) relating hereto shall be transmitted to the Company and the Reinsurer through John B. Collins Associates, Inc., 8300 Norman Center Drive, Minneapolis, Minnesota 55437. Payments by the Company to John B. Collins Associates, Inc. shall be deemed to constitute payment to the Reinsurer. Payments by the Reinsurer to John B. Collins Associates, Inc. shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

IN WITNESS WHEREOF, the Company by its duly authorized representative has executed this Agreement in duplicate as of the dates under mentioned.

DATED: _____          STATE NATIONAL INSURANCE COMPANY, INC.

                                  BY: _____

                                  ITS: _____

**IUGA/GERE**
**00616**

COLLINS

**EXCESS STOP LOSS REINSURANCE AGREEMENT**

**BETWEEN**

**STATE NATIONAL INSURANCE**

**AND**

**INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC.**

**AND**

**THE SUBSCRIBING REINSURERS**

**EFFECTIVE: MARCH 1, 1999**


Sedgwick Re

**IUGA/GERE**
**00617**

## Table of Contents

| Article | | Page |
|---------|---|------|
| I | Business Reinsured | 1 |
| II | Retention and Limit | 1 |
| III | Exclusions | 2 |
| IV | Term and Condition | 3 |
| V | Consideration | 5 |
| VI | Territory | 5 |
| VII | Currency | 5 |
| VIII | Loss Notices and Settlement | 5 |
| IX | Errors and Omissions | 6 |
| X | Inspection of Records | 7 |
| XI | Arbitration | 7 |
| XII | Assessments, Assignments, Fines and Penalties | 8 |
| XIII | Insolvency of Company | 8 |
| XIV | Regulatory Matters | 9 |
| XV | Loss in Excess of Policy Limits/ECO | 9 |
| XVI | Hold Harmless | 9 |
| XVII | Savings Clause | 11 |
| XVIII | Miscellaneous | 11 |
| XIX | Liability of the Reinsurer | 12 |
| XX | Net Retained Lines | 12 |
| XXI | Loss and Unearned Premium Reserve Funding | 13 |
| XXII | Intermediary | 13 |
| XXIII | Participation | 14 |



Sedgwick Re

IUGA/GERE
00618

 

## EXCESS STOP LOSS REINSURANCE AGREEMENT

THIS EXCESS STOP LOSS REINSURANCE AGREEMENT (this "Agreement") is made and entered into as of the first day of March, 1999 by and among the Reinsurer specifically identified on the signature page of this Agreement ("Reinsurer"), STATE NATIONAL INSURANCE COMPANY, a corporation organized under the terms of the State of Texas ("Company"), and INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., organized under the laws of the State of Texas ("General Agent").

### WITNESSETH:

THAT, in consideration of the mutual covenants hereinafter contained and upon the terms and conditions hereinbelow set forth, the parties hereto agree as follows:

### ARTICLE I
### BUSINESS REINSURED

The Reinsurer hereby reinsures the excess liability, including, but not limited to, losses and loss adjustment expenses, which may accrue to the Company under policies, certificates, binders, contracts or agreements (herein called "Policies") issued or renewed on or after the effective date hereof on behalf of the Company under that certain Quota Share Reinsurance Agreement dated effective March 1, 1999, by and between the parties hereto (the "Quota Share Agreement"), and pertaining to business produced by the General Agent, a copy of which Quota Share Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

### ARTICLE II
### RETENTION AND LIMIT

2.1    No claim shall be made hereunder in respect of any Underwriting Year unless and until the Company's loss ratio plus expense ratio for that Underwriting Year exceeds 100%. The Reinsurer shall then be liable for an amount equal to (a) the Company's subject net earned premium for the subject agreement year multiplied by (b) the difference in percentage points between the Company's actual loss ratio and expense ratio for such Underwriting Year and 100%.

2.2    "Loss ratio" as used herein shall mean the ratio of the Company's net paid losses for any one Underwriting Year to its subject net earned premium for the same Underwriting Year.

2.3    "Expense ratio" as herein shall mean the ratio of the developed ceding commission as provided in the Quota Share Reinsurance Agreement to the total subject net earned premium for the same Underwriting Year plus 6.5%.

2.4    "Subject net earned premium" as used herein shall mean the Company's net written premium allocated to the agreement year (i.e., net of cancellations and return amounts and net of amounts ceded by the Company for reinsurance which inures to the benefit of this Agreement), less the unearned portion thereof as of the effective date of calculation.

IUGA/GERE
00619

S21400-26A 99-03-01 A.doc



Sedgwick Re

Page 1
02/18/99

**2.5**    "Net paid losses" as used herein shall mean net losses and loss adjustment expenses paid as of the effective date of calculation which are allocated to the agreement year (i.e., net of all claims and recoveries on inuring insurance or reinsurance, whether collectible or not), including loss in excess of policy limits and extra contractual obligations, as defined in Article XV, plus any assignments and/or assessments as defined in Article XI, plus any amounts paid under Article XVI.

**2.6**    The term "Underwriting Year" as used in this Agreement shall mean those Policies with inception, renewal or anniversary date during each 12-month period commencing with each March 1, and all premium attributable to, and all loss arising out of such Policies from such inception, renewal or anniversary date until expiration, cancellation, or next anniversary, whichever occurs first, will be ascribed to the Underwriting Year.

**2.7**    The maximum Policy limits subject to this Agreement are as follows:

    **(a)**    **Mexican National Private Passenger Automobile Liability**

| | | |
|---|---|---|
| (i) | Bodily Injury | $100,000  each person |
| | | $300,000  each occurrence |
| (ii) | Property Damage | $50,000  each occurrence |

    **(b)**    **Commercial Automobile Liability**

| | |
|---|---|
| Combine Single Limit (CSL) | $1,000,000  each occurrence |
| | $1,000,000  each Policy |

**ARTICLE III**
**EXCLUSIONS**

The following risks, perils and classes of business are specifically excluded:

**3.1**    If the General Agent binds or issues any business excluded, the Company shall notify the Reinsurer promptly upon actual knowledge of such business being bound or issued. The Reinsurer shall provide coverage for any such risk bound until canceled by the Company at the Reinsurer's request.

    **a.**    Business written on a co-surety or co-indemnity basis when the issuing company is not the controlling carrier.

    **b.**    War Risks as excluded in the attached North American War Exclusion Clause (Reinsurance) No. 08-45.

    **c.**    Business excluded by the attached Nuclear Incident Exclusion Clauses - Liability - Reinsurance - U.S.A., No. 08-31.1., Physical Damage - Reinsurance - U.S.A., No. 08-33, Liability - Reinsurance - Canada, No. 08-32.1 and Physical Damage - Reinsurance - Canada, No. 08-34.1.

    **d.**    Pools, Associations, Syndicates and Insolvency Funds per the attached Pools, Associations, Syndicates and Insolvency Funds Exclusion Clause No. 08-04.3.

    **e.**    Financial Guarantee.

IUGA/GERE
00620


Sedgwick Re

S21400-26A 99-03-01 A.doc

    f.      Racing automobiles, and government law enforcement vehicles.

    g.      **As respects the Non-Standard Program, theft coverage for vehicles without protective safeguards.**

    h.      **As respects the Mexican National program:**

            (i)      Vehicles garaged in the United States;
            (ii).     Motorcycles, Travel Trailers and Motor Homes.

**3.2**    The foregoing exclusions listed, other than b. and c., will not apply when the operations or exposures are only incidental to and a comparatively small part of the original insured's major activities or total operations.

**3.3**    Errors and omissions notwithstanding, if without the knowledge and contrary to the instructions of its supervisory underwriting personnel, the Company is bound on a risk specifically excluded hereunder, other than b. and c., or by an existing insured extending its operations, such reinsurance as would have been afforded but for the exclusion shall apply for a period of 30 days following receipt by said underwriting personnel of knowledge thereof or until the Company is able to cancel, non-renew whichever is greater.

## ARTICLE IV
## TERM AND CONDITION

**4.1**    This Agreement shall become effective on the first day of March, 1999 at 12:01 a.m., Central Standard Time, as respects losses arising out of occurrences commencing under Policies written on or after such date at the offices of the Company, and shall remain continuously in force unless terminated as provided herein.

**4.2**    This Agreement shall continue from the effective date and thereafter until termination to the Quota Share Agreement. The parties may not cancel this Agreement independent of the Quota Share Agreement, and this Agreement shall terminate automatically and only upon termination of the Quota Share Agreement.

**4.3**    When this Agreement terminates for any reason, reinsurance hereunder shall continue to apply to the business in force at the time and date of termination until expiration or cancellation of such business. It is understood that any Policies with effective dates prior to the termination date but issued after the termination date are covered under this Agreement. Additionally, the reinsurance hereunder shall continue to apply as to Policies which must be issued or renewed, as a matter of state law or regulation or because a sub-agent has not been timely cancelled, until the expiration dates on said Policies.

**4.4**    Upon termination of this Agreement, the Reinsurer and the Company shall not be relieved of or released from any obligation created by or under this Agreement in relation to payment, expenses, reports, accounting or handling, which relate to outstanding insurance business under this Agreement existing on the date of such termination. The parties hereto expressly covenant and agree that they will cooperate with each other in the handling of all such run-off insurance business until all policies have expired either by cancellation or by terms of such policies and all outstanding losses and loss adjustment expenses have been



Sedgwick Re

**IUGA/GERE**
**00621**

Page 3
02/18/99

S21400-26A 99-03-01 A.doc

settled. While by law and regulation, the Company recognizes its primary obligations to its policyholders, the Reinsurer recognizes that to the extent possible there shall be no cost or involvement by the Company in servicing this run-off. All costs and expenses associated with handling of such run-off business following the cancellation or termination of this Agreement shall be borne solely by the General Agent and, to the extent not borne by the General Agent, solely by Reinsurer. If for any reason the General Agent fails or is unable to service any such run-off business (or any business while this Agreement is still in effect), including the payment of claims, then consistent with this Agreement, the Reinsurer's obligation with respect to such run-off business shall continue and the Reinsurer shall either service such run-off business directly or appoint, at the Reinsurer's expense, a successor to the General Agent, subject to the approval of the Company, which approval shall not be unreasonably withheld. Such successor shall perform all of the duties and obligations of the General Agent with respect to servicing such run-off business including the payment of claims.

4.5    This Agreement provides for termination on a runoff basis. The relevant provisions of this Agreement shall apply to business being run off. It is expressly agreed that the terms, conditions and obligations of Sections 4.3, 4.4 and 4.5; Articles V through XVI; Sections 18.2, 18.3, 18.5, 18.7, and 18.8; and Articles XIX, XX, XXI and XXII shall survive termination of this Agreement.

4.6    In addition to the provisions set forth in Section 4.2 herein, this Agreement may be terminated at any time in accordance with the following terms and conditions:

(a)    Immediately upon written notice by the Reinsurer or the Company in the event of the cancellation or non-renewal of the General Agent's license in the State of Texas.

(b)    By the Reinsurer after thirty (30) days written notice to the General Agent and Company of the General Agent's failure to pay to the Reinsurer all payments of premiums due hereunder and due under the Stop Loss Agreement; provided, however, that in the event such payment is received by the Reinsurer prior to the date of cancellation stated in the Reinsurer's written notice this Agreement shall not be so terminated and the said written notice shall be of no further force or effect;

(c)    After thirty (30) days written notice by the Reinsurer or the Company in the event the Reinsurer, General Agent or Company amalgamates with or passes under the control of any other company or corporation or changes a majority of its officers or board of directors during the term of this Agreement;

(d)    Immediately, upon written notice by the Company, if the Reinsurer or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation, or liquidation, or has a receiver or supervisor appointed. By the Reinsurer, upon thirty (30) days written notice, if the Company or General Agent is found to be insolvent by a state insurance department or court of competent jurisdiction, or is placed in supervision, conservation, rehabilitation or liquidation, or has a receiver or supervisor appointed;

(e)    By the Company immediately and automatically without prior written notice should the Texas Department of Insurance or other state insurance department



Sedgwick Re

**IUGA/GERE**
**00622**

having jurisdiction requires cancellation or disallows credit for this reinsurance or the reinsurance provided in the Stop Loss Agreement;

(f)     After thirty (30) days written notice by the Reinsurer in the event that the Reinsurer disagrees with any action independently taken by the Company in the exercise of the Company's final authority to determine disputes relating to claims settlement and setting of loss reserves under Section 1.03 of the General Agency Agreement; or

(g)     After thirty (30) days written notice by the Reinsurer to the Company and the General Agent in the event that the Reinsurer makes a payment based upon its undertaking as stated in Section 15.1 and/or Section 16.1 of this Agreement.

## ARTICLE V
## CONSIDERATION

5.1     In consideration of the acceptance by the Reinsurer of reinsurance provided hereunder, the Reinsurer is entitled to 6.50% of the net written premium on Policies reinsured hereunder less return amounts and amounts ceded by the Company for reinsurance under the Quota Share Agreement which inures to the benefit of this Agreement.

5.2     Within 60 days after the end of each month, the General Agent shall report to the Reinsurer the Company's net written premium for the month of account. The premium due the Reinsurer, at the rates set forth in Section 5.1 above, shall be remitted by the General Agent with its report.

5.3     "Net written premium" shall mean the gross premiums (excluding policy fees) charged on all original and renewal policies written by the Company less return premiums and less premiums ceded by the Company for reinsurance under the Quota Share Agreement which inures to the benefit of this Agreement.

## ARTICLE VI
## TERRITORY

This Agreement will cover wherever the Company's Policies cover.

## ARTICLE VII
## CURRENCY

The currency to be used for all purposes of this Agreement shall be United States of America currency.

## ARTICLE VIII                                   IUGA/GERE
## LOSS NOTICES AND SETTLEMENTS              00623

8.1     Subject to Section 1.03 of the General Agency Agreement between the Company and the General Agent, all loss settlements made by the Company or the General Agent under the terms of this Agreement whether under strict policy conditions or by way of


Sedgwick Re

S21400-26A 99-03-01 A.doc

Page 5
02/18/99



compromise, shall be unconditionally binding upon the Reinsurer and the Reinsurer agrees to pay all amounts for which it may be liable as hereinafter provided.

8.2     Within 30 days after the end of each month, the General Agent shall report to the Reinsurer the Company's net paid losses for the month, and the Company's loss ratio plus expense ratio as of the end of the month for the then current Underwriting Year. If the Company's loss ratio plus expense ratio at any time during any Underwriting Year exceeds an amount equal to the Company's retention hereunder based on an estimate of the Company's net written premium for the Underwriting Year, the Reinsurer shall pay its portion of such estimated excess, but any such payment shall be provisional, subject to adjustment when the Company's actual net paid loss and subject net earned premium for the Underwriting Year have been determined.

8.3     Within 45 days after the end of each month, the Company will determine its loss ratio plus expense ratio for each Underwriting Year, and the Company shall make a final report to the Reinsurer of the amount (if any) due from the Reinsurer hereunder for the Underwriting Year, less any amounts previously paid. Any amount due either party shall be remitted.

8.4     All records pertaining to claims arising under insurance policies issued on behalf of the Company through or by the General Agent subject to this Agreement shall be deemed to be jointly owned records of the Company and the Reinsurer, and shall be made available to the Company or the Reinsurer or their respective representatives or any duly appointed examiner for any State within the United States; and these records shall be kept in the State of Texas or such other jurisdiction as may be required by applicable state law or regulation. Notwithstanding the foregoing, the Reinsurer is authorized to maintain duplicate working files of all such records outside the State of Texas. The Company, the Reinsurer and the General Agent each agree that it will not destroy any such records in its possession without the prior written approval of the other parties except that the Company shall not be required to retain files longer than required by the guidelines set forth by any applicable state department of insurance.

8.5     The Reinsurer shall, or shall cause the General Agent to, establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or General Agent, with such claims register to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense. Such claim register shall be kept in a manner whereby the Company can, at any time, determine the status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon.

IUGA/GERE<br>00624

**ARTICLE IX**
**ERRORS AND OMISSIONS**

        The Company shall not be prejudiced in any way by any omission through clerical error, accident or oversight to cede to the Reinsurer any reinsurance rightly falling under the terms of this Agreement, or by erroneous cancellation, either partial or total, of any cession, or by omission to report, or by erroneously reporting any losses, or by any other error or omission, but any such error or omission shall be corrected immediately upon discovery.



## ARTICLE X
## INSPECTION OF RECORDS

The books and records pertaining to liability and losses under this Agreement maintained by any party hereto shall at all times be subject to the inspection by an authorized representative of any other party hereto. This provision shall survive the termination of this Agreement.

## ARTICLE XI
## ARBITRATION

11.1   As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereinafter arising between the Company and the Reinsurer with respect to this Agreement or with respect to these Parties' obligations hereunder, whether such dispute arises before or after termination of this Agreement, it is hereby mutually agreed that such dispute of difference of opinion shall be submitted to arbitration.

11.2   One arbiter (an "Arbiter") shall be chosen by the Company and one Arbiter shall be chosen by the Reinsurer and an umpire (an "Umpire") shall be chosen by the Arbiters, all of whom shall be active or retired disinterested executive officers of property and casualty insurance or reinsurance companies.

11.3   In the event that a party fails to choose an Arbiter within thirty (30) days following a written request by either party to the other to name an Arbiter, the party who has chosen its Arbiter may choose the unchosen Arbiter. Thereafter, the Arbiters shall choose an Umpire before entering upon arbitration. If the Arbiters fail to agree upon the selection for the Umpire within thirty (30) days following their appointment, either party may petition the American Arbitration Association to appoint an Umpire.

11.4   Each party shall present its case to the Arbiters and Umpire within thirty (30) days after the selection of the Umpire, unless the period is extended by the Arbiters and the Umpire in writing, at a hearing in Dallas, Texas. The Arbiters and Umpire shall consider this Agreement as an honorable engagement, as well as a legal obligation, and they are relieved of all judicial formalities and may abstain from following the strict rules of law regarding entering of evidence. The decision in writing by a majority of the Arbiters and Umpire when filed with the Parties shall be final and binding on the parties; provided, however, that the Arbiters and Umpire shall have no authority to award punitive damages to one party in respect of the actions or inactions of the other party. Judgment upon the final decision of the Arbiters and Umpire may be entered in any court of competent jurisdiction.

11.5   Each party shall pay the expenses of its Arbiter and attorneys and one-half of the fees of the Umpire and the common expenses of the arbitration, unless a majority of the Arbiters and Umpire determine otherwise.

11.6   In the event that the amount of any claim or counterclaim made in any such arbitration is in excess of Two Million Dollars ($2,000,000), including in such calculation all amounts of compensatory and punitive damages, upon written election of either party to the other, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. Any such written election must be provided to the other party within ten (10) business days of the receipt by such party of any documents wherein


Sedgwick Re

**IUGA/GERE**
**00625**

the amount of the claim or counterclaim is first stated to be in excess of Two Million Dollars ($2,000,000). In the event of any such litigation between the Company and the Reinsurer, the prevailing party shall be entitled to recover its reasonable attorneys' fees and expenses.

## ARTICLES XII
## ASSESSMENTS, ASSIGNMENTS, FINES AND PENALTIES

**12.1**    The Reinsurer hereby assumes liability for any and all assessments and assignments imposed as a result of Policies reinsured hereunder (whether before or after the termination of this Agreement). The Reinsurer shall immediately reimburse the Company for any assessments made against the Company pursuant to those laws and regulations creating obligatory funds (including, but not limited to, insurance guaranty and insolvency funds), pools, joint underwriting associations, FAIR plans and similar plans. Amounts owed by the Reinsurer under this Section 12.1 shall be payable directly by the Reinsurer to the Company. The Reinsurer shall be entitled to receive from the Company on or prior to the 31st day of March of each year thereafter (or such date on which such premium taxes are paid) a sum equal to the premium tax credit that is allowed to the Company with respect to such assessments. The premium tax credit allowed the Reinsurer hereunder is to be on a pro-rata and first-in, first-out basis. The Company shall promptly return to the Reinsurer any amount of assessment refunded to or credited to the Company.

**12.2**    This Agreement shall apply to risks assigned to the Company under any assigned risk plan if, in the reasonable judgment of the Company, such risks were assigned to the Company because of the business written and reinsured hereunder.

**12.3**    The Reinsurer shall also pay promptly and directly to the Company any fines, penalties and/or any other charge incurred by the Company as respects the business reinsured hereunder arising out of the actions or inactions of the General Agent unless such fines, penalties and/or any other charge was a direct result of any willful misconduct on the part of the Company.

## ARTICLE XIII
## INSOLVENCY OF COMPANY

IUGA/GERE
00626

**13.1**    In the event of the insolvency and the appointment of a conservator, liquidator or statutory successor of the Company, the portion assumed by the Reinsurer shall be payable to such conservator, liquidator or statutory successor immediately upon demand, with reasonable provision for verification, on the basis of the liability of the Company without diminution because of such insolvency or because such conservator, liquidator or statutory successor has failed to pay all or a portion of any claim.

**13.2**    It is agreed and understood that in the event of the insolvency of the Company, the liquidator or receiver or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the policy reinsured within a reasonable time after such claim in filed in the insolvency proceeding; that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor; that the expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of


Sedgwick Re

liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

13.3    It is further agreed and understood that as to all reinsurance made, ceded, renewed or otherwise becoming effective hereunder, the reinsurance shall be payable by the Reinsurer directly to the Company or to its liquidator, receiver or statutory successor, except where the Reinsurer has expressly assumed in writing such policy obligations of the Company as direct obligations of the Reinsurer to the payees under such policy and in substitution for the obligation of the Company to such payees.

## ARTICLE XIV
## REGULATORY MATTERS

The Reinsurer shall agree, at no cost to the Company, to take those actions (including, but not limited to, modifications in how funds are handled and how accounts are cleared, settled and the manner in which incurred losses are accounted for) and agree to those arrangements necessary to ensure that the Company suffers no adverse impact because of this reinsurance program and is in compliance with any applicable laws of a state insurance department, in so far as this reinsurance program is concerned.

## ARTICLE XV
## LOSS IN EXCESS OF POLICY LIMITS/ECO

15.1    In the event the Company pays or is held liable to pay an amount of loss in excess of its policy limit, but otherwise within the terms of its policy (hereinafter called "loss in excess of policy limits") or any punitive, exemplary, compensatory or consequential damages, other than loss in excess of policy limits (hereinafter called "extra contractual obligations") because of alleged or actual bad faith or negligence on its part in rejecting a settlement within policy limits, or in discharging its duty to defend or prepare the defense in the trial of an action against its policyholder, or in discharging its duty to prepare or prosecute an appeal consequent upon such an action, or in otherwise handling a claim under a policy subject to this Agreement, 100% of the loss in excess of policy limits and/or 100% of the extra contractual obligations shall be added to the Company's loss, if any, under the Policy involved, and the sum thereof shall be reinsured 100% under this Agreement.

15.2    An extra contractual obligation shall be deemed to have occurred on the same date as the loss covered or alleged to be covered under the Policy.

15.3    Notwithstanding anything stated herein, this Agreement shall not apply to any loss incurred by the Company as a result of any fraudulent and/or criminal act which has been finally determined by a court of competent jurisdiction, after the exhaustion of all appeals, by any officer or director of the Company acting individually or collectively or in collusion with any individual, corporation or any other organization or party involved in the presentation, defense or settlement of any claim covered hereunder.

## ARTICLE XVI
## HOLD HARMLESS

IUGA/GERE
00627

16.1    In consideration of these presents and the reciprocal benefits derived by the Company and the Reinsurer hereunder, the Reinsurer hereby holds the Company harmless


Sedgwick Re

from, and assumes all liability for, every claim, demand, liability, loss, damage, cost, charge, attorneys' fees, expense of suit, order, judgment and adjudication of whatever kind or character incurred by the Company in connection with this Agreement or any contract or transaction related thereto, including, but not limited to, all costs and fees incurred by the Company in asserting its rights hereunder. The Reinsurer's obligations hereto relate to, but are not limited to the following: all liability for agents' balances, return premiums and commissions, deceptive trade practice liability, premiums, policy fees, premium taxes or other charges (whether collected or not); all actions or inactions by the General Agent, its sub-agents or any independent claims adjusters relating to this Agreement and the General Agency Agreement; and any agreement with a premium finance company, and all fees owing to the General Agent under this and the aforementioned related agreements.

Notwithstanding anything to the contrary, this provision shall not apply to:

(a)     fraud, dishonesty, theft or collusion on the part of any director, officer or employee of the Company, or

(b)     policies not reinsured hereunder, or

(c)     the Company's failure to perform its duties and obligations under this Agreement due to the Company's willful misconduct, or

(d)     expenses incurred by the Company under Section 11.5 hereof, or

(e)     costs and fees incurred by the Company in connection with litigation under Section 11.6 hereof wherein the Reinsurer is the prevailing party.

16.2    In the event any provision, term and/or condition of this Agreement is inconsistent with the provision, terms and/or conditions of Section 16.1 above, the provisions, terms and/or conditions of said Section 16.1 above shall control over and supersede such inconsistent provisions, terms and/or conditions.

16.3    The Company shall not be liable to the Reinsurer for premiums unless the Company itself has actually received those premiums and wrongfully not remitted them to the Reinsurer. The Reinsurer may not offset any balances on account of losses, loss adjustment expenses or any other amounts due except as to premiums actually received by the Company itself (as distinct from premiums not collected, or premiums collected by the General Agent, or premium placed in the premium trust account pursuant to the General Agency Agreement) which have wrongfully not been transmitted to the Reinsurer.

16.4    If for any reason the General Agent fails or is unable to administer the Policies reinsured hereunder (whether the Agreement is still in effect or the business is being run-off), the Reinsurer shall appoint a party (acceptable and approved by the Company) to administer the business and the Reinsurer shall be responsible for 100% of the cost of said administration. If return premiums or other funds need to be returned to premium finance companies, policyholders or sub-agents, the Reinsurer shall pay these amounts if the successor or General Agent does not.

16.5    The Reinsurer shall not sue, or seek arbitration, against the Company for any acts of the General Agent for any monies which the General Agent owes the Company unless the Company has actually received those monies and has wrongfully not remitted them to the Reinsurer; and

S21400-26A 99-03-01 A.doc


Sedgwick Re

IUGA/GERE
00628

Page 10
02/18/99

 

the Reinsurer shall indemnify the Company for any damages, liabilities and expenses incurred by reason of the General Agent's acts or failure to act. The Company is not responsible for any commissions or other monies payable to the General Agent in connection with this Agreement and the General Agent shall not sue, or seek arbitration against, the Company for any actions by, or debts owing from, the Reinsurer. The Reinsurer shall not seek to recover from, or offset against, the Company any sums, whether premiums or other monies, which the General Agent was unable or unwilling to remit to the Company or the Reinsurer.

## ARTICLE XVII
## SAVINGS CLAUSE

**17.1**   It any law or regulation of any Federal, State or local government of the United States of America, or the ruling of officials having supervision over insurance companies, should prohibit or render illegal this Agreement, or any portion thereof, as to risks or properties located in the jurisdiction of such authority, either the Company or the Reinsurer may upon written notice to the other suspend or abrogate this Agreement insofar as it relates to risks or properties located within such jurisdiction to such extent as may be necessary to comply with such law, regulations or ruling. Such illegality shall in no way affect any other portion thereof; provided, however, that the Reinsurer or the Company may terminate or suspend this Agreement insofar as it relates to the business to which such law or regulation may apply.

**17.2**   This Agreement shall be interpreted in accordance with the laws of the State of Texas. All provisions of this Agreement are intended to be enforced to the fullest extent permitted. Accordingly, should a court of competent jurisdiction or arbitration panel determine that the scope of any provision is too broad to be enforced as written, the parties intend that the court or arbitration panel should reform the provision to such narrower scope as it determines to be enforceable under present or future law; such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision were never a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance.

## ARTICLE XVIII
## MISCELLANEOUS

**18.1**   This Agreement has been made and entered into in the State of Texas.

**18.2**   All notices required to be given hereunder shall be deemed to have been duly given by personally delivering such notice in writing or by mailing it, Certified Mail, return receipt requested, with postage prepaid. Any party may change the address to which notices and other communications hereunder are to be sent to such party by giving the other party written notice thereof in accordance with this provision.

**18.3**   This Agreement shall be binding upon the parties hereto, together with their respective successors and permitted assigns. The Reinsurer shall not assign any of its rights or obligations under this Agreement without the prior written consent of the Company.

IUGA/GERE
00629

S21400-26A 99-03-01 A.doc


Sedgwick Re

Page 11
02/18/99

**18.4    This Agreement** may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**18.5    This Agreement** may be amended, modified or supplemented only by a written instrument executed by all parties hereto.

**18.6    This Agreement** is the entire agreement between the parties and supersedes any and all previous agreements, written or oral, and amendments thereto.

**18.7    A waiver** by the Company or the Reinsurer of any breach or default by the other party under this Agreement shall not constitute a continuing waiver or a waiver by the Company or the Reinsurer of any subsequent act in breach or of default hereunder.

**18.8    Headings** used in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement.

**18.9    This Agreement** is not exclusive and the Company reserves the right to appoint or contract with other reinsurers, agents and/or managing agents in the territory covered by this Agreement and General Agent may contract and represent other insurers.

**18.10 The Reinsurer** or General Agent shall not insert any advertisement respecting the Company or the business to be written under this Agreement in any publication or issue any circular or paper referring to the Company or such business without first obtaining the written consent of the Company. The Reinsurer and/or General Agent shall establish and maintain records of any such advertising as required by applicable statute and regulation.

**ARTICLE XIX**
**LIABILITY OF THE REINSURER**

**19.1    The liability** of the Reinsurer shall follow that of the Company in every case and be subject in all respects to all the general and specific stipulations, clauses, waivers and modifications of the Company's policies and any endorsements thereon. However, in no event shall this be construed in any way to provide coverage outside the terms and conditions set forth in this Agreement.

**19.2    Except** as provided in Article XII, nothing herein shall in any manner create any obligations or establish any rights against the Reinsurer in favor of any third party or any persons not parties to this Agreement.

**ARTICLE XX**                            **IUGA/GERE**
**NET RETAINED LINES**                    **00630**

**20.1    This Agreement** applies only to that portion of any policy which the Company retains net for its own account, and in calculating the amount of any loss hereunder and also in computing the amount or amounts in excess of which this Agreement attaches, only loss or losses in respect of that portion of any policy which the Company retains net for its own account shall be included.

**20.2    The amount** of the Reinsurer's liability hereunder in respect of any loss or losses shall not be increased by reason of the inability of the Company to collect from any other



Sedgwick Re

S21400-26A 99-03-01 A.doc

reinsurer(s), whether specific or general, any amounts which may have become due from such reinsurer(s), whether such inability arises from the insolvency of such other reinsurer(s) or otherwise.

## ARTICLE XXI
### LOSS AND UNEARNED PREMIUM RESERVE FUNDING

In the event that either (i) the Texas Department of Insurance or other regulatory entity having authority over this Agreement requires cancellation or disallows credit for this reinsurance or (ii) the Reinsurer's A.M. Bast rating at any time is lower than A-, the Reinsurer will immediately secure its obligations (including Incurred But Not Reported loss) under this Agreement via a security fund agreement to be executed by the Reinsurer and the Company, which security fund agreement shall be in form and content acceptable to the Company.

## ARTICLE XXII
### INTERMEDIARY

Sedgwick Re, Inc. is hereby recognized as the intermediary negotiating this Agreement for all business hereunder. All communications, including notices, premiums, return premiums, commissions, taxes, losses, loss adjustment expenses, salvages and loss settlements relating thereto shall be transmitted to the Reinsurer or the Company through Sedgwick Re, Inc., 1501 Fourth Avenue, Suite 1400, Seattle, Washington 98101. Payments by the Company to the Intermediary shall be deemed to constitute payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed only to constitute payment to the Company to the extent that such payments are actually received by the Company.

IUGA/GERE
00631



Sedgwick Re

## ARTICLE XXIII

**PARTICIPATION:** **EXCESS STOP LOSS REINSURANCE AGREEMENT**
**EFFECTIVE: March 1, 1999**

**This Agreement obligates the Reinsurer for 40.00% of the interests and liabilities set forth under this Agreement.**

**The participation of the Reinsurer in the interests and liabilities of this Agreement shall be separate and apart from the participations of other reinsurers and shall not be joint with those of other reinsurers, and the Reinsurer shall in no event participate in the interests and liabilities of other reinsurers.**

**IN WITNESS WHEREOF, the parties hereto, by their authorized representatives, have executed this Agreement as of the following dates:**

**In Long Grove, Illinois, this**                    **day of**                        **, 1999.**

**KEMPER REINSURANCE COMPANY**
**Long Grove, Illinois**

**By**_____
                                    **(signature)**

_____
                                    **(name)**

_____
                                    **(title)**

**IUGA/GERE**
**00632**


Sedgwick Re

S21400-26A 99-03-01 AS.doc

IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above mentioned.

DATED: _____     **STATE NATIONAL INSURANCE COMPANY**

BY: _____

ITS: _____

IUGA/GERE
00633



Sedgwick Re

IN WITNESS WHEREOF, the Parties hereto by their respective duly authorized representatives have executed this Agreement in duplicate as of the date first above mentioned.

DATED: _____    INTERNATIONAL   UNDERWRITERS   GENERAL
    AGENCY, INC.

    BY: _____

    ITS: _____

IUGA/GERE
00634

### NORTH AMERICAN WAR EXCLUSION CLAUSE (REINSURANCE)

As regards interests which at time of loss or damage are on shore, no liability shall attach hereto in respect of any loss or damage which is occasioned by war, invasion, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, or martial law or confiscation by order of any government or public authority.

This War Exclusion Clause shall not, however, apply to interests which at time of loss or damage are within the territorial limits of the United States of America (comprising the fifty States of the Union, the District of Columbia, and including bridges between the U.S.A. and Mexico provided they are under United States ownership), Canada, St. Pierre and Miquelon, provided such interests are insured under policies, endorsements or binders containing a standard war or hostilities or warlike operations exclusion clause.

IUGA/GERE
00635

08–45
(8/29/77)



Sedgwick Re

## NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - REINSURANCE - U.S.A.

*(Wherever the word "Reassured" appears in this clause, it shall be deemed to read "Reassured," "Reinsured," "Company," or whatever other word is employed throughout the text of the reinsurance agreement to which this clause is attached to designate the company or companies reinsured.)*

(1)    This reinsurance does not cover any loss or liability accruing to the Reassured as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

(2)    Without in any way restricting the operation of paragraph (1) of this Clause it is understood and agreed that for all purposes of this reinsurance all the original policies of the Reassured (new, renewal and replacement) of the classes specified in Clause II of this paragraph (2) from the time specified in Clause III in this paragraph (2) shall be deemed to include the following provision (specified as the Limited Exclusion Provision):

**Limited Exclusion Provision.***

I.    It is agreed that the policy does not apply under any liability coverage,

To { *injury, sickness, disease, death or destruction*   bodily injury or property damage   with respect to which an insured under the policy is also an insured under a nucl

energy liability liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability.

II.    Family Automobile Policies (liability only), Special Automobile Policies (private passenger automobiles, liability only), Farmers Comprehensive Personal Liability Policies (liability only), Comprehensive Personal Liability Policies (liability only) or policies of a similar nature; and the liability portion of combination forms related to the four classes of policies stated above, such as the Comprehensive Dwelling Policy and the applicable types of Homeowners Policies.

III.    The inception dates and thereafter of all original policies as described in II above, whether new, renewal or replacement, being policies which either

(a)    become effective on or after 1st May, 1960, or

(b)    become effective before that date and contain the Limited Exclusion Provision set out above; provided this paragraph (2) shall not be applicable to Family Automobile Policies, Special Automobile Policies, or policies or combination policies of a similar nature, issued by the Reassured on New York risks, until 90 days following approval of the Limited Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(3)    Except for those classes of policies specified in Clause II of paragraph (2) and without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that for all purposes of this reinsurance the original liability policies of the Reassured (new, renewal and replacement) affording the following coverages:

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability)

shall be deemed to include, with respect to such coverages, from the time specified in Clause V of this paragraph (3), the following provision (specified as the Broad Exclusion Provision):

**Broad Exclusion Provision.***

It is agreed that the policy does not apply:

I.    Under any Liability Coverage, to { *injury, sickness, disease, death or destruction*   bodily injury or property damage

(a)    with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any



Sedgwick Re

08-31.1 (7/84)

**IUGA/GERE**
**00636**

agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating

to { *immediate medical or surgical relief* *first aid,*    to expenses incurred with respect

to { *Bodily injury, sickness, disease or death* *bodily injury*    resulting from the hazardous properties of nuclear material and

arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to { *injury, sickness, disease, death or destruction* *bodily injury or property damage*
resulting from the hazardous properties of nuclear material, if

(a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)  the { *injury, sickness, disease, death or destruction* *bodily injury or property damage* .    arises out of the furnishing by an insured of services,

materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only

to { *injury to or destruction of property at such nuclear facility.* *property damage to such nuclear facility and any property thereat.*

IV.  As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material," "special nuclear material," and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof; "spent fuel" means any fuel element of fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material other than tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (2) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility; "nuclear facility" means

(a)  any nuclear reactor,

(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

*With respect to injury to or destruction of property, the word "injury" or destruction* "property damage" includes all forms of radioactive contamination of property. *includes all forms of radioactive contamination of property.*



Sedgwick Re

**IUGA/GERE 00637**

V.  The inception dates and thereafter of all original policies affording coverages specified in this paragraph (3), whether new, renewal or replacement, being policies which become effective on or after 1st May, 1960, provided this paragraph (3) shall not be applicable to

(i)  Garage and Automobile Policies issued by the Reassured on New York risks, or

(ii)  statutory liability insurance required under Chapter 90, General Laws of Massachusetts,

until 90 days following approval of the Broad Exclusion Provision by the Governmental Authority having jurisdiction thereof.

(4)  Without in any way restricting the operation of paragraph (1) of this Clause, it is understood and agreed that paragraphs (2) and (3) above are not applicable to original liability policies of the Reassured in Canada and that with respect to such policies this Clause shall be deemed to include the Nuclear Energy Liability Exclusion Provisions adopted by the Canadian Underwriters' Association or the Independent Insurance Conference of Canada.

---

* NOTE. The words printed in italics in the Limited Exclusion Provision and in the Broad Exclusion Provision shall apply only in relation to original liability policies which include a Limited Exclusion Provision or a Broad Exclusion Provision containing those words.

---



Sedgwick Re

**IUGA/GERE
00638**

**NUCLEAR INCIDENT EXCLUSION CLAUSE - PHYSICAL DAMAGE - REINSURANCE - U.S.A.**

1.   This Contract does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any Pool of Insurers or Reinsurers formed for the purpose of covering Atomic or Nuclear Energy risks.

2.   Without in any way restricting the operation of paragraph (1) of this Clause, this Contract does not cover any loss or liability accruing to the Reassured, directly or indirectly and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

   I.   Nuclear reactor power plants including all auxiliary property on the site, or

   II.  Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and "critical facilities" as such, or

   III. Installations for fabricating complete fuel elements or for processing substantial quantities of "special nuclear material," and for reprocessing, salvaging, chemically separating, storing or disposing of "spent" nuclear fuel or waste materials, or

   IV. Installations other than those listed in paragraph (2) III above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3.   Without in any way restricting the operations of paragraphs (1) and (2) hereof, this Contract does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith except that this paragraph (3) shall not operate

   (a)  where the Reassured does not have knowledge of such nuclear reactor power plant or nuclear installation, or

   (b)  where said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused.  However on and after 1st January 1960 this sub-paragraph (b) shall only apply provided the said radioactive contamination exclusion provision has been approved by the Governmental Authority having jurisdiction thereof.

4.   Without in any way restricting the operations of paragraphs (1), (2) and (3) hereof, this Contract does not cover any loss or liability by radioactive contamination accruing to the Reassured, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5.   It is understood and agreed that this Clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Reassured to be the primary hazard.

6.   The term "special nuclear material" shall have the meaning given it in the Atomic Energy Act of 1954 or by any law amendatory thereof.

7.   The Reassured to be sole judge of what constitutes:

   (a)  substantial quantities, and

   (b)  the extent of installation, plant or site.

Note._Without in any way restricting the operation of paragraph (1) hereof, it is understood and agreed that

   (a)  all policies issued by the Reassured on or before 31st December 1957 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply,

   (b)  with respect to any risk located in Canada policies issued by the Reassured on or before 31st December 1958 shall be free from the application of the other provisions of this Clause until expiry date or 31st December 1960 whichever first occurs whereupon all the provisions of this Clause shall apply.

N.M.A. 1119            08-33                            **IUGA/GERE**
12/12/57                                        Sedgwick Re          **00639**



## NUCLEAR INCIDENT EXCLUSION CLAUSE - LIABILITY - REINSURANCE - CANADA

1.   This Agreement does not cover any loss or liability accruing to the Company as a member of, or subscriber to, any association of insurers or reinsurers formed for the purpose of covering nuclear energy risks or as a direct or indirect reinsurer of any such member, subscriber or association.

2.   Without in any way restricting the operation of paragraph 1 of this clause it is agreed that for all purposes of this Agreement all the original liability contracts of the Company, whether new, renewal or replacement, of the following classes, namely,

   Personal Liability.
   Farmers Liability.
   Storekeepers Liability.

which become effective on or after 31st December 1984, shall be deemed to include, from their inception dates and thereafter, the following provision:_

**Limited Exclusion Provision.**

   This Policy does not apply to bodily injury or property damage with respect to which the Insured is also insured under a contract of nuclear energy liability insurance (whether the insured is unnamed in such contract and whether or not it is legally enforceable by the insured) issued by the Nuclear Insurance Association of Canada or any other group or pool of insurers or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability.

   With respect to property, loss of use of such property shall be deemed to be property damage.

3.   Without in any way restricting the operation of paragraph 1 of this clause it is agreed that for all purposes of this Agreement all the original liability contracts of the Company, whether new, renewal or replacement, of any class whatsoever (other than Personal Liability, Farmers Liability, Storekeepers Liability or Automobile Liability contracts), which become effective on or after 31st December 1984, shall be deemed to include, from their inception dates and thereafter, the following provision of:_

**Broad Exclusion Provision.**

   It is agreed that this Policy does not apply:
   (a)   to liability imposed by or arising under the Nuclear Liability Act; nor
   (b)   to bodily injury or property damage with respect to which an Insured under this Policy is also insured under a contract of nuclear energy liability insurance (whether the insured is unnamed in such contract and whether or not it is legally enforceable by the insured) issued by the Nuclear Insurance Association of Canada or any other insurer or group or pool of insurers or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; nor
   (c)   to bodily injury or property damage resulting directly or indirectly from the nuclear energy hazard arising from:
      (i)   the ownership, maintenance, operation or use of a nuclear facility by or on behalf of an Insured;
      (ii)   the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility; and
      (iii)   the possession, consumption, use, handling, disposal or transportation of fissionable substances, or of other radioactive material (except radioactive isotopes, away from a nuclear facility, which have reached the final stage of fabrication so as to be useable for any scientific, medical, agricultural, commercial or industrial purpose) used, distributed, handled or sold by an Insured.

   As used in this Policy:
   1.   The term "nuclear energy hazard" means the radioactive, toxic, explosive, or other hazardous properties of radioactive material;
   2.   The term "radioactive material" means uranium, thorium, plutonium, neptunium, their respective derivatives and compounds, radioactive isotopes of other elements and any other substances that the Atomic Energy Control Board may, by regulation, designate as being prescribed substances capable of releasing atomic energy, or as being requisite for the production, use or application of atomic energy;
   3.   The term "nuclear facility" means:
      (a)   any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of plutonium, thorium and uranium or any one or more of them;
      (b)   any equipment or device designed or used for (i) separating the isotopes of plutonium, thorium and uranium or any one or more of them, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging waste;
      (c)   any equipment or device used for the processing, fabricating or alloying of plutonium, thorium or uranium enriched in the isotope uranium 233 or in the isotope uranium 235, or any one or more of them if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;
      (d)   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste radioactive material;

      and includes the site on which any of the foregoing is located, together with all operations conducted thereon and all premises used for such operations.

   4.   The term "fissionable substance" means any prescribed substance that is, or from which can be obtained, a substance capable of releasing atomic energy by nuclear fission.
   5.   With respect to property, loss of use of such property shall be deemed to be property damage.



Sedgwick Re

08-32.1 (R 11/84)

**IUGA/GERE**
**00640**

IUGA/GERE
00641

08-32 1 (R 11/84)



Sedgwick Re

 

**NUCLEAR INCIDENT EXCLUSION CLAUSE - PHYSICAL DAMAGE - REINSURANCE - CANADA**

1.    This Agreement does not cover any loss or liability accruing to the Company directly or indirectly, and whether as Insurer or Reinsurer, (from any Pool of Insurers or Reinsurers) formed for the purpose of covering Atomic or Nuclear Energy risks.

2.    Without in any way restricting the operation of paragraph 1 of this clause, this Agreement does not cover any loss or liability accruing to the Company, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance against Physical Damage (including business interruption or consequential loss arising out of such Physical Damage) to:

　　(1)    Nuclear reactor power plants including all auxiliary property on the site, or

　　(2)    Any other nuclear reactor installation, including laboratories handling radioactive materials in connection with reactor installations, and critical facilities as such, or

　　(3)    Installations for fabricating complete fuel elements or for processing substantial quantities of prescribed substances, and for reprocessing, salvaging, chemically separating, storing or disposing of spent nuclear fuel or waste materials, or

　　(4)    Installations other than those listed in (3) above using substantial quantities of radioactive isotopes or other products of nuclear fission.

3.    Without in any way restricting the operation of paragraphs 1 and 2 of this clause, this Agreement does not cover any loss or liability by radioactive contamination accruing to the Company, directly or indirectly, and whether as Insurer or Reinsurer, from any insurance on property which is on the same site as a nuclear reactor power plant or other nuclear installation and which normally would be insured therewith, except that this paragraph 3 shall not operate:

　　(a)    where the Company does not have knowledge of such nuclear reactor power plant or nuclear installation, or

　　(b)    where the said insurance contains a provision excluding coverage for damage to property caused by or resulting from radioactive contamination, however caused.

4.    Without in any way restricting the operation of paragraphs 1, 2 and 3 of this clause, this Agreement does not cover any loss or liability by radioactive contamination accruing to the Company, directly or indirectly, and whether as Insurer or Reinsurer, when such radioactive contamination is a named hazard specifically insured against.

5.    This clause shall not extend to risks using radioactive isotopes in any form where the nuclear exposure is not considered by the Company to be the primary hazard.

6.    The term "prescribed substances" shall have the meaning given to it by the Atomic Energy Control Act R.S.C. 1974 or by any law amendatory thereof.

7.    Company to be sole judge of what constitutes:

　　(a)    substantial quantities, and

　　(b)    the extent of installation, plant or site.

8.    Without in any way restricting the operation of paragraphs 1, 2, 3 and 4 of this clause, this Agreement does not cover any loss or liability accruing to the Company, directly or indirectly, and whether as Insurer or Reinsurer caused by any nuclear incident as defined in The Nuclear Liability Act, nuclear explosion or contamination by radioactive material.



Sedgwick Re

**IUGA/GERE**
**00642**

08-34.1 (R 83)

# EXHIBIT H



## ADDENDUM 1

attaching to and forming a part of
### QUOTA SHARE REINSURANCE AGREEMENT
EFFECTIVE MARCH 1, 1999

ISSUED TO:   STATE NATIONAL INSURANCE COMPANY, INC.
(hereinafter called the "Company")

ISSUED BY:   VARIOUS REINSURERS IDENTIFIED BY
INTERESTS AND LIABILITIES AGREEMENTS

It is hereby mutually understood and agreed that effective August 28, 2000, Article XXV, Intermediary, is deleted and replaced with the following:

### "ARTICLE XXV

### "INTERMEDIARY

"Aon Re Inc., an Illinois corporation, or one of its affiliated corporations duly licensed as a reinsurance intermediary, is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder. All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss expenses, salvages, and loss settlements) relating to this Agreement shall be transmitted to the Company or the Reinsurer through the Intermediary. Payments by the Company to the Intermediary shall be deemed payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed payment to the Company only to the extent that such payments are actually received by the Company."

It is further mutually understood and agreed that as of April 30, 2001, the captioned Agreement is canceled on a run-off basis in accordance with the provisions set forth in Article IV, Term and Condition.

All other terms and conditions of the captioned Agreement will remain unchanged.

**IUGA/GERE
00664**

AR 13107 -- 8/28/00 and 4/30/01
(11/15/01)

*Aon Re Inc.*

<u>ENDORSEMENT 1</u>
to
INTERESTS AND LIABILITIES AGREEMENT
attaching to and forming a part of

EXCESS STOP LOSS REINSURANCE AGREEMENT
EFFECTIVE MARCH 1, 1999

between

STATE NATIONAL INSURANCE COMPANY, INC.
(hereinafter called the "Company")

and

GE REINSURANCE CORPORATION
(hereinafter called the "Subscribing Reinsurer")

It is hereby understood and agreed by and between the Company and the Subscribing Reinsurer that effective August 28, 2000, Addendum 1 attaches to and forms a part of the captioned Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Endorsement to be executed by their duly authorized representatives.

Signed at FORT WORTH, TEXAS

STATE NATIONAL INSURANCE COMPANY, INC.

Signature: _____   Title: President

Attest: _____   Date: as of: 5/28/01

Signed at BARRINGTON, ILLINOIS

GE REINSURANCE CORPORATION
FORMERLY KNOWN AS KEMPER REINSURANCE COMPANY

Signature: _____   Title: Richard A. Clymer  Vice President Ref.
                                         6096000/01

Attest: Robert E. Morrow   Date: January 11, 2002

AR 13108 -- 8/28/00 and 4/30/01

**IUGA/GERE
00665**

*Aon Re Inc.*



## ADDENDUM 1

**attaching to and forming a part of**
**EXCESS STOP LOSS REINSURANCE AGREEMENT**
**EFFECTIVE MARCH 1, 1999**

ISSUED TO:  STATE NATIONAL INSURANCE COMPANY, INC.
(hereinafter called the "Company")

ISSUED BY:  VARIOUS REINSURERS IDENTIFIED BY
INTERESTS AND LIABILITIES AGREEMENTS

It is hereby mutually understood and agreed that effective August 28, 2000, Article XXII, Intermediary, is deleted and replaced with the following.

### "ARTICLE IV

### "INTERMEDIARY

"Aon Re Inc., an Illinois corporation, or one of its affiliated corporations duly licensed as a reinsurance intermediary, is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder. All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss expenses, salvages, and loss settlements) relating to this Agreement shall be transmitted to the Company or the Reinsurer through the Intermediary. Payments by the Company to the Intermediary shall be deemed payment to the Reinsurer. Payments by the Reinsurer to the Intermediary shall be deemed payment to the Company only to the extent that such payments are actually received by the Company."

It is further mutually understood and agreed that as of April 30, 2001, the captioned Agreement is canceled on a run-off basis in accordance with the provisions set forth in Article IV, Term and Condition.

All other terms and conditions of the captioned Agreement will remain unchanged.

**IUGA/GERE**
**00666**

AR 13108 -- 8/28/00 and 4/30/01
(11/15/01)

*Aon Re Inc.*

# EXHIBIT I

## AFFIDAVIT ALEJANDRO VILLARREAL ALBA

THE STATE OF TEXAS           §
                             §
COUNTY OF CAMERON            §

BEFORE ME, the undersigned authority, on this day personally appeared
ALEJANDRO VILLARREAL ALBA, known to me, who being by me duly sworn,
deposed and said on their oath that:

1.   My name is ALEJANDRO VILLARREAL ALBA.  I am over the age of
     eighteen (18) years.  I am capable of making this affidavit.  I have never been
     convicted of a felony or a crime of moral turpitude.  The facts stated in this
     affidavit are within my personal knowledge and are true and correct.

2.   I am President of International Underwriters General Agency, Inc. ("IUGA").
     IUGA is a wholesaler of certain types of casualty insurance.  IUGA
     specializes in a niche market, primarily selling non-resident commercial and
     personal automobile insurance for Mexican nationals crossing into the
     United States along the borders of Texas, New Mexico, Arizona, and
     California.  IUGA has enjoyed success and steady growth until the events
     giving rise to this action occurred.

3.   GE is in the reinsurance business.  During the relevant time period, Tucker
     was GE's primary agent, representative and vice-principal for GE's
     reinsurance program.

4.   GE agreed to provide reinsurance for some of IUGA's insurance products.
     The terms, conditions and commissions are negotiated.  Beginning in
     November of 2000, GE made various promises and representations to IUGA
     in regards to the reinsurance for its non-resident programs as well as its
     fledgling non-standard program.  In reliance upon GE's promises and
     representations, IUGA made crucial and strategic business decisions and
     investments.  For example, additional reinsurers were not approached as is
     customary because GE had represented that it would continue on IUGA's
     book of business at renewal in March 1, 2001.  IUGA also procured software
     programs valued at $250,000 based on GE's assertions and support for
     IUGA's plans to enter the non-standard auto market.

5.   Shortly after IUGA altered its business plan based on GE's commitments, GE
     "pulled the plug" and refused to provide the level of reinsurance it had

promised to IUGA.  Consequently, IUGA was unable to obtain alternative reinsurance coverage and was forced to write business through another managing general agency but at a substantially lower commission level and a drastic cut in market presence by causing IUGA to lose its wholesale status and being relegated to a retail agent level while supporting a base of over 600 agents.  GE's actions subsequently caused IUGA to lose identity and market presence due to the loss of name brand recognition, prestige, and its main competitive edge in the market place.  Additionally, since then, IUGA has been unable to procure another contract and has been unable to enter the non-standard auto market to this day.

6.      Thereafter, through written and verbal communications, IUGA made GE well aware of the impact of GE's betrayal would have on IUGA and its agents.  Instead of rectifying its prior misconduct, GE began a vindictive and malicious campaign of harassment and interference with IUGA's business in obvious retaliation for IUGA's refusal to acquiesce to GE's conduct.

7.      For example, GE began wrongfully withholding claims relief payments, threatening IUGA and its policyholders with unnecessarily delayed payment of claims and the threat of further damage through litigation.  TUCKER is the individual most responsible for this conduct.  Furthermore, GE initiated multiple and unreasonable audits of IUGA.  The unspecified audits were burdensome on IUGA, causing IUGA's productivity to suffer.  The nature and scope of the audits were unwarranted and calculated to harass, intimidate and injure IUGA.

SUBSCRIBED AND SWORN TO on this 30th day of April, 2003.


_____
ALEJANDRO VILLARREAL ALBA


        SUBSCRIBED AND SWORN TO on this 30TH day of April, 2003, to certify which, my hand and seal of office.


_____
Notary Public, State of Texas

# EXHIBIT J

NO. *2003-05-2265-C*

FILED _4:55_ O'CLOCK
AURORA DE LA GARZA DIST.

MAY 0 2 2003

DISTRICT COURT OF CAMERON COUNTY, TE
_Kay Goez Z_ DEPU.

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY<br>Plaintiff, | § | IN THE DISTRICT ~~COURT~~ |
| | § | |
| | § | |
| V. | § | _197th_ JUDICIAL DISTRICT |
| | § | |
| GE REINSURANCE CORPORATION ("GE"), AND SPENCER TUCKER ("TUCKER")<br>Defendants. | § | |
| | § | Of CAMERON COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR INJUNCTIVE RELIEF

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES INTERNATIONAL UNDERWRITERS GENERAL AGENCY (collectively "IUGA"), hereinafter called Plaintiff, complaining of and about GE REINSURANCE CORPORATION ("GE") and SPENCER TUCKER ("TUCKER"), hereinafter called Defendants, and for cause of action shows unto the Court the following:

### I.
### DISCOVERY CONTROL PLAN LEVEL

1.      Plaintiff intends that discovery be conducted under Discovery Level 2.

### II.
### PARTIES AND SERVICE

2.      Plaintiff, INTERNATIONAL UNDERWRITERS GENERAL AGENCY, is a Texas Corporation whose address is P.O. Box 3966, Brownsville, Texas 78520.

3.      Defendant GE REINSURANCE CORPORATION ("GE"), is an Illinois corporation doing business in Texas and may be served with process at Corporate Service Corporation, 800 Brazos, Austin, Texas 78701.

4.      Defendant SPENCER TUCKER ("TUCKER"), is an individual residing in the

State of Texas.  Said Defendant may be served with process at his home at the following address:  5400 Preston Oaks Road, Dallas, Texas 75240.

### III.
### JURISDICTION AND VENUE

5.      Venue is mandatory in Cameron County, Texas pursuant to Section 15.017, Texas Civil Remedies Code. Alternatively, venue is proper in Cameron County, Texas because: (1) all or a substantial part of the events or omissions giving rise to the claim occurred in Cameron County; (2) the agreements were performable in Cameron County; and (3) Plaintiff's principle office is located in Cameron County.

6.      All relief sought is within the jurisdictional limits of the Court.

### IV.
### FACTS

7.      IUGA is a wholesaler of certain types of casualty insurance. IUGA specializes in niche market, primarily selling non-resident commercial and personal automobile insurance for Mexican nationals crossing into the United States along the borders of Texas, New Mexico, Arizona, and California. IUGA has enjoyed success and steady growth until the events giving rise to this action occurred.

8.      GE is in the reinsurance business. During the relevant. time period, TUCKER was GE's primary agent, representative and vice-principal for GE's reinsurance program.

9.      GE agreed to provide reinsurance for some of IUGA's insurance products. The terms, conditions and commissions are negotiated.  Beginning in November of 2000, GE made various promises and representations to IUGA in regards to the reinsurance for its non-resident programs as well as its fledgling non-standard program.  In reliance upon GE's promises and representations, IUGA made crucial and strategic business decisions and investments.  For example, additional reinsurers

were not approached as is customary because GE had represented that it would continue on IUGA's book of business at renewal in March 1, 2001. IUGA also procured software programs valued at $250,000 based on GE's assertions and support for IUGA's plans to enter the non-standard auto market.

10.     Shortly after IUGA altered its business plan based on GE's commitments, GE "pulled the plug" and refused to provide the level of reinsurance it had promised to IUGA. Consequently, IUGA was unable to obtain alternative reinsurance coverage and was forced to write business through another managing general agency but at a substantially lower commission level and a drastic cut in market presence by causing IUGA to lose its wholesale status and being relegated to a retail agent level while supporting a base of over 600 agents. GE's actions subsequently caused IUGA to lose identity and market presence due to the loss of name brand recognition, prestige, and its main competitive edge in the market place. Additionally, since then, IUGA has been unable to procure another contract and has been unable to enter the non-standard auto market to this day.

11.     Thereafter, through written and verbal communications, IUGA made GE well aware of the impact of GE's betrayal would have on IUGA and its agents. Instead of rectifying its prior misconduct, GE began a vindictive and malicious campaign of harassment and interference with IUGA's business in obvious retaliation for IUGA's refusal to acquiesce to GE's conduct.

12.     For example, GE began wrongfully withholding claims relief payments, threatening IUGA and its policyholders with unnecessarily delayed payment of insurance claims and the threat of further damage through litigation. TUCKER is the individual most responsible for this conduct. Furthermore, GE initiated multiple and

unreasonable audits of IUGA. These unspecified audits were burdensome on IUGA, causing IUGA's productivity to suffer. The nature and scope of the audits unwarranted and calculated to harass, intimidate and injure IUGA.

## V.
## Causes of Action

### A. Fraud

**13.**     Defendants conduct, as described herein, constitutes *fraud.* In particular, Defendants made representations to IUGA which they knew were false, or they were made with reckless disregard for the truth. Defendants' intended for IUGA to rely on Defendants promises and representations, which IUGA reasonably did to its detriment. Defendants' fraud has proximately caused harm to IUGA.

### B. Negligent Misrepresentation

**14.**     Alternatively, Defendants negligently misrepresented material facts to IUGA. IUGA justifiably relied upon Defendants' promises and representations to IUGA's detriment. Defendants' conduct in this regard has proximately caused harm to IUGA.

### C.   Breach of Duty of Good Faith

**15.**     GE owed a duty of good faith and fair dealing to IUGA. As shown herein, GE breached the duty of good faith and fair dealing. GE's breach proximately caused harm to IUGA.

### D.   Defamation/Business Disparagement

**16.**     TUCKER  and other representatives of GE have published written and immoral statements designed and calculated to injure IUGA and its reputation and saiiiding in the relevant community. These statements were false and were made with malice, and without privilege or legal excuse. Defendants' conduct in this regard has proximately

caused harm to IUGA.

### E.    Insurance Code Violations

**17.**    Defendants' conduct, as described herein, constitutes multiple violations of the Texas Insurance Code. These violations include Article 21.21 which prohibit an insurance carrier from engaging in false, misleading and deceptive conduct. Defendants' conduct in this regard is a producing cause of damages to IUGA.

### VI.

**18.**    Defendants acts and omissions have caused IUGA actual damages well in excess of $2 million. These damages include lost profits, loss of commissions, loss of business opportunities, damage to good will and reputation and detrimental reliance damages. IUGA also seeks to recover exemplary damages, treble damages, statutory penalties and prejudgment interest.

### VII.
### Conditions Precedent/Capacities

**19.**    All conditions precedent to bringing this lawsuit and to recovery have been performed or have occurred. Plaintiffs are suing Defendants in all capacities in which hey are entitled to recover.

### VIII.
### Application for Temporary Restraining Order
### and Temporary Injunction

**20.**    IUGA pleads for a Temporary Restraining Order and Temporary Injunction. IUGA requests that the Court enter a temporary restraining order and a temporary injunction preventing Defendants from causing or requiring any further audits of IUGA absent further order of this Court. Further, IUGA requests that Defendants be prohibited, from terminating its reinsurance business in contravention of its previous agreements with IUGA and be required to continue to honor any funds due under

said agreements. It is probable that IUGA will recover from Defendants because Defendants have breached their fiduciary duties, committed fraud and misrepresentations, and violated Art. 21.21 of the Texas Insurance Code. IUGA only needs to show the Court a probable right of recovery and probable injury if injunctive relief is not granted and is not required to establish that it will finally prevail in the litigation. See *State v. Southwestern Bell Telephone Co., 526 S.W.2nd 526, 528 (Tex. 1975); El Paso Development Company v. Berryman, 729 S.W.2d 883, 886 (Tex.App.-Corpus Christi 1987, no writ).* IUGA testifies to the harm it will suffer in an Affidavit in support of its application for injunctive relief. This Affidavit is attached and incorporated as Exhibit "A".

21.     The harm to IUGA that will result if the requested injunctive relief is not granted is immediate and irreparable because it will further lose revenues, market share, goodwill, credit rating, reputation, and may be unable to meets its financial obligations and be unable to continue as a viable business. IUGA has no adequate remedy at law because many of these damages are intangible and not readily ascertainable. The injunctive relief requested will protect the status quo and will serve the public interest. The temporary restraining order must be issued without notice to Defendants because there is insufficient time for notice, and further, advance notice may cause Defendants to further retaliate against IUGA, as evidenced by Defendants' prior misconduct.

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer and, on final trial, have and recover from Defendants, jointly and severally, the following:

a.  injunctive relief as requested herein;

b.  actual damages;

c.  exemplary damages;

d.  prejudgment and post-judgment interest;

e.  court costs; and

f.  general relief.

Respectfully submitted,

By:

Christopher Lee Phillippe
Texas Bar No. 15915400
307-3 McFadden Drive
Brownsville, Texas  78521
Tel. (956)544-6096
Fax. (956)982-1921
Attorney for Plaintiff
INTERNATIONAL UNDERWRITERS

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

## AFFIDAVIT ALEJANDRO VILLARREAL ALBA

THE STATE OF TEXAS              §
                                §
COUNTY OF CAMERON               §

BEFORE ME, the undersigned authority, on this day personally appeared
ALEJANDRO VILLARREAL ALBA, known to me, who being by me duly sworn,
deposed and said on their oath that:

1.  My name is ALEJANDRO VILLARREAL ALBA. I am over the age of
    eighteen (18) years. I am capable of making this affidavit. I have never been
    convicted of a felony or a crime of moral turpitude. The facts stated in this
    affidavit are within my personal knowledge and are true and correct.

2.  I am President of International Underwriters General Agency, Inc. ("IUGA").
    IUGA is a wholesaler of certain types of casualty insurance. IUGA
    specializes in a niche market, primarily selling non-resident commercial and
    personal automobile insurance for Mexican nationals crossing into the
    United States along the borders of Texas, New Mexico, Arizona, and
    California. IUGA has enjoyed success and steady growth until the events
    giving rise to this action occurred.

3.  GE is in the reinsurance business. During the relevant time period, Tucker
    was GE's primary agent, representative and vice-principal for GE's
    reinsurance program.

4.  GE agreed to provide reinsurance for some of IUGA's insurance products.
    The terms, conditions and commissions are negotiated. Beginning in
    November of 2000, GE made various promises and representations to IUGA
    in regards to the reinsurance for its non-resident programs as well as its
    fledgling non-standard program. In reliance upon GE's promises and
    representations, IUGA made crucial and strategic business decisions and
    investments. For example, additional reinsurers were not approached as is
    customary because GE had represented that it would continue on IUGA's
    book of business at renewal in March 1, 2001. IUGA also procured software
    programs valued at $250,000 based on GE's assertions and support for
    IUGA's plans to enter the non-standard auto market.

5.  Shortly after IUGA altered its business plan based on GE's commitments, GE
    "pulled the plug" and refused to provide the level of reinsurance it had

promised to IUGA.  Consequently, IUGA was unable to obtain alternative reinsurance coverage and was forced to write business through another managing general agency but at a substantially lower commission level and a drastic cut in market presence by causing IUGA to lose its wholesale status and being relegated to a retail agent level while supporting a base of over 600 agents.  GE's actions subsequently caused IUGA to lose identity and market presence due to the loss of name brand recognition, prestige, and its main competitive edge in the market place.  Additionally, since then, IUGA has been unable to procure another contract and has been unable to enter the non-standard auto market to this day.

6.      Thereafter, through written and verbal communications, IUGA made GE well aware of the impact of GE's betrayal would have on IUGA and its agents. Instead of rectifying its prior misconduct, GE began a vindictive and malicious campaign of harassment and interference with IUGA's business in obvious retaliation for IUGA's refusal to acquiesce to GE's conduct.

7.      For example, GE began wrongfully withholding claims relief payments, threatening IUGA and its policyholders with unnecessarily delayed payment of claims and the threat of further damage through litigation.  TUCKER is the individual most responsible for this conduct.  Furthermore, GE initiated multiple and unreasonable audits of IUGA.  The unspecified audits were burdensome on IUGA, causing IUGA's productivity to suffer.  The nature and scope of the audits were unwarranted and calculated to harass, intimidate and injure IUGA.

SUBSCRIBED AND SWORN TO on this 30th day of April, 2003.

_____
ALEJANDRO VILLARREAL ALBA

SUBSCRIBED AND SWORN TO on this 30TH day of April, 2003, to certify which, my hand and seal of office.

_____
Notary Public, State of Texas

# EXHIBIT K

## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNDERWRITERS GENERAL AGENCY, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO.  B-03-108 |
| GE REINSURANCE CORPORATION AND SPENCER TUCKER, | § § § | |
| Defendants. | § § § | |

---

### AFFIDAVIT OF DAVID BRODNAN

---

THE STATE OF ILLINOIS    §
                         §
COUNTY OF LAKE           §

BEFORE ME, the undersigned authority, personally appeared David Brodnan, who being by me duly sworn, deposed and said:

1.    My name is David Brodnan, I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts stated in it.

2.    I am the Vice President & Assistant Secretary of GE Reinsurance Corporation ("GE Reinsurance").  Upon information and belief, I aver the facts set forth in this Affidavit are true and correct.

3.    The transactions giving rise to this suit are the subject of, and governed by, five written agreements, true and correct copies of which are attached hereto as Exhibits C-G (referred to collectively as "the Agreements"):

   (a)    The General Agency Agreement between International Underwriters General Agency, Inc. ("IUGA") and State and County Mutual Fire Insurance Company (Exhibit C);

   (b)    The General Agency Agreement between IUGA and State National Insurance Company, Inc (Exhibit D);

02/13/2004  16:35     8472775424                    GE REINSURANCE                              PAGE  03

(c)     The Quota Share Reinsurance Contract between State National Insurance Company and Kemper Reinsurance Company (Defendant GE is formerly known as Kemper) (Exhibit E);

(d)     The 100% Quota Share Reinsurance Contract between State and County Mutual Fire Insurance Company and Kemper Reinsurance Company (Exhibit F).

(e)     The Excess Stop Loss Reinsurance Agreement (Exhibit G).

4.     GE Reinsurance sent a letter, dated November 29, 2000, stating that the Quota Share Agreement with State National Insurance Company and the Excess Stop Loss Agreement would be terminated effective February 28, 2001.  A true and correct copy of that notice is attached as Exhibit A.

5.     GE Reinsurance sent a letter, dated February 19, 2001, extending the cancellation date of the State National Quota Share Agreement to April 30, 2001.  A true and correct copy of that notice is attached as Exhibit B.

6.     The State National Quota Share Agreement and the Excess Stop Loss Agreement were terminated on April 30, 2001.  A true and correct copy of the addenda reflecting this cancellation are attached as Exhibit H.

7.     Upon information and belief, GE Reinsurance terminated the reinsurance agreement with State and County Mutual Fire Insurance Company, effective April 30, 2001.

8.     At no time did GE Reinsurance issue an insurance policy to International Underwriters General Agency.

Further affiant sayeth not.


DAVID BRODNAN


SUBSCRIBED AND SWORN TO BEFORE ME on the 13th day of February 2004, to certify which witness my hand and official seal.


OFFICIAL SEAL
KELLY M KLINKO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:10/17/07

NOTARY PUBLIC, STATE OF ILLINOIS


066099.0003 WEST #3458702                              2

## ENDORSEMENT 1
to
### INTERESTS AND LIABILITIES AGREEMENT
attaching to and forming a part of

### 100% QUOTA SHARE REINSURANCE AGREEMENT
### EFFECTIVE MARCH 1, 1999

between

### STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY
(hereinafter called the "Company")

and

### GE REINSURANCE CORPORATION
(hereinafter called the "Subscribing Reinsurer")

It is hereby understood and agreed by and between the Company and the Subscribing Reinsurer that effective August 28, 2000, Addendum 1 attaches to and forms a part of the captioned Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Endorsement to be executed by their duly authorized representatives.

Signed at FORT WORTH, TEXAS

### STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY

Signature: _____   Title: _____

Attest: _____   Date: _____

Signed at BARRINGTON, ILLINOIS

### GE REINSURANCE CORPORATION
FORMERLY KNOWN AS KEMPER REINSURANCE COMPANY

Signature: *(signature)*   Title: Richard A. Clymer, Vice President Ref:

Attest: *Robert E. Morrow*   Date: 4/22/2002

6095981/82

AR 13106 -- 8/28/00 and 4/30/01

*Aon Re Inc.*

## ADDENDUM 1

attaching to and forming a part of
100% QUOTA SHARE REINSURANCE AGREEMENT
EFFECTIVE MARCH 1, 1999

ISSUED TO:   STATE AND COUNTY MUTUAL FIRE INSURANCE COMPANY
(hereinafter called the "Company")

ISSUED BY:   VARIOUS REINSURERS IDENTIFIED BY
INTERESTS AND LIABILITIES AGREEMENTS

It is hereby mutually understood and agreed that, effective 12:01 a.m. standard time, August 28, 2000, Article XXIV, Intermediary, is deleted and replaced with the following:

### "ARTICLE XXIV

### "INTERMEDIARY

"Aon Re Inc., an Illinois corporation, or one of its affiliated corporations duly licensed as a reinsurance intermediary, is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder.  All communications (including but not limited to notices, statements, premiums, return premiums, commissions, taxes, losses, loss expenses, salvages, and loss settlements) relating to this Agreement shall be transmitted to the Company or the Reinsurer through the Intermediary. Payments by the Company to the Intermediary shall be deemed payment to the Reinsurer.  Payments by the Reinsurer to the Intermediary shall be deemed payment to the Company only to the extent that such payments are actually received by the Company."

It is further mutually understood and agreed that as of April 30, 2001, the captioned Agreement is canceled on a run-off basis in accordance with the provisions set forth in Article IV, Term and Condition.

All other terms and conditions of the captioned Agreement will remain unchanged.

AR 13106 -- 8/28/00 and 4/30/01
(11/15/01)

*Aon Re Inc.*